DECLARATION OF DANIEL FRIED

I, Daniel Fried, pursuant to 28 U.S.C. § 1746, hereby declare and say as follows:

1. I have been the Special Envoy for the Closure of the Guantanamo Bay Detention Facility since accepting my appointment on May 15, 2009. In my capacity as Special Envoy, I engage in diplomatic dialogue with foreign governments concerning the repatriation and/or resettlement of individuals who are detained at the U.S. detention facility at Guantanamo Bay, Cuba. My position was established in order to intensify diplomatic efforts to arrange for the repatriation or resettlement of individuals approved for such disposition under the review procedures established by Executive Order 13,492, which was signed by President Obama on January 22, 2009. Prior to accepting these appointments, I was the Department of State's Assistant Secretary for European and Eurasian Affairs from May, 2005-May, 2009 and the Special Assistant to the President and NSC Senior Director for European and Eurasian Affairs from January, 2001-May-2005. I also served as Ambassador to Poland from 1997-2000 and prior to that in various posts at the State Department, at overseas posts, and at the NSC starting in 1977.

2. This declaration is submitted in support of the Government's motion to maintain the decisions resulting from reviews by the Guantanamo Review Task Force as "Protected Information" under the protective orders entered in the Guantanamo Bay habeas litigation. For the reasons discussed below, indiscriminate public disclosure of the decisions resulting from reviews by Guantanamo Review Task Force will impair the U.S. Government's ability effectively to repatriate and resettle Guantanamo detainees in accordance with the procedures established by Executive Order 13,492.



2

3. As Special Envoy, my primary task is to implement the mission set forth in Executive Order 13,492 of finding dispositions for individuals who are approved for repatriation or resettlement in a manner that is consistent with the national security and foreign policy interests of the United States, and that will allow the U.S. government to achieve the closure of the Guantanamo Bay Detention Facility as soon as practicable and in any event not later than January 22, 2010. In this task I am guided by the U.S. government's policies with respect to post-transfer security and post-transfer humane treatment, including the policy that the U.S. government will not transfer individuals to countries where it has determined that they are more likely than not to be tortured. In light of these policies, there are certain individuals who have been (or will be) approved for transfer out of U.S. custody but who the U.S. government determines cannot be safely and/or responsibly returned to their home countries.

4. While there have been some recent signs of progress in our efforts to identify appropriate resettlement options for approved Guantanamo detainees who cannot be repatriated, the task of identifying such options has up to this point been challenging. In order to find safe and responsible options for these individuals within the one year timeframe ordered by the President, the United States Government will need every tool of statecraft at its disposal, including the ability to develop and implement a comprehensive strategy under which potential destination countries are asked to focus on those detainees whom the U.S. government considers to be the best fit for those countries. Although I am aware that decisions by the Department of Defense Administrative Review Board (ARB) approving specific detainees for transfer or release were previously disclosed publicly, in my judgment the current circumstances and diplomatic climate render it necessary to maintain control over the dissemination of the decisions resulting

3

from review by the Guantanamo Review Task Force in order to enhance the U.S. Government's efforts to repatriate and transfer detainees as soon as practicable. Particularly given the pace at which the Executive Order review must proceed in order to meet the deadline set by the President, if large numbers of approved individuals (acting through, *inter alia*, counsel or non-government organizations) approach the same group of governments at the same time seeking resettlement, it could cause complications for and in some cases jeopardize our ability to implement a coherent diplomatic strategy.

5. More specifically, we have already seen a tendency of many of the detainees who are approved by the review process to express a preference for resettlement in certain European countries, even in cases where the U.S. government has determined that they can be returned to their home countries consistent with our humane treatment and security policies. Given that these European countries have in many cases expressed to the U.S. government that their capacity to absorb detainees is limited, it is important to the U.S. goal of closing Guantanamo to be able to focus diplomatic discussions with those countries on detainees for whom there is a compelling reason not to return them to their home countries. If petitioners' counsel or other organizations acting on behalf of dozens of detainees approach the same small group of governments at the same time, particularly if they relay information about formal U.S. government decisions resulting from review by the Guantanamo Review Task Force, it could confuse, undermine, or jeopardize our diplomatic efforts with those countries and could put at risk our ability to move as many people to safe and responsible locations as might otherwise be the case.



4

6. I am aware that counsel for many petitioners have conducted their own efforts to repatriate and resettle detainees by way of, *inter alia*, lobbying efforts and asylum applications to foreign governments. These efforts do not, however, involve petitioners' counsel conveying official U.S. Government information to a foreign country regarding the transfer status of a particular petitioner. It is the provision of this additional information– *i.e.*, the fact that a particular Guantanamo detainee has been approved for repatriation or resettlement as a result of review by the Guantanamo Review Task Force – by someone other than a representative of the U.S. Government that has the potential to create confusion and mixed messages. This is not to say that petitioner's counsel and non-government organizations have no role to play in the transfer process. In cases where the U.S. government considers it helpful, we may choose to reach out to petitioners' counsel, non-government organizations, and other interlocutors in order to seek to work collaboratively; indeed, we have done so on several occasions. In general, however, given the foreign policy and national security equities at stake in closing Guantanamo, it is important for the U.S. government to retain the prerogative to "speak with one voice" and to have the latitude to manage resettlement efforts without the problems potentially created by inconsistent signals from petitioners' counsel or other organizations.

7. As Special Envoy, I also have responsibility for conducting repatriation and resettlement discussions in a manner that comports with the foreign policy interests of the United States. Despite making a determination that we cannot repatriate a detainee to a particular country because of post-transfer security or humane treatment considerations, the U.S. government may nevertheless have an important bilateral and strategic relationship with that country that it is in the foreign policy interests of the United States to maintain. The friction



5

caused by a decision to resettle detainees from the country of origin in a third country can be significant if not properly handled, and in particular if there is a failure to pursue resettlement efforts in a manner that is non-public and that minimizes embarrassment to the country of origin. The involvement of petitioners' counsel or other organizations in resettlement discussions may be considered on a case-by-case basis, but such involvement must be weighed carefully against the increased the risk of premature public disclosure of resettlement efforts in a manner that could result in friction of this nature and potentially undermine the bilateral relationship between the United States and the country of origin.

8.    Premature disclosure of resettlement efforts also presents an opportunity for the country of origin to seek to undermine those resettlement efforts.  Examples of this occurring go beyond the publicized instances of China exerting pressure on other countries not to accept the Chinese Uighurs currently at Guantanamo. I have been told by a number of European governments that such pressure exists and has complicated their ability to accept certain detainees.   Because efforts of this nature have the potential for slowing and ultimately undermining our resettlement efforts, it is important for the U.S. government to have the latitude to approach potential destination countries in a discreet and confidential manner, in order to minimize the risk of undue publicity for as long as can be managed.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on June 9, 2009.

Daniel Fried