IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NABIL HADJARAB (ISN 238),<br>SHAKER AAMER (ISN 239),<br>AHMED BELBACHA (ISN 290),<br>ABU WA'EL JIHAD DHIAB (ISN 722),<br><br>                    Petitioners,<br><br>        v.<br><br>BARACK OBAMA, President of the<br>  United States, *et al.*,<br><br>                    Respondents. | Civil Action Nos.   04-CV-2215 (RMC)<br>                              05-CV-1457 (GK)<br>                              05-CV-1504 (RMC)<br>                              05-CV-2349 (RMC) |

**RESPONDENTS' OPPOSITON TO PETITIONERS' MOTION FOR
PRELIMINARY INJUNCTION TO STOP INVOLUNTARY FEEDING**

Respondents hereby oppose Petitioners motion for a preliminary injunction against enterally feeding, which seeks extraordinary judicial intervention that would stop Respondents from providing essential nutritional and medical care.  There is no legal basis for such relief because this Court lacks jurisdiction over conditions-of-confinement and treatment claims, including the type of claims brought here to enjoin the administration of specific medical care. Further, well-established legal authority supports Respondents' policies of enteral feeding hunger-striking detainees to preserve their health and lives.

Petitioners also cannot establish irreparable injury, as Petitioners' arguments in support of emergency relief are based on false and meritless factual allegations.  First, Petitioners incorrectly speculate that Respondents' enteral feeding policies will interfere with their upcoming observance of Ramadan because they will not be able to fast from sunup to sundown. Consistent with long-standing practice, however, absent any unforeseen emergency or

1

operational issues, Joint Task Force-Guantanamo ("JTF-GTMO") plans to feed all detainees, including detainees undergoing enteral feeding, before dawn and after sunset in order to accommodate their religious practices during Ramadan. Second, Petitioners' speculative allegation that they have been administered the drug Reglan is false. Reglan has never been administered to the four Petitioners. Third, as explained more fully in the declaration of the JTF-GTMO Senior Medical Officer[1] (attached as Exhibit 1), JTF-GTMO has adopted appropriate clinical practices for hunger-striking detainees that follows the Bureau of Prisons' model. The protocols for providing care to hunger-striking detainees have been performed in a humane fashion, with concern for Petitioners' well-being, and never in a manner designed to inflict pain or discomfort, or as punishment or retaliation. All four Petitioners are in good health, they are not hospitalized, and they are receiving adequate nutrition. Accordingly, there is no legal or factual basis for the Court to enjoin Respondents from continuing to provide Petitioners with humane and appropriate medical care. Petitioners' motion should be denied.

## BACKGROUND

Since February 2013, a large group of Guantanamo Bay detainees have been participating in a hunger strike to protest their continued detention. Currently, JTF-GTMO has designated 106 detainees as hunger strikers, of which 45 have been further approved to receive enteral feeding by way of a nasogastric tube. The four Petitioners seeking relief here have been designated by

---

[1] Pursuant to paragraph 34 of the Protective Order entered in these actions, Respondents hereby designate the name of the Senior Medical Officer as "protected" information, and respectfully request the Court's approval of that designation. Protection of the Senior Medical Officer's identity is warranted for largely the same reasons that Judge Hogan approved protecting the identities of certain other Government personnel in *In re: Guantanamo Bay Detainee Litig.*, 787 F. Supp. 2d 5, 15-17 (D.D.C. 2011). Pending the Court's approval, Respondents have redacted the name of the Senior Medical Officer from the publicly filed versions of his declaration and Respondents' opposition to Petitioners' motion. Unredacted versions of the declaration will be filed with the Court under seal and provided to Petitioners' counsel.

JTF-GTMO as hunger strikers, and three of the Petitioners – Dhiab (ISN 722), Belbacha (ISN 290), and Hadjarab (ISN 238) – have been approved to receive enteral feeding.  *See* SMO Decl. ¶¶ 21-24.

It is the policy of the Department of Defense to support the preservation of life and health by appropriate clinical means and standard medical intervention, in a humane manner, and in accordance with all applicable standards.  *See* Senior Medical Officer Decl. ¶ 9.  To that end, JTF-GTMO has established clinically appropriate procedures to address the medical care and treatment of hunger striking detainees.  *See id*. ¶¶ 9-19.  JTF-GTMO's hunger strike protocol follows the Federal Bureau of Prisons' model and guidelines for managing hunger strikers.  *Id*. ¶ 9.

The Joint Medical Group ("JMG") at JTF-GTMO designates detainees as hunger strikers based on various criteria, such as the detainee's intent, purpose, and behavior, as well as objective factors such as weight loss to less than 85% of Ideal Body Weight, or missing nine consecutive meals.  *Id*. ¶ 10.  Once a detainee is designated as a hunger striker, the medical staff carefully monitors his health by means of physical and psychological examinations.  *Id*.  Further, medical staff provide extensive counseling and detailed warnings to detainees about the consequences of refusing to eat or drink.  *Id*.  Medical personnel explain that their role is to preserve and promote the detainees' life and health, and urge the detainees to accept enough nutrition voluntarily to increase their weight and improve their health.  *Id*.

