# EXHIBIT 1

## (U//FOUO) DECLARATION OF COMMANDER ███████████, M.D.

(U//FOUO) Pursuant to 28 U.S.C. § 1746, I, ███████████, hereby declare:

1. (U//~~FOUO~~) I am a Commander in the United States Navy with over 15 years of active and reserve service. I currently serve as the Senior Medical Officer, Joint Medical Group, Guantanamo Bay, Cuba. I am responsible for the medical care provided to detainees at Guantanamo Bay and supervise the operation of the Joint Medical Group that provides medical care to the detainees being held at Guantanamo Bay. There are currently 166 detainees being held at the detainee camp at Guantanamo Bay, Cuba. I have served in this position since ███████.

2. (U//~~FOUO~~) ███████████████████████████████████████████████

3. (U) I have personal knowledge of the procedures that are in place for the operation and application of medical care at all JTF-GTMO medical facilities and I am responsible for ensuring that they are followed. Due to my responsibilities, I have personal knowledge of, or have received information in the course of my responsibilities concerning, the matters raised by ISNs 238 (Nabil Hadjarab), 239 (Shaker Aamer), 290 (Ahmed Belbacha) and 722 (Abu Wa'el (Jihad) Dhiab) through their counsel in their 30 June 2013 "Application for a Preliminary Injunction against Force-Feeding." This declaration is based on information made available to me through my official duties and from the medical records of ISNs 238, 239, 290, and 722.

### JOINT MEDICAL GROUP

4. (U) The Joint Medical Group staff consists of licensed, board-certified physicians of different specialties. Specifically, as of June 2013, the hospital staff has approximately 147 professionally trained individuals. The JMG provides services from numerous medical professionals including an anesthesiologist, a general surgeon, an orthopedic surgeon, family physicians, internal medicine physicians, a psychiatrist, a psychologist, a physician's assistant, a licensed dietician, dentists, and a physical therapist. In addition, the staff includes licensed medical surgical nurses, corpsmen (formally trained Navy medical personnel akin to a "medic" in the Army), various technicians (lab, radiology, pharmacy, operating room, respiratory,

physical therapy, information technology and biomedical repair), and administrative staff. We have routinely brought in specialists, including medical professionals practicing in the areas of Dermatology, Cardiology, Ear Nose and Throat, Gastroenterology, Neurosurgery, Urology, and Audiology, and have the ability to request specialists from other areas as needed. Specialists specifically involved in the care of the detainees on hunger strike include nutrition, internal medicine, and behavioral health professionals, all of whom assisted in monitoring and providing specialized care, as needed.

5. (U) All detainees, upon arrival at JTF-GTMO, were given a complete physical examination. Medical issues identified during the examination, or identified during subsequent examinations, are followed by medical staff. Detainees may request medical care at any time by making a request to guard personnel in the cell blocks or to the medical personnel who make daily rounds on each cellblock. In addition to responding to such detainee requests, the medical staff will investigate any medical issues observed by JTF-GTMO guards or staff. The availability of this care has resulted in thousands of outpatient contacts between detainees and the medical staff, followed by inpatient care as needed.

6. (U) Outpatient healthcare provided to the detainees is provided at the medical facility in the detention camps as well as the Detention Hospital. The Detention Hospital is a 15-bed facility that is comparable to a small community hospital in the United States. For medical procedures beyond the capability of the Detention Hospital, the detainees are transferred to the Naval Base Hospital at Guantanamo Bay. As noted above, we can and have requested that specialists be flown in to provide care to detainees when the medical need warrants it.

7. (U) The Joint Medical Group is committed to providing unconditional, appropriate, and comprehensive medical care to all detainees. The healthcare provided to the detainees being held at JTF-GTMO rivals that provided in any community in the United States and is comparable to that afforded our active duty service members. Detainees receive timely, compassionate, quality healthcare and have regular access to primary care and specialist physicians.

8. (U) All medical procedures performed are justified and meet accepted standards of care. A detainee is provided medical care and treatment based solely on his need for such care and the level and type of treatment is dependent on the accepted medical standard of care for the condition being treated. Medical care is not provided or withheld based on a detainee's

UNCLASSIFIED//~~FOR OFFICIAL USE ONLY~~

compliance or noncompliance with detention camp rules or on his participation in a hunger strike. Medical decisions and treatment are not withheld as a form of punishment. Moreover, the medical staff has no involvement in discipline decisions made by detention personnel.

