**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ABU WA'EL (JIHAD) DHIAB, | : |
| Petitioner, | : |
| v. | : |
| BARACK H. OBAMA, <u>et al.</u> | : |
| Respondents. | : |

Civil Action No. 05-1457 (GK)

**<u>MEMORANDUM OPINION</u>**

Pursuant to Federal Rule of Civil Procedure 24 and Local Rule of Civil Procedure 7(j), Hearst Corporation, Inc., ABC, Inc., Associated Press, Bloomberg L.P., CBS Broadcasting, Inc., The Contently Foundation, Dow Jones & Company, Inc., First Look Media, Inc., Guardian US, The McClatchy Company, National Public Radio, Inc., The New York Times Company, Reuters America LLC, Tribune Publishing Company, LLC, USA TODAY, and The Washington Post ("Press Applicants" or "Intervenors") seek to intervene and to unseal twenty-eight videotapes that have been entered into the record of the above captioned matter.

Before filing their Motion to Intervene and to Unseal Videotape Evidence, Intervenors conferred with counsel for Petitioner Abu Wa'el (Jihad) Dhiab ("Petitioner" or "Dhiab") and with the Government ("the Government" or "Respondents").

Petitioner consents to the intervention and does not oppose unsealing the videotapes. Intervenors' Mot. at 1 [Dkt. No. 263]. The Government does not object to Press Applicants' Motion to Intervene, but the Government opposes unsealing the videotapes. Intervenors' Mot. at 1; Resp'ts' Opp'n at 2.

Upon consideration of Intervenors' Motion to Intervene and to Unseal Videotape Evidence, Respondents' Opposition to Press Applicants' Motion to Unseal Videotape Evidence, Intervenors' Reply, and the entire record herein, and for the reasons stated below, Intervenors' Motion to Intervene is hereby **granted** and Intervenors' Motion to Unseal is hereby **granted**, with modifications.

## I.   BACKGROUND

### A.   Factual Background

Wa'el (Jihad) Dhiab, a citizen of Syria, has been held by the United States Government in a detention facility at the United States Naval Base in Guantánamo Bay, Cuba since as early as 2002.[1] [Dkt. No. 1]. In 2009, the Guantánamo Review Task Force cleared Mr. Dhiab for release from his ongoing detention at Guantánamo Bay. [Dkt. No. 175]. To this day, he remains imprisoned there. In protest of his indefinite detention, Mr. Dhiab has been on a long-term hunger strike. [Dkt. No. 175].

---

[1]    Petitioner alleges that the "precise date" of his transfer to Guantánamo Bay is "unknown to [his] counsel, but known to Respondents." [Dkt. No. 1 at ¶ 23].

On April 9, 2013, the Government notified Mr. Dhiab's counsel that, in response to his on-going hunger strike, it had begun to feed Mr. Dhiab nasogastrically against his will. [Dkt. No. 175]. Mr. Dhiab continues to undergo enteral feeding when the Government deems it necessary. Alka Pradhan Decl. at ¶ 6 [Dkt. No. 256].

The Government has explained that when prisoners fail to follow instructions, resist guards (or "demonstrate the intent to resist"), cause a disturbance, or endanger themselves or anyone else, they are removed from their cells and taken to the medical facilities where enteral feeding takes place. Col.Bogdan Decl. at ¶ 7 [Dkt. No. 288]. The military officials in charge of the Guantánamo Bay facility sometimes employ a method called Forced Cell Extraction ("FCE") in order to accomplish the feeding. The FCE procedures practiced at the Guantánamo Bay facility are modeled on those used by military corrections facilities and the Federal Bureau of Prisons. Col. Bogdan Decl. at ¶¶ 4, 5.

In May of 2014, the Government disclosed that it possessed videotapes of Mr. Dhiab's forced-feedings and forcible cell extractions. [Dkt. No. 217]. Mr. Dhiab has left no doubt that he wants these videotapes to be made public. Intervenors' Mot. at 1 [Dkt. No. 263]; Cortney Busch Decl. at ¶¶ 5-7 [Dkt. No. 287] (Paralegal's declaration recounting Mr. Dhiab's statements: "I

-3-

want Americans to see what is going on at the prison today, so they will understand why we are hunger-striking, and why the prison should be closed. If the American people stand for freedom, they should watch these tapes. If they truly believe in human rights, they need to see these tapes.").

### B.   Procedural Background

On July 22, 2005, Mr. Dhiab filed his Petition for a Writ of Habeas Corpus, asserting that his indefinite detention by the United States Government violated the U.S. Constitution, the Alien Tort Statute, 28 U.S.C. § 1350, and international law. [Dkt. No. 1]. His Petition further alleged that the conditions of his confinement violated the Fifth Amendment to the United States Constitution. [Dkt. No. 1].

