IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABU WA'EL (JIHAD) DHIAB (ISN 722),<br><br>*Petitioner*,<br><br>v.<br><br>BARACK H. OBAMA, *et al.*,<br><br>*Respondents*. | Civil Action No. 05-CV-1457 (GK) |

**RESPONDENTS' MOTION TO STAY ORDER UNSEALING
CLASSIFIED VIDEOS PENDING POSSIBLE APPEAL
AND REQUEST FOR AN ADMINISTRATIVE STAY**

Respondents are considering whether to appeal the Court's Order of October 2, 2014 (ECF No. 348), ordering, for the first time in any Guantanamo habeas proceeding,[1] the public disclosure of classified information and substituting (contrary to established precedent) the Court's judgment for that of Executive Branch officials reflected in the record that the release of the classified information could reasonably be expected to cause serious harm to national security.  Because compliance with the Court's Order requiring Respondents to redact 32 classified videos that record Petitioner being removed from his cell via Forced Cell Extraction (FCE) would moot Respondents' right to appeal, Respondents respectfully move to stay the Order pending final resolution of any appeal of the Order or until Respondents decide not to appeal the Order.[2]  "[C]ourts have routinely issued stays where the release of documents would

---

[1] *See* Mem. Op. at 11 (Oct. 3, 2014) (ECF No. 349) (noting that "in no case involving Guantanamo Bay detainees has any court ordered disclosure of classified information over the Government's opposition").

[2] Counsel for Respondents have conferred with counsel for Petitioner and for Press Applicants regarding the relief requested in this motion.  Counsel for Petitioner indicated they oppose this motion, but would be willing to consent to an extension of seven days to complete redaction of the videos.  Counsel for Press Applicants indicated that they would be willing to consent to a stay conditioned on Respondents completing redactions and filing the redacted videos with the Court by October 31, 2014, on expedition of certain deadlines related to any appeal, and a schedule for release of the redacted videos following any appeal or decision not to appeal.  For the reasons discussed below, Respondents are unable to agree to the redaction and release schedule proposed by Press Applicants.  However, Respondents can agree to expedition of any appeal they might take of the Court's Orders.

moot a defendant's right to appeal." *People for the Am. Way Found. v. U.S. Dep't of Education*, 518 F. Supp. 2d 174, 177 (D.D.C. 2007) (collecting cases in the FOIA context).

The schedule imposed by the Court's Order of October 9, 2014 (ECF No. 355), which requires that redactions must be completed by Friday, October 17, 2014, does not afford the government sufficient time to determine whether an appeal will be taken under applicable Department of Justice procedures,[3] much less for any such appeal to be resolved by that date. In any event, even were disclosure appropriate pending a possible appeal, Respondents could not meet the October 17 deadline.[4] Two weeks is not enough time for Respondents to review more than 11 hours of video and implement the complex redaction process necessary to comply with the Court's Order.

For this reason, Respondents also request that the Court grant an immediate administrative stay of the Order pending resolution of Respondents' motion for a stay. Respondents further request that, should the Court deny Respondents' motion for a stay pending resolution of any appeal, the Court grant a week-long stay after such denial to permit Respondents to seek stay relief in the Court of Appeals and permit the Court of Appeals a reasonable time to act on Respondents' request. In light of the exigency occasioned by the Court's October 9 Order, the Government requests that the Court, subject to its schedule, rule on the request for an administrative stay as soon as possible. The Government anticipates that it will be compelled to seek an emergency stay from the Court of Appeals shortly after 3:00 pm, Friday, October 17, 2014, if its request for an administrative stay is delayed or denied.

**ARGUMENT**

A stay pending appeal is appropriate where (1) the moving party has a substantial likelihood of success on the merits; (2) the moving party will suffer irreparable injury absent the

---

[3] Respondents have until 60 days after the date of the Order to file a notice of appeal. F.R.A.P. 4(a)(1)(B).

[4] Respondents note that the parties were not consulted regarding the schedule for disclosure and did not learn that the Court was considering such a tight schedule until nine days' before the current deadline.

stay; (3) the stay will not substantially injure the other parties interested in the proceeding; and (4) the public interest will be served by a stay. *Nken v. Holder*, 129 S.Ct. 1749, 1761 (2009); *United States v. Philip Morris, Inc.*, 314 F.3d 612, 617 (D.C. Cir. 2003) (citing *Washington Metro. Area Transit Comm'n, v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)). These factors are not prerequisites to be met, but rather considerations to be balanced. Thus, "[a] stay may be granted with either a high probability of success and some injury, or vice versa." *Cuomo v. Nuclear Regulatory Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). Where the movant has established substantial irreparable harm and the balance of harms weighs heavily in its favor, it need only raise "serious legal questions going to the merits" to obtain a stay pending appeal. *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986) (quoting *Wash. Metro. Area Transit Comm'n*, 559 F.2d at 844); *see Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979) (where "the denial of a stay will utterly destroy the status quo, irreparably harming appellants, but the granting of a stay will cause relatively slight harm to appellee, appellants need not show an absolute probability of success in order to be entitled to a stay").

     Here, enforcement of the Order before any appeal is heard and resolved will undoubtedly cause Respondents irreparable injury, forcing the disclosure of classified information with no remedy and wasting significant time and resources should Respondents prevail on appeal. The balance of harms and the public interest heavily favors a stay. Respondents' arguments are likely to succeed on the merits of any appeal and, in any event, raise serious legal challenges to the Court's findings and holdings. For these reasons, a stay pending the government's determination whether to appeal (and, should an appeal be taken, pending resolution of that appeal) is warranted, as is an administrative stay pending resolution of this motion.

**A.     The Government Would Suffer Certain and Immediate Irreparable Harm in the Absence of a Stay**

**1.     Compliance with the Court's Order Would Moot Respondents' Right to Appeal and Cause Irreparable Injury**

Compliance with the Court's Order would irreparably harm Respondents, as it would deprive them of a meaningful opportunity to contest on appeal this Court's determinations that the public has a right of access to classified information used in judicial proceedings and that the release of the FCE videos is unlikely to cause serious harm to national security. Any disclosure compelled by the Court's Order, once made, could not be undone. The prospect of such compelled disclosure constitutes irreparable harm and militates in favor of a stay. *See John Doe Agency, et al. v. John Doe Corp.*, 488 U.S. 1306, 1308–09 (1989) (Marshall, J., in chambers) (issuing stay in FOIA action and observing that disclosure of documents would moot defendant's ability to appeal, thereby resulting in irreparable injury); *People for the Am. Way Found.*, 518 F. Supp. 2d at 177 (stay necessary "to avoid irreparable injury to [the government] by having to release documents prior to having the opportunity to seek meaningful appellate review"); *Providence Journal Co.*, 595 F.2d at 890 (concluding that irreparable harm exists where the failure to enter a stay will irrevocably destroy the status quo); *Center for Int'l Envtl. Law*, 240 F.Supp.2d at 22 (D.D.C.2003) (issuing limited stay in FOIA action "because disclosure of the documents in question will render any appeal moot").

The harm is magnified by the classified nature of the information that would be disclosed if the Court's Order is carried out before Respondents have an opportunity to appeal. As discussed in more detail in Respondents Opposition to the Motion to Unseal, Background § I (ECF No. 288), and in the Declaration of Rear Admiral Richard W. Butler (RDML Butler Decl.) (ECF No. 288-1), the FCE videos "could reasonably be expected to cause serious damage to national security if disclosed," *id.* ¶ 5, and, so, are properly classified SECRET, *id.* ¶ 7. In support of this conclusion, RDML Butler lists several serious harms that are likely to occur if the videos are disclosed to the public. First, disclosing the videos poses a risk to military personnel

4

as detainees and other enemies armed with such information can develop countermeasures to FCE tactics, techniques, and procedures. RDML Butler Decl. ¶ 12. Second, disclosure of the physical layout of the camp infrastructure would allow an adversary to discover how detainees are housed in response to various acts of misconduct, information that could be provided to detainees to allow them to manipulate the system, disrupt good order and discipline within the camps, and enable them to test, undermine, and threaten physical and personnel security. *Id.* ¶ 16-17. Third, some detainees would likely respond to public release of FCE videos by behaving in such a way as to require more frequent FCEs that would be recorded and potentially released to the public, increasing the risk of injury to both detainees and military personnel at Guantanamo. *Id.* ¶ 18. Fourth, the videos could be altered and manipulated to increase anti-American sentiment and inflame Muslim sensitivities overseas, thereby placing the lives of U.S. service members at risk. *Id.* ¶ 21-22. Fifth, release of the videos would be contrary to the Government's commitment to a firm policy of protecting detainees from public curiosity and could affect the practice of other states in this regard, which would in turn dilute protections afforded U.S. service personnel in ongoing overseas contingency operations and future conflicts. *Id.* ¶ 20.[5] Dilution of these protections could significantly damage national security. *Id. See Int'l Counsel Bureau*, 906 F. Supp. 2d at 6 (citing several of these harms in finding that videos of FCEs—even still images from such videos—were properly classified at the SECRET level and thus properly withheld under FOIA). Although the Court disagrees with Respondents' assessment of these harms, *see* § C.2, *infra*, failure to grant the stay would usurp the ability of Respondents to seek review of, and the Court of Appeals to consider, as appropriate, these important issues with respect to whether public disclosure of the FCE videos can reasonably be expected to cause serious harm.

---

[5] RDML Butler also explained how public disclosure of the FCE videos would reveal personally identifying information of the FCE team members and other Guantanamo personnel, placing them and their families at risk of physical harm and harassment. *Id.* ¶¶ 38-41. The Court has allowed Respondents to redact information that could identify Guantanamo personnel.

5

### 2.     Redaction of the Videos Before any Appeal is Resolved Would Impose an Unnecessary and Heavy Burden on Respondents and, in any Event, Could not be Completed By the Court's Deadline

The Court's Order allows Respondents to redact "all identifiers of individuals in the video[s] (i.e., faces other than [Petitioner's], voices, names, etc.)" in the 32[6] FCE videos before producing them. While the government would certainly want to undertake these redactions to protect to the extent possible the identities of service members and other individuals depicted on the videos, this redaction process will be a time-consuming, lengthy, and burdensome process that cannot be completed on the timeline set by the Court's Order. Redaction will be conducted by the Department of Defense Security Classification/Declassification Review Team ("DoD SC/DRT"). Declaration Regarding Redaction Process ("Redaction Process Dec'l") ¶ 16.[7] The DoD SC/DRT ensures that documents used in habeas cases, other criminal and civil litigation in federal courts, military commission proceedings, and Periodic Review Boards are properly classified and declassified as needed. *Id.* ¶ 3. Since January of this year, the DoD SC/DRT has reviewed more than 47,000 pages of documents. *Id.* ¶ 7 The team is currently processing approximately 3,000 pages, most of them due before November 1, 2014, and, in addition, has a numerous other documents awaiting review. *Id.* As military commission proceedings continue to progress towards trial, the workload is expected to increase substantially. *Id.* ¶ 10. Since the Court issued its order requiring redaction of the FCE videos by October 17, the DoD SC/DRT has been working to determine the appropriate organization to redact the videos, devise a process to make redactions and protect against inadvertent release of identifying information, and formulate an estimate of how long redaction will take. *Id.* ¶ 16.

---

[6] Though the Court's Order refers to 28 videos, Respondents have produced to Petitioner's counsel pursuant to Court orders, and Petitioner has entered into the record, a total of 32 FCE videos that Respondents believe are covered by the Court's Order.

[7] A public version of this declaration, with certain sensitive information related to personal identity and internal DoD procedures redacted, is attached to this motion. Respondents neither cite nor rely on the redacted portions of this declaration and have designated the redacted information as "Protected" pursuant to the Protective Order. Respondents will file an unredacted copy of the declaration under seal and serve it via email on Petitioner's counsel (who have filed the Memorandum of Understanding required by the Protective Order to permit them access to protected information) shortly after filing this motion.

The DoD SC/DRT has access to only three video editing workstations; consequently, the team will be able to work on only three videos at a time.[8]  *Id.* ¶ 20.a.  The entire process will take approximately 15 to 19 hours per video, assuming there are no unexpected problems: (1) approximately 3 hours to conduct an initial review to identify what sections of the videos require redactions and to convert the videos into a format compatible with the video editing software, *id.* ¶ 17; and (2) approximately 12 to 16 hours to edit the video, which requires redacting audio, adding edit points, inserting paint effects, drawing elliptical masks over each face, enabling tracking on selected tracking points, checking and adjusting each mask over each face frame-by-frame, and exporting each video to a commonly supported format, *id.* ¶¶ 18, 20.e.[9]  At 15 to 19 hours per video, with three videos processed at a time, the entire effort will take approximately 25 business days, or 5 weeks, assuming there are no technical issues such as equipment breakdowns or interruption of work due to other court deadlines.  *Id.* ¶ 19.  Each video will require a DoD SC/DRT team member full-time throughout the entire process and a video technician to conduct the actual editing; this diversion of resources could significantly reduce the unit's capacity to perform on a timely basis the tasks necessary to support the many ongoing detainee-related proceedings and meet tight, often court-ordered deadlines.[10]  *Id.* ¶ 14-15, 19.  These efforts and the disruption to the DoD SC/DRT's work in these habeas proceedings, the ongoing military commission proceedings, the Periodic Review Boards, and other federal litigation will be entirely unnecessary if the Court's Order is ultimately reversed on appeal.

---

[8] Because the video editing will have to be done at an off-site location, the DoD SC/DRT team members assigned to this project will be unable to work on multiple projects simultaneously, as is the usual practice.  *Id.* ¶ 20.a.

[9] There are 30 frames per second of video.  *Id.* ¶ 20.c.  Frame-by-frame editing is necessary to reduce the risk of releasing identifying information which could be obtained through use of publicly available editing software to conduct frame by frame reviews or otherwise penetrate the edits.  *Id.* ¶¶ 20.c, 20.d.

[10] If disputes arise between the parties concerning the redactions taken, negotiation or litigation may require yet more effort by DOD SC/DRT's members and otherwise delay production of final redacted versions of the videos.

**B.     In Light of the Certain and Immediate Harm to Respondents, the Balance of Harms and the Public Interest Warrant a Stay**

Given the entirely irreparable and severe nature of the harm Respondents will suffer if they are denied a chance to meaningfully appeal the Court's Order, the balance of harms and the public interest heavily favor granting the stay. Any potential harm of a stay to Press Applicants, or the public, would be minimal, because a stay would merely postpone the moment of disclosure if Respondents ultimately appeal and are unsuccessful. *See Providence Journal Co. v. Fed. Bureau of Investigation*, 595 F.2d 889, 890 (1st Cir. 1979). "Weighing this latter hardship against the total and immediate divestiture of appellants' rights to have effective review in [the Court of Appeals], . . . the balance of hardship . . . favor[s] the issuance of a stay." *Id.* And a stay would protect the public's strong interest in ensuring that national security is not harmed by unwarranted disclosure of classified information. *See In re Guantanamo Bay Detainee Litig.*, 624 F.Supp. 2d 27, 36-37 (D.D.C 2009) (finding that "any positive role [of public access to habeas proceedings] would be severely diminished if the public gains access to classified information").[11]

**C.     Respondents Would Have a Strong Likelihood of Success on Appeal**

Respondents would have a strong likelihood of success should an appeal be pursued, thus supporting issuance of the requested stay. As to this factor, Respondents need not establish "an absolute certainty of success"; instead "[i]t will ordinarily be enough that the [movant] has raised serious legal questions going to the merits, so serious, substantial, and difficult as to make them fair grounds of litigation . . . ." *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986) (quoting *Holiday Tours*, 559 F.2d at 844). Respondents recognize that "the Court ultimately [does] not agree with [Respondents'] position" on release of the FCE videos, but even so, "it is evident that [Respondents'] have made out a 'substantial case on the merits'" that is

---

[11] To the extent the Court will rely on the classified FCE videos in drafting its opinion regarding Petitioner's Application for Preliminary Injunction, the Department of Defense declassification team will conduct an expedited review of the classified opinion to ensure a timely public release.

sufficient to "weigh[ ] in favor of a stay." *Ctr. For Int'l Envtl. Law v. Office of U.S. Trade Representative*, 240 F. Supp. 2d 21, 22 (D.D.C. 2003) (quoting *Holiday Tours*, 559 F.2d at 843). The Court itself acknowledges that never before in any Guantanamo detainee habeas litigation has a court ordered public disclosure of classified information. Mem. Op. at 11.

As an initial matter, the Court's Order is appealable at the least as a collateral order because it "(1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." *Ameziane v. Obama*, 699 F.3d 488, 493 (D.C. Cir. 2012) (reviewing order requiring disclosure of information deemed sensitive by government); *see also In re Reporters Comm. for Freedom of the Press*, 773 F.2d 1325, 1330 (D.C. Cir. 1985) (holding that "a district court order to unseal documents obtained in connection with a criminal trial [is] a collateral order capable of being appealed immediately") (citing *United States v. Hubbard*, 650 F.2d 293 (D.C. Cir.1980)); *In re Sealed Case*, 237 F.3d 657, 665 (D.C. Cir. 2001) (holding that a district court order unsealing a record was immediately appealable as a collateral order "[b]ecause the public would have had immediate access to the record, [and] the issue would have been effectively unreviewable by the time the district court had" issued a final judgment) ; *Oliner v. Kontrabecki*, 745 F.3d 1024, 1025 (9th Cir. 2014) ("We have jurisdiction because an order denying a motion to unseal or seal documents 'is appealable either as a final order under 28 U.S.C. § 1291 or as a collateral order.') (quoting *Foltz v. State Farm Mutual Auto. Ins. Co.*, 331 F.3d 1122, 1129 (9th Cir. 2003)).

### 1.     There is no First Amendment Right of Access to Classified Information Entered into Evidence in a Habeas Proceeding

Before a First Amendment right of access will attach to a particular proceeding, the entity seeking access must make two showings: first, that "the place and process" to which access is sought "have historically been open to the press and general public," and, second, that "public access plays a significant positive role in the functioning of the particular process in question."

*Press-Enterprise Co. v. Super. Ct. of Cal.*, 478 U.S. 1, 8-9 (1986) ("*Press-Enterprise II*") (criminal proceeding).  A failure to make either showing is fatal to a First Amendment access claim.  *United States v. El-Sayegh*, 131 F.3d 158, 161 (D.C. Cir. 1997); *In re Reporters Comm.*, 773 F.2d 1325, 1332 (D.C. Cir. 1985).  Whether the public has a qualified right to access filings in civil habeas proceedings is an open question in the D.C. Circuit.  *In re Guantanamo Bay Detainee Litig.*, 624 F.Supp. 2d at 34-35; *see also Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 934 (D.C. Cir. 2003) ("neither [the D.C. Circuit Court of Appeals] nor the Supreme Court has ever *indicated* that it would apply" the two-prong test described in *Press Enterprises II* "to anything other than criminal judicial proceedings").

Respondents' position is that the Court misapplied the *Press-Enterprise II* test in finding a First Amendment right to the classified information at issue.  Among other things, the Court disregarded that there is no history of public access to classified information in judicial proceedings.[12]  Indeed, the Court of Appeals has recognized the propriety of denying access to classified material in litigation even when access is being sought by a party to the suit rather than, as here, members of the public who are non-parties.  *See, e.g.*, *Holy Land Found. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003); *People's Mojahedin v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003); *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); s*ee also Abourezk v. Reagan*, 785 F.2d 1043, 1060 (D.C. Cir. 1986) (explaining that a litigant should be "accorded access to the decisive evidence [considered in a court proceeding] to the fullest extent possible," but only "without jeopardizing legitimately raised national security interests").[13]  The Protective Order in this case (ECF No. 57), which forbids the public disclosure of classified

---

[12] The Court also rejected Respondents' argument that the release of classified information would not serve a significant positive role in the functioning of these habeas proceedings.  *See* Resp'ts Opp'n to Mot. to Unseal at 20-21; *see also In re Guantanamo Bay Detainee Litig.*, 624 F.Supp. 2d 27, 36-37 (D.D.C 2009) (finding that "any positive role [of public access to habeas proceedings] would be severely diminished if the public gains access to classified information").

[13] In contrast to these cases, Respondents have already provided copies of the classified FCE videos to Petitioner's counsel.

information and requires that all filings that contain classified information be made non-publicly through the Court Information Security Officer, reflects the longstanding tradition of protecting classified information in judicial proceedings from public disclosure.

The Court's analysis also misapplies the holdings in three key Court of Appeals cases—*Bismullah v. Gates*, 501 F.3d 178, 187 (D.C. Cir. 2007) *cert. granted, judgment vacated*, 554 U.S. 913 (2008) and *on reconsideration*, 551 F.3d 1068 (D.C. Cir. 2009); *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir. 2008); and *Ameziane*—to support its conclusion that the Court has discretion to unseal classified judicial records. The Court quoted *Bismullah*'s admonition that "[i]t is the court, not the Government, that has discretion to seal a judicial record," Mem. Op. at 9-10 (quoting *Bismullah*, 501 F.3d 187-89). But, in context, the *Bismullah* court "rejected a Government proposal that would have granted it the authority to determine unilaterally whether *unclassified* information is 'protected' and therefore kept under seal." *Id.* (emphasis added). With regard to classified information, on the other hand, the *Bismullah* court did not require the Government to disclose, even to security-cleared counsel for detainees, classified information when the Government objected to such disclosure. The Court of Appeals did not require the Government "to disclose such information to counsel because, consistent with our rule of deference, '[i]t is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role.'" *Id.* at 187-88 (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 932 (D.C. Cir.2003)).

The Court's opinion notes that *Parhat* required the government to provide a tailored explanation when seeking to have unclassified information protected. Mem. Op. at 10. But in *Parhat*, the Court of Appeals was addressing the withholding of nonclassified information from public disclosure under the protective order issued in *Bismullah*, a protective order with entirely different provisions regarding classified information. *See Parhat*, 532 F.3d at 852 (noting that

11

"[c]lassified material is treated under separate provisions of the order") (citing *Bismullah v. Gates*, 501 F.3d 178, 188 (D.C. Cir.2007)).

The Court's opinion cites to *Ameziane*'s clarification of the test for sealing unclassified information first set forth in *Parhat*, requiring the government to show "[1] a specific, tailored rationale for protecting a general category of information, and [2] a precise designation of each particular item of information that purportedly falls within the category described." *See* Mem. Op. at 10-11 (internal quotation marks omitted). Yet the Court again fails to note that this two-part test addressed the sealing of unclassified information and did not address the issue of nondisclosure of classified information to the public.[14]

Because the Court failed to target its analysis and did not account for the strong tradition allowing withholding of classified judicial records from the public (as well as parties to the litigation at issue), and improperly applied rules that were expressly limited to nonclassified information, the likelihood of success prong weighs in favor of a stay.

### 2. Respondents have Demonstrated that Disclosure of the FCE Videos can Reasonably be Expected to Cause Serious Harm to National Security

The Court's opinion analyzes the harms of releasing the FCE videos under the two-step test set forth in *Parhat* and *Ameziane*. As an initial matter, the *Parhat/Ameziane* test does not apply to the disclosure of classified information. As explained above, the test set forth in *Parhat* and *Ameziane* dealt only with the sealing of nonclassified information and not with the withholding of classified information from public disclosure.

Even were use of the *Parhat/Ameziane* test appropriate, however, the Court's analysis misapplies it. "*Parhat* did not free courts to substitute their own policy judgments for those of the executive." *Ameziane*, 699 F.3d at 497. In *Ameziane*, the Court of Appeals overturned a district court order requiring disclosure of nonclassified but sensitive information because a

---

[14] The Court in *Ameziane* was addressing unclassified information the government sought to protect pursuant to the Protective Order in these habeas cases.

"district court [is] not entitled to toss the [Executive Branch's] [d]eclaration [supporting nondisclosure] aside merely because it disagree[s] with its premise[s]." *Id.* "[T]he failure to give deference when it is due is error." *Id.* Indeed, the Court of Appeals is all the more clear that a "rule of deference" applies with respect to issues of disclosure of classified information. *See Bismullah*, 501 F.3d at 187; *see also Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d at 932 ("It is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role."); ; *El-Masri v. United States*, 479 F.3d 296, 305 (4th Cir. 2007) ("[T]he Executive and the intelligence agencies under his control occupy a superior position to that of the courts in evaluating the consequences of a release of sensitive information."); *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998) (Declarations submitted in support of withholding of classified information "merit 'substantial weight.'") (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 217 (D.C. Cir.1987)); *McGehee v. Casey*, 718 F.2d 1137, 1148 (D.C. Cir. 1983) ("courts . . . should defer to [the Executive's] judgment as to the harmful results of publication" of classified information"). [15]

The Court did not accord deference, but rather substituted its judgment for that of the executive multiple times in evaluating the Butler Declaration. For example, in rejecting RDML Butler's explanation that release of video footage of FCEs poses a risk to military personnel because detainees and other enemies armed with such information could develop countermeasures to FCE procedures, RDML Butler Dec'l ¶ 12, the Court ignores RDML Butler's explanation that the fact that detainees have experienced FCEs themselves does not

---

[15] The Court also goes far beyond the review contemplated by the Court of Appeals in *McGehee*, *see* Mem. Op. at 11-12. In *McGehee*, the Court of Appeals "merely . . . determine[d] that the CIA properly classified the deleted items." 718 F.2d 1137, 1148, n.22. Classification at the SECRET level is proper when disclosure of the information could reasonably be expected to cause serious harm to national security, and the court's role is at most to determine if the cited harms are "rational and plausible." *Id.* at 1149. The Court applied what seems to be a much more stringent standard, requiring the government to demonstrate a "substantial probability of harm." Mem. Op. at 16 (internal quotation marks omitted).

13

change the value that videos of FCEs would have in permitting detainees, alone or with the help of others outside Guantanamo, to more thoroughly assess FCE procedures and develop countermeasures, *id.* Instead, the Opinion simply asserts that "detainees are already familiar with the tactics used to extract them," Mem. Op. at 21, substituting its judgment of the tactical value of video footage for RDML Butler's.

Similarly, the Court's analysis summarily concludes that the government has released "the very same information to the public" about the physical layout of the Guantanamo detention facilities without conducting any comparison between what is shown in the publicly released information and in the FCE videos. Mem. Op. at 23-25. The Court appears to have rejected RDML Butler's conclusions about how the public availability of other related information does not eliminate the likelihood of harm should the far more specific information in the videos be released. Furthermore, in reality, photos of the interior of the detention center that are released to the media are pre-screened to protect classified information.[16] Dec'l of RDML Kyle J. Cozad ("RDML Cozad Dec'l") ¶ 4. Indeed, this public information could be used in combination with information in the FCE videos to reveal even more information than the videos themselves. *Id. See also Int'l Counsel Bureau v. U.S. Dep't of Def.*, 906 F. Supp. 2d 1, 6 (D.D.C. 2012) (Bates, J.) (upholding SECRET classification of FCE videos because they "differ[ ] from the written descriptions of those videos [and] other disciplinary records" and rejecting argument that

---

[16] Moreover, the photos and videos showing selected portions of the physical layout and infrastructure only speak to one of the six independent reasons that release of the videos would harm national security. Nor do the various operating procedures the Court points to, Mem. Op. at 22, reveal the information contained in the FCE videos. First, the Camp Delta Standard Operating Procedures the Court cites, *id.* at 22, n.11, "do not fully reflect current operating procedures." RDML Cozad Dec'l ¶ 5. Second, most detainees at Guantanamo are housed in Camps 5 and 6, not Camp Delta, and none of the FCEs recorded in the videos took place in Camp Delta. *Id.* Third, the operating procedures to which the Court refers do not disclose many operational details that the FCE videos do. *Id.*; *see also* RDML Butler Dec'l ¶ 10. Fourth, the state and federal procedures that the Court contends disclose information in the FCE videos are not identical to the procedures used at Guantanamo, and those differences, many of which the videos disclose in detail, have not been publicly disclosed. RDML Cozad Dec'l ¶ 6; *see also id.* ¶ 4 ("[T]he videos include imagery of locations and details not viewed by the press and not the subject of imagery released to the public by JTF-GTMO. Additionally, the videos show procedures that have never been disclosed to the public in photos or videos as well as those procedures actually in use.").

14

previous release of such information undermined national security contentions where there was "no indication in the record that any portion of the FCE videos . . . were ever publicly released"); *see also Edmonds v. FBI*, 272 F. Supp. 2d 35, 49 (D.D.C. 2003) (upholding Government's classification designation where "the information that is being withheld is not identical to the information in the public domain"); *Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir.1990) (recognizing "unequivocally . . . that the fact that information resides in the public domain does not eliminate the possibility that further disclosures can cause harm. . . .").

The Court's analysis does not dispute RDML Butler's assessment that the public release of FCE videos "would prove useful as propaganda for Al Qaeda and its affiliates and could increase anti-American sentiment, thereby placing the lives of United States service members at risk." Mem. Op. at 24-25. But the Court nonetheless rejects this basis for withholding the videos from public disclosure, likening release to a heckler's veto, *id.* at 25 (citing *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966)), despite citing no authority for applying the heckler's veto concept to either the qualified First Amendment right of public access or assessments of the dangers of publicly disclosing classified information. And at least one judge has rejected the Court's conclusion that, because terrorists will commit barbaric acts whether the videos are released or not, it should not take into account the likely manipulation for use in propaganda, *see* Mem. Op. at 26 (citing *ACLU v. Dep't of Def.*, 389 F.Supp.2d 547, 575-76 (S.D.N.Y. 2005)). *See Int'l Counsel Bureau*, 906 F. Supp. 2d at 6 (citing the potential "manipulat[ion] and/or use[ ] as a propaganda tool" as one of the "particular harms and dangers to national security from disclosure" of FCE videos in support of its holding that the videos were properly withheld).

The Court's analysis also is dismissive of concerns about increased detainee resistance resulting in more FCEs should detainees become aware that FCE videos can be made public. Mem. Op. at 26-27. Although it is true that the Court's order does not give "detainees the unilateral right to publicize videos of their own FCEs," Mem. Op. at 27, RDML Butler's analysis

reflects the reasonable expectation, based on the accumulated expertise and knowledge the military has acquired while managing the detention center, that some detainees, upon becoming aware that a Court has ordered release of FCE videos, would endeavor to create opportunities to appear in videos that would be released to the public at a later date.  RDML Butler Dec'l ¶ 18; *see also McGehee*, 718 F.2d at 1149 (relying on supporting declarations' description of likely harms even though the risks "do not, of course, rise to the level of certainty").

Finally, the Court erred in dismissing the concerns expressed by RDML Butler about the harms caused by exposing Petitioner to public curiosity.  The Court points to Petitioner's desire to have the videos publicized, Mem. Op. at 27, but this does not fully address the harm caused by exposing him to public curiosity,[17] which is not limited to harm to Petitioner.  As explained by RDML Butler, disclosure of the FCE videos could result in damage to national security arising from a likely perception in the international community that the United States is unconcerned about the public release of images of detainees without legitimate purpose and the resulting dilution of protections available to military service members in overseas conflicts.  RDML Butler Decl. ¶ 20.  And, to the extent the Court concludes that airing videos of Petitioner better serves the goals of the Geneva Convention than withholding the videos, the Court has improperly substituted its own policy judgment for that of the executive.

Because the Court applied an inappropriate test to evaluate Respondents' evidence of the harms likely to arise from public disclosure of the FCE videos and because the Court did not defer to the Government's judgments as to harm from public disclosure of the videos, the likelihood of success factor supports issuance of a stay of the Court's Order.

---

[17] *Cf.* Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, art. 13 [1955] 6 U.S.T. 3316, T.I.A.S. No. 3364 (Third Geneva Convention) (prisoners of war "must at all times be protected . . . against insults and public curiosity"); *id.* art. 7 (prisoners of war may not renounce protections afforded them by the Convention in whole or in part, under any circumstances).

16

**CONCLUSION**

For these reasons, the Court should (1) stay its Orders of October 3, 2014 and October 9, 2014 pending Respondents' consideration of whether they will appeal those orders (and, should they do so, final resolution of the appeals), and (2) enter an immediate administrative stay until this motion is resolved, and should it be denied, until one week after such denial so that Respondents can seek relief from the Court of Appeals.

October 15, 2014                                                Respectfully submitted,

JOYCE R. BRANDA
Acting Assistant Attorney General

JOSEPH H. HUNT
Branch Director

TERRY M. HENRY
Assistant Branch Director

*/s/ Robert J. Prince*
ANDREW I. WARDEN (IN Bar 23840-49)
TIMOTHY B. WALTHALL
ROBERT J. PRINCE (D.C. Bar 975545)
PATRICK D. DAVIS
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530
Tel: 202.305.3654
E-mail: robert.prince@usdoj.gov

Counsel for Respondents