UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ABU WA'EL (JIHAD) DHIAB, | : |
| Petitioner, | : |
| v. | : Civil Action 05-1457 (GK) |
| BARACK H. OBAMA, *et al.*, | : |
| Respondents. | : |

MEMORANDUM OPINION

On April 18, 2014, Petitioner Abu Wa'el (Jihad) Dhiab ("Dhiab" or "Petitioner") filed an Application for Preliminary Injunction and an Immediate Order for Disclosure of Protocols Forthwith.[1] [Dkt. No. 203.] On May 7, 2014, the Government ("the Government" or "Respondents") filed its Opposition [Dkt. No. 214], and on May 12, 2014, Petitioner filed his Reply [Dkt. No. 215].

Thereafter, parties engaged in discovery and on June 20, 2014, Petitioner filed a Motion for Further Discovery in Aid of Application for Preliminary Injunction [Dkt. No. 265]. Following a hearing on August 12, 2014, the Court granted in part and denied in part Petitioner's Motion and ordered the Parties to complete all discovery [Dkt. No. 304].

On October 6, 7, and 8, 2014, the Court held a Hearing on Petitioner's Application for Preliminary Injunction ("the Hearing"). On October 17, 2014, the Parties filed Post-Hearing Briefs summarizing their positions in light of the evidence presented at the hearing [Dkt. Nos. 361, 362].

---

[1] The portion of Petitioner's application that sough disclosure of the current Standard Operating Procedures/Protocols directly addressing enteral feeding and/or the use of a restraint chair at Guantanamo Bay was resolved by the Court's Order of May 23, 2014 [Dkt. No. 225].

Upon consideration of the Application, the Opposition, the Response, Post-Hearing Briefs, testimony delivered by expert witnesses, representations made by the parties at the October Hearing including classified materials heard and viewed *in camera*, and the entire record herein, and for the reasons stated below, Petitioner's Application for Preliminary Injunction [Dkt. No. 203] must be **denied**.

## I. BACKGROUND

On July 22, 2005, Petitioner filed a Petition for Habeas Corpus [Dkt. No. 1]. In 2009, Petitioner was cleared for release by President Obama's Guantanamo Review Task Force [Dkt. Nos. 152, 172]. After five years, and as of this writing, he still remains held at the United States Naval Station at Guantanamo Bay, Cuba.

To protest his continued confinement, Mr. Dhiab, along with other detainees, has intermittently engaged in a hunger strike since March or April of 2013. On June 30, 2013, Petitioner filed an Application for a Preliminary Injunction ("2013 Application") [Dkt. No. 175]. In the 2013 Application, Petitioner sought to enjoin the Government from "subjecting petitioners to force-feeding of any kind, including forcible nasogastric tube feeding, and from administering medications related to force-feeding without the petitioners' consent." 2013 Application at 1.

On July 8, 2013, the Court denied Petitioner's Application for lack of jurisdiction. Memorandum Order [Dkt. No. 183] and on August 29, 2013, the Court denied Petitioner's Motion for Reconsideration of that Memorandum Order [Dkt. No. 192].

On February 11, 2014, our Court of Appeals affirmed the denial, but found that the Court did, in fact, have jurisdiction over Petitioner's challenge to the conditions of his confinement. Aamer v. Obama, 742 F.3d 1023, 1028-306 (D.C. Cir. 2014).[2]

On April 18, 2014, Petitioner filed his second Application for Preliminary Injunction ("2014 Application"). [Dkt. Nos. 203, 204 (sealed); 226-1 (unsealed exhibit)]. The Court then set a Motion Hearing on the 2014 Application for May 21, 2014. That hearing was converted to a Status Conference in order to resolve various discovery disputes that had arisen [Dkt. No. 221]. After the Status Conference, the Court ordered Respondents to produce certain items to Petitioner, including medical records and videotapes recording Mr. Dhiab's Forcible Cell Extractions and subsequent enteral feedings [Dkt. No. 225].

## II. CURRENT STATUS OF PETITIONER'S POSITION

Petitioner no longer seeks to enjoin all force-feeding; rather, he seeks to enjoin several practices and protocols allegedly involved in the force-feeding process. See Proposed Order [Dkt. No. 203-10]; Statement of Claims Asserted and Relief Requested [Dkt. No. 304]. The list of practices Petitioner contests has changed significantly since he initially filed his Second Application for a Preliminary Injunction on April 28, 2014. On August 14, 2014, in order to clarify the scope of Petitioner's challenge, the Court ordered Petitioner to submit a brief statement of the claims pursued and relief sought under his Application. [Dkt. No. 304].[3]

---

[2] In Aamer, the Court of Appeals consolidated Mr. Dhiab's appeal with those of two other Guantanamo Bay detainees: Ahmed Belbacha and Shaker Aamer.

[3] In addition to the practices cited in his Statement of Claims Asserted and Relief Requested, Petitioner initially sought to enjoin "genital searches in connection with enteral feeding[,]" the use of enteral feeding more than once per day, the use of feeding tubes larger than size 10 French, and
(continued...)

On August 18, 2014, Petitioner filed his Statement clarifying his objection to the following practices:

- Use of Forcible Cell Extraction or a Five Point Restraint Chair to transport Mr. Dhiab to or from force-feedings when he is willing to go compliantly;

- Denial of the use of either a wheelchair or crutches to go to and from force-feedings;

- Use of the Five Point Restraint Chair during force-feedings;

- Insertion and withdrawal of the nasogastric feeding tube on a daily or twice-daily basis instead of leaving the tube in place between feedings;[4]

- Vesting senior, non-medical military personnel, rather than physicians, with the final authority to determine whether detainees are force-fed; and

- Force feeding detainees before they are in imminent risk of death or great bodily injury [Dkt. No. 307].[5]

However, by the time of the hearing itself, Petitioner's requests had narrowed significantly and the Government had taken several positive actions which responded to his complaints. Those changes were:

---

[3](...continued)
treatment intended to induce vomiting or defecation during the enteral-feeding process. See Pet'r's Mot. for Prelim. Inj. [Dkt. No. 203]; Proposed Order [Dkt. No. 203-10]. Because Petitioner did not raise these issues in his Statement of Claims Asserted and Relief Requested [Dkt. No. 307], the Court does not reach them.

[4] In his Statement of Claims Asserted, Petitioner did not specifically raise the practice of using auscultation, see infra. pp. 12-13, to confirm nasogatric tube placement. However, because Petitioner raised the issue in his April 2014 Application for Preliminary Injunction, presented evidence on the practice at the Hearing, and both parties addressed the practice in their Post-Hearing Briefs, the Court will reach that issue.

[5] In his Statement of Claims Asserted, Petitioner also objected to the use of "rapid bolus force-feeding." However, Petitioner did not discuss the issue in his Post-Hearing Brief, nor did he present evidence on the subject at the Hearing. Consequently, the Court need not address that issue.

First, Mr. Dhiab made it clear that he did not want to die.

Second, he agreed to comply with the force-feeding procedure if he could use a wheelchair to get to the room in which feedings were given.

Third, the Government entered a Medical Order allowing Petitioner to use a wheelchair to go for his enteral feedings that, the Government represents, will remain in effect until September 1, 2015. Resp'ts' Ex. 33 at 3; Hr'g Tr. 52, Oct. 8, 2014.

Fourth, the Government stopped using olive oil for the insertion of nasogastric tubes and changed to a different lubricant.[6]

Fifth, the Government represented that there would be no Forcible Cell Extraction as long as Mr. Dhiab continued to walk from his cell to the wheelchair only a few steps away, used the wheelchair to go to the room in which the feedings were given, and was compliant with the feedings.

In short, many of the significant requests he had made in his Application were no longer subject to disagreement. The claims which now remain in dispute are:

--  First, whether the nasogastric tube should be left in place for at least three days rather than be inserted twice a day;

--  Second, whether the method of auscultation should not be used to ensure that the nasogastric tube has been properly inserted into Mr. Dhiab's stomach rather than his lungs;

--  Third, whether the Five Point Restraint Chair should not be used during force-feeding;

--  Fourth, whether current protocols lead to force-feeding before there is an immanent risk of death or serious physical injury; and

---

[6] Notably, Petitioner did not raise his challenge to the use of olive oil as a lubricant until the Hearing itself, long after the Government had ceased the practice. Hr'g' Tr. 10, Oct. 6, 2014; Pet'r's Br. at 19-20.

--     Fifth, whether non-medical military personnel should not be the final authority over whether detainees should be force fed.

## III.   LEGAL ANALYSIS

### A.   Subject Matter Jurisdiction

Our Court of Appeals has recently acknowledged that "challenges to conditions of confinement [of detainees at Guantanamo Bay] can properly 'be raised in a federal habeas petition under [28 U.S.C.] section 2241[.]" Hatim v. Obama, 760 F.3d 54, 58 (D.C. Cir. 2014) (reh'g denied (D.C. Cir. No. 13-5218)) (quoting Aamer, 742 F.3d at 1030, 1038). Accordingly, it is now clear that the Court has jurisdiction to hear Petitioner's claims. Id.[7]

### B.   Requirements for Granting a Preliminary Injunction

It has long been established that preliminary injunctions are "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." In re Navy Chaplaincy, 697 F.3d 1171, 1178 (D.C. Cir. 2012) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)); see also Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290,

---

[7] In its Opposition to Petitioner's Application for a Preliminary Injunction, filed months before the Hearing, the Government argued that Petitioner did not have standing to pursue his claims because, *inter alia,* he was not at that time approved for enteral feeding. Resp'ts' Opp'n at 20. Thus, the Government argued, Mr. Dhiab "cannot claim any current actual or imminent injury traceable to Respondents' enteral feeding policies." Id. Precisely one week after the Government made that statement to the Court, it resumed Mr. Dhiab's force-feedings. Resp'ts' Ex. 34 at 6.

The Government also argued that Mr. Dhiab lacked standing because he did not claim to have ever been subjected to many of the practices he then sought to challenge. Resp'ts' Opp'n at 20. As already noted, the scope of Mr. Dhiab's claims has narrowed since the submission of Respondents' Opposition. See Statement of Claims Asserted and Relief Requested [Dkt. No. 307]. The government does not repeat its standing argument in its Post-Hearing Brief. The Court is satisfied that Petitioner has adequately put forth the facts necessary to maintain the claims he pursues at this stage. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992) (discussing factual showing required to demonstrate standing in pleadings and at summary judgement).

297 (D.C. Cir. 2006) (noting that preliminary injunction is an "'extraordinary remedy that should ne granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion'") (quoting Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004))).

A party seeking a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction were not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).

The "first and most important factor" is whether Petitioner has "established a likelihood of success on the merits." Aamer, 742 F.3d at 1038. "[I]t remains an open question [in this Circuit] whether the 'likelihood of success' factor is 'an independent, free-standing requirement,' or whether, in cases where the other three factors strongly favor issuing an injunction, a plaintiff need only raise a 'serious legal question' on the merits." Id. at 1043-44 (quoting Sherley v. Sebelius, 644 F.3d 388, 393, 398 (D.C. Cir. 2011)); see also Davis v. Pension Ben. Guar. Corp., 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (discussing but not deciding whether Winter, 555 U.S. at 7 abrogated the "sliding scale" standard, which, following "an unusually strong showing on one of the factors," permitted movants to make a lesser showing on other factors).

It is clear, however, that "failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction even if the other three factors entering the calculus merit such relief." Chaplaincy, 454 F.3d at 297 (internal citation omitted). Our Court of Appeals has "set a high standard for irreparable injury," requiring that it be "both certain and great" and that the alleged harm is "actual and not theoretical." Id. at 297 (internal quotation marks and citation omitted).

Finally, this Court is well aware that the courts "traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." Munaf v. Geren, 553 U.S. 674, 689 (2008) (quoting Department of Navy v. Egan, 484 U.S. 518, 530 (1988)). Courts "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." Al-Adahi v. Obama, 596 F. Supp. 2d 111, 116 (D.D.C. 2009) (quoting Winter, 555 U.S. at 24).

### C. Standard of Proof

In Estelle v. Gamble, 429 U.S. 97, 104-106 (1976), the Supreme Court ruled that in assessing whether the government has met its obligation to provide medical care for those whom it incarcerates, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 105. Estelle requires prisoners challenging the adequacy of medical care to show "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Id. at 106. The medical need must be "objectively, sufficiently serious[,]" and the official denying care must have a "sufficiently culpable state of mind" to demonstrate "deliberate indifference to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 834 (1994) (internal quotation marks omitted).

Petitioner argues that it is Turner v. Safley, 482 U.S. 78, 89 (1987), not Estelle, that applies. Turner established the standard for constitutional challenges to prison regulations and held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. (emphasis added). However, Petitioner has failed to identify any constitutional right or rights offended by the challenged practices. Thus, in effect, he is challenging the day to day procedures that the medical staff at Guantanamo Bay use

to carry out their mission, rather than making a constitutional challenge as Turner requires. Indeed, Petitioner has failed to offer any legal authority where a court has relied on the Turner analysis to question the procedures used to force-feed hunger-striking prisoners. The Government cites numerous cases that rely on Estelle. Resp'ts' Br. at 4-7.

Petitioner also argues that the very recent Hatim case from our Court of Appeals supports his position, but that is simply not accurate. Hatim, 760 F.3d at 54. Hatim had absolutely nothing to do with medical care of prisoners, and is distinguishable on that basis alone. Id. Moreover, since the petitioner in that case was making the requisite constitutional challenge under Turner -- claiming violation of his Sixth Amendment right to have access to counsel -- the Court did not even mention Estelle or the "deliberate indifference" standard.

For these reasons, the Court concludes that the appropriate standard to be applied is that enunciated in Estelle v. Gamble and will now turn to the merits of Petitioner's Motion.

## IV. THE MERITS OF PETITIONER'S REMAINING CLAIMS

### A. Insertion of the Nasogastric Tube

Petitioner challenges the Government's practice of inserting and removing the nasogastric tube each time he is force-fed. He argues that daily reinsertion of the tube causes him needless pain, creates the possibility of infection, and increases the risk that the tube will be placed into his lung rather than his stomach. Pet'r's Br. at 22 (citing Pet'r's Ex. 25 at ¶¶ 3(d), 8(a)). At one point, Petitioner cites medical literature and his experts' testimony, claiming that nasogastric tubes may be left in place for as long as four weeks without harm. Pet'r's Br. at 23 (citing Pet'r's Ex. 32, Hr'g Tr. 61, Oct. 6, 2014; Hr'g Tr. 50, Oct. 7, 2014). He requests that, at the very least, the tube be left in for three days. Hr'g Tr. 12, Oct. 6, 2014.

In opposing Petitioner's position, the Government relies on the affidavit of a Senior Medical Officer at Guantanamo Bay and medical literature to establish that removal of the nasogastric tube after each feeding is common in detention settings. Resp'ts' Ex. 2 at ¶ 24; Resp'ts' Ex. 27 at 133; see also White v. Suneja, 2013 WL 1144466 at *3 (S.D. Ill. Mar. 19, 2013) ("[D]aily feeding tube changes are common practice for inmates who are otherwise able to dislodge their own tubes."). Contrary to the testimony of Petitioner's expert, affidavits from the military medical officers assert that the risk of infection decreases, rather than increases, with daily removal. Resp'ts' Ex. 2 at ¶ 24; Resp'ts' Ex. 4 at 2-4; Resp'ts' Ex. 13 at 2-3.

The Government also persuasively detailed the complications that had resulted from allowing hunger strikers at Guantanamo Bay to keep their nasogastric tubes in place between feedings, including use of the tubes to purge recently force fed nutrients, ear, nose, and throat problems, and manipulation and destruction of the feeding tubes. Resp'ts' Ex. 10 at ¶ 18; Resp'ts' Ex. 11 at ¶ 12.

The Government's Medical Officers stated that tube removal after each enteral feeding reduces the risk of infection inherent in keeping a foreign object in place in the body. Resp'ts' Ex. 2 at ¶ 24; Ex. 4 at 2-4; Ex. 13 at 2-3. In 2005, when the medical staff was managing a large scale hunger strike, the nasogastric tubes were kept in place for longer periods of time. See Resp'ts' Ex. 11 at 3-5, 8, 12; Ex. 13 at 3. That policy led to increased incidence of security breaches and violence, including attacks on the medical staff at Guantanamo Bay, and was ultimately changed. Resp'ts' Ex. 9 at 4-5, 8-9; Ex. 11 at 15-16. See Resp'ts' Ex. 4 at 4; Ex. 13 at 13. Indeed, one detainee bit his feeding tube in half which resulted in endoscopic removal of the portion still in his stomach. Moreover, the length of tube that would have to remain in place for the longer period of time requested by Petitioner would be sufficient for a detainee to asphyxiate himself or other

detainees. See Resp'ts' Ex. 4 at 4; Ex. 13 at 3. That policy led to increased incidences of security incidents and violence, including attacks on the medical staff at Guantanamo Bay and was ultimately changed. See Resp'ts' Ex. 9 at 4-5, 8-9; Ex. 11 at 15-16. See Resp'ts' Ex. 4 at 4; Ex. 13 at 3.

One of the Petitioner's own experts, Dr. Crosby, admitted in her testimony that if a detainee was psychotic, combative, suicidal, or generally causing risk to himself or others, removing the tube between feedings would be appropriate and safer. Hr'g Tr. 61, Oct. 6, 2014.

Finally, the experience of Petitioner's experts was limited to inserting nasogastric tubes in compliant patients in a traditional hospital setting. In such an accommodating setting, they testified that tubes may safely remain in place for a longer period of time if medically appropriate. Their testimony denying that the insertion and removal of the tube between feedings is appropriate in the context of treating hunger striking detainees was unpersuasive.

As to the existence of pain, the evidence produced at the Hearing regarding pain was very mixed. The Government produced highly credible evidence that enteral feeding is rarely painful. Resp'ts' Ex. 4 at 3, 6-7; Resp'ts' Ex. 13 at 2-4; Resp'ts' Ex. 26 at 7.[8] Indeed, Petitioner's experts did not disagree. Hr'g Tr. 83-89, Oct. 6, 2014; Hr'g Tr. 54, Oct. 7, 2014. Furthermore, there is evidence in the record, including Mr. Dhiab's medical chart, that he often tolerates the procedure without complaints of pain or significant discomfort. See e.g., Resp'ts' Ex. 5 at ¶ 12; Resp'ts' Ex. 34 at 1-13. There are also entries in the medical records that he has complained of pain and nasal bleeding because of the tube insertions. Pet'r's Ex. PX050 at 224, 248. Yet these isolated incidents are not enough to show that the practice of daily insertion rises to the level of deliberate indifference.

---

[8] The current Senior Medical Officer stated in an affidavit that when he began his stint at Guantanamo Bay, he personally subjected himself to the insertion procedures and did not find it painful. See Resp'ts' Ex. 4 at 3, 6-7.

a method to confirm the proper placement of nasogastric tubes. See Resp'ts' Ex. 22 at 260; Resp'ts' Ex. 24 at 1-2; Resp'ts' Ex. 25 at 1; Resp'ts' Ex. 26 at 12; Resp'ts' Ex. 27 at 132. Petitioner's expert, Dr. Myles, in discussing his objections to use of auscultation, also never mentioned the additional water test that medical staff at Guantanamo Bay use to confirm the proper placement of the tube.

It is true that the immediate past SMO has admitted that "auscultation is not the preferred method in the medical community," and "the use of a chest x-ray . . . is the standard in the medical community." Resp'ts' Ex. 2A at ¶ 23; see also Hr'g Tr. 66, Oct. 7, 2014). However, he justified the use of the auscultation instead of x-rays because the latter "presents a risk to patients in the form of exposure to radiation, which would not be tenable for long term enteral feeding patients at Guantanamo who are enterally fed one to two times daily over a period of many years." Resp'ts' Ex. 2A at ¶ 23. Given the problems that Guantanamo Bay staff have been presented with in terms of leaving the nasogastric tube in for longer periods of time, the fact that medical staff has chosen to insert the tube twice a day makes it impossible to use a chest x-ray which, it must be remembered, Dr. Myles was recommending in the compliant civilian medical community, not within the context of detainees at Guantanamo Bay.

For these reasons, the Court cannot find the staff at Guantanamo Bay exhibited deliberate indifference in using the auscultation procedure to protect detainees from improper placement of the nasogastric tube.

### C.     Use of Five Point Restraint Chair

Use of the Five Point Restraint Chair is standard operating procedure at Guantanamo Bay for all enteral feedings. Resp'ts' Ex. 19A at 38-66. Mr. Dhiab, who suffers back pain from a long-ago automobile accident, complains that the Five Point Restraint Chair severely worsens that pain, and

For the reasons stated, the Court concludes that Petitioner has failed to show any deliberate indifference on the Government's part as to the insertion and withdrawal of the nasogastric tube, and has failed to show that continued daily insertion would lead to irreparable harm.

### B.   Use of Auscultation

Petitioner criticizes the use of auscultation, a procedure to ensure that the nasogastric tube is properly pushed into the stomach, rather than the lungs. Auscultation involves pushing a small amount of air through the nasogastric tube while medical staff listen for bubbles with a stethoscope. The sound of bubbles indicates placement in the stomach rather than the lungs. During placement, medical staff also injects small amounts of water into the feeding tube so that if it has been misplaced into the lungs instead of the stomach, the water will trigger a cough and alert medical staff to the misplacement.

Petitioner argues, through the testimony of his experts, that an x-ray would be far more reliable to ensure that the tube had not been misplaced. Pet'r's Br. at 26-27 (citing Hr'g. Tr. 49-50, 66 (Oct. 7, 2014)). The Government responds that daily or twice daily x-rays would expose Mr. Dhiab to unsafe levels of radiation. Petitioner's answer is to leave the nasogastric tube in place for several weeks, obviating the risk of frequent x-rays. The Government also provides evidence that auscultation is an acceptable method for confirming nasogastric tube placement. Resp'ts' Ex. 22 at 260; Resp'ts' Ex. 24 at 1-2; Resp'ts' Ex. 26 at 12; Resp'ts' Ex. 27 at 132.

Petitioner's expert witness contended that while there had once been disagreement among the medical community as to the appropriateness of auscultation, the issue had been resolved against that procedure. Hr'g Tr. 66, Oct. 7, 2014. However, the Government presented evidence from respected medical authorities, including children's hospitals, recommending use of auscultation as

that he wants to be fed while being restrained with only a single-point restraint on his wrist or ankle. Pet's Ex. 50 at 250; Statement of Claims [Dkt. No. 307].

The Government rests its use of the Five Point Restraint Chair on a number of reasons: (1) to properly position and stabilize detainees during insertion of the nasogastric tube; (2) to ensure the proper amount of food is fed to detainees and not vomited during or immediately after the force-feeding; and (3) to keep the guard staff, as well as the medical staff, safe from physical retaliation. Resp'ts' Ex. 2 at ¶ 30; Resp'ts' Ex. 6 at ¶¶12-13; Resp'ts' Ex. 8 at 2.

The Government contends that the Restraint Chair is ergonomically designed, that the seat and back are padded, that the restraint straps secure detainees safely, and that Mr. Dhiab remains in the restraint chair only during the period necessary for his enteral feeding. While the duration of a feeding varies,[9] the Court notes that there are times when Mr. Dhiab's enteral feeding took close to two hours because he was talking with other detainees who are being fed. See Hr'g Tr. 23, Oct. 6, 2014.

The Government justifies its use of the Restraint Chair by noting that in the past, there have been attacks on both medical and guard staff during use of the one-point Restraint Chair Mr. Dhiab requests. In particular, Mr. Dhiab himself has a history of violent and disruptive behavior. The Government states that since April 1, 2014, Mr. Dhiab has engaged in numerous physical assaults, threats of murder, throwing feces and vomit at guards, and physically striking and kicking medical and guard staff. See Resp'ts' Ex. 14 at ¶ 4 and Resp'ts' Ex. 1 at 274, 879.

---

[9] The time for his feedings varies from just a few minutes to over two hours. Resp'ts' Ex. 34.

Mr. Dhiab asks that his enteral feedings take place in the camp's "media space" because, since 2013, six other, hunger-striking detainees have been receiving their force-feedings in that area, using only a One Point Restraint Chair. As to them, the Government explained that it had modified the force-feeding protocol for them in particular in an effort to encourage them to improve their eating habits and overall health since they had been part of a long-term, non-religious fasting since 2007 and were fully compliant with the feedings. Resp'ts' Ex. 2 at ¶ 30; Resp'ts' Ex. 6 at ¶ 14 Resp'ts' Ex. 8 at 2.

This Court has been asked before to evaluate the propriety of the Government's Restraint Chair policy. See Al-Adahi v. Obama, 596 F. Supp. 2d 111 (D.D.C. 2009). As the Court noted in Al-Adahi, "[r]esolution of this issue requires the exercise of penal and medical discretion by staff with the appropriate expertise, and is precisely the type of question that federal courts, lacking that expertise, leave to the discretion of those who do possess such expertise." Id. at 122. Furthermore, the Government has provided evidence that in 2005, it did consider and experiment with less-restrictive options, but discontinued them because of instances of resistance and assaults against staff. Resp'ts' Ex. 9 at ¶¶ 4-5, 8-9.

While the Court has no doubt that at times Mr. Dhiab has found the chair to be extremely uncomfortable, there is simply no evidence that the Government uses the Five Point Restraint Chair-- which is used for all hunger-striking detainees--in order to deliberately cause him pain or suffering. For all these reasons, the Court concludes that Petitioner has not submitted sufficient evidence to demonstrate deliberate indifference on the part of the Government.

### D.     Final Authority to Allow Forced-Feeding

Petitioner claims that the Government inappropriately vests non-medical officials with the right to determine whether a particular detainee should be force-fed. Pet'r's Br. at 27 (citing Resp. Ex. 19A at 38-4(a) (SOP No. 38, section 38-4(a): "Commander, Joint Task Force is the approval authority for enteral feeding of detainees.")). He argues that only a physician should have the authority to determine whether force-feeding is appropriate, although he does not contend that he has been force-fed any time without a physician's recommendation.[10]

To the extent Petitioner believes the standard operating procedures ("SOPs") at Guantanamo Bay put him at risk of being force-fed without a prior determination of medical necessity, he simply misreads the regulations governing enteral feeding. It is correct that under SOP 1, the JTF-GTMO Commander's approval is a necessary final step before a detainee may be approved for force-feeding. However, the recommendation for enteral feeding must originate with a physician or physician's assistant and must be approved by the Senior Medical Officer before it even reaches the JTF Commander. Resp'ts' Ex. 17A at ¶ III. L.

DOD Instruction 2310.08E, which applies to the care of detainees at all DOD facilities, confirms the necessity of a medical determination: "[i]n the case of a hunger strike . . . medical treatment may be directed without the consent of the detainee to prevent death or serious harm . . . such action <u>must</u> be based on a medical determination that immediate treatment or intervention is necessary to prevent death or serious harm." Resp'ts' Ex. 21 at 5 (emphasis added). Finally, SOP 1 permits medical officers to "perform . . . emergent actions deemed medically necessary to preserve

---

[10] Petitioner produced no testimony that any force-feeding has ever taken place without medical approval.

life and health" without the Commander's approval, thus, avoiding the possibility that the procedural hurdle of the JTF Commander's approval could unreasonably delay emergency care. Resp'ts' Ex. 17 at ¶ II. D.

Petitioner's claim rests upon the mistaken belief that current Guantanamo Bay protocols permit force-feeding without a medical officer's approval. Accordingly, it is perfectly clear that Petitioner has failed to demonstrate a likelihood of success on the merits.

### E. Forced-Feeding in the Absence of Imminent Risk

The parties agree that JFT-GTMO officials cannot lawfully force-feed a detainee unless he is in imminent risk of death or great bodily injury. Pet'r's Br. at 5 (citing Aamer, 742 F.2d at 1041); Resp'ts' Br. at 8 (citing DOD Instruction 2310.08E). Petitioner argues, however, that the SOPs in force at Guantanamo Bay, as written, authorize the force-feeding of detainees who are not at imminent risk. He believes that he has been unlawfully force-fed when he was not in imminent risk of death or great bodily injury.

Petitioner relies on SOP No. 1, which, according to him, "states that the detainee may be force-fed if any of the following conditions exist: (1) he weighs less than 85 percent of his so-called 'ideal body weight' (IBW), (2) he has lost more than a specified percentage of his 'usual body weight,' (3) he has sustained weight loss 'associated with evidence of deleterious health effects,' (4) he has a 'pre-existing co-morbidity' such as high blood pressure, or (5) he has had a 'prolonged period of weight loss.'" Pet'r's Br. at 6 (citing Pet'r's Ex. 7 at 2-3).

However, Petitioner is not correct that a finding that a detainee weighs less than 85 percent of his so called "ideal body weight" automatically triggers the imposition of forced-feeding. The criteria Petitioner cites are merely definitions of "clinically significant weight loss." Pet'r's Ex. 7 at

2-5. A finding of "clinically significant weight loss" does not lead inexorably to force-feeding; rather, such a finding simply triggers further medical review. Id. SOP 1 makes clear that whether "continued fasting results in a threat to [a detainee's life] or seriously jeopardizes his health" does not turn on a rigid consideration of weight alone. Id. Rather, weight is only a threshold issue in making a final determination.[11]

Petitioner also challenges the Government's May 13, 2014 decision to resume his force-feedings. He believes that the medical determination leading to his ongoing force-feeding was made solely on the basis of his body weight. Pet'r's Br. at 9-12. Moreover, according to Petitioner, the Government relied on faulty body-weight data. Id. Finally, Petitioner contends that the Government's body-weight-based decision was irrational because his weight was nearly the same when the Government stopped force-feeding him in October of 2013 (156.6 pounds) as when it resumed his force-feedings in May of 2014 (155.5 pounds). Id. at 12.

An affidavit of the Senior Medical Officer (SMO) who made the May 13, 2014, determination that the resumption of force-feeding was medically appropriate stated that Mr. Dhiab's weight was just one of many factors considered. From April 3, 2014, to May 13, 2014, Mr. Dhiab's weight declined by over eight pounds; he had not eaten substantial amounts of food for over 20 days; he was showing physical manifestations of clinical malnutrition in the form of muscle weakness; and he had made it clear that he would continue to refuse to eat and hydrate voluntarily. Resp'ts' Ex. 5 at ¶ 6. Making it even more difficult for the staff to make an accurate determination of his situation, Mr. Dhiab "was refusing all diagnostic examinations." Id.

---

[11] DOD Instruction 2310.08E also confirms that "a medical determination that immediate treatment or intervention is necessary to prevent death or serious harm" is required to begin force-feeding. Resp'ts' Ex. 21 at 5.

Petitioner argues that the Government is wrongly using 85 percent of ideal body weight as a threshold for force-feeding. This argument is not convincing. Petitioner's expert witnesses presented their opinions regarding the appropriateness of using the percentage of 85 percent as a threshold. While that learned testimony was very interesting, it did not establish that the Government's reliance on the 85 percent number as a threshold indicator was erroneous. Nor was it proven in any way that by using that percentage, the Government was deliberately showing indifference to Petitioner's physical condition. Quite the contrary. The medical staff was monitoring Mr. Dhiab closely during the period in question, even though Mr. Dhiab was refusing to cooperate with medical staff, was refusing lab tests and examinations, and was showing clinical signs of malnutrition. Even Dr. Crosby, one of Petitioner's expert witnesses, described his medical condition as "very complicated" and a "very complex case, even for senior doctors." See Hr'g Tr. 4, Oct. 6, 2014.

For these reasons, the Court concludes that Petitioner has not submitted sufficient evidence to demonstrate deliberate indifference on the part of the Government.

## V.    CONCLUSION

For the reasons stated above, the Court concludes that the Petitioner's Application for a Preliminary Injunction must be **denied** because he has failed to satisfy the "deliberate indifference" standard of proof. As the Court of Appeals stated in Greater New Orleans Fair Hous. Action Ctr. v. HUD, 639 F.3d 1078, 1088 (D.C. Cir. 2011), "when a plaintiff has not shown a likelihood of success on the merits, we need not consider the other factors [required for a preliminary injunction]."

Having reached this conclusion, the Court feels constrained to make certain comments about the Government's treatment of Mr. Dhiab. It is very hard to understand why the Government refused to give Mr. Dhiab access to the wheelchair and/or crutches that he needed in order to walk to the room for enteral feedings.[12] Had that simple step been taken, numerous painful and humiliating forced cell extractions could have been avoided. While the Government ultimately--but only a short time before the hearing--allowed Mr. Dhiab to use the wheelchair, thereby inducing him to comply with the force-feeding as he had agreed to do, common sense and compassion should have dictated a much earlier result. By the same token, the Government refused Mr. Dhiab's request to provide him with an additional mattress. What could more reasonable than providing an additional mattress to a man with back pain so severe that he was given morphine to alleviate it?

Mr. Dhiab is clearly a very sick, depressed, and desperate man. It is hard for those of us in the Continental United States to fully understand his situation and the atmosphere at Guantanamo Bay. He has been cleared for release since 2009 and one can only hope that that release will take place shortly.

November 7, 2014

*Gladys Kessler*
Gladys Kessler
United States District Judge

**Copies via ECF to all counsel of record**

---

[12] The Court understands full well that the medical staff at Guantanamo Bay could not reach a conclusion as to what, if any, medical problem was interfering with Mr. Dhiab's walking.