In the event a detainee's refusal to consume food or nutrients voluntarily reaches the point where the medical staff determine that the detainee's life or health might be threatened, the medical staff will obtain authorization to enterally feed the detainee.  *Id*. ¶ 11.  The decision to designate a detainee for enteral feeding does not mean that a detainee must receive all nutrition

through a nasogastric tube. Prior to each feeding, the detainee is always offered the opportunity to eat a standard meal or consume a liquid nutritional supplement orally, instead of being enterally fed. *Id*. Medical personnel counsel the detainee on his options, to include an explanation of how and why enteral feeding will be implemented to preserve his health and life. *Id*.

Enteral feeding is administered in a humane manner through a nasogastric tube, and only when medically necessary to preserve the detainee's health or life. *Id*. ¶ 12. The nasogastric tubes are inserted only by physicians or credentialed registered nurses who have received appropriate training. *Id*. When inserting nasogastric tubes, a lubricant or (if requested by the detainee) olive oil is applied to the sterile tube. *Id*. ¶ 13. A topical anesthetic such as lidocaine is offered to minimize any pain, but the detainee may decline it. *Id*. Anesthetic throat lozenges are also made available to the detainees if they so choose. *Id*. ¶ 15. JTF-GTMO uses 8, 10, and 12 french-sized tubes, which are smaller than the tubes used by the Bureau of Prisons. *Id*. ¶ 14. The nasogastric tube is inserted down into the stomach slowly and directly. *Id*. The process is never undertaken in a fashion intentionally designed to inflict pain or harm on the detainee. *Id*.

Each detainee receives an appropriate quantity and type of nutritional formula tailored to the detainee's specific needs. *Id*. at ¶ 15. To ensure the safety of the guard staff, medical staff, and the detainee, enteral feedings are conducted in a restraint chair. *Id*. ¶¶ 17-18. This process usually lasts 30 to 40 minutes, and a detainee is kept in the chair only for the time required to administer the nutritional formula and an additional observation period to ensure digestion. *Id*. ¶¶ 15, 18. Guantanamo medical staff carefully monitor the feeding process, adjusting the rate and amount of nutrients and fluids given if there are indications of discomfort to the detainee.

through a nasogastric tube. Prior to each feeding, the detainee is always offered the opportunity to eat a standard meal or consume a liquid nutritional supplement orally, instead of being enterally fed. *Id*. Medical personnel counsel the detainee on his options, to include an explanation of how and why enteral feeding will be implemented to preserve his health and life. *Id*.

Enteral feeding is administered in a humane manner through a nasogastric tube, and only when medically necessary to preserve the detainee's health or life. *Id*. ¶ 12. The nasogastric tubes are inserted only by physicians or credentialed registered nurses who have received appropriate training. *Id*. When inserting nasogastric tubes, a lubricant or (if requested by the detainee) olive oil is applied to the sterile tube. *Id*. ¶ 13. A topical anesthetic such as lidocaine is offered to minimize any pain, but the detainee may decline it. *Id*. Anesthetic throat lozenges are also made available to the detainees if they so choose. *Id*. ¶ 15. JTF-GTMO uses 8, 10, and 12 french-sized tubes, which are smaller than the tubes used by the Bureau of Prisons. *Id*. ¶ 14. The nasogastric tube is inserted down into the stomach slowly and directly. *Id*. The process is never undertaken in a fashion intentionally designed to inflict pain or harm on the detainee. *Id*.

Each detainee receives an appropriate quantity and type of nutritional formula tailored to the detainee's specific needs. *Id*. at ¶ 15. To ensure the safety of the guard staff, medical staff, and the detainee, enteral feedings are conducted in a restraint chair. *Id*. ¶¶ 17-18. This process usually lasts 30 to 40 minutes, and a detainee is kept in the chair only for the time required to administer the nutritional formula and an additional observation period to ensure digestion. *Id*. ¶¶ 15, 18. Guantanamo medical staff carefully monitor the feeding process, adjusting the rate and amount of nutrients and fluids given if there are indications of discomfort to the detainee.

*Id*.  Detainees are offered pain relievers, such as ibuprofen, if they indicate discomfort from the procedures.  The comfort and safety of the detainee is a priority for the medical staff.  *Id*.

All detainees who are enterally fed are assessed daily by medical professionals and receive regular and periodic reviews by a physician to ensure the feeding process is being administered properly.  *Id*. ¶ 16.  The detainee's health is closely monitored to ensure he receives appropriate nutrition and to assess the need for any modifications.  *Id*.

JMG occasionally prescribes anti-nausea medication to detainees undergoing enteral feeding, including, on occasion, Reglan.  *Id*. ¶ 19.  Reglan, however, is very rarely used as there are other anti-nausea drugs that are equally effective.  *Id*.  None of the four Petitioners seeking relief here have been administered Reglan.  *Id*. ¶ 21-24.  Petitioner Hadjarab (ISN 238) was prescribed Reglan in March 2013, but he declined to accept the medication and, in accordance with his wishes, it was never administered to him.  *Id*. ¶ 21.  Reglan or other medications are not placed in enteral nutritional solutions, or otherwise given to a detainee without his knowledge and consent.  *Id*. ¶ 19.  JMG's protocol is to obtain voluntary and informed consent as a routine part of any testing, treatment or medical procedures, following a review of the risks and benefits with the detainee, as well as any available alternatives.  *Id*.  In the absence of such consent, involuntary treatment or medication is only implemented when necessary to preserve the detainee's health and life.  *Id*.

JMG also makes every effort to accommodate the religious and cultural practices of detainees.  *Id*. ¶ 20.  Consistent with prior practice, barring any unforeseen emergency or operational issues, JTF-GTMO will modify the hours of meal delivery, including enteral feeding, in accordance with the Ramadan fasting hours.  *Id*.  Although the number of enterally fed detainees is greater than in the past, JTF-GTMO has shifted existing resources and has sufficient
5

medical personnel on hand to provide detainees with the proper nutrition in a manner that is in accordance with Ramadan's fasting requirements. *Id.* Accordingly, enteral feedings will be administered after sundown each day during Ramadan. *Id.*

The four Petitioners seeking relief are all presently in good health, none is in the hospital, and their vital signs are normal as of their most recent check-ups. *Id.* ¶¶ 21-24. Additional medical information about each Petitioner can be found in the Senior Medical Officer's declaration. *Id.*

## ARGUMENT

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 679-80 (2008) (quotation marks and citations omitted). A preliminary injunction normally seeks to maintain the status quo pending the resolution of the underlying litigation, but here Petitioners seek to alter the status quo by prohibiting Respondents from continuing to provide life-saving nutritional and medical care. This type of request for a mandatory injunction is subject to even higher scrutiny. *See Spadone v. McHugh*, 842 F. Supp. 2d 295, 301 (D.D.C. 2012) ("In this Circuit, the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised") (internal quotation omitted); *Sierra Club v. Johnson*, 374 F. Supp. 2d 30, 33 (D.D.C. 2005) (stating that a mandatory injunction that changes the status quo "is an extraordinary remedy, especially when directed at the United States Government").

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The

Supreme Court has emphasized that a preliminary injunction cannot issue on the basis of speculation or possibility. *Winter*, 555 U.S. at 20-24. In *Winter*, the Supreme Court rejected the then-controlling law in the Ninth Circuit, which provided a "more lenient standard" that allowed for a preliminary injunction "based only on a 'possibility' of irreparable harm." *Id*. at 22. The Supreme Court emphasized that a preliminary injunction should issue only upon a showing that irreparable harm is "*likely* in the absence of an injunction." *Id*. at 375-76 (emphasis in original). Both the Court of Appeals and this Court have recognized that *Winter* provides the controlling standard for addressing a motion for preliminary injunction. *See Sherley v. Sebelius*, 644 F.3d 388, 392-93 (D.C. Cir. 2011); *Bayer HealthCare, LLC v. U.S. Food and Drug Admin.*, 2013 WL 1777481 * 4-5 (D.D.C. Apr. 17, 2013) (Collyer, J.); *Sweis v. U.S. Foreign Claims Settlement Com'n*, 2013 WL 2986252, *3-4 (D.D.C. Jun 15, 2013) (Kessler, J.).

I.   **PETITONERS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.**

   A. **The Court Lacks Jurisdiction Over Conditions-of-Confinement and Treatment Claims.**

Petitioners cannot establish a likelihood of success on the merits of their claim because the Court lacks jurisdiction to consider a conditions-of-confinement and treatment request to enjoin Respondents from providing essential nutritional and medical care. Federal courts are courts of limited subject-matter jurisdiction. *E.g.*, *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 318 (D.C. Cir. 2012). Accordingly, for a federal court to exercise jurisdiction, "the Constitution must have supplied the courts with the capacity to take the subject matter and an Act of Congress must have supplied jurisdiction over it." *Id*. Here, through Section 7 of the Military Commission Act of 2006 ("MCA"), 28 U.S.C. § 2241(e), Congress has exercised its constitutional prerogative,

not to grant, but to withdraw from the federal courts jurisdiction to adjudicate conditions-of-confinement and treatment claims by detainees at Guantanamo Bay:

> **[N]o court, justice, or judge shall have jurisdiction** to hear or consider any other action against the United States or its agents relating to any aspect of the **detention**, transfer, **treatment**, trial, or **conditions of confinement** of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant.

28 U.S.C. § 2241(e)(2) (emphasis added).[2]

As reflected in a number of floor statements, by withdrawing court jurisdiction over detainees' conditions-of-confinement and treatment claims, members of Congress specifically intended to prevent the detainees from raising claims related to the provision of medical care. *See*, *e.g.*, 152 Cong. Rec. S10375 (daily ed. Sept. 28, 2006) (Sen. Domenici) (noting conditions-of-confinement claims had been brought by detainees regarding "base security procedures, speed of mail delivery, and medical treatment"); 152 Cong. Rec. S10367 (daily ed. Sept. 28, 2006) (Sen. Graham) (same). Congressional proponents of the legislation were concerned that such claims would inappropriately consume resources and disrupt operations at the Guantanamo Bay

---

[2] Petitioners are being held pursuant to the Authorization for the Use of Military Force, Pub. L. No. 107-40, 115 Stat 224 (Sept. 18, 2001), as informed by the laws of war. Contrary to Petitioners' claims that their detention is unlawful, the Court of Appeals has "stated repeatedly" that detention of Guantanamo detainees under the AUMF is lawful. *See Hussein v. Obama*, 2013 WL 2990993 at *2 (D.C. Cir. June 18, 2013). Petitioners, of course, may challenge the legality of their detention in accordance with *Boumediene v. Bush*, 553 U.S. 723 (2008), but they have thus far chosen not proceed to the merits of their cases. Petitioners Belbacha (ISN 290), Dhiab (ISN 722), and Hadjarab (ISN 238) have decided to stay their habeas cases. *See Dhiab v. Obama*, 05-CV-1457 (GK) (ECF No. 109) (Jan. 29, 2009) (granting Petitioner Dhiab's unopposed motion to stay); *Hadjarab v. Obama*, 05-CV-1504 (RMC) (Minute Order) (June 15, 2012) (granting Hadjarab's consent motion to stay); *Belbacha v. Obama*, 05-CV-2349 (RMC) (Minute Order) (Sept. 14, 2012) (granting Belbacha's motion to stay). Petitioner Aamer's habeas case was stayed for three years with his consent (from December 2008-December 2011), but it is now moving forward with discovery. *See Aamer v. Obama*, 04-CV-2215 (RMC) (ECF No. 198) (joint motion to lift stay). There is no basis for any claim that Petitioners have been deprived of the opportunity to contest the lawfulness of their detention.

Naval Base through litigation not related to the legality of Petitioners' detention. *See, e.g.*, 152 Cong. Rec. S10268 (daily ed. Sept. 28, 2006) (Sen. Kyl).

      The Court of Appeals has squarely held that section 2241(e)(2) is a valid exercise of congressional power. *Al-Zahrani,* 669 F.3d at 318-19 (upholding the continuing applicability of the section 2241(e)(2) bar to "our jurisdiction over 'treatment' cases"). And Section 2241(e)(2) has been repeatedly applied by the judges of this District to bar a variety of conditions-of-confinement and treatment requests, including claims related to the provision of medical care. *See, e.g.*, *In re Guantanamo Bay Detainee Litig.*, 577 F. Supp. 2d 312, 314-16 (D.D.C. 2008) (Hogan, J.) (requests for mattress and blanket, for access to medical records, and to meet with detainee's treating military physician); *Tumani v. Obama*, 598 F. Supp. 2d 67 (D.D.C. 2009) (Urbina, J.) (requests for transfer to less restrictive camp, to terminate interrogations, and to see father (who was another detainee)); *Al-Shurfa v. Obama*, 2009 WL 1451500 (D.D.C. May 21, 2009) (Leon, J.) (requests for transfer to less restrictive camp and to evaluate detainee's competence to dismiss his case); *Al-Ghizzawi v. Bush*, 2008 WL 948337 (D.D.C. April 8, 2008) (Bates, J.) (requests for transfer to civilian medical facility and for allegedly needed medical treatments); *Khadr v. Bush*, 587 F. Supp. 2d 225, 234-37 (D.D.C. 2008) (Bates, J.) (request for transfer to a rehabilitation and reintegration program).

      Notably, in *Al-Adahi v. Obama*, 596 F. Supp. 2d 111 (D.D.C. 2009) (Kessler, J.), the Court relied on Section 2241(e)(2) to deny a motion for a preliminary injunction to "enjoin certain treatment [detainees] are undergoing as a result of voluntary hunger strikes they have undertaken to protest their lengthy detentions." *Id.* at 114. The Court concluded that the claims raised in *Al-Adahi*, which included requests to enjoin use of forcible restraints during enteral feeding and to prohibit inserting and removing the feeding tube for each feeding session, fell

9

within the ambit of Section 2241(e)(2): "Petitioners seek an injunction to alter the conditions under which they are force-fed and provided medical treatment." *Id*. at 118. Consequently, the Court concluded that it had "no jurisdiction to decide this Motion." *Id*. The same result should govern here. Petitioners here seek non-habeas relief to address, in their view, the conditions under which they are being held at Guantanamo Bay. *See id*. at 114. JTF-GTMO's provision of life-saving nutritional and medical care to hunger-striking detainees clearly falls under the bar of Section 2241(e)(2), and this Court has no jurisdiction to consider Petitioners' request to enjoin such practices.

Petitioners maintain on two separate grounds that Section 2241(e)(2) does not bar the relief sought here. *See* Pet'rs' Mot. at 24-28. Both arguments lack merit and should be rejected. First, Petitioners contend that the relief they seek is not related to the conditions of their confinement, but instead to the duration of their confinement, because force-feeding, by prolonging their lives, prolongs their indefinite detention. *Id*. at 24-26. In support of this proposition they cite *Jenkins v. Haubert,* 179 F.3d 19 (2d Cir. 1999), which held that a prison inmate could bring an action under 42 U.S.C. § 1983 to challenge the validity of a disciplinary sanction so long as it affected the conditions rather than the fact or overall length of his confinement, as that distinction was drawn in *Preiser v. Rodriguez,* 411 U.S. 475, 498 (1973). *See Jenkins,* 179 F.3d at 27-28. In *Rodriguez* the Supreme Court distinguished conditions-of-confinement claims that can be heard under § 1983 from habeas corpus actions, in which a prisoner, challenging the fact or duration of his custody, seeks immediate or speedier release. 411 U.S. at 498. Petitioners did not bring the instant motion to obtain their release, however, but instead, as they themselves complain, because they consider enteral feeding to be painful and degrading. *See* Pet'rs' Mot. at 6-10. Hence, their protests to the contrary notwithstanding, *see*

*id.* at 25, Petitioners' motion takes issue with "conditions affecting their quality of life" in confinement, *Jenkins*, 179 F.3d at 28, and so is barred by Section 2241(e)(2).

At bottom, Respondents are detaining Petitioners under the authority conferred by the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat 224 (Sept. 18, 2001), the U.S. Government may lawfully detain Petitioners for the duration of hostilities against Al Qaeda, Taliban, and associated forces, *see Uthman v. Obama*, 637 F.3d 400, 401-02 (D.C. Cir. 2011), and that remains the case regardless of whether Petitioners are enterally fed or not.  The relief they seek can have no impact on the length of their detention as authorized by law, and thus does not concern the duration of their confinement as that term is properly understood.  *See Preiser,* 411 U.S. at 487-88.

Second, Petitioners alternatively argue that Section 2241(e)(2) would operate as an unconstitutional suspension of the writ of habeas corpus if the statute were construed to bar the relief sought here.  Pet'rs' Mot. at 26-28.   That is not the case, because contrary to Petitioners' assertions, *see id*. at 27, the relief sought here does not implicate the right to habeas corpus.  As held in *Boumediene v. Bush*, 553 U.S. 723 (2008), Petitioners are entitled under the Suspension Clause to bring habeas corpus actions "to challenge the legality of their detention," *id.* at 771, in which the habeas court must "conduct a meaningful review of both the cause for detention and the Executive's power to detain, " *id.* at 783.  The instant motion, in which Petitioners seek to halt their continued enteral feeding, does not contest the lawfulness of their detention, or seek review of the legal or factual bases on which the Government has detained them.  *See also Preiser*, 411 U.S. at 484 ("the essence of habeas corpus is an attack by a person in custody upon the legality of that custody . . . the traditional function of [which] is to secure release from illegal custody").  They make no contention (nor could they) that enteral feeding interferes with their

11

ability to seek meaningful habeas relief -- the very fact of the instant motion and the statements that Petitioners have provided in support of it are proof to the contrary.

Petitioners nevertheless contend that barring judicial review of their instant claim would constitute an unconditional suspension of the writ because there is no alternate tribunal in which a detainee can obtain relief from unwanted force-feeding or other putatively unlawful conditions of confinement. Pet'rs' Mot. at 26-27, citing *Boumediene*, 553 U.S. at 779. But the Suspension Clause, as construed in *Boumediene*, does not guarantee Petitioners a judicial forum in which to present any and all grievances they may have with the quality of life provided them while in detention. As Petitioners observe, *Boumediene* held that administrative review of detentions under the Detainee Treatment Act of 2005 did not constitute an adequate substitute for habeas, and consequently that the jurisdictional bar to detainee habeas claims erected by 28 U.S.C. 2241(e)(1) effected an unconstitutional suspension of the writ. 553 U.S. at 779, 792. But that conclusion followed only because the Suspension Clause guaranteed detainees "a meaningful opportunity to demonstrate that [they are] being held pursuant to [an] erroneous application or interpretation of relevant law." Id. at 779 (internal quotation marks and citation omitted). The Suspension Clause extends no similar guarantee when a detainee seeks to challenge the legality of enteral feeding.

### B. Enteral Feeding Of Hunger-Striking Detainees Is Lawful And Reasonably Related To Legitimate Government Interests.

Even assuming the Court had jurisdiction, Petitioners cannot establish a likelihood of success on the merits of their claims. Relying on the line of cases beginning with *Turner v. Safely*, 482 U.S. 78 (1987), Petitioners' primary argument is that the Court should enjoin the provision of life-saving nutritional and medical treatment because such care is not reasonably related to legitimate penological interests. *See* Pet'rs' Mot. at 12-21. Petitioners cite no legal

12

authority for such an extraordinary proposition. The motion cites no case in which a court has enjoined a government official from providing life-saving medical and nutritional care to a hunger-striking detainee in government custody. Indeed, such an order would functionally authorize a detainee to commit suicide by starvation. The absence of any legal authority establishing such a remarkable proposition means that Petitioners have no likelihood of success on the merits. *See Munaf*, 553 U.S. at 690 ("a party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits") (internal quotation marks and citations omitted).

But even accepting Petitioners' own proposed standard and applying the *Turner* line of cases to Guantanamo detainees,[3] Respondents can easily establish that JTF-GTMO's policy of providing life-saving medical and nutritional care to hunger striking detainees "bears a rational relation to legitimate penological interests." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). Under the *Turner* standard, the Court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). This is especially the case in the area of medical care. *See, e.g., Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (stating that federal courts will "disallow any attempt to second-guess the propriety of a particular course of treatment" chosen by prison doctors); *Martinez v. Mancusi*, 443 F.2d 921, 924 (2d Cir. 1971) ("Obviously, courts cannot go around second-guessing

---

[3] *Turner* held that a prison regulation must be reasonably related to a valid penological interest "when [it] impinges on inmates' constitutional rights." *See Turner*, 482 U.S. at 89. Petitioners ignore this threshold requirement for application of scrutiny under *Turner*, and it is unclear, to say the least, whether scrutiny under *Turner*'s "reasonable relation" standard would apply to the detention of aliens at Guantanamo Bay. *See Kiyemba v. Obama*, 555 F.3d 1022, 1026 (D.C. Cir. 2009).

doctors."). "The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Overton*, 539 U.S. at 132. Here, Petitioners have not carried their burden of establishing that JTF-GTMO's policy of enterally feeding hunger-striking detainees is unreasonable.

Respondents have a legitimate interest in providing life-saving nutritional and medical care in order to preserve the life and prevent suicidal acts of individuals in Respondents' care. Courts have repeatedly recognized this interest in upholding involuntary feeding of domestic prisoners and detainees, and that interest is equally important in the Guantanamo context. *See, e.g., Freeman v. Berge*, 441 F.3d 543 (7th Cir. 2006); *In re Grand Jury Subpoena*, 150 F.3d 170 (2d Cir. 1998); *Garza v. Carlson*, 877 F.2d 14 (8th Cir. 1989); *In re Soliman*, 134 F. Supp. 2d 1238 (N.D. Ala. 2001), *vacated as moot*, 296 F.3d 1237 (11th Cir. 2002); *Bezio v. Dorsey*, 2013 WL 1829892 (N.Y. May 2, 2013). Indeed, the federal regulations governing management of inmates who engage in hunger strikes "authorize medical officers to force-feed an inmate if they determine that the inmate's life or permanent health is in danger." *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992); *see* 28 C.F.R. §§ 549.60-66 (2012). Enteral feeding is also reasonably related to preserving order, security, and discipline within the detention facility. "If prisoners are allowed to kill themselves, prisons would find it even more difficult than they already do to maintain discipline, because of the effect of a suicide in agitating other prisoners." *Freeman*, 441 F.3d at 547; *see Bezio*, 2013 WL 1829892 at *7 (N.Y. May 2, 2013) ("there is virtually universal recognition among appellate courts that an inmate hunger strike can have a significant destabilizing impact on the institution"); *In re Soliman*, 134 F. Supp. 2d at 1253; *In re Grand Jury*, 150 F.3d at172 . Further, "[p]rison officials who let prisoners starve to death would also expose themselves to lawsuits by prisoners' estates." *See Freeman*, 441 F.3d at 547; *see also Al-*

*Zahrani*, 669 F.3d at 317 (damages lawsuit against government officials related to suicide of Guantanamo Bay detainees). Respondents have a legitimate interest in avoiding such burdensome litigation. *See Freeman*, 441 F.3d at 547; *In re Soliman*, 134 F. Supp. 2d at 1257; *Bezio*, 2013 WL 1829892 at *6 (N.Y. May 2, 2013).

Petitioners' attempt to distinguish this well-established body of law lacks merit. Petitioners' sole argument is that "[i]n none of those cases was the prisoner detained indefinitely without trial." *See* Pet'rs' Mot. at 20-21.[4] Petitioners are mistaken. *In re Soliman* authorized involuntary feeding of an immigration detainee who began a hunger strike to protest "being detained for more than three years without a crime . . . and the INS's plan to keep [him] in jail indefinitely." 134 F. Supp. 2d at 1245. Similarly, *In re Grand Jury Subpoena* involved a hunger strike by a civil contemnor who had been detained indefinitely for refusing to testify before a grand jury. 150 F.3d at 171. The court authorized involuntary feeding and reasoned that although "a civil contemnor has been convicted of no crime, the institution where he is housed is still responsible for his care while incarcerated." *Id.*; *see also In re Sanchez*, 577 F. Supp. 7, 8 (S.D.N.Y. 1983) (authorizing involuntary feeding for civil contemnor detained for thirteen months for failure to testify before a grand jury).

In any event, the Court's decision in *Al-Adahi* did not turn on the underlying legal basis of the petitioner's detention and the Court even remarked about the length of ongoing detention at the beginning of its analysis. *See Al-Adahi*, 596 F. Supp. 2d at 117. The fact that Petitioners here are presently detained pursuant to the AUMF, as opposed to a criminal conviction or authority, is of no consequence to whether Respondents have the authority to administer life-saving nutrition and medical care to preserve the detainees' health and life. *See In re Soliman*,

---

[4] Petitioners are not indefinitely detained. They are detained pursuant to the AUMF, as informed by the laws of war.

134 F. Supp. 2d at 1255 ("Federal Courts generally have approved of force-feeding hunger striking inmates, regardless of whether the person was a convicted prisoner, a pre-trial detainee, or a person held pursuant to a civil contempt order."). Courts have consistently rejected similar attempts by other detainees to enjoin such life-saving actions and this Court should reach the same result here.

## II.  PETITONERS CANNOT DEMONSTRATE IRREPARABLE HARM.

Petitioners' motion makes no serious attempt to argue that they will suffer irreparable harm in the absence of the requested injunction. Petitioners do not – and cannot – claim that Respondents have been deliberately indifferent to their medical needs. *See, e.g.*, *O.K. v. Bush*, 344 F. Supp. 2d 44, 60-63 & n.23 (D.D.C. 2004) (Bates, J.) ("Without concluding that the 'deliberate indifference' doctrine applies" to challenges to Guantanamo detainee medical care, "the Court will draw on this well-developed body of law to guide its analysis").  As explained in the Senior Medical Officer's Declaration, JTF-GTMO provides hunger-striking detainees with humane, high-quality medical care to preserve their life and health. All four Petitioners are in good health, they are not in the hospital, and they are receiving adequate nutrition. *See* Senior Medical Officer Decl. ¶¶ 21-24. The requested injunction would, in all likelihood, increase the risk of irreparable harm to Petitioners' health and well-being, not prevent it.

In an effort to create the illusion of irreparable harm, Petitioners' motion raises several complaints about the manner in which enteral feeding is administered, but none has merit. First, Petitioners speculate that they have been involuntarily administered the drug Reglan during the enteral feeding process. *See* Pet'rs' Mot. at 22-23 (arguing Reglan poses a significant risk of adverse side effects from prolonged use). To be clear:  Reglan has never been administered to the four Petitioners. *See* Senior Medical Officer Decl. ¶¶ 21-24. Reglan, an anti-nausea drug, is

very rarely used by JTF-GTMO because other available anti-nausea drugs are equally effective. *Id.* ¶ 19. Moreover, Reglan or other medications are not placed in the nutritional solutions, or otherwise given to a detainee without his knowledge and consent. *Id.* JMG protocol is to obtain voluntary and informed consent as a routine part of any testing, treatment or medical procedures, following a review of the risks and benefits with the detainee, as well as any available alternatives. *Id.* In the absence of such consent, involuntary treatment or medication is only implemented when necessary to preserve the detainee's health and life. *Id.* Here, Petitioners cannot establish irreparable harm because Reglan has never been administered to them. And even in the unlikely event Reglan were to be administered to them in the future, they would receive appropriate notice and counseling prior to its administration. Indeed, Petitioner Hadjarab was prescribed Reglan in March 2013, but he declined the medication and, consistent with his informed choice, it was not administered to him. *Id.* ¶ 21.

Second, Petitioners incorrectly speculate that enteral feeding will interfere with their upcoming observance of Ramadan because they will not be able to fast from sunup to sundown. *See* Pet'rs' Mot. at 19-20. Consistent with long-standing practice, absent any unforeseen emergency or operational issues, JTF-GTMO plans to feed all detainees, including detainees undergoing enteral feeding, before dawn and after sunset in order to accommodate their religious practices during Ramadan. *See* Senior Medical Officer Decl. ¶ 20; *see also Al-Adahi v. Obama*, 05-CV-280 (GK) (ECF No. 61) (Oct. 19, 2005) (including declaration describing JTF-GTMO's practice to accommodate enteral feedings in accordance with Ramadan holiday). Petitioners acknowledge JTF-GTMO's prior feeding practices during Ramadan, but speculate that such feedings may be logistically infeasible given the number of detainees currently undergoing enteral feeding. *See* Pet'rs' Mot. at 20. Although the number of enterally-fed detainees is

17

greater than in in past years, JTF-GTMO has shifted existing resources and has ascertained that it has sufficient medical personnel on hand to provide detainees with the proper nutrition in a manner that is in accordance with Ramadan's fasting requirements. *See* Senior Medical Officer Decl. ¶ 20. Given JTF-GTMO's long-standing policy to adjust the enteral feeding times of hunger striking detainees during Ramadan, there is no factual basis for the Court to enjoin enteral feeding during the Ramadan holiday.[5]

Third, Petitioners raise allegations about the invasive and painful nature of the enteral feeding process, *see* Pet'rs' Mot. at 7-10, but the Senior Medical Officer Declaration establishes that the enteral feeding process is undertaken in a humane manner modeled on the Federal Bureau of Prisons' guidelines for managing hunger strikers. *Id*. ¶ 9. JTF-GTMO administers nutrition using a nasogastric tube, the least invasive of all involuntary feeding methods. *See In re Soliman*, 134 F. Supp. 2d at 1254. JTF-GTMO uses a feeding tube even smaller than the one used by the Bureau of Prisons. *See* Senior Medical Officer Decl. ¶ 14. Before inserting nasogastric tubes, a lubricant is applied. *Id*. A topical anesthetic such as lidocaine is offered to minimize any pain, but the detainee may decline it. *Id*. The nasogastric tube is inserted only by medical professionals (nurses or doctors), and once inserted is never moved up and down; it is inserted down into the stomach slowly and directly. *Id*. The process is never undertaken in a fashion intentionally designed to inflict pain or harm on the detainee. *Id*. In sum, the Senior

---

[5] Because there is no factual basis for Petitioners' Ramadan-related claim, there is no need for the Court to address Petitioner's legal arguments that the Third Geneva Convention and the Religious Freedom Restoration Act compel the injunctive relief Petitioners' seek. *See* Pet'rs' Mot. at 19-20. In any event, those arguments are foreclosed by binding Circuit precedent. *See Al Bihani v. Obama*, 590 F.3d 866, 875 (D.C. Cir. 2009) (holding that § 5 of the Military Commissions Act of 2006, Pub. L. 109-366, 120 Stat. 2600, "explicitly precludes detainees from claiming the Geneva conventions . . . as a source of rights"); *Rasul v. Myers*, 563 F.3d 527, 532 (D.C. Cir. 2009) (as a matter of statutory interpretation, non-resident aliens are not protected "persons" within the meaning of RFRA).

Medical Officer Declaration establishes that JTF-GTMO has adopted appropriate clinical practices designed to improve Petitioners' overall health, and that the medical care provided to Petitioners has been performed in a humane fashion, with concern for Petitioners' well-being, and never in a manner designed to inflict pain or discomfort or as punishment or retaliation. Accordingly, Petitioners cannot establish an irreparable injury.

### III. THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH DECISIVELY AGAINST THE RELIEF PETITIONERS SEEK.

When the choice presented is to stand by and watch as Petitioners starve themselves and their health declines, or to continue providing them essential nourishment and care, there is no disputing where the balance of interests lies. If injunctive relief is granted and Petitioners must be allowed to refuse food and lay waste to their bodies, even to the point of death, then above and beyond the irreparable harm they may do to themselves, Respondents will suffer harm in several respects. First, Respondents suffer harm if they are prohibited from administering treatment that, in their professional medical judgment, they are obligated to provide to individuals, held in their custody, for whose health and well-being they are responsible. Further injury will befall Respondents as any deaths of hunger-striking detainees will undermine the security and good order of the detention facility, threatening the safety of detainees and prison personnel alike. On the other side of the scale, the "harm" to Petitioners if their request for injunctive relief is denied is the preservation of their health and well-being through the humane (and religiously observant) administration of essential nutritional and medical care.

By much the same token, the public interest lies with maintaining the status quo. The public interest surely lies in preserving the health and safety of persons held in government custody, for whose welfare the public has assumed responsibility, and in avoiding the threat to good order, and to the safety of detainees and military personnel alike, should hunger-striking

detainees be allowed to perish. Given the potentially dire consequences that could flow from granting Petitioners' motion, the balance of harms and the public interest clearly weigh against the relief Petitioners seek.

## CONCLUSION

For the reasons stated above, Petitioners' motion for a preliminary injunction should be denied. A proposed order is attached.

Dated: July 3, 2013

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

JOSEPH H. HUNT
Director

TERRY M. HENRY
JAMES G. GILLIGAN
Assistant Branch Directors

   /S/
ANDREW I. WARDEN (IN Bar No. 23840-49)
TIMOTHY B. WALTHALL
DANIEL M. BARISH (D.C. Bar. No. 448263)
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW
Washington, DC 20530
(202) 616-5084
Fax: (202) 305-2685