### Hunger Strike Protocols

9. (U) It is the policy of the Department of Defense to support the preservation of life by appropriate clinical means and standard medical intervention, in a humane manner, and in accordance with all applicable standards. Accordingly, there are procedures and/or protocols for providing medical care to detainees, which are to be followed at all times by all medical personnel at the Detention Hospital and throughout JTF-GTMO, including for detainees who are participating in a hunger strike. JTF-GTMO's hunger strike protocol follows the Federal Bureau of Prisons' model and guidelines for managing hunger strikers. The protocol used by the Joint Medical Group equals or exceeds the standard of care available at accredited hospitals in the United States.

10. (U) A detainee can be designated a hunger striker by the JTF-GTMO Senior Medical Officer (SMO), in conjunction with input from the Detention Hospital medical staff and the Commander, Joint Detention Group (CJDG), based on the detainee's intent, purpose, and behavior. Weight loss to a level less than 85% of the detainee's Ideal Body Weight (IBW) will also designate a detainee as a possible hunger striker as will missing nine consecutive meals. The medical staff carefully assesses each hunger-striking detainee's health by means of physical and psychological examinations, weight monitoring, personal observation and laboratory tests. The ability to monitor a detainee's health is affected by the detainee's willingness to cooperate with medical staff. Joint Medical Group personnel provide extensive counseling and detailed warnings to the detainees concerning the risks of their failure to eat or drink when they begin a hunger strike, prior to the commencement of enteral feeding, and periodically thereafter if the detainee continues to participate in the hunger strike. Medical personnel (including behavioral health professionals) continually remind detainees who persist in their hunger strike that this behavior could endanger their health or life. During these conversations, the medical personnel explain that their role is to preserve and promote the detainee's life and health (not to stop the hunger strike) and urge the detainees to voluntarily accept enough nutrients to increase their weight and improve their health.

11. (U) If medical personnel determine the detainee's refusal to voluntarily consume adequate food or nutrients could now threaten his life or health, I make a recommendation to the Commander of the Joint Task Force that the detainee be approved for enteral feeding. Even after the Commander authorizes the use of enteral feeding for that detainee, the detainee is always offered the opportunity to eat a standard meal or consume the liquid supplement orally, instead of being enterally fed. If the detainee continues to refuse to eat or consume the liquid supplement orally, medical personnel will only implement enteral feeding when it becomes medically necessary to preserve a detainee's life and health. The medical personnel explain to the detainee how and why the enteral feeding regime will be implemented to preserve the detainee's health and life.

12. (U) The enteral feed is administered through the use of a nasogastric tubes. Feeding through those tubes is only conducted by physicians or credentialed registered nurses, and only when medically necessary to preserve that detainee's life and health. The application of the enteral feeding process is carried out in accordance with prior training received at accredited nursing schools and training conducted here at JTF-GTMO.

13. (U) When inserting nasogastric tubes, a lubricant is always used. In all cases, a topical anesthetic such as lidocane (a widely used local anesthetic) is offered, but the detainee may decline the anesthetic. Prior to insertion, the medical professional will lubricate a sterile nasogastric tube with a lidocane gel or surgilube, or olive oil at the detainee's request.

14. (U) Registered nurses insert the enteral feeding tube in accordance with standard medical protocol. JTF-GTMO uses 8, 10, or 12 french tubes, which are smaller than the 16 french tubes used by the Bureau of Prisons. A nasogastric tube is never inserted and then moved up and down. Instead, it is inserted down into the stomach slowly and directly, and removed carefully. Medical personnel do not remove, insert or administer nasogastric tubes in a manner intentionally designed to inflict pain or harm on the detainee.

15. (U) Typically, anesthetic throat lozenges are also available to the detainees on request. After verification of tube placement, an appropriate amount of nutritional supplement formula is infused by gravity into the detainee's stomach. This process typically takes 30 to 40 minutes. Concentrated and fiber-fortified formulas (also used in U.S. hospitals) are used to reduce volume and enhance digestion, respectively, and to make the procedure as comfortable as

possible. Detainees are given only appropriate formula, as determined by standard medical protocol and custom-tailored for the detainee's specific needs. The medical staff carefully monitors the process the entire time, adjusting the rate and amount of nutrients and fluids given if there are any indications of discomfort from the detainee. The comfort and safety of the patient is a priority for the medical staff.

16. (U) All detainees being enterally fed are assessed daily by a medical professional subject to regular and periodic review by a physician to ensure the feeding process is being safely administered and tolerated by the detainee. The detainee's health is closely monitored through direct observation and medical testing to ensure he receives the appropriate daily amounts of nutrition and hydration and to assess any complications or need for modification of the regime.

17. (U) When a detainee receives an enteral feed, he is placed in a restraint chair. A restraint chair is utilized to ensure the safety of the guard staff, medical staff, and the detainee. The restraint chair is also used in United States federal correctional facilities and provides the safest and most reliable method for the administration of the nutritional requirements needed to protect and preserve the detainee's health and life. The chair is not used to deliberately inflict pain on detainees, or as a form of punishment or retaliation against them. The chair is ergonomically designed for the detainee's comfort and protection, with a padded seat and padded back support. Straps are positioned to ensure the detainee is safely restrained. Furthermore, to ensure any risk is minimized, the detainee is constantly monitored by medical personnel while in the restraint chair.

18. (U) A detainee is only kept in the chair for the time required to administer a feeding and to ensure the nutritional supplement is digested properly. Therefore, an observation period is necessary to ensure the detainee has tolerated the feeding and to permit digestion of the nutritional formula. If the medical staff does not ensure the nutritional formula is properly digested, a detainee could induce vomiting and therefore place their health and life at greater risk. The entire process generally lasts less than an hour. Detainees are offered pain relievers, such as ibuprofen, if they indicate any discomfort from the feeding procedure.

### Reglan Use

UNCLASSIFIED//~~FOR OFFICIAL USE ONLY~~

19. (U) JMG protocol is to obtain voluntary and informed consent as a routine part of any testing, treatment or medical procedures, following a review of the risks and benefits with the detainee, as well as any available alternatives. In the absence of such consent, involuntary treatment or medication is only implemented when necessary to preserve the detainee's health and life. Reglan is very rarely used by our medical staff as there are other anti-nausea drugs that are just as effective. Reglan or other medications are not placed in the feed solutions, or otherwise given to a detainee, without his knowledge and consent.

### Meals During Ramadan

20. (U) JMG staff makes every effort to accommodate the religious and cultural practices of the detainees. As has been done in the past, barring any unforeseen emergency or operational issues, JTF-GTMO will accommodate religious practices during Ramadan, which begins on 8 July 2013. JTF-GTMO will modify the hours of meal delivery, including enteral feeding, in accordance with the fasting hours, and detainees will be provided with a mid-night snack. Although the number of enterally fed detainees is greater than in the past, JTF-GTMO has shifted existing resources and has sufficient medical personnel on hand to provide detainees with the proper nutrition in a manner that is in accordance with Ramadan's fasting requirements. Accordingly, enteral feedings will be administered after sundown each day during Ramadan. At the end of Ramadan, detainees may participate in morning Eid prayer and feast meals will be offered to all detainees on 8 and 9 August 2013. Upon completion of Ramadan, the standard enteral feed schedule will then resume.

### Medical Condition of Petitioners

21. (U) Nabil Hadjarab (ISN 238) is presently in good health. He is currently not hospitalized and at his last medical evaluation, all of his vital signs were normal. His current weight is 130 lbs, which is 95% of his ideal body weight of 136 lbs. Mr. Hadjarab was designated as a hunger striker on March 8, 2013. He was approved for enteral feeding on 21 March, 2013 and, since then, he has at times been enterally fed and at times chosen to consume food and nutritional supplements orally. Although Mr. Hadjarab was prescribed Reglan on 21 March 2013 on an as needed basis, he declined the medication and it has not been prescribed since that time.

22. (U) Shaker Aamer (ISN 239) is presently in good health. He is currently not hospitalized and at his last medical evaluation, all of his vital signs were normal. His current weight is 157 lbs, which is 95% of his ideal body weight of 165 lbs. Mr. Aamer was designated as a hunger striker on 25 March 2013, but has not been approved for enteral feeding. Mr. Aamer has never been prescribed nor administered Reglan.

23. (U) Ahmed Belbacha (ISN 290) is presently in good health. He is currently not hospitalized and at his last medical evaluation, all of his vital signs were normal. His current weight is 120 lbs, which is 85% of his ideal body weight of 140 lbs. He was designated as a hunger striker on March 7, 2013. He was approved for enteral feeding on April 13, 2013 and, since then, he has at times been enterally fed and at times chosen to consume food and nutritional supplements orally. The JMG is aware of his prior nasal surgery and therefore makes every effort to accommodate his situation during the enteral feeding process. Mr. Belbacha has never been prescribed nor administered Reglan.

24. (U) Abu Wa'el (Jihad) Dhiab (ISN 722) is presently in good health. He is currently not hospitalized and at his medical evaluation, all of his vital signs were normal. His current weight is 155 lbs, which is 81% of his ideal body weight of 190 lbs. He was approved for enteral feeding on March 23, 2013 and, since then, he has at times been enterally fed and at times chosen to consume food and nutritional supplements orally. Mr. Dhiab has never been prescribed nor administered Reglan.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true, accurate and correct.

Dated: 7/3/13

(U//FOUO) ███████
Commander, Medical Corps, U.S. Navy