On July 30, 2013, Mr. Dhiab and several other hunger-striking detainees submitted a motion to enjoin the Government from continuing to enterally feeding them. [Dkt. No. 175]. This Court denied the Motion for a Preliminary Injunction for lack of subject matter jurisdiction. [Dkt. No. 183].

On February 11, 2014, our Court of Appeals held that this Court does have subject matter jurisdiction to hear Guantánamo Bay detainees' challenges to the conditions of their confinement. See Aamer v. Obama, 742 F.3d 1023, 1038 (D.C. Cir. 2014).

-4-

Accordingly, on April 18, 2014, Mr. Dhiab again filed a Motion for a Preliminary Injunction, requesting that the Court enjoin the Government from enterally feeding him and from forcibly extracting him from his cell. [Dkt. No. 203]. After Petitioner renewed his Motion, the Government disclosed that it possessed videotapes of Mr. Dhiab's forced-feedings and FCEs. [Dkt. No. 217].

On May 13, 2014, Petitioner filed an Emergency Motion for an order compelling the Government to preserve videotapes of Mr. Dhiab's forced-feedings and forcible cell extractions and to produce those videotapes to Petitioner's counsel. [Dkt. No. 217]. On May 23, 2014, the Court granted Petitioner's Motion in part, and directed the Government to produce to Petitioner's counsel "all videotapes made between April 9, 2013 and February 19, 2014, that record both [Mr. Dhiab's] Forcible Cell Extractions and subsequent enteral feeding." [Dkt. No. 225]. The Government complied with that Order, and later provided additional videotapes to Petitioner's counsel. [Dkt No. 250].

In a series of filings beginning June 14, 2014, Petitioner placed 28 videotapes in the judicial record for this case. [Dkt. Nos. 252, 262, 267]. The Government produced four additional videotapes to Petitioner and asserts that "they are substantially the same as the [other] 28 videos." Resp'ts' Opp'n at 4 n.3.

-5-

The videotapes have been classified at the "secret" level, RDML Butler Decl. at ¶ 7, based on the Government's belief that the contents of these twenty-eight videotapes "could reasonably be expected to cause serious damage to national security if disclosed[,]" Id. at ¶ 5. Thus, in accordance with the Court's standing protective order applicable to all Guantánamo Bay detainee habeas proceedings, the videotapes have been placed on the Court's docket under seal. [Dkt. No. 57 ¶ 47] (requiring all documents containing classified information to be filed under seal).

On June 20, 2014, Intervenors filed their Motion to Unseal Videotape Evidence filed in this proceeding's record. Intervenors' Mot. at 8. Members of the news media may properly intervene for the purpose of seeking to unseal judicial records. See In re Guantánamo Bay Detainee Lit., 624 F.Supp.2d 27, 31 (D.D.C. 2009) ("Detainee Lit. I"); See also Wash. Post Co. v. Robinson, 935 F.2d 282, 289-90 (D.C. Cir. 1991). Neither the Government nor Petitioner oppose Press Applicants' Motion to Intervene. Resp'ts' Opp'n at 2 n.1. Therefore, Intervenors' Motion shall be **granted.**

## II.  Standard for Unsealing Judicial Records

### A.    The First Amendment Right to Judicial Records

The First Amendment's express guarantees of free speech, freedom of the press, and the right to petition the government

carry with them an implicit right of public access to particular government information. Richmond Newspapers Inc. v. Virginia, 448 U.S. 555, 575-76 (1980). Our Court of Appeals has held that "[t]he first amendment guarantees the press and the public a general right of access to court proceedings and court documents unless there are compelling reasons demonstrating why it cannot be observed." Washington Post v. Robinson, 935 F.2d 282, 287 (D.C. Cir. 1991) (emphasis added).

As Judge Hogan explained in Detainee Lit. I, 624 F.Supp.2d at 35, in order to determine whether a particular proceeding and related judicial records are subject to the public's right of access, courts apply a two-part test, commonly referred to as the test of "experience and logic," Press-Enterprise Co. v. Superior Court, 478 U.S. 1, 8-9 (1986) ("Press-Enterprise II"). The first prong of that test asks whether there is a history of access to the proceeding. Press-Enterprise II, 478 U.S. at 8-9. The second prong considers whether public access "plays a significant positive role in the functioning of the particular process in question." Id. Failure at either stage of the test is fatal to a First Amendment public access claim. See United States v. El-Sayegh, 131 F.3d 158, 161 (D.C. Cir. 1997).[2]

---

[2]     In addition to the First Amendment right of access to judicial records, the Supreme Court has recognized a common law right "to inspect and copy judicial records." Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978); see also In re

-7-

The public's right of access, once established, is a
qualified one. Limits on the public's right to access judicial
records are appropriate only upon the demonstration of an
"overriding interest based on findings that closure is essential
to preserve higher values." Press-Enterprise Co. v. Superior
Court, 464 U.S. 501, 510 (1984) ("Press-Enterprise I"). "The
[overriding] interest [must] be articulated along with findings
specific enough that a reviewing court can determine whether the
closure order was properly entered." Id.

The party seeking closure must show a "substantial
probability" of harm to an "overriding interest" which has been
identified; even a "reasonable likelihood" of harm does not
suffice. Press Enterprise II, 478 U.S. at 14 (California statute
providing for closure of preliminary hearings "upon finding a
reasonable likelihood of substantial prejudice" placed "a lesser

---

NBC, 653 F.2d 609, 612 (D.C. Cir. 1981). Although courts
traditionally avoid constitutional questions if adequate
statutory or common law relief is available, our Court of
Appeals has made clear that courts should look first to the
Constitutional right of access where judicial records are at
issue. Washington Post v. Robinson, 935 F.2d 282, 288 n.7 (D.C.
Cir. 1991) ("Appellant also claims that there is a common law
right of access to court records and documents. Like our sister
circuits, however, we reach the constitutional issues raised in
the appeal because of the different and heightened protections
of access that the first amendment provides over common law
rights"). Because the Court finds that Intervenors have a
Constitutional right of access to the videotapes at issue, it
need not reach Intervenors' common law claim.

burden on the defendant than the 'substantial probability' test which . . . is called for by the First Amendment.").

Any limit on public access that a court does impose must be "narrowly tailored to serve that interest." Press Enterprise I, 464 U.S. at 510. Complete closure of the judicial record is proper only in the absence of any alternatives that would provide adequate protection. Robinson, 935 F.2d at 290.

### B. Court Discretion to Seal Judicial Records

In a trio of cases--Bismullah, Parhat, and Ameziane--our Court of Appeals developed the standard for determining whether information on the docket of Guantánamo Bay detainee habeas cases may be sealed from public disclosure. In order to keep judicial records under seal, "the [G]overnment first must demonstrate what kind of information requires protection and why, and then must show exactly what information in the case at hand it seeks to protect." Ameziane v. Obama, 699 F.3d 488, 495 (D.C. Cir. 2012) (emphasis in original).

First, in Bismullah v. Gates, 501 F.3d 178, 187-89 vacated 554 U.S. 913 (2008), reinstated, Order, No. 06-1197 (D.C. Cir. Aug. 22, 2008), petitions dismissed for lack of jurisdiction, 551 F.3d 1068 (D.C. Cir. 2009) the Court of Appeals considered how and when to protect the sensitive information common to the Guantánamo Bay detainee habeas cases and made clear  that "[i]t is the court, not the Government, that has discretion to seal a

judicial record, which the public ordinarily has the right to inspect and copy." (internal citations omitted). Accordingly, the Court rejected a Government proposal that would have granted it the authority to determine unilaterally whether unclassified information is "protected" and therefore kept under seal. Id.

Second, in Parhat v. Gates, 532 F.3d 834, 852-53 (D.C. Cir. 2008), the Court of Appeals further explained that in order to maintain records under seal, the Government must provide an "explanation tailored to the specific information at issue" rather than "spare, generic assertions of the need to protect information." The Court rejected the Government's motion to protect from public disclosure "all nonclassified record information that it has labeled law enforcement sensitive, as well as the names and identifying information of all U.S. government personnel mentioned in the record." Id. at 235 (internal quotation marks omitted.) The Court concluded that "[b]y resting its motion on generic claims, equally applicable to all of the more than one hundred other detainee cases now pending in this court, the government effectively 'proposes unilaterally to determine whether information is protected.'" Id. (citing Bismullah, 501 F.3d at 188).

Third, in Ameziane v. Obama, 699 F.3d 488, 494-95 (D.C. Cir. 2010) (citing Parhat, 532 F.3d at 853) (internal quotation marks omitted), the Court set out a two-part test to govern the

sealing of judicial records in detainee cases: the Government must put forth "at a minimum, [1] a specific, tailored rationale for protecting a general category of information, and [2] a precise designation of each particular item of information that purportedly falls within the category described.'"   The Court observed that "the narrower the category for which the government seeks protection, the more likely the government's rationale will be sufficiently tailored[,]" although, the government need not provide "a specific and distinct rationale addressed to each detainee's situation." <u>Ameziane</u>, 699 F.3d at 495.

## III. ANALYSIS

### A.   Whether the Qualified Right of Access to Judicial Records Extends to Classified Documents

The Court is well aware, as the Government has emphasized, that in no case involving Guantánamo Bay detainees has any court ordered disclosure of classified information over the Government's opposition.   However -- to be clear -- that does not mean that in a given factual situation no court has the discretion to do so if warranted.   Quite the contrary. Our Court of Appeals has stated that it is the judiciary's responsibility, when ruling on an issue as overwhelmingly important as diminution of our precious First Amendment rights, to ensure that classification of the items in question, i.e., the FCE

videos, is proper.[3] See McGehee v. Casey, 718 F.2d 1137, 1148 (D.C. Cir. 1983).

Following the two-step test of Press-Enterprise II, Judge Hogan in Detainee Lit. I first determined that "access to habeas proceedings has been historically available." Detainee Lit. I, 624 F.Supp.2d at 35. Recognizing that "the D.C. Circuit has been silent on the issue," Judge Hogan noted that "other Circuits have opined and uniformly held that the public has a First Amendment right of access to civil proceedings and records," Id. at 36, and concluded that "[a] petition for a writ of habeas corpus is a civil proceeding[,]" Id. at 35 (citing Fay v. Noia, 372 U.S. 391, 423 (1963)).

Under Press-Enterprise II's second prong, the Court found "that 'public access plays a significant positive role in the functioning' of these habeas proceedings." Detainee Lit. I, 624 F.Supp.2d at 36 (quoting Press-Enterprise II, 478 U.S. at 8). "Publicly disclosing the factual returns [produced in the habeas proceedings] would enlighten the citizenry and improve

---

[3]   The fact the judicial records sought are videotapes, rather than written documents, does not affect the analysis. See, e.g., In re ABC, 537 F. Supp. 1168, 1170 n.4 (D.D.C. 1982) (the right of access "extends to records which are not in written form, for example, videotapes"); cf. United States v. Graham, 257 F.3d 143, 153-54 (2d Cir. 2001) (videotape relied upon by court subject to common law access right even though not admitted into evidence); Application of CBS, Inc., 828 F.2d 958 (2d Cir. 1987) (common law access right applies to videotape of deposition presented to jury); United States v. Criden, 648 F.2d 814 (3d Cir. 1981) (same).

perceptions of the proceedings' fairness." Id. at 37 (citing New York Times Co. v. United States, 403 U.S. 713, 728 (1971) (Stewart, J., concurring) (observing that in the areas of national defense and international relations, "the only effective restraint upon executive policy and power ... may lie in an enlightened citizenry")). Moreover, "[d]isclosing the factual returns to the public would also benefit both parties. . . . The government's detention decisions would gain the legitimacy that accompanies transparency." Detainee Lit. I, 624 F.Supp.2d at 37.[4]

Respondents deny that the qualified right of access identified by the Court in Detainee Lit. I extends to the videotapes at issue here. They contend, first, that the history of access to habeas corpus proceedings and records does not extend to classified information. Second, pointing to dicta in Detainee Lit. I, 624 F.Supp.2d at 37 ("any positive role would be severely diminished if the public gains access to classified information"), the Government argues that when a document has been deemed classified by the Executive Branch, that fact alone should bind the court to conclude that public access would not play a significant positive role. Resp'ts' Opp'n at 18-21.

---

[4]     While the factual returns at issue in Detainee Lit. I were not classified, the Government argued that they should have been deemed "protected" and therefore not subject to public access. 624 F.Supp.2d at 38.

By applying the test of experience and logic directly to
classified information, the Government misreads Press Enterprise
II, 478 U.S. at 8-9. Courts must consider the history and
virtues of access to particular proceedings, not the information
that may arise during those proceedings. See Press-Enterprise II
478 U.S. at 8-9 (comparing the history and virtues of open jury
trials with the necessary "secrecy of grand jury proceedings").
Once the right of access to a proceeding has been established,
courts may use narrowly tailored measures to protect compelling
interests, like the safeguarding of sensitive information. See
Robinson, 935 F.2d at 290 (D.C. Cir. 1991).

In addition to misconstruing Press-Enterprise II, the
Government's arguments, if accepted, would displace the Court's
power to seal its own record, putting that authority in the
Government's hands alone.  However, the Court of Appeals in
Busmillah, 501 F.3d at 188, clearly stated that "[i]t is the
court, not the Government that has discretion to seal a judicial
record."

The Fourth Circuit, in In re Washington Post Co., 807 F.2d
383, 391-92 (4th Cir. 1986), concluded that although the
Executive has the sole authority to determine what information
is properly classified for its purposes, only the judiciary has
the discretion to seal or unseal a judicial record. While the
Court admitted to being "troubled . . . by the risk that

-14-

disclosure of classified information could endanger the lives of both Americans and their foreign informants, [it was] <u>equally troubled by the notion that the judiciary should abdicate its decision-making responsibility to the executive branch whenever national security concerns are present.</u> History teaches us how easily the spectre of a threat to 'national security' may be used to justify a wide variety of repressive government actions. A blind acceptance by the courts of the government's insistence on the need for secrecy, without notice to others, without argument, and without a statement of reasons, would impermissibly compromise the independence of the judiciary and open the door to possible abuse." <u>Id.</u> (emphasis added).

**B.  Application of <u>Press Enterprise II</u> and <u>Parhat</u> to the Twenty-Eight Video Tapes**

The Government identifies five means by which release of the videotapes would give rise to a substantial probability of harm to a compelling interest: (1) the videos could aid the development of countermeasures to FCEs; (2) depictions of camp infrastructure in the videos could allow detainees or others to disrupt the camp; (3) detainees might respond to release of the videos by deliberately trying to behave in such a way that necessitates greater use of the FCEs; (4) the videos could "inflame Muslim sensitivities overseas" or be used as propaganda; (5) release of the videotapes could subject Mr.

Dhiab to "public curiosity" and "could affect the practice of other states in this regard, which would in turn dilute protections afforded U.S. service personnel in ongoing overseas contingency operations and future conflicts." Resp'ts' Opp'n at 27.

### 1.    The Government's Burden

In order to seal the judicial record and defeat the public's qualified right of access, the Government carries a heavy burden. It must put forth "at a minimum, [1] a specific, tailored rationale for protecting a general category of information, and [2] a precise designation of each particular item of information that purportedly falls within the category described." Ameziane, 699 F.3d at 494-95 (citing Parhat, 532 F.3d at 853) (internal quotation marks omitted). The reasons it gives for protecting the information must demonstrate a "substantial probability of harm" to an "overriding interest." Press-Enterprise II, 478 U.S. at 14.

As already noted, the fact that the Government has unilaterally deemed information classified is not sufficient to defeat the public's right. See Bismullah, 501 F.3d at 188. Even when the Government's reasons for classification point to a substantial probability of harm, the Court must assure itself that the justifications given are "rational and plausible." See McGehee, 718 F.2d at 1149. The Government must provide "reasoned

and detailed explanations" and courts "must . . . satisfy themselves . . . that the [Government] in fact had good reason to classify." Id. at 1148-49.

In short, it is our responsibility, as judges, as part of our obligation under the Constitution, to ensure that any efforts to limit our First Amendment protections are scrutinized with the greatest of care. That responsibility can not be ignored or abdicated.

Therefore, when the sealed facts are already public, maintaining documents under seal is only appropriate when, despite what the public already knows, the documents' release would still give rise to a substantial probability of harm. See Robinson, 935 F.2d at 291-92 (unsealing a plea agreement because Government's concerns that "release of a plea agreement may threaten an ongoing criminal investigation, or the safety of the defendant and his family" were unfounded when "the fact that the plea agreement was entered into in exchange for McWilliams' cooperation was already within the public knowledge."); see also In re The Herald Co., 734 F.2d 93, 101 (2d Cir.1984) ("Though the basis for apprehending harm to the defendant is apparent, the record raises a question as to whether the information sought to be kept confidential has already been given sufficient public exposure to preclude a closure order on this account.").

-17-

Our Court of Appeals has cautioned that while "it is our customary policy to accord deference to the President in matters of foreign affairs . . . [the] detainee cases are unique." Ameziane, 699 F.3d at 494 (emphasis added) (internal citations and quotation marks omitted). "Because of the independent role carved out for the judiciary, and our concomitant obligation to balance the needs of the government against the rights of the detainee, and also to preserve to the extent feasible the traditional right of public access to judicial records grounded in the First Amendment, we exercise greater caution in deciding to defer." Id. The Court must give deference when it is due, but "deference is not equivalent to acquiescence." Campbell v. U.S. Dep't of Justice, 164 F.3d 20, 30 (D.C. Cir. 1998).

This Court viewed the initial 28 videos made by the Government, and has read, re-read, and carefully analyzed the Declaration of Rear Admiral Richard W. Butler, which contains the Government's justification for opposing disclosure of the forced-feeding and FCE videos in this case, as well as Exhibit 1 attached to his Declaration.

In reviewing Rear Admiral Butler's justifications for closure, the Court finds -- as it will now detail -- that most of them are unacceptably vague, speculative, lack specificity, or are just plain implausible.

-18-

### 2. The Government's Concerns

#### a. Development of Countermeasures

At several points, the Declaration relied on by the Government refers to the possibility that "detainees and other enemies" may develop countermeasures to the FCE and forced-feeding procedures. RDML Butler Decl. at ¶ 12; accord. Id. at ¶¶ 11-14. Nowhere does the Government specify what these "countermeasures" may be or what form they might take.

Paragraph 13 discusses enteral feeding videos, which depict, among other things, "the layout of the enteral feeding space, location of equipment that [according to the Government] could be used as a weapon, and the number of personnel involved [in the enteral feeding process]." The declaration states that the "release of any footage of this type provides the enemy with opportunity to search for weaknesses and vulnerabilities exposing FCE and medical personnel to possible attack." (emphasis added). Paragraph 13 also states that "[p]ublic release of FCE videos could . . . provide detainees with the ability to devise new ways to thwart the enteral feeding process[.]" However, the detainees subjected to forced-feeding are already intimately familiar with the enteral feeding process and facilities. Moreover, the Government has already released substantial information relating to the feeding process, including the layout of and equipment in the enteral feeding

-19-

space.[5] It strains credulity to conclude that release of these videos has a substantial probability of causing the harm the Government predicts.

Paragraphs 11, 12, 14, and 17 of the Declaration all amount to a claim that release of the "videos" "poses risk to military personnel as detainees and other enemies armed with such information can develop countermeasures to FCE tactics and procedures[,]" Id. at ¶ 12. Paragraph 17, in particular, claims that upon release of the "videos" detainees could obtain information from relatives that would help them develop FCE "countermeasures." This statement is particularly difficult to understand. The fact of the matter is that all detainees' communications with outsiders are closely monitored by the personnel at Guantánamo Bay.[6]

_____

[5]    See, e.g., DVIDS, Joint Medical Group (Apr. 10, 2013), available at http://www.dvidshub.net/image/920530/joint-medical-group#.U9Qkv4BdWv0 (picture of feeding chair); http://www.dvidshub.net/image/920537/joint-medical-group#.U9QlL4BdWv0 (picture of enteral feeding preparation kit); http://www.dvidshub.net/image/920535/joint-medical-group#.U9QldIBdWv0 (same); http://www.dvidshub.net/image/920549/joint-medical-group#.U9Pq3oBdWv0 (gallery of sixteen images showing, among others, "medical stay area inside the Joint Medical Group"); see also Joint Task Force Guantánamo Bay, Cuba, Joint Medical Group, MEDICAL MANAGEMENT OF DETAINEES ON HUNGER STRIKE (March 5, 2013) [Dkt. 203-7].

[6]    P. Finn & J. Tate, Guantánamo Bay detainees' family members may be allowed to visit, Wash. Post (May 11, 2011), available at http://www.washingtonpost.com/national/Guantánamo-bay-detaineesfamily-members-may-be-allowed-to-visit/2011/05/11/AFGAMtsG_story.html (reporting that the "[a]ll

-20-

More generally, it is not sufficient to say that release of the videotapes "poses risk to military personnel" because enemies "can develop countermeasures." RDML Butler Decl. at ¶ 12; see also Id. at ¶ 14 ("Divulging videos of [FCEs and enteral feedings] could reasonably be expected to result in the development of countertactics"). The Government's burden is to show a "substantial probability" of harm to a compelling interest. Press Enterprise II, 478 U.S. at 14 (statute providing for closure of preliminary hearings "upon finding a reasonable likelihood of substantial prejudice" placed "a lesser burden on the defendant than the substantial probability test which . . . is called for by the First Amendment.").

Furthermore, the Government's claim that release of the videos would lead to unspecified FCE "countermeasures" is implausible. The detainees are already familiar with the tactics used to extract them from their cells and enterally feed them, and detailed descriptions of the procedures are publicly available on the internet.[7]

----

conversations [between detainees and their families] are monitored by the military").

[7]  See Joint Task Force Guantánamo Bay, Cuba, Joint Medical Group, MEDICAL MANAGEMENT OF DETAINEES ON HUNGER STRIKE (March 5, 2013) [Dkt. 203-7]; Joint Task Force – Guantánamo, CAMP DELTA STANDARD OPERATING PROCEDURES §§ 24.1-24.3 (Mar. 1, 2004), available at http://www1.umn.edu/humanrts/OathBetrayed/sop_2004.pdf (procedures governing Immediate Reaction Force ("IRF") teams at Guantánamo).

The Government notes that some elements of the FCE procedure are performed outside the detainees' view. RDML Butler Decl. at ¶ 12. But those procedures, described in minute detail, are already in the public sphere.[8] Bureau of Prison regulations, on which the Guantánamo Bay regulations are modeled, Resp'ts' Opp. 3; Bogdan Decl. at ¶ 4, are public,[9] as are analogous state regulations.[10] One fact the government specifically worries about -- that the videos would show the number of guards involved in the FCE procedure, Resp'ts' Opp'n at 5; RDML Butler Decl. at ¶ 10 -- is easy to locate on-line.[11]

Given what is already available to the public and known to the detainees, it simply is not plausible to argue that release of the videos will give rise to an additional probability of harm by encouraging the development of FCE countermeasures.

---

[8]   Id.

[9]   See Federal Bureau of Prisons Program Statement P5566.06, Subject: Use of Force and Application of Restraints; 28 C.F.R. § 552.21 et seq.

[10]   See, e.g., Cal. Dep't of Corr. & Rehab., Operations Manual § 51020.12.3, available at http://www.cdcr.ca.gov/regulations/Adult_Operations/DOM_TOC.html; Fla. Admin. Code §33-602.210, available at http://florida.eregulations.us/rule/33-602.210; Minn. Dep't of Corr., Policies, Directives, and Instructions Manual, available at http://www.doc.state.mn.us/DocPolicy2/html/DPW_Display_TOC.asp?Opt=301.081.htm.

[11]   Joint Task Force – Guantánamo, CAMP DELTA STANDARD OPERATING PROCEDURES §§ 24.1-24.3 (Mar. 1, 2004), available at http://www1.umn.edu/humanrts/OathBetrayed/sop_2004.pdf   ("There will be primary and alternate [Immediate Reaction ("IRF")] team[s] designated for each camp. IRF teams consist of five guards.").

Robinson, 935 F.2d at 292 (unsealing plea agreement because it was not "evident how such disclosure could pose any extra threat to the safety of [the defendant] and his family" when the defendant's cooperation with the government was public knowledge "already validated by an official source") (emphasis added).

### b.   Disclosure of the Physical Layout of Camp Infrastructure

A number of paragraphs in Rear Admiral Butler's Declaration argue that release of the "videos" would allow adversaries to reconstruct considerable portions of the camp infrastructure, thereby threatening the security of the camps. See, e.g., RDML Butler Decl. at ¶¶ 10, 15. Intervenors note that significant information about the infrastructure of the Guantánamo camp is already in the public domain. Unlike the information about the FCEs, which is similar to but distinct from the information in the videos themselves, Intervenors contend that public information about the infrastructure of the camp is the same information the Government here attempts to seal. Moreover, they point out that the Government itself has released this information.[12]

---

[12]    C. Rosenberg, A prison camps primer, Miami Herald (June 15, 2014),                        available                        at http://www.miamiherald.com/2014/06/15/2558413/web-extra-a-prison-camps-primer.html (describing layout and details of various camps within Guantánamo); R. Johnson, Inside Gitmo: An Exclusive Tour of the Most Notorious Prison on Earth, Business Insider      (Apr.      25,      2013),      available      at

For example, the Government has released pictures of cellblocks and medical facilities, surveillance rooms, and actual pictures of several camps, which include images of medical facilities. [13] The Government claims that release of images of medical facilities could allow detainees to find items that might be used as weapons and that public knowledge of infrastructural information could facilitate disruption of good order and discipline within the camps. In the face of what the Government has already released, its concerns are simply not "rational or plausible." See McGehee, 718 F.2d at 1148.

Ameziane made clear that courts may consider the Government's own prior release of information when choosing whether to seal a record. Ameziane, 699 F.3d at 498 (Although "it was error to rely on third parties' purported knowledge of his cleared status[,]" "it would have been proper to consider whether the government already had publicly acknowledged

---

http://www.businessinsider.com/gitmo-guantanamo-bay-photo-tour-2013-4?op=1 (providing photographs of various parts of Guantánamo, including a medical treatment room and occupied cellblocks); Explorer: Inside Guantánamo, NAT'L GEOGRAPHIC CHANNEL (Apr. 5, 2009) ("Inside Guantánamo I"), at 3:38-4:44, 11:38-14:27, 18:30-19:30, 25:34-28:00, 36:09-37:17 (cellblock), 2:13-3:38, 14:39-15:06, 18:00-18:29 (exterior and interior of holding cells), 37:19-34 (force-feeding chair), available at https://www.youtube.com/watch?v=B4J6_tCy8To; see also Inside Guantánamo, 60 MINUTES (Nov. 3, 2013) ("Inside Guantánamo II"), at 2:46-3:11 (cellblock), 9:53-10:22 (exterior and interior of holding cells), 10:23-30 (surveillance room), available at http://www.cbsnews.com/news/inside-Guantánamo/.
[13]     Id.

Ameziane's clearance for transfer."). Accordingly, the Government cannot meet its burden by simply asserting that information regarding the infrastructure of the camp is critical to national security when it has already released the very same information to the public. Ameziane, 699 F.3d at 495 requires the Government to provide "a specific, tailored rationale for protecting a general category of information" and identify "each particular item of information that purportedly falls within the category." It has failed to do so.

### c.   Use of the Videos as Propaganda

Paragraphs 18, 21, 22, 23, and 24 all warn that the public release of FCE and enteral feeding "videos," not necessarily Mr. Dhiab's videos, would prove useful as propaganda for Al Qaeda and its affiliates and could increase anti-American sentiment, thereby placing the lives of United States service members at risk.

As we have seen in recent years, terrorists of all stripes and ideologies have long been attempting to create anti-American sentiment abroad by using publications as recruiting material for new members.

However, courts have long rejected arguments to abridge the First Amendment that would give rise to a "heckler's veto." Brown v. Louisiana, 383 U.S. 131, 133 n.1 (1966). The rights afforded by the First Amendment cannot be defeated "simply

-25-

because [the rights exercised] might offend a hostile mob."
Forsyth Cnty., Ga. v. Nationalist Movement, 505 U.S. 123, 134-35
(1992). As was aptly stated in ACLU v. Department of Defense,
389 F.Supp.2d 547, 576 (S.D.N.Y. 2005), "[t]errorists . . . do
not need pretexts for their barbarism."[14] Accordingly, "fear of
blackmail is not a legally sufficient argument to prevent [the
court] from performing a statutory command[,]" Id. at 575, much
less, complying with a Constitutional mandate.

### d.    Detainee Behavior that Would Require More FCEs

The Government also contends that if any videotapes of FCEs
were to be released, other prisoners would be more likely to
engage in disruptive behavior, endangering themselves,
Guantánamo Bay staff and, eventually, national security. RDML
Butler Decl. at ¶ 16; Resp'ts' Opp'n at 27. This justification
for denying the public's First Amendment right of access to
judicial records fails to show a substantial probability of
harm.

Paragraph 18 of RDML Butler's Declaration claims that "if
video recordings of forced cell extractions" were released to
the public, detainees would become aware of this and react by

---

[14]    Congress subsequently passed legislation that temporarily
exempted the photos at issue in ACLU from disclosure under the
Freedom of Information Act. See Protected National Security
Documents Act of 2009, 123 Stat. 2184, Pub. L. 111-83, Title V,
§ 565 (Oct. 28, 2009). Pursuant to the language of the statute,
that temporary exemption later expired.

behaving in ways "likely [to] result in more [FCEs]." This argument fails to show a substantial probability of harm and is entirely too speculative to defeat the public's right of access. Intervenors' Motion does not ask that all videotapes of all FCEs performed at Guantánamo Bay be released to the public. They ask only to unseal those tapes that compose the particular record for this proceeding. Nothing in this Court's decision would give Guantánamo Bay detainees the unilateral right to publicize videos of their own FCEs.

### e.  Public  Curiosity  and  International Reputation

What the Government means when it worries that "any portion of the videotapes containing an image of the Petitioner could expose him to public curiosity" is not immediately apparent. Opp'n at 28. Mr. Dhiab has been clear that he wishes release of the videotapes. It is hard to believe that Mr. Dhiab -- whose particular videos are the only ones at issue -- would be offended or distressed by knowing that the public was able to view his treatment at Guantánamo Bay. Given the extensive publicity about his situation, and the fact that on any number of occasions his lawyers have talked to members of the press to describe his plight, the Government's concern that he would be harmed in any way by release of the videos is not plausible.

Rear Admiral Butler claims in Paragraph 20 that release of "videos, of detainees subject to forced cell extraction or enteral feeding would raise serious questions by United States allies and partners and others in the international community as to whether the United States is acting in accordance" with what he states is our country's "longstanding policy to protect detainees from public curiosity, consistent with the Geneva Conventions."

The Government's claim, if accepted, would turn the Third Geneva Convention on its head. Rather than a source of rights to humane treatment, Article 13 would become a means to shield from public view treatment that Mr. Dhiab (and undoubtedly other detainees) believe to be inhumane. Am. Civil Liberties Union v. Dep't of Def., 543 F.3d 59, 91 (2d Cir. 2008) cert. granted, judgment vacated on other grounds, 558 U.S. 1042 (2009) ("Release of the photographs [showing mistreatment of Abu Ghraib prisoners] is likely to further the purposes of the Geneva Conventions by deterring future abuse of prisoners. To the extent the public may be 'curious' about the Army photos, it is not in a way that the text of the Conventions prohibits; curiosity about enemy prisoners being subjected to mistreatment through the streets is different in kind from the type of concern the plaintiffs seek to inspire.") (internal citations and quotation marks omitted).

-28-

**6.    Personally Identifying Information about Members of the FCE Team and the Possibility of Covert Communication**

The Government contends, Resp'ts' Opp'n at 9-10, 29, and Intervenors acknowledge, Intervenors' Reply at 20-21, that protection of the identities of Guantánamo Bay staff is a legitimate goal. Such protection, however, does not require complete sealing of the videotapes. Adequate protection can be provided by appropriate audio and visual edits, for example, screening names and voices, blurring faces and identifying portions of uniforms, and blacking-out written materials on walls. The Government's concerns regarding the possibility of covert communications through the released videos can likewise be so addressed. Complete closure is only appropriate when there are no reasonable alternatives. Robinson, 935 F.2d at 290. That is not the case here.

**IV.   CONCLUSION**

For the foregoing reasons, Intervenors' Motion to Intervene and to Unseal Videotape Evidence is hereby **granted with specified conditions.**

October 3, 2014

Gladys Kessler
United States District Judge

**Copies to**: attorneys on record via ECF