UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ABU WA'EL (JIHAD) DHIAB,** | ) |
| | ) |
| **Petitioner,** | ) Civil Action |
| | ) No. 05-1457 |
| **v.** | ) |
| | ) Monday, October 6, 2014 |
| **BARACK H. OBAMA,** | ) 10:00 a.m. |
| | ) |
| **et al.,** | ) Washington, D.C. |
| | ) |
| **Respondents.** | ) |

**DAY 1**
*TRANSCRIPT OF MOTION HEARING PROCEEDINGS*
*BEFORE THE HONORABLE GLADYS KESSLER,*
*UNITED STATES DISTRICT COURT JUDGE*

APPEARANCES:

For the Petitioner:     **Alka Pradhan, Esq.**
LEWIS BAACH, PLLC
1899 Pennsylvania Ave. NW
Suite 600
Washington, DC 20006
614-804-2561
Email: Alka.pradhan@reprieve.org

**Eric Leslie Lewis, Esq.**
LEWIS BAACH, PLLC
1899 Pennsylvania Ave, NW
Suite 600
Washington, DC 20006
(202) 833-8900
Fax: (202) 466-5738
Email: Eric.lewis@lewisbaach.com

**Cori Crider, Esq.**
REPRIEVE
P.O. Box 52742
22 Tudor Street
London, UK EC4Y 0AY
011 44 207 353
Fax: 011 44 207 353 4641
Email: Cori@reprieve.org.uk

APPEARANCES:   Cont.


For the Petitioner:          **Elizabeth L. Marvin, Esq.**
                             LEWIS BAACH, PLLC
                             1899 Pennsylvania Avenue, NW
                             Suite 600
                             Washington, DC 20006
                             (202) 833-8900
                             Fax: 202-466-5738
                             Email:
                             Elizabeth.marvin@lewisbaach.com

                             **Jon B. Eisenberg, Esq.**
                             1970 Broadway
                             Suite 1200
                             Oakland, CA 94612
                             (510) 452-2581
                             Fax: (510) 452-3277
                             Email: Jeisenberg@horvitzlevy.com


For the Respondents:         **Andrew I. Warden, Trial Attorney**
                             U.S. DEPARTMENT OF JUSTICE
                             Federal Programs Branch
                             20 Massachusetts Avenue, NW
                             Washington, DC 20530
                             (202) 616-5084
                             Fax: (202) 305-2685
                             Email: Andrew.warden@usdoj.gov

                             **Timothy Burke Walthall, Trial
                             Attorney**
                             U.S. DEPARTMENT OF JUSTICE
                             Civil Division
                             P.O. Box 883
                             Washington, DC 20044
                             (202) 305-0692
                             Fax: (202) 305-2685
                             Email: Timothy.walthall@usdoj.gov

                             **Ronald Wiltsie, Trial Attorney**
                             Federal Programs Branch
                             20 Massachusetts Avenue, NW
                             Washington, DC 20530-0001
                             (202) 307-1401
                             Fax: (202) 616-8470
                             Email: Ronald.wiltsie@usdoj.gov

```
          APPEARANCES:   Cont.

     For the Respondents:        Patrick D. Davis, Trial attorney
                                 U.S. DEPARTMENT OF JUSTICE
                                 Civil Division
                                 20 Massachusetts Avenue, NW
                                 Washington, DC 20530
                                 (202) 305-0879
                                 Fax: (202) 616-8470
                                 Email: Patrick.davis2@usdoj.gov

                                 Terry Marcus Henry, Trial Attorney
                                 U.S. DEPARTMENT OF JUSTICE
                                 Civil Division, Federal Programs
                                 Branch
                                 20 Massachusetts Avenue, NW
                                 Suite 5100
                                 Washington, DC 20530
                                 (202) 514-4107
                                 Fax: (202) 616-8470
                                 Email: Terry.henry@usdoj.gov


     Court Reporter:             Scott L. Wallace, RDR, CRR
                                 Official Court Reporter
                                 Room 6503, U.S. Courthouse
                                 Washington, D.C. 20001
                                 202.354.3196
                                 scottlyn01@aol.com


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.
```

1            <u>MORNING SESSION, OCTOBER 6, 2014</u>

2    (10:04 a.m.)

3         THE COURT:  Good morning, ladies and gentlemen.

4         ALL PARTIES PRESENT:  Good morning, Your Honor.

5         THE COURT:  It's always nice to see a full courtroom.  Let

6    me first call the case, which is *Abu Wa'el Dhiab*, D-H-I-A-B,

7    *versus Barack Obama*, CA-05-1457.  Would counsel please identify

8    themselves for the record.

9         MR. LEWIS:  Good morning, Your Honor.  Eric Lewis for

10   Lewis Baach on behalf of Respondent -- excuse me, on behalf of

11   Petitioner.  With me at counsel table:  Elizabeth Marvin of Lewis

12   Baach, Corie Crider of Reprieve, Alka Pradhan of Reprieve, and

13   Mr. Eisenberg is just fetching a computer and should be here

14   momentarily.

15        THE COURT:  I heard that there was a problem with the

16   computer, which is why we're a little bit a late.  There's always

17   technical problems.  We'll see him sooner or later.

18        For the government, please.

19        MR. WARDEN:  Good morning, Your Honor.  Andrew Warden from

20   the Department of Justice for the Respondents.  With me at

21   counsel table is Ronald Wiltsie, Timothy Walthall, Terry Henry,

22   and Patrick Davis.

23        THE COURT:  I think it will be a good idea, because there

24   are so many counsel involved, and while we have a wonderful court

25   reporter, it would make it a little easier, at least as we start

1    these proceedings, if each individual will reidentify themselves

2    because it just will be easier for him.

3           In addition, everyone, I have to say this all the time.

4    Will everybody please use the mic that's there, talk slowly and

5    clearly so that our court reporter can get everything, and so

6    that I can get everything.

7           For the benefit of our audience, I want to just tell you

8    how this morning's proceeding will go forward.  It's a little

9    different than is usually the case in a hearing, and it is a

10   little different because, of course, we have the issue of

11   classified and protected information.

12          I have established a procedure which I hope will cause a

13   minimum of disruption to those in the audience, and hopefully to

14   counsel as well.  And counsel and I have talked about this in

15   an on-the-record phone conversation we had Friday afternoon.

16          First, Petitioner will begin with an opening statement, a

17   brief opening statement.  If the government wishes to make an

18   opening statement, it may, of course, also brief.  Then we're

19   going to have direct examination in open court of the

20   Petitioner's first witness, who happens to be named Dr. Sondra

21   Crosby.  If it is possible for the government to do any in-court

22   cross, you may, or you may prefer to do it in the afternoon as we

23   had talked about.

24          After Dr. Crosby, we will have the testimony of the

25   Petitioner's second witness, another doctor, Dr. Stephen

1    Xenakis -- and I guess I did pronounce it correctly, good.  That,

2    of course, will be in open court, and again, if the government

3    wishes to have open-court cross in the morning, it may but is

4    certainly not required to.  It may wish to conclude that in the

5    afternoon session.

6         And, finally -- and I'm hoping we can accomplish all of

7    this this morning -- the Petitioner may introduce or will

8    introduce its documentary evidence.  I think that will take up a

9    full morning, but whether it does or not, at that point we will

10   have to close the courtroom, because the government is, of

11   course, entitled to cross-examination, and has alerted me in

12   advance, and certainly alerted Petitioner's counsel as well, that

13   some of that cross-examination will involve classified or

14   protected materials.

15        So, again, my thinking in planning this was that we should

16   have the morning session open for the entire morning session.  If

17   we can accomplish what I just indicated, I'll be glad about that.

18   And then in the afternoon there will be a closed session, and

19   that -- as I've indicated, that closed session will undoubtedly

20   involve classified and/or protected information.

21        I can't tell you-all how long that will last for obvious

22   reasons, so people can do what they want in terms of staying

23   around in the courthouse.  Tomorrow morning, we will hear the

24   third witness for Petitioner, and his name is Dr. Steven Miles.

25   And, again, we'll follow the same procedure.  His direct

1     examination will be in open court, and the government will have

2     an option as to whether to cross-examine him in open court on

3     things that are appropriate or to hold its cross-examination

4     until we close the court, again, because I believe some of the

5     cross-examination will cover classified or protected information.

6          I think that's as much as I want to spell out right now.

7     We haven't talked about the government's case, of course, and we

8     will get to that, I am hopeful, either late Tuesday morning or

9     Tuesday afternoon.  We'll just have to see how things go, but at

10    least for members of the public you have a pretty good idea, I

11    hope, of what the schedule's going to be.

12         All right.  Let us proceed.

13         MR. WILTSIE:  Your Honor, one housekeeping point.

14         THE COURT:  Yes.

15         MR. WILTSIE:  First, based on the expert reports as

16    they've been provided to us, we do not anticipate having to have

17    closed cross-examination of their witnesses.  We reserve the

18    right, if they drift into areas that are protected or classified,

19    to inform the Court of that fact, and then that direct and cross

20    would have to happen in closed session.

21         And, secondly, Your Honor --

22         THE COURT:  And let me just say, the Petitioner's counsel

23    have made it very clear that in their direct examination they do

24    not intend in any way to get into that, meaning into protected or

25    classified, although certainly the government should keep

1    vigilant about that.

2         MR. WILTSIE:  Yes, Your Honor.  And second, I do not see

3    Dr. Xenakis in the courtroom; however, if he does arrive we

4    invoke the rule.

5         THE COURT:  All right.  All right.  We're ready to proceed

6    with opening statements, please, for Mr. Dhiab to begin with.

7         MR. LEWIS:  Thank you.  Good morning, Your Honor.

8         THE COURT:  Morning.

9              **OPENING STATEMENT ON BEHALF OF THE PETITIONER**

10        MR. LEWIS:  My name is Eric Lewis, and I'm counsel for

11   Petitioner, Mr. Abu Wa'el Dhiab.  Mr. Dhiab has been at

12   Guantanamo for more than 12 years and on hunger strike at various

13   times for more than seven years.  His hunger strike is the only

14   way that he has peacefully to protest his indefinite detention.

15   It's the only way he has to express his autonomy and his

16   essential human dignity.  In return, he's been dragged out of his

17   cell, trussed up like an animal, secured tightly to what

18   detainees universally call the "torture chair," has had

19   110-centimeter tube put down his -- up his nose, down his throat,

20   and --

21        THE COURT:  Are you --

22        MR. WILTSIE:  -- into his stomach.

23        THE COURT:  Are you holding up the size 8 or the size 10?

24        MR. LEWIS:  This is a size 10 tube, Your Honor.

25        THE COURT:  Thank you.

1        MR. LEWIS:  He's been force-fed in a chair.  He's had the

2   tube pulled out of his nose, forced from the chair to the ground,

3   carried back to his cell, put face down on a comment floor and

4   the restraints removed with guards straddling his injured back;

5   day after day, month after month, year after year.

6        Mr. Dhiab does not want to die.  He wants to be treated

7   like a human being.  The history of force-feeding at Guantanamo

8   shows that since JTF Commander Craddock decided in 2006 that he

9   would make the hunger strike, in quote, less convenient, for

10  detainees, the government, whenever offered a choice between a

11  humane alternative and a coercive, degrading and painful one, has

12  always chosen the latter.

13       Everything that's gone at Guantanamo with regard to

14  force-feeding has the purpose, in Colonel Bogdan's words, of

15  incentivizing detainees to stop the hunger strike.

16       The Court of Appeals recently made clear in Hatim, the

17  standard is as set out by the Supreme Court in the Turner case,

18  whether specific practices serve a legitimate penological goal

19  and whether there are ready alternatives to these practices.

20       The evidence will show over the next two days that the

21  practices challenged here do not serve any legitimate penological

22  goal, and the government, in fact, never really considered ready

23  alternatives, except that at certain times the government did

24  have less restrictive protocols, but abandoned them or declined

25  to extend them as part of a get-tough strategy to shut down the

1    hunger strikes.

2         The government says it is essentially implemented the

3    Bureau of Prisons' standards.  That is wrong.  The government has

4    deviated from the BOP protocols in important ways, and always in

5    ways that caused additional and gratuitous suffering to

6    detainees.

7         The government says it's complied with standards of care

8    with respect to detainees.  That is also wrong.  Justice Brandeis

9    said sunshine is the best disinfectant, and this action has

10   already shown a light on the degrading way Mr. Dhiab and his

11   fellow hunger strikers are treated.  We in the court have seen

12   those videotapes, and further to Your Honor's order, the American

13   public will soon see them as well.

14        Now, why does Mr. Dhiab put himself through this?  One's

15   instinctive reaction might be he should just eat his food and

16   stop causing trouble, but that's what rights are about, the right

17   to peacefully protest.  And in a system with our rights the

18   government cannot punish, cannot retaliate, cannot abuse, cannot

19   incentivize as the government has done here.

20        Now, some of that sunshine has come since Mr. Dhiab

21   brought the case.  We argue to this Court that lubricating the

22   tubes with olive oil can cause a serious condition called lipoid

23   pneumonia.  The government has said it has recently discontinued

24   this practice.  In addition, we've asked that Mr. Dhiab be

25   allowed to go to his feeding sessions in his wheelchair so that

1    he's not subject to the violence and pain of forcible cell

2    extraction.   Here again, this lawsuit has had its impact.

3    Mr. Dhiab told us he's very recently been permitted to use a

4    wheelchair again to go to force feedings without being FCE'd.

5         THE COURT:  Do you have the date?  I think I read it this

6    morning, but I'm not sure of the date when that be began.  I

7    think it was a couple of months ago.  I'm not sure.

8         MR. LEWIS:  Our best knowledge is September 10th, about

9    four weeks ago.

10        THE COURT:  All right.  We'll get to it with the

11   government.

12        MR. LEWIS:  So we're pleased that the government has

13   agreed to stop the olive oil and to give Mr. Dhiab back his

14   wheelchair on the eve of this hearing.  Now, we asked the

15   government to stipulate that these practices remain in place for

16   as long as Mr. Dhiab remains at Guantanamo.  The government

17   refused.  So there's no guarantee that Wednesday or Thursday,

18   when this court is no longer in session, the government changes

19   its policies once again.

20        As the Court's aware, Mr. Dhiab's wheelchair has been

21   given and taken away and given and taken away multiple times.

22   The government has said that these issues are now moot.  That is

23   wrong.  The Supreme Court has held it's well-settled that a

24   defendant's voluntary cessation of a challenged practice does not

25   deprive a Federal Court of its power to determine the legality of

1    the practice, and that's the city of City of *Mesquite versus*
2    *Aladdin's Castle* case.

3          Now, there are other remaining issues that we ask the
4    Court to resolve where we have not yet had the government change
5    its practice in recent weeks.  We seek an order that Mr. Dhiab
6    only be force-fed when a competent medical doctor makes the
7    clinical judgment that he's at immediate serious risk of death or
8    serious bodily harm.

9          We want to enjoin the government from FCE'g Mr. Dhiab from
10   his cell unless he refuses to go in his wheelchair.

11         We seek to enjoin the government from using a 5 point
12   restraint chair, but instead use a 1 point restraint, which has
13   been used successfully.

14         We seek an order that requires the government to leave the
15   feeding tube in place for at least three days at a time or longer
16   if medically indicated.

17         We will present evidence that supports our case that each
18   of these changes is medically indicated and a viable, ready
19   alternative.

20         Let me address first the standards for force-feeding.  The
21   law is clear that force-feeding may only be a last resort.  We
22   are extremely mindful of this Court's profound concern that
23   Mr. Dhiab not be put at risk of death or serious injury.  We,
24   too, are concerned with his health, and Mr. Dhiab's looking
25   forward to the day when he can leave Guantanamo.  But the

1   force-feeding as practiced is harming his health, and it's not to

2   be undertaken simply because a prisoner goes on hunger strike.

3   As this Court has said, it is, quote, a painful, humiliating and

4   degrading process.  And the Court of Appeals stated in Aamer

5   that, absent exceptional circumstances, you can only force-feed a

6   starving inmate, quote, actually facing the risk of death.  The

7   Bureau of Prisons' protocol also allows force-feeding when a

8   physician determines the inmate's life or health will be

9   threatened if treatment is not initiated immediately.  And the

10  Bureau of Prisons says only a physician can make that judgment.

11       Now, the protocols here in deciding when a detainee should

12  be force-fed violate the Turner standard as well as the standard

13  set by the Court in the Aamer case and the BOP protocol.

14       First, and most important, the decision to force-feed is

15  made, not by a doctor, but by the JTF-GTMO commander.  This is a

16  medical decision to be made by a doctor and not a jailer.

17       Second, they authorize force-feeding in situations well

18  short of a risk of death or serious bodily harm.  Dr. Miles will

19  testify as to how one should determine nutrition that raises a

20  dangerous health situation.  He'll testify that based on the

21  records he's seen, Mr. Dhiab is not malnourished to the point of

22  the risk of death or serious bodily harm.

23       Dr. Crosby --

24       THE COURT:  Excuse me, a minute.  I just want to make sure

25  everybody -- not everybody, but that Petitioner's counsel notice

1     just a couple of days ago the government did file an affidavit

2     countering Dr. Miles' testimony.  Did you get that?  Am I correct

3     about that?

4          MR. LEWIS:  We did receive that affidavit, and we will

5     address it.  Thank you, Your Honor.

6          Similarly, Dr. Crosby will opine that, although Mr. Dhiab

7     is underweight and requires medical monitoring, there's no

8     available data to indicate his life is in imminent risk.  She and

9     Dr. Xenakis, who also saw Mr. Dhiab, will testify he's willing to

10    eat if he's treated properly, and, indeed, he ate with them.

11         Dr. Miles will --

12         THE COURT:  Did he eat real food or Ensure?

13         MR. LEWIS:  He had Ensure and he had some nuts.

14         THE COURT:  Okay.

15         MR. LEWIS:  Dr. Miles will testify to the standard of care

16    and the required metrics for making that clinical judgment that

17    someone is at serious risk of death or grievous bodily harm, and

18    this has not been done here.

19         I'd like to turn now to --

20         THE COURT:  You've got five minutes at the most left.  I

21    warned everybody, brief opening statements.

22         MR. LEWIS:  The Court will hear evidence that Mr. Dhiab is

23    FCE'd, not because he refuses to go to feedings, but because he

24    cannot walk to them, and the government has not allowed him to

25    use his wheelchair.  That's flatly contradicted in the medical

1    records, as well as by the doctors.  He has chronic back pain,

2    degenerative disc condition, blood in his urine, kidney

3    condition, cervical neck pain, and other symptoms, but somehow

4    they've decided a wheelchair is not medically necessary.

5         Now, the immediate past SMO -- we called him the current

6    SMO but he's just gone -- states in his declaration he approved a

7    wheelchair, not because it was medically indicated, but because

8    it was an incentive to attend medical appointments and maintain

9    basic hygiene.  When the incentive didn't work the wheelchair was

10   taken away.  With all due respect, that declaration is

11   demonstratively false.  That SMO did not approve the wheelchair.

12   It was approved by his predecessor.  That SMO didn't even arrive

13   at Guantanamo until three weeks later.  It was signed by his

14   predecessor, and it wasn't done as some sort of incentive.  That

15   was just sort of rank speculation.  If we take a look at the

16   order itself, on February 5th, three weeks before the affiant

17   arrived, it says, "This is a medical recommendation, that he get

18   a wheelchair and that he keep it for a year to go to

19   appointments."  So why was the wheelchair given and taken away?

20   Presumably for the same reason that in June 2013 he had his

21   walker, crutches, athletic shoes, support pillow, ISO-MAT, ankle

22   braces, even his boxer shorts taken away.

23        The only fair inference is that Colonel Bogdan took away

24   the wheelchair and the other items as punishment for not being

25   adequately cooperative, and the medical records confirm that.

1    ISN wants a wheelchair and crutches.  ISN notified that his

2    disciplinary status with guard force is effecting his ability to

3    have a wheelchair.

4         Now, the five-point restraint chair -- I will turn to

5    quickly -- he says it's a extremely painful, and the evidence

6    will make clear that everyone gets a five-point restraint chair,

7    and there's no individualized determination.

8         He says it was -- Colonel Bogdan says he applied the

9    Bureau of Prisons' protocol.  Once again, that's wrong.  The

10   prison's protocol says that it's only the amount of force

11   necessary to gain control of the inmate.  These inmates are not

12   resisting.  So GTMO -- Standard Operating Procedure 33 also says

13   the amount of force necessary, but we're told that Standard

14   Operating Procedure 38, which was actually promulgated before 33,

15   controls.

16        Now, Colonel Bogdan has said, with one set of exceptions,

17   the restraints chair was used for all enteral feedings to

18   incentivize these detainees to stop their fast, with the one

19   exception:  Everyone gets the restraints chair -- six didn't get

20   it -- to incentivize them.  And Colonel Bogdan says when the

21   incentive didn't work, that was it, experiment over.  And that's

22   the smoking gun:  Colonel Bogdan's admission of the central

23   progress here.  He could implement less coercive practices, he

24   could use a 1 point restraint chair, and he did so.  But when the

25   detainees didn't give up their hunger strike that was it,

1   everyone else gets harsh, painful, abusive and unnecessary

2   treatment.

3        I'll turn briefly to the nasal gastric tubes.  There's a

4   clear and convincing view in the medical literature that

5   nasogastric tube insertion is very painful.  We'll present

6   medical literature that says it's the most painful procedure

7   commonly done in emergency rooms.  In descending order

8   nasogastric intubation, access drainage, fracture reduction and

9   urethral catheterization.  Nasogastric insertion is the most

10  painful.  And that pain's exacerbated by having that tube

11  inserted and removed for every feeding, often up to twice a day.

12  We submit that this Court should order, consistent with medical

13  practice, that his tube should be left in.

14       Now, we will understand that Guantanamo is a prison, and

15  it's a difficult environment where security is important, but

16  security -- the security argument only goes so far, and we can --

17  we submit the videotapes speak for themselves about the kind of

18  threat that Mr. Dhiab presents, and the record's replete with

19  evidence that when he's treated properly he responds in kind.  On

20  certain occasions he's been hurt very badly, and he has responded

21  badly.

22       But imagine, Your Honor, he's asked us to put ourselves in

23  his position.  You're in a 10-foot-6 rectangle -- 10 foot by 6

24  foot rectangle for 12 years, and every so often someone comes and

25  tells you you're going to get out, soon you'll be free, and then

1    months and years pass and you're still there in the rectangle.

2    Then one day someone comes and tells you your son is dead, Wa'el,

3    the boy that gives you your name of pride, Abu Wa'el, he's died

4    in Syrian attacks, 15 years old.  You've been cleared for five

5    years, but you're never going to see your boy again.

6         Respondents are wrong about Mr. Dhiab.  There are ready,

7    available alternatives in the way they're treating him and he

8    will respond in kind.  His hunger strike is not just a

9    disciplinary problem.  It's a cry of humanity from a person who

10   reasonably feels he has no choice left but to make this protest.

11        THE COURT:  Mr. Lewis, you're going to have to close.

12        MR. LEWIS:  We're asking this Court to enjoin the

13   practices that are unnecessary, inhumane, unconstitutional, and

14   unworthy of us as a nation.  Thank you.

15        THE COURT:  Does the government wish to make its opening

16   statement?

17        MR. WARDEN:  Thank you, Your Honor.

18             **OPENING STATEMENT ON BEHALF OF THE RESPONDENTS**

19        MR. WARDEN:  This is Andrew Warden again from the

20   Department of Justice on behalf of the Respondents.

21        Your Honor, the Department of Defense has provided high

22   quality medical care to Mr. Dhiab throughout his time at

23   Guantanamo Bay.  There's no basis, legal or factual, for this

24   Court to take the extraordinary step of issuing a preliminary

25   injunction, forcing the medical staff at Guantanamo to alter

1    their treatment in ways contrary to their considered medical

2    judgment.

3         Providing medical care to Mr. Dhiab is challenging, Your

4    Honor.  He undermines his own health by refusing to eat.  He

5    regularly and consistently refuses to accept treatment offered by

6    the Guantanamo medical staff, and he has a history of physically

7    assaulting and verbally abusing the medical staff that attempts

8    to treat him.

9         Notwithstanding these obstacles, Your Honor, medical staff

10   at Guantanamo Bay works in good faith every day in an attempt to

11   improve his health.  Each day, Your Honor, Mr. Dhiab is offered

12   the opportunity to eat three culturally appropriate meals.  He

13   may refuse those meals, but if his refusals reach the point where

14   immediate treatment or intervention is necessary to prevent death

15   or serious harm, then the medical staff will step in and

16   enterally feed him.

17        At present, Mr. Dhiab is about 40 pounds below his ideal

18   body weight.  He's not eating enough to provide his body with the

19   nutrition that it needs.  He requires enteral feeding, and absent

20   that, Your Honor, it's the determination of the medical staff at

21   Guantanamo Bay, who has the most experience dealing with him,

22   that he --

23        THE COURT:  Do you know the most recent figure for what

24   his weight is now?

25        MR. WARDEN:  It's 152 pounds as of, I believe, it was last

1    Thursday.

2              THE COURT:  Okay.

3              MR. WARDEN:  But absent enteral feeding, Your Honor, it is

4    the determination of the medical staff at Guantanamo Bay that he

5    would face significant health complications that could lead to

6    permanent injury or death.

7              The issues presented in this case, Your Honor, focus

8    solely on the manner in which the medical staff at Guantanamo Bay

9    provides medical care, specifically enteral feeding, to

10   Mr. Dhiab, and in such cases, courts consistently defer to the

11   considered decisions of the doctors who administer that care,

12   particularly in the challenging and complex circumstances of

13   managing a hunger strike where detainees like Mr. Dhiab refuse

14   treatment and often resist.

15             During this hearing, Your Honor, the government will

16   present evidence establishing that enteral feeding at Guantanamo

17   Bay is conducted in a humane and medically appropriate fashion.

18   We will show that Mr. Dhiab has been provided with quality

19   medical care and that the medical staff are attentive to his

20   needs, notwithstanding the obstacles that he presents.  And we

21   also welcome the opportunity to rebut many of the unsubstantiated

22   allegations assert by the Petitioner regarding enteral feeding.

23             Briefly, Your Honor, I'd just like to review several of

24   the major topics that we will cover during this proceeding.

25   These are the very details and the specific manners in which the

1    enteral feeding is conducted.  First, Your Honor, there is the
2    issue of the nasogastric tube.  Nasogastric tube feeding is the
3    most common and safest form of enteral feeding.  It's not a
4    painful procedure.  The staff at Guantanamo Bay makes a number of
5    steps to ensure that any potential discomfort is minimized.  For
6    example, the tubes that are used, Your Honor, the very one that
7    Mr. Lewis held up, is a pediatric tube.  These are tubes sized
8    for infant children ages three and under.  The staff at
9    Guantanamo Bay does not use adult-sized tubes that you would find
10   in a hospital setting, and that differentiates all of the
11   authorities that they will present to you.  They use a very small
12   tube at Guantanamo Bay.  It is lubricated appropriately, and
13   detainees are offered an anesthetic prior to insertion.
14   Mr. Dhiab's own medical records confirm regularly that he
15   tolerates the procedure well, without complaints, and on the rare
16   occasions when any issues are raised, the medical staff is
17   responsive to those concerns.
18        Second, Your Honor, is the issue much confirming the
19   placement of the tube.  Petitioners have challenged the specific
20   medical procedure by which the doctors at Guantanamo Bay confirm
21   that the nasogastric tube is correctly placed into the stomach
22   and not misplaced into the airway and into the lungs.  As a
23   threshold manner, there's no evidence that there's been any tube
24   misplacement in the case of Mr. Dhiab, and that completely
25   undercuts the need for any form of preliminary injunctive relief.

1          But in any event, the staff at Guantanamo Bay takes a

2     number of careful steps to ensure the tubes are placed correctly.

3     Multiple medical providers use a process called auscultation

4     where they place a stethoscope on his stomach and push air

5     through the nasogastric tube before the feeding begins and

6     listens for that air over his stomach, and in addition, an

7     additional check is performed, specifically 10 milliliters of

8     water are pushed through the nasogastric tube before the feeding

9     begins.  That's about two teaspoons of water.  If the tube were

10    misplaced into the airway or into the lung, that amount of water

11    would cause an immediate coughing or gagging reaction, similar to

12    all of us who have taken a sip of water and had it go down the

13    wrong pipe.  You cough and you have a hoarseness of breath.  The

14    detection would be immediate, and that confirms that there have

15    been no tube misplacements for Mr. Dhiab, and certainly no basis

16    for a leave with respect to that procedure.

17         Next, Your Honor, there have been claims that the rate and

18    the volume of the enteral feeding are excessive and designed to

19    inflict pain.  That is demonstrative false.  The volumes are

20    medical appropriate to ensure that Mr. Dhiab's nutritional needs

21    are met, and the rate of administration is modest, dictated by

22    Mr. Dhiab's own preference and comfort.  Mr. Dhiab, when he is

23    enterally fed -- and it's been rare more recently -- he consumes

24    typically one 8-ounce can of nutritional supplement, with an

25    additional small quantity of water to assist with hydration,

1    totalling about 12 ounces, the size of a can of a soft drink.

2         On average, he consumes it over the course of about 20

3    minutes, but it's up to him.  He can ask for it to be faster,

4    which he does on occasion, and on occasion he ask that it be

5    slower; for example, when he's talking with other detainees

6    during the process.  But these are medical determinations and in

7    no way designed to inflict pain or punishment on Mr. Dhiab.

8         Next, Your Honor, is the issue of inserting the

9    nasogastric tube and removing it upon completion and then

10   inserting it again at the beginning of the next enteral feed.

11   That is a standard procedure in a detention setting.  Recently

12   another Federal Court upheld that practice, finding that no

13   reasonable juror could find that inserting and removing a tube on

14   a daily basis is a departure from accepted medical practice.

15   That case is *White versus Suneja* from the Southern District of

16   Illinois in 2013.

17        There's no medical need to keep the nasogastric tube in

18   place for prolonged period of time, and there's significant

19   health risk to doing so, specifically in the form of infection;

20   sinusitis; ear, nose and throat problems.

21        THE COURT:  Have you had to keep the tube for an extended

22   period of time in other detainees at Guantanamo?

23        MR. WARDEN:  Yes, Your Honor.  And, specifically, in 2005

24   there was a large scale hunger strike, and we'll show this

25   evidence.  During that time, the medical staff at Guantanamo kept

1    the tubes in place to provide the detainees with a bit more

2    autonomy.  The results of that, Your Honor, were that infections

3    resulted, the detainees' health deteriorated, and in addition,

4    the detainees used the tube to purge the nutritional contents and

5    there were security risks with doing so.  Detainees can remove

6    the tubes easily.  They could use it to asphyxiate themselves or

7    potentially guards or medical staff that they interact with.  And

8    so as a result of those concerns, which are borne out of

9    extensive practice, the decision was played to insert and remove

10   the tube, standard with typical practice in a detention

11   environment.  This is not a hospital setting where we have a

12   comatose or otherwise inactive patient who needs nutrition.

13   These are active detainees who often resist the care that's being

14   provided to them.

15        Next, Your Honor, is the issue of the restraint chair.  As

16   Your Honor may recall, you entertained a similar challenge in

17   2009 to the use of the restraint chair in the enteral feeding

18   context in the Al-Adahi case.  And that was *Al-Adahi versus*

19   *Obama*, 596 F.Supp.2d 111.  And you concluded that the use of the

20   chair did not constitute deliberative indifference.  The same --

21        THE COURT:  Let me interrupt you for a minute.  I think

22   there are a few additional seats.  I see people wanting to come

23   in or one person, actually.  All right.  Go ahead, please.

24        MR. WARDEN:  Sure.  In the Al-Adahi case you upheld the

25   use of the restraint chair in the enteral feeding context.  We

1   believe the same conclusion holds true today.  The chair's not

2   used as punishment.  It's not used to inflict pain on detainees.

3   It is used to ensure that the nasogastric tubes are placed

4   properly, that detainees consume sufficient nutrition and they do

5   not purge.  It's also used as a security measure to ensure that

6   guards and detainees and the medical staff are safe and not

7   disrupted from any violent outbursts that may occur.

8          Mr. Dhiab, in fact, has engaged in such outbursts.  He's

9   physically assaulted medical staff.  He's kicked them on multiple

10  occasions.  He's thrown urine and feces at Guantanamo Bay staff,

11  and he's used vulgar and abusive language.  The chair is

12  reasonable and it's appropriate and it's designed to ensure that

13  his health is maintained.

14         Finally, Your Honor, there's the issue of the trans- --

15  manner by which Mr. Dhiab is transported from his cell to the

16  location where the enteral feeding is conducted.  Our view is

17  that that issue is moot.  Beginning of September, at Mr. Dhiab's

18  request, the leadership at Guantanamo Bay granted his request to

19  have a wheelchair provided to him for trans- -- for purposes of

20  transportation.  This is not the restraint chair.  This is a

21  standard hospital style wheelchair that's placed outside of his

22  cell.  He -- like every other detainee, he is offered to eat his

23  food.  He may consume his nutritional supplement voluntarily, and

24  if he does not do that he may ride in his wheelchair to the

25  enteral feeding location.  Mr. Dhiab has not been forcibly

1    extracted from his cell for enteral feeding since mid-July.  We

2    believe that issue's moot.

3         THE COURT:  Since he has started using or -- let me say it

4    a little more accurately.  Since he has been allowed to use the

5    wheelchair, have there been any difficulties or incidents with

6    the feedings?

7         MR. WARDEN:  My understanding is no, Your Honor.  More

8    recently, Mr. Dhiab has been consuming the nutritional supplement

9    voluntarily.  There have been not been many -- I don't know the

10   exact number.  I'd have to check, but many enteral feedings over

11   the course of the last month or so, he's been consuming it

12   voluntarily.  He has gone to several enteral feedings, maybe just

13   a handful, and my understanding is he's either used the

14   wheelchair or, in fact, he's walked to several of those.

15        But, even if the Court were to consider the merits of the

16   claim, regarding the forced cell extraction process, that process

17   is only used as a last resort after all other alternatives have

18   failed.  The guard staff uses the minimal amount of force

19   necessary, and the evidence will show restraint and not excessive

20   force.

21        And, finally, Your Honor, a brief word on the law.

22        THE COURT:  Let me ask you a question.  You have said that

23   use of the FCE procedure is a last alternative; however, you

24   started Mr. Dhiab back on the -- allowing him his wheelchair --

25   not his, but a wheelchair, and you haven't had any trouble since.

1   I don't think, reading all the affidavits, that on the prior

2   occasions when, again, Mr. Dhiab was allowed to use the

3   wheelchair, that there were any incidents or problems.  And so,

4   therefore, what's the justification for using the FCEs, if you

5   have an alternative of the wheelchair?

6        MR. WARDEN:  Part of that, Your Honor, goes, I think, to a

7   medical dispute about whether Mr. Dhiab could walk on his own

8   from his cell location to the enteral feeding location.  There's

9   no medical reason why Mr. Dhiab can't walk and, in fact, recently

10  he has.  And so the medical determination is that he could walk

11  and he was given the option of walking.  Indeed, he regularly

12  walks to other appointments where he chooses to attend, and we

13  believe that he was simply refusing to move to those

14  appointments, and in such cases when he was refusing to move, the

15  only alternative left was to forcibly remove him, which again, is

16  a very controlled and measured process and not designed to use

17  excessive force.

18        Finally, Your Honor, a brief point on the law, if I may.

19        THE COURT:  Your time is starting to run out.  You have a

20  few more minutes.

21        MR. WARDEN:  Briefly.  We're here on a Motion for a

22  Preliminary Injunction.  That's an extraordinary and drastic

23  remedy.  It requires a clear showing of a likelihood of success,

24  as well as a showing of irreparable injury, absent the requested

25  injunction.  And here, while preliminary injunctions are

1    typically used to maintain the status quo, we have a situation

2    where Petitioner is asking to essentially rewrite the medical

3    care at Guantanamo Bay and drastically alter the status quo.

4         THE COURT:  By the way, I certainly know that there are

5    requirements for a preliminary injunction.  In the government's

6    view, is maintaining the status quo, does that mean allowing

7    Mr. Dhiab to continue in the wheelchair?

8         MR. WARDEN:  The wheelchair is the status quo, the medical

9    staff, as mentioned, and the leadership at Guantanamo Bay has

10   allowed -- is allowing him to use the wheelchair.  We'll bring

11   those documents up.  There's a specific order that was dated

12   September 5th that allows him use of the wheelchair.  Medical

13   orders have an expiration date.  My recollection is that order

14   expires in February of 2015, and that order is -- will remain in

15   place.  We do not believe there's any basis for a court ordered

16   injunction on that matter, however, and no legal basis to do so.

17   But the status quo at the moment is that Mr. Dhiab will have the

18   opportunity to ride in a hospital style wheelchair to his enteral

19   feeds if he chooses to do so.

20        THE COURT:  I want to be very sure about this:  There's a

21   specific order in place in Guantanamo that he is allowed to use

22   the wheelchair until, I think you said, February 15?

23        MR. WARDEN:  I believe that's correct, yes.

24        THE COURT:  All right.  Go ahead.

25        MR. WARDEN:  Finally, Your Honor, on the substance, we

1    believe that this case should be decided on a deliberate,

2    indifferent standard.  That's the standard Your Honor used in

3    2009 in the Al-Adahi case when you considered a similar challenge

4    to inadequate medical care at Guantanamo Bay.  That's the

5    standard every other judge of this court has utilized when

6    considering medical challenges at Guantanamo Bay, and it's the

7    standard, outside of the Guantanamo detention context, that

8    courts routinely use whether the detainee is a pretrial detainee,

9    a post conviction detainee or an immigration detainee.  Claims

10   regarding inadequate medical care are decided under that

11   standard, and that's a very high bar for a Petitioner to meet.

12   He must show a serious medical need, and a knowing and reckless

13   disregard of an excessive risk of harm.  Essentially that's a

14   criminal recklessness standard, and mere disagreement between

15   Petitioner's experts and the treating physicians at Guantanamo

16   Bay, with respect to medical treatment, is not sufficient to meet

17   that standard; nor, the case law is clear, is even negligence

18   sufficient to meet that standard.  But, Your Honor, what we will

19   show here today is the very opposite of deliberative

20   indifference.  The staff at Guantanamo Bay has provided Mr. Dhiab

21   with thoughtful, attentive and high-quality medical care, and we

22   look forward to presenting that evidence.  Thank you.

23          THE COURT:  All right.  Thank you.

24          MR. WILTSIE:  Your Honor, if I could bring to the Court's

25   attention before we call the first witness, Dr. Xenakis has

 1    entered the courtroom.  We ask that he be excluded.

 2         THE COURT:  Are you calling a witness?

 3         MR. WILTSIE:  No, Your Honor.  They're going to call their

 4    first witness.  We invoke the rule.  Dr. Xenakis is not the first

 5    witness.

 6         THE COURT:  Oh, I see.  Okay.

 7         MR. WILTSIE:  We're asking him to be excluded.

 8         THE COURT:  Right.  I knew I didn't change the procedure

 9    that much.

10         MR. LEWIS:  Your Honor, there's no jury here.  Dr. Xenakis

11    and Dr. Crosby saw Mr. Dhiab together.  We think that's a

12    technicality for which there's no good justification.

13    Dr. Xenakis is here --

14         THE COURT:  He may testify.  Certainly there was nothing

15    in opening statements that could change his testimony, plus he

16    has submitted a written report in some detail.

17         MR. WILTSIE:  Yes, Your Honor, but as Mr. Lewis said,

18    Dr. Crosby and Dr. Xenakis were together at Guantanamo.  It'd be

19    very interesting if they testified to different facts from those

20    meetings.  We ask that Dr. Xenakis be excluded.

21         THE COURT:  She may wait outside, then.  Is it she or he?

22         MR. LEWIS:  He.

23         THE COURT:  Sorry.  We will follow that rule.

24         MS. MARVIN:  Good morning, Your Honor.

25         THE COURT:  Good morning.

 1          MS. MARVIN:  My name is Elizabeth Marvin.  I represent the

 2     Petitioner.

 3          THE COURT:  And you are?

 4          MS. MARVIN:  Elizabeth Marvin with Lewis Baach.

 5          THE COURT:  Okay.

 6          MS. MARVIN:  I would like to call our first witness,

 7     Dr. Sondra Crosby.

 8          THE COURT:  Okay.

 9            (SONDRA CROSBY, PLAINTIFF'S WITNESS, SWORN)

10          THE COURT:  Now, let me give you an instruction.  You may

11     be seated.  And those mics at the witness stand, for some unknown

12     reason, are not placed overly comfortably, so you'll have to sit

13     close to it and talk directly into it, please.

14          MS. MARVIN:  Your Honor, I am going to spend some time

15     qualifying Ms. Crosby.  The government has refused to stipulate

16     to her qualifications as an expert witness.

17          THE COURT:  All right.

18                DIRECT EXAMINATION OF SONDRA CROSBY

19     BY MS. MARVIN:

20     Q.   Dr. Crosby, can you please state your name and

21     professional title.

22     A.   Sondra Crosby.  I'm an associate professor of medicine

23     and public health at Boston University, an attending physician

24     at Boston Medical Center.

25     Q.   And, Dr. Crosby, I am going to hand to you what we've

1  marked as exhibit -- plaintiff's -- or Petitioner's Exhibit 62,

2  which is Dr. Crosby's curriculum vitae.

3      MS. MARVIN:  And we have not previously provided this to

4  you.

5      THE COURT:  And this is going to be exhibit what now?  Is

6  this your Exhibit 1?

7      MS. MARVIN:  We've -- we have premarked exhibits because

8  we filed them with the court, so this is the next number after

9  our last exhibit that was filed with the court, so it'd be

10  Petitioner's exhibit --

11      THE COURT:  Well, find out what number it's going to be

12  because we're going to have to have a separate listing for the

13  exhibits in court and then a separate listing, of course, for the

14  classified exhibits.  And one second.

15      MS. MARVIN:  Our last -- the way we filed them, we had a

16  list of unclassified exhibits that went 1 through 50, and then a

17  separate list that started at 51 and went to 61, and those were

18  the classified exhibits, so the next number in our exhibits would

19  be Exhibit 62.

20      THE COURT:  What does the government have to say on this?

21      MR. WALTHALL:  Your Honor, Timothy Walthall for the United

22  States.  We object to the introduction of this exhibit.  There's

23  no reason why this exhibit shouldn't have been provided with

24  Dr. Crosby's report, which was done at your order and your

25  request.  This is the first time we've seen it.  They didn't even

1    provide it with the pretrial exhibits.  We object to the use of

2    that exhibit.

3          THE COURT:  Well, the objection is well taken, but the

4    reason I'm going to overrule it is solely practical, and that is,

5    yes, the government is right, that this résumé should certainly

6    have been submitted in advance, and would have taken, I am sure,

7    no trouble at all.  I don't know why you didn't do that.  On the

8    other hand, however, to be practical, Petitioner's counsel could

9    go through the résumé.  We'd have to hear all the answers.  It

10   would take longer that way, so go ahead.  I want to be clear,

11   though, that that is the reason that I'm overruling the

12   government's objection.

13         MR. WALTHALL:  Your Honor, could I ask one other thing?

14   Could we have -- are you going -- is Petitioner's counsel going

15   to introduce --

16         THE COURT:  Come forward, please.

17         MR. WALTHALL:  Is Petitioner's counsel going to introduce

18   Dr. Xenakis' and Dr. Miles' curriculum vitae as well?  If they

19   are, we would like to see them now.

20         MS. MARVIN:  Your Honor, Dr. Miles' curriculum vitae was

21   submitted with our exhibits.  We do intend to introduce

22   Dr. Xenakis' curriculum vitae, and we have it here and can give

23   it to Respondents' counsel if --

24         THE COURT:  During a break?

25         MS. MARVIN:  Yes.

1          THE COURT:  All right.

2          MR. WILTSIE:  Your Honor, could we have it now --

3          THE COURT:  Oh, you have it?

4          MR. WILTSIE:  -- instead of waiting?

5          THE COURT:  Okay.  Thank you.

6          MS. MARVIN:  And we apologize, Your Honor.

7          THE COURT:  For the record, this curriculum vitae will be

8     Plaintiff's 62 -- I should say Petitioner's 62.

9          (Petitioner's Exhibit 62 marked for identification.)

10    BY MS. MARVIN:

11    Q.    Dr. Crosby, you stated -- can you restate your current

12    position, please?

13    A.    I'm an associate professor of medicine at Boston

14    university, and associate professor of public health in the

15    Boston University School of Public Health.  I'm an attending

16    physician at Boston Medical Center.

17    Q.    How long have you been in your current position?

18    A.    I did my training at Boston City Hospital, which is

19    formerly -- the former Boston Medical Center, and I started on

20    faculty in 1995.

21    Q.    Where are you licensed to practice medicine?

22    A.    I'm licensed in the Commonwealth of Massachusetts.

23    Q.    And when were you first licensed to practice medicine?

24    A.    I received my full license after completion of residency

25    and when I started my faculty position in 1995.

1   **Q.**     Where did you go to medical school?

2   **A.**     I attended medical school at the University of Washington

3   in Seattle, Washington.

4   **Q.**     Do you have any board certifications?

5   **A.**     I am board certified in internal medicine.

6   **Q.**     In your practice do you have occasion to care for victims

7   of torture and hunger strikers?

8   **A.**     Yes.  The focus of my medical practice at Boston Medical

9   Center is on refugees, asylum seekers, and I care for people

10  from over 60 countries.  Many of them have experienced war

11  trauma and/or torture.

12  **Q.**     Have you published any scholarly articles on the subject

13  of caring for victims of hunger strikes -- of hunger striking

14  patients or victims of torture?

15  **A.**     I have published, and the publications are listed in my

16  CV.

17  **Q.**     Are you a member of any professional organizations or

18  groups?

19  **A.**     I have served as a medical consultant for Physicians For

20  Human Rights; and cofounder and codirector of the Forensic

21  Medical Evaluation Group, which is a group at Boston Medical

22  Center who performs independent forensic evaluations on people

23  alleging trauma, torture abuse.

24  **Q.**     Have you previously been qualified as an expert witness

25  before a court or tribunal?

1    **A.**      I have been qualified, most frequently in the Boston

2    Immigration Court for political asylum cases.   I was qualified

3    as an expert witness in the Federal Court here in the *Karachi*

4    *versus United States* case, and I was qualified as an expert

5    witness in Guantanamo at the Military Commission in the case of

6    *Al-Nashiri versus United States*.

7    **Q.**      In what fields were you previously qualified as an expert

8    witness?

9    **A.**      As an expert on caring for survivors of torture and

10   trauma, a internist.

11   **Q.**      Has anyone ever successfully objected to your

12   qualifications as an expert witness in the fields of internal

13   medicine or on the care of victims of torture and abuse and

14   hunger strikers?

15   **A.**      No.

16   **Q.**      Dr. Crosby, when did you become involved in Mr. Dhiab's

17   case?

18   **A.**      I believe I was called by Reprieve and asked to do an

19   examination in May or June of this year, 2014.

20   **Q.**      Have you examined other detainees at Guantanamo?

21   **A.**      I have examined other detainees at Guantanamo, about

22   four, four other detainees.

23   **Q.**      Do you hold a security clearance?

24   **A.**      I do have an active top secret security clearance.

25   **Q.**      And that security clearance permits you to travel to

1    Guantanamo and to review classified information?

2    **A.**     Yes.

3    **Q.**     Were you provided with any information or documentation

4    to review before examining Mr. Dhiab?

5    **A.**     Yes.   I was provided with some medical records for

6    approximately a year prior to my visit, although they weren't

7    complete, and I was also able to view videotapes, although those

8    are protected information.

9          MS. MARVIN:   Your Honor, I would like to offer Dr. Sondra

10   Crosby as a qualified expert in the field of internal medicine in

11   the medical sequelae of "Hunger Striking Patients and Victims of

12   Torture and Abuse."

13         THE COURT:   Is there any --

14         MR. WALTHALL:   Objection, Your Honor.

15         THE COURT:   All right.   You may come forward.   Do you have

16   questioning of this witness?

17         MR. WALTHALL:   No, Your Honor, we have no objection.

18         THE COURT:   All right.   The witness may be accepted as an

19   expert in her field.

20         MS. MARVIN:   Thank you, Your Honor.

21   BY MS. MARVIN:

22   **Q.**     Dr. Crosby, I -- did you prepare a report after your

23   examination of Mr. Dhiab?

24   **A.**     I did prepare a report and provided one to the Court.

25   **Q.**     I am -- there is a -- there are two binders with exhibits

1    up there.  If it's easier for you for me to hand copies of the

2    exhibits that I'm going to go through with you, I can do that,

3    and if it --

4         MS. MARVIN:  I'm not sure what the Court prefers.

5         THE COURT:  Well, are you going to be submitting the

6    binders in evidence?

7         MS. MARVIN:  No we're not.  We plan to go to --

8         THE COURT:  Well, if the government can stipulate -- after

9    looking at the pages you're holding, if the government can

10   stipulate that those are portions of the medical records -- which

11   I assume they are, correct me if I'm wrong in a minute -- then

12   you should just use those pages.  If that's not possible, then

13   you'll have to remove those pages from the binders.  Certainly

14   the witness can look at them in the binder, but if the government

15   is not able to stipulate, then you'll have to take out those

16   pages from the binder and put them in separately.

17        MS. MARVIN:  Okay.

18        (Discussion had off the record.)

19        MS. MARVIN:  I'm going to provide these in hard copy to

20   the clerk.  That will be easier.

21        THE COURT:  And this should be Petitioner's 63.

22        MS. MARVIN:  This is prelabeled -- I'm sorry, it's so

23   confusing, but it's part of the -- this is actually one of the

24   exhibits that we submitted to the Court.  It's Petitioner's

25   Exhibit 27.

1          THE COURT:   Okay.

2          (Petitioner's Exhibit 27 marked for identification.)

3    BY MS. MARVIN:

4    Q.    Dr. Crosby, is the document that you have in front of you

5    the report that you prepared after examining Mr. Dhiab?

6    A.    Yes, it is.

7    Q.    You previously stated that you were able to meet with

8    Mr. Dhiab.  When was that meeting?

9    A.    I met with Mr. Dhiab on September 2nd, 3rd and 4th of

10   2014, last month.

11   Q.    What were the circumstances of your meeting?

12   A.    I performed an interview, along with Dr. Xenakis, in the

13   usual counsel echo room where I met Mr. Dhiab in echo camp.  And

14   we probably had a total of about 14 hours of time with him.  In

15   addition, we spent approximately 90 minutes doing a physical

16   examination in the detention hospital.

17   Q.    Did you review Mr. Dhiab's medical history before meeting

18   with him?

19   A.    I did review a number of records that were provided to me

20   prior to my meeting with him.

21   Q.    Did you obtain an oral medical history from Mr. Dhiab

22   when you met with him?

23   A.    Yes.

24   Q.    What did Mr. Dhiab tell you during that examination?

25   A.    So, you know, certainly it's important to understand what

1   illnesses and injuries he might have had prior to coming to

2   Guantanamo, and he did tell us about a severe back injury that

3   he had sustained in a motor vehicle accident prior to his

4   arrival at Guantanamo.

5          In terms of his current medical complaints, he -- I'll

6   say he's a very complex case, even for senior doctors.  I'm

7   skilled at taking care of patients like Mr. Dhiab.  He is very

8   complicated.  I'll go through some of what his medical

9   complaints were to us.

10          He has a long-standing history of back pain, severe back

11  pain, that he states predated his time at Guantanamo, but then

12  has really become progressively worse since about 2003, 2004.

13          He did report that these -- that this pain has been made

14  worse by a number of forcible cell extractions, and he estimated

15  to us -- I have no way to verify -- that he thinks he's probably

16  had 1,300 forced cell extractions.

17          He also complains of chronic mechanic pain, so the spinal

18  pain extends up into his neck.

19          He has severe headaches, mostly on the right side, which

20  sound migrainous, and those have been particularly troubling and

21  difficult to treat.

22          And I think one of the most peculiar complaints and one

23  of the most mystifying is his complaint of right-sided weakness

24  that began in his leg, has extended to his arm.  The weakness is

25  associated with numbness and is now on the right side of his

1    face.  And he describes the loss of sensation in his lower leg,

2    and the weakness has made it very, very difficult for him to

3    walk, and he requires -- currently required assistive devices.

4    **Q.**    Did Mr. Dhiab use a word to describe that discomfort?

5    Did he character- -- did he use a word to describe what made --

6    what he believes caused that pain or weakness in his right leg?

7    **A.**    Okay.  Let me get there.  Can I finish the rest of the

8    medical history?

9    **Q.**    Sure.  I'm sorry.

10   **A.**    So, anyway, that complaint is troubling and certainly,

11   you know, observations during our interviews, he was in

12   discomfort.  He was constantly moving position like someone

13   would with lumbar disc disease, couldn't stay in one position.

14        We did note that he did not use his right leg at all but

15   was able to use his right arm in terms of writing and shaking

16   hands.  He also complains of flank pain that he ascribes to

17   kidney pain, although there's no way to determine that, and

18   right-sided abdominal pain, and he described it as radiating

19   down to his testicles and penis.

20        He described blood in his urine and also what we call

21   urinary retention, where he finds it difficult to empty his

22   bladder.  It takes him a long time to urinate; as someone might

23   get with an enlarged prostate.

24        In putting, you know, the whole story together,

25   Mr. Dhiab -- I mean, his symptoms are confusing, they're

1    complicated, and he thinks that it's possible that one of the

2    explanatory -- there are -- one explanatory model might be the

3    presence of jinns, which are not human creatures, that actually

4    are common in Arab culture, inhabit the body and can cause,

5    usually psychological, but also physical symptoms, and he was

6    interested in pursuing that theory.

7    Q.    Are you -- I'm going put a medical record --

8         MS. MARVIN:  Your Honor, the government has stated that

9    they will not object to Petitioner's Exhibit 50, and -- which is

10   the exhibit that I'm taking these medical records from.  So they

11   have not -- they are not objecting to these records.  I'm going

12   to pull out records from Exhibit 50 to use in my examination of

13   Dr. Crosby.

14        THE COURT:  Are you ultimately going to be moving in all

15   the medical records or only the specific ones to which your

16   witnesses are going to refer?

17        MS. MARVIN:  We will be moving the specific ones that our

18   witnesses will refer to.

19        THE COURT:  Well, that's fine.  And I'm sure that will

20   make things a lot smaller, but you're going to have to then --

21   and maybe you've done it already -- mark each of the pages of the

22   medical records because those records are very extensive at this

23   point.

24        MS. MARVIN:  They are, Your Honor.  The government put

25   document reference numbers on the bottom right-hand corner of the

1    medical records.  We've collected a small portion of the records

2    and we've submitted those as Exhibit 50, so we may be able to

3    refer to them by reference to the document reference numbers on

4    the bottom right-hand corner.

5          THE COURT:  Well, I thought you just said that you've

6    already submitted them with a separate -- submitted that small

7    batch with a separate number.  Did I misunderstand that?

8          MS. MARVIN:  No, that is correct.  We -- from the batch

9    that the government provided --

10         THE COURT:  Why do you want to use the government's

11   numbers, then?

12         MS. MARVIN:  We -- we decided that it would be -- we

13   agreed on -- the government produced the medical records to us --

14         THE COURT:  I know.

15         MS. MARVIN:  -- and so they have a document reference

16   number on them, and we decided to use the copy that was produced

17   in this litigation.

18         THE COURT:  All right.  So it's got to get -- that batch

19   has to get a number for this hearing, though.

20         MS. MARVIN:  Okay.

21         THE COURT:  What number do you want to give it?

22         MS. MARVIN:  50.

23         THE COURT:  50?

24         MS. MARVIN:  Yes.

25         THE COURT:  All right.  This is Petitioner's 50.

1          (Petitioner's Exhibit 50A marked for identification.)

2          MS. MARVIN:  And, Your Honor, I'm not -- I just want to

3    make -- I would like to move Dr. Crosby's curriculum vitae and

4    her report into evidence.  I'm not sure if that was done.

5          THE COURT:  Well, what's the government have to say?

6          MR. WALTHALL:  Your Honor, on the same grounds we object

7    to the admission of those.

8          THE COURT:  Well, the curriculum vitae may be accepted

9    into evidence.  There's been so much testimony about it.

10          MS. MARVIN:  Okay.

11          (Petitioner's Exhibit 62 admitted into the record.)

12          THE COURT:  But did you mark that?

13          MS. MARVIN:  We did.  We marked it as Exhibit 62.

14          THE COURT:  Right, right.  Okay.  That's admitted.

15          MS. MARVIN:  And the report as well?

16          THE COURT:  Right.

17          MS. MARVIN:  That's Exhibit 27.

18          THE COURT:  Okay.  And that may be admitted.

19          (Petitioner's Exhibit 27 admitted into the record.)

20          THE COURT:  And now we're on Petitioner's 50, I do

21    believe, medical records?

22          MS. MARVIN:  Yes, medical records.

23          THE COURT:  Okay.

24    BY MS. MARVIN:

25    Q.    Dr. Crosby, I've handed you a medical record with the

1    document reference number 419 at the bottom.  It's a medical

2    record dated February 14th, 2014.

3        I'd like to direct your attention to the first notation,

4    midway through the paragraph where it states, "We spoke for 40

5    minutes about how he has no" -- and then in capital letters --

6    "physical abnormality that would preclude walking.  He believes

7    it to be, quote, genies, end quote, that control the headaches

8    and weakness, and we don't recognize that as a medical problem,

9    but his brothers know how to treat it."

10        Do you agree that Mr. Dhiab suffers from no physical

11   abnormalities?

12   A.   I -- I don't believe that.  I do believe he has physical

13   abnormalities; however, we don't have enough information to rule

14   in or rule out specific diagnoses.  For instance, an MRI of his

15   lumbar spine would be very helpful, especially since I do recall

16   reading one note where he had a test or a note referred to, a

17   radiculopathy, an S1 radiculopathy, and disc disease, although

18   it was never clarified with a radiological study, and so I

19   disagree.  I think there probably is some element of a physical

20   disease.  I also agree that there's likely an element of

21   psychosomatic disease as well.

22   Q.   Dr. Crosby, in the medical record where it states that he

23   believes that it is to be, quote, genies, end quote, do you

24   believe that is actually jinns, which he spoke to you about?

25   A.   I believe the note is referring to the jinns that he

1    spoke to us about, yes.

2    Q.    And can you describe for the Court what a jinn is?

3    A.    As I said, it's really a mythical nonhuman being that

4    inhabits the body and causes usually psychological symptoms such

5    as psychosis, seizures, sometimes physical symptoms, and this is

6    part of certain -- certain cultures in the Arab world.  It's --

7    it can be seen in certain cultures in the Arab world.  I have

8    patients in my own practice who believe jinns are responsible

9    for some of their symptomatology, and they use it as an

10   explanatory model of disease.

11   Q.    And what would you do if a patient presented to you with

12   a complaint of jinns?

13         MR. WALTHALL:  Your Honor, may I impose an objection here?

14   This is -- the basis of it's going to be primarily relevance.

15   None of this testimony has anything to do with the enteral

16   feeding.

17         THE COURT:  The objection's overruled.  Go ahead, please.

18   She may answer the question.

19         THE WITNESS:  I'm sorry.  Will you repeat the question?

20   BY MS. MARVIN:

21   Q.    How would you treat a patient that presented to you with

22   a complaint of jinns?

23   A.    You know, that depends on the individual patient, what

24   the complaint was, what the context of the medical illness was.

25   In somebody like Mr. Dhiab's case, I would probably utilize an

1    Islamic or cultural healer as part of the treatment team to

2    further discuss this with him.

3    **Q.**    When you -- when you met with Mr. Dhiab, did he indicate

4    that he had the benefit of meeting with an Islamic healer or

5    Muslim healer?

6    **A.**    He did not.

7    **Q.**    Dr. Crosby, are you aware that Mr. Dhiab has declined to

8    go to medical appointments, especially medical appointments in

9    the Behavioral Health Unit?

10   **A.**    I am aware of that.  I read it in the medical record, and

11   he also explained to us that he wasn't willing to go to medical

12   appointments.

13   **Q.**    In your opinion, based on your review of Mr. Dhiab's

14   medical records and after meeting with him, do you know of a

15   reason why Mr. Dhiab would not want to attend medical

16   appointments?

17   **A.**    Mr. Dhiab, as he explained to us in their -- which is

18   largely corroborated in the medical records, he does not have

19   faith or trust in the medical staff at Guantanamo.  You know,

20   reasons, I think, his -- his perception of the medical staff

21   being intimately involved with the forcible cell extractions and

22   the force-feeding, which he described were degrading and

23   inhuman.

24        His perception that his pain's not being adequately

25   treated.  You know, and in fact, Dr. Xenakis and I, you know,

1   witnessed one episode where he asked the nurse for more pain

2   medicine because he was in pain, and that request was denied.

3   He then asked to speak to the doctor about his pain, and that

4   request was also denied.  So, I mean, we could actually observe

5   a -- kind of a contentious relationship.

6        Also, what Mr. Dhiab described, and which is corroborated

7   in the medical records, is the issue of the wheelchair being

8   withheld from him when he felt he wasn't able to walk, and he

9   felt that was punishment.  I'm glad to hear he has his

10  wheelchair back.

11       So, you know, there are a number of instances where he

12  felt the medical staff were involved in punishment, and in

13  activities that were non-medical, and that has eroded his trust

14  in the medical doctors caring for him.

15       I think also the fact that there's a fairly rapid

16  turnover of doctors at Guantanamo makes it hard to establish

17  trust.  And, again, he's a very, very complex patient.

18  Q.   In your view, should doctors ever be involved in

19  disciplinary matters?

20  A.   Absolutely not.  That goes -- that's a violation of

21  medical ethics of professionalism.  Doctors should be completely

22  firewalled from disciplinary action.  And I think that

23  distinction has been blurred here in this situation.

24  Q.   And can you please describe how?

25  A.   How the --

1    Q.    How it's been eroded?

2    A.    How it -- as I said, the doctors involved in what he

3    feels are degrading and inhumane treatment with the forced cell

4    extractions and force-feeding.  He described he was force cell

5    extracted once for a phlebotomy when he just asked the nurse if

6    he could wait a little while because he was feeling tired.

7          The fact he doesn't feel his pain is being adequately

8    treated.  He reported to us he didn't feel the medical staff

9    were taking a lot of his complaints seriously.  As I said

10   before, the withdrawal and not letting him have access to

11   assistive devices such as crutches or a wheelchair when he felt

12   he could not walk.  All of these things have eroded the

13   confidence that he has in the medical staff, and I think taking

14   everything together and what we observed, you know, I think

15   that's a reasonable perception on his part.

16   Q.    Dr. Crosby, I'm going put another medical record up.

17         THE COURT:  And now what number is this going to be?

18         MS. MARVIN:  This is part of our Exhibit 50, Your Honor.

19         THE COURT:  All right.  So, therefore, what we marked

20   before as 50 should really be 50A and what you're handing the

21   witness now will be 50B.

22         MS. MARVIN:  Okay.

23         (Petitioner's Exhibit 50B marked for identification.)

24   BY MS. MARVIN:

25   Q.    Dr. Crosby, this is a medical record that's titled, "Cell

1    Visit Nursing Note."  It's dated April 25th, 2014.  Do you see

2    that?

3    **A.**     Yes.

4    **Q.**     At the bottom of the page there's a box that says,

5    "Notes."  Do you see that?

6    **A.**     Yes.

7    **Q.**     The second full sentence starts with "ISN 722."  Can you

8    please read that note to me?

9    **A.**     "ISN 722 wants WC" -- which I believe is wheelchair --

10   "and crutches.  ISN 722 notified that his disc" -- DISC, which I

11   believe is disciplinary -- "status with guard force is affecting

12   his ability to have a wheelchair.  722 insists it is a medical

13   thing."

14   **Q.**     Do you agree with Mr. Dhiab that it is a, quote, medical

15   thing, end quote?

16   **A.**     Well, this note in and of itself is troubling in that it

17   looks like medical care is being withheld as part of

18   disciplinary status, and that -- that should never happen.

19   **Q.**     Is it consistent with the proper standard of medical care

20   to withhold a wheelchair to a patient who needs it -- for a

21   patient?

22   **A.**     No.  It would not be consistent with standard of medical

23   care.  It feels punitive on the part of the medical staff.

24   **Q.**     Dr. Crosby, you -- you conducted a physical examination

25   of Mr. Dhiab; is that correct?

1    **A.**     Yes, I did.

2    **Q.**     Can you summarize for the Court your findings and

3    conclusions based on that physical examination?

4    **A.**     Um, certainly.  So Mr. Dhiab visibly is -- is in pain, in

5    chronic back pain.  When we saw him, he was not using his right

6    leg.  He was not ambulating.  He was completely -- had full

7    capacity, was engaging, was cooperative with our evaluation.

8    And the -- the pertinent findings on the physical examination

9    were he did have moderate to severe back pain, both in his neck

10   and his lower back.  He also had a scar over his lower back that

11   was consistent with some sort of blunt injury in the past.  No

12   idea when that might have occurred.

13       And he had pain in his right flank and the right side of

14   his abdomen.  He -- his neurological exam was very interesting.

15   He complained that he could not feel on the right leg below the

16   knee and that he was weak.  He had decreased sense of feeling in

17   his right thigh, his right arm and the right side of his face,

18   so it's a very unusual distribution.  He was not able to use his

19   right leg for me.  He was able to use his right arm, although I

20   described it was weaker, and again, described the decreased

21   sensation on his face.

22       You know, supporting, you know, my findings, when I took

23   an instrument and -- a painful stimuli to the bottom of his

24   feet, he withdrew quickly on the left and didn't respond at all

25   on the right, indicating that he does have decreased sensation.

1          So those are -- those are the highlights of my findings

2    on the physical exam.

3    **Q.**    Are you aware, based on your review of Mr. Dhiab's

4    medical records, that the Joint Detention Group has

5    characterized Mr. Dhiab's symptoms as malingering?

6    **A.**    I -- I think I've seen that somewhere in the records.

7    **Q.**    Can you please describe for the Court what malingering

8    is?

9    **A.**    I will, but I just want to make it clear:  I did not have

10   a chance to speak to the Joint Medical Group or any of the

11   doctors caring for him, which would have made things a lot

12   easier, I think, for me.

13         Malingering is the deliberate manufacturing or faking,

14   fainting of symptoms for an end for a cause, such as faking pain

15   to get narcotics or faking an injury to get insurance or

16   disability.

17   **Q.**    In your view, based on your examination of Mr. Dhiab and

18   your review of his medical records, do you believe Mr. Dhiab is

19   malingering?

20   **A.**    I don't believe Mr. Dhiab is malingering, and, you know,

21   this is based on almost 20 years of clinical experience.  I do

22   believe that there may be an element of -- some of his physical

23   symptoms may be expression of psychological distress.  So I

24   think there may be both a physical and somatic -- psychosomatic

25   component to the symptoms he's exhibiting, but I do not believe,

1    in my medical opinion, that he's faking or malingering.

2    Q.    Would the combination of psychosomatic and physical

3    symptoms impact how you would treat a patient in terms of what

4    standard of care you would provide?

5    A.    Yes, it would.

6    Q.    How?

7    A.    Well, certainly in someone like Mr. Dhiab, for whatever

8    reason, you know, he's not using his right side, he's not using

9    his leg, he would need a multidisciplinary approach to his

10   medical treatment, and that would include culturally competent

11   psychotherapist, physiotherapist, physical therapy, orthopedics,

12   internists, really a broad approach, along with potentially

13   culturally Islamic healers.

14   Q.    When you reviewed Mr. Dhiab's medical records -- oh, I'm

15   sorry.

16         When Mr. Dhiab spoke to you about his complaints, he

17   stated that he had blood in his urine; is that correct?

18   A.    He did complain of that, and that complaint was

19   corroborated in the medical records that I reviewed.

20   Q.    And has he been adequately treated for those symptoms?

21   A.    Not to my knowledge.  And, again, I did not have a chance

22   to confer with the physicians at Guantanamo.  I did see that he

23   had a urology consult.  A urologist came to see him, confirmed

24   presence of blood in the urine.  And I'm quite happy to see that

25   after I departed from Guantanamo, he obtained an abdominal CAT

1    scan, although I don't know the results of that.  And he's not

2    undergone cystoscopy, which is actually looking into the bladder

3    to ascertain if there's any lesions causing the bleeding.  So

4    he's not -- he's not had a full evaluation, to my knowledge.

5    **Q.**    And you haven't seen any of the results of the testing

6    that occurred in late September; is that correct?

7    **A.**    No.  There was reference to them in an affidavit that we

8    received -- or a declaration that we received recently that made

9    reference to the fact that he'd had some scans and tests done

10   after we left Guantanamo, but I don't have -- I don't have the

11   copies of those.

12   **Q.**    I'm going to put up another medical record for your

13   review.

14        THE COURT:  I think this is probably a good time to take a

15   short break, especially for our court reporter.  Would you step

16   down, please.  We'll take a 15-minute break, but when I say 15

17   minutes, everybody, I really mean 15 minutes.

18        (Thereupon, a break was had from 11:26 a.m. until

19   11:45 a.m.)

20        THE COURT:  We are back on the record, everybody, in

21   05-1457.  All counsel are present, and the witness may take the

22   stand, please.

23        MS. PRADHAN:  Your Honor, this is Alka Pradhan for the

24   petitioners.  I just wanted to make a brief point of

25   clarification, if I may, regarding the exhibits.  The medical

1    records that we've been showing have already been submitted to

2    the Court and to Respondents under PX50, so that --

3         THE COURT:  So they're all a part of -- well, the new

4    pages don't have to be put in, but number -- and we've just got

5    to have things accurate.  There has to be -- and maybe you all

6    want to talk about this at lunch time -- a showing of whichever

7    pages the witnesses are testifying to, and that's why I started

8    with 50A, B, C, after I was told that all the records were 50.

9    Why won't that work?

10        MS. PRADHAN:  I absolutely understand, Your Honor, and the

11   issue is that the medical records are so voluminous that it can

12   be confusing, so what we he did in submitting our exhibits, is

13   the government submitted all of the medical records as one

14   exhibit.  What we did on the Petitioner's side is submit a subset

15   of those medical records, of those same medical records that the

16   government had already submitted, under PX50.  So the PX50

17   records already have the government's Bates numbers on the top

18   and bottom of each page.  So the way that we would like to refer

19   to it when we pull them up on the screen in front of you is by

20   the government Bates number which can be turned to in the binders

21   that you already have in front of you, if that's acceptable to

22   you.

23        THE COURT:  Is this going to make it easier for counsel,

24   for all counsel?

25        MR. WARDEN:  This is Andrew Warden from the Department of

1    Justice.  This was the organizational way we thought it would be

2    most convenient for everybody, was to premark everything with --

3            THE COURT:  All right.

4            MR. WARDEN:  -- one set of numbers, but we'll do whatever

5    the Court would prefer.

6            THE COURT:  We'll do it that way on one condition, and

7    that is that you carefully, both sides, go over all of these

8    medical records with Mr. Smith so that we get it straight and

9    he's not left holding the bag.  Okay?

10           MS. PRADHAN:  Thank you, Your Honor.

11           MS. MARVIN:  Your Honor, I'm going to resume direct --

12           THE COURT:  Go ahead.

13           MS. MARVIN:  -- of Dr. Crosby.

14   BY MS. MARVIN:

15   Q.    Dr. Crosby, before the break I handed you an exhibit that

16   is a medical record that's part of PX50.  On the bottom it

17   states it's document reference number 237.

18         Do you have that in front of you?

19   A.    Yes, I do.

20   Q.    Can you please -- there's an entry on the record for June

21   28th, 2013.  Can you please --

22           THE COURT:  Excuse me a minute.  You still have to give me

23   a copy of the page you're referring to.

24           MS. MARVIN:  I gave Mr. Smith a copy of that record before

25   the break.

1      THE COURT:  Oh, thank you.  And these are the two we had

2  before the break.  Okay.  Go ahead.

3  BY MS. MARVIN:

4  Q.    Dr. Crosby, you can see on the record that it's dated

5  June 28th, 2013?

6  A.    Yes.

7  Q.    Can you please read for me the entry for that date?

8  A.    Yes.  "Reviewed 508s.  Discontinue, walker/crutches,

9  athletic shoes, cotton socks, lumbar support pillow, extra

10  ISO-MAT, boxer briefs, bilateral knee Neoprene Sleeve, bilateral

11  wrist Neoprene Sleeve, bilateral ankle braces, cervical soft

12  neck collar, ring cushion pillow, wrist sleeve, back brace,

13  continue Sensodyne toothpaste."

14      And I should add that this is a doctor's orders.

15  Q.    Based on your examination of the medical records and your

16  examination of Mr. Dhiab, is there any medical reason why a

17  doctor would take these items away from Mr. Dhiab?

18  A.    I cannot think of any medical reason why a doctor would

19  write orders to discontinue these items, and especially items

20  that might relieve some of his pain, would assist him in

21  ambulation, such as a walker and crutches, the lumbar support

22  pillow, the extra ISO-MAT, the joint sleeves to help stabilize

23  his joints, the cervical soft neck collar, and the back brace

24  which he said had helped him.  I can't think of any reason why a

25  doctor would discontinue these items.  You know, it seems

1    punitive on the -- on the surface.

2    Q.    In your opinion, could withholding items such as the

3    lumbar support pillow, the extra ISO-MAT, and the cervical soft

4    neck collar, exacerbate Mr. Dhiab's neck and back problems?

5    A.    Yes.  I absolutely do believe that withholding these

6    items would exacerbate his severe back pain.  He specifically

7    talked to me about the thin ISO-MAT that he sleeps on, and how

8    it just is not sufficient support for his back, and he is in

9    pain when he sleeps.  He also talked about how the back brace

10   was helpful and how it -- he was not able to ambulate without

11   the walker or his crutches.  So in my opinion these are all

12   items that would help to relieve Mr. Dhiab's pain.  I mean,

13   anybody with severe back pain will really understand that

14   sleeping on a thin ISO-MAT and not having access to some of

15   these items would not be -- you know, would be bad, would

16   exacerbate his condition.

17   Q.    Thank you.  I'm going to show you one more medical record

18   from Petitioner's Exhibit 50.  The medical record is record 224.

19   A.    And I just wanted --

20         THE COURT:  Excuse me for just one minute.

21         Go ahead, please.

22         THE WITNESS:  Yeah.  I just wanted to make one more

23   comment.  And I can't think of any reason why a physician would

24   write an order to discontinue socks or boxer briefs.  I mean,

25   I've never seen anything like that in any medical record.

1          THE COURT:  I'm sorry.  Would you go over that again,

2     please?

3          MS. MARVIN:  Yes, Your Honor.  She's still -- Dr. Crosby

4     was testifying as to the previous medical record.

5          THE COURT:  Oh, well, no wonder.

6          MS. MARVIN:  It has 237 on the bottom right-hand corner.

7          THE COURT:  Again, Mr. Smith, could I have that one back,

8     please?

9          THE WITNESS:  And this is important because this is an

10    example of why the trust in the medical staff has been undermined

11    with Mr. Dhiab, and --

12         THE COURT:  But what were you referring to when you first

13    started speaking on this page?

14         THE WITNESS:  On this page?  Um, I initially talked about

15    how withdrawing items, medical items --

16         THE COURT:  I know that, but when we had about a 30-second

17    stop.

18         THE WITNESS:  Oh, sorry.  I don't understand a doctor's

19    order to discontinue cotton socks or boxer briefs.  I -- I don't

20    see how that's in any way -- should be in a doctor's order.  That

21    is a guard disciplinary -- that is some other function.  It is

22    not a medical function.  And my impression is that this helps

23    explain why the trust has been undermined with the medical staff

24    and why Mr. Dhiab feels the medical staff are not there to look

25    out for his best interest, when they're writing orders to

1    discontinue these items.

2    BY MS. MARVIN:

3    Q.     Thank you.  I'm going to move now to medical record 224.

4           MS. MARVIN:  Your Honor, I gave a copy of that to

5    Mr. Smith previously.

6           THE COURT:  Yes, I do have a copy of that.

7    BY MS. MARVIN:

8    Q.     Dr. Crosby, I would like to draw your attention to the

9    May 11th, 2013 entry.  Do you see that?

10   A.     Yes.

11   Q.     Can you please read for me the first sentence of that

12   entry?

13   A.     You're referring to the RN note --

14   Q.     Yes.

15   A.     -- 2230?

16   Q.     Yes.

17   A.     "Detainee complained of fire-like pain in his nose

18   because "A nurse just jammed the tube in my nose yesterday

19   morning.  Detainee was offered multiple times to drink his feed

20   instead of having to have an NG tube placed."

21   Q.     Thank you.  That's -- thank you.

22          In your opinion, based on your review of Mr. Dhiab's

23   medical records and your examination of Mr. Dhiab, does repeated

24   insertion of the nasogastric tube used for force-feeding cause

25   Mr. Dhiab pain?

1   **A.**     He certainly described the procedure as painful at times.

2   Obviously there's variability, and it's confirmed in the

3   records.

4   **Q.**     In your 20 years of practice, have you ever heard of a

5   situation where the nasogastric tube was inserted multiple times

6   a day?

7   **A.**     So normally, if somebody needs nasogastric feeding, for

8   instance in the hospital, you place a tube and it can safely

9   stay in place for even up to weeks before changing.  And that is

10  to -- for the comfort of the patient and to prevent repeated

11  insertions of the tube, potentially causing a complication,

12  again, which has to be weighed against the risk of keeping a

13  foreign body in place that could be the locus of an infection.

14          Typically what we do in standard practice would be to

15  keep the tube in place.  I can think of situations where a tube

16  would have to be removed if a patient was psychotic, very

17  combative, actively suicidal, using the tube as a weapon, not

18  competent, causing risk to others.  It certainly -- there would

19  be exceptions to -- well, contraindications to leaving a tube in

20  place.

21          THE COURT:  But how substantial is the government's

22  response that they -- that it is trying to avoid infection?

23          THE WITNESS:  I think that's controversial.  I absolutely

24  believe there is a risk of infection with leaving any foreign

25  body in place in the body.  There's also that has to be balanced

1    against the risk of pulmonary intubation, perforation,

2    complications of repeated insertion of the tube.  So it's always

3    a risk/benefit ratio.  And in patients in the hospital, we

4    routinely do not insert and remove a tube for every feeding.  We

5    leave it in place and change it at some interval.

6         THE COURT:  Do you have any knowledge as to whether in the

7    United States Bureau of Prisons facilities, upon which the

8    government is claiming it has modelled many of its procedures, in

9    those facilities do you know whether they keep those tubes in --

10   for an extended period of time or change them after every use, if

11   you know?

12        THE WITNESS:  I have only seen one person in the Bureau of

13   Prisons, and I've seen both.  It depends on the individual

14   situation.  Is there a safety risk with the tube?  Can the tube

15   be left safely in place?  And that's going to be an individual

16   assessment of every person, but I do not have extensive knowledge

17   of the Bureau of Prisons.

18        THE COURT:  And you may have said this.  In your

19   observation of that individual person, what was happening?  Did

20   they keep it in or take it out?

21        THE WITNESS:  In this individual person, it was necessary

22   to take it out and -- and replace it.

23        THE COURT:  Okay.  Go ahead, please.

24   BY MS. MARVIN:

25   Q.    In your opinion, does Mr. Dhiab present with any of the

1    indicia for causing the doctors to remove it every day?

2    **A.**      In -- in my evaluation of Mr. Dhiab, he was fully

3    cooperative.   He indicated to us that he would accept enteral

4    feedings in order to maintain his protest against what he feels

5    was disrespect and inhuman treatment, but would not resist.   He

6    would accept enteral feedings voluntarily.

7         He also is drinking nutritional supplements on his own

8    and he's eating food.   In fact, Dr. Xenakis and I ate with him,

9    and it was actually pretty surprising.   The guards would not let

10   him take food that he was eating back to his cell.   They

11   actually confiscated food from him, despite our request to let

12   him have the food and to continue to eat; so, you know, again,

13   this sort of contention situation.

14        But at least my opinion is that my evaluation of

15   Mr. Dhiab is that he's willing to accept enteral feeding in a

16   non-forceful way, and that's been documented in the medical

17   record, that he is willing to do that without the forced cell

18   extraction and without the five-point restraints.

19   **Q.**      I'm going to show you one more record.   This is also part

20   of Petitioner's Exhibit 50.   It's medical record 248.

21        Dr. Crosby, you'll see I've given you medical record 248.

22   You'll see midway through the page there's a notation for an

23   entry dated November 19th, 2013?

24   **A.**      Yes.

25   **Q.**      Do you see that?

1    A.    Yes.

2    Q.    It states, "Detainee requested RN visit.  Detainee states

3    that he does not want levity -- Jevity.  He would like to have

4    Ensure.  Detainee also complained of nasal bleeding in the right

5    nostril.  Does not work, left nostril works but bleeds heavy

6    when a nasal tube was inserted."

7          Does that affect your judgment?

8    A.    I mean, this is an example of the discomfort of inserting

9    the nasogastric tube repeatedly, and he does have complaints

10   throughout the medical record where it is painful and has caused

11   bleeding.

12   Q.    Okay.  Dr. Crosby, you've mentioned the term "forcible

13   cell extraction" earlier today.  How do you know about the

14   forcible cell extraction, or what is known as the FCE procedure?

15   A.    This has been described to me by various detainees at

16   Guantanamo, including Mr. Dhiab.

17   Q.    I think you said earlier that Mr. Dhiab told you that he

18   was FCE'd approximately 1,300 times; is that correct?

19   A.    That's what he told me, yes.

20   Q.    What is your medical opinion on how the FCE process has

21   impacted Mr. Dhiab's health?

22   A.    From a physical standpoint, I think it's exacerbated his

23   chronic back and neck pain, and the position that he is -- that

24   he's described that he's in when the guards go in to pick him up

25   is painful.  He's described being dropped.  He's described

1    having pressure from somebody's foot to stay -- to put on his

2    back, and the end result is that it's exacerbated his chronic

3    back and neck pain.

4    Q.     Based on your examination of Mr. Dhiab and your review of

5    his medical records, is it your opinion that Mr. Dhiab would be

6    willing to eat or be enterally fed without being FCE'd?

7    A.     Yes, it is.  And that's based on, you know, my

8    conversations with Mr. Dhiab but also based on medical records

9    where he has told medical staff that he would be willing to be

10   enterally fed in a humane way where he's not forcibly cell

11   extracted and restrained.

12   Q.     All right.  Dr. Crosby, Judge Kessler mentioned an

13   exhibit that was filed recently on September 29th, 2004.  It's a

14   declaration of the current senior medical officer at Guantanamo.

15   I now want to ask you a couple of questions about that.

16          MS. MARVIN:  It's Respondents' Exhibit 37A.  Do you want a

17   copy?

18   BY MS. MARVIN:

19   Q.     Have you seen this declaration before?

20   A.     Yes, I have reviewed this declaration.

21   Q.     Let's look at paragraph 10 of this declaration.  The

22   current SMO or senior medical officer states, "Dr. Xenakis and

23   Dr. Crosby take issue with what they perceive to be a diagnosis

24   of, quote, culturally-bound syndrome, end-quote by the Joint

25   Medical Group."

1       Can you please describe what is meant by the term

2   "culturally-bound syndrome?"

3   A.      Yes.  This is -- this is quite common and it is when

4   patients, people have an explanatory model for symptoms that is

5   based either in cultural beliefs, religious beliefs, and it

6   forms the basis of their explanation.  And as an example, I have

7   a number of patients who actually have seizures when they

8   believe their ancestors are inhabiting their body and coming to

9   visit them from the past.  And this would be an example of a

10  culturally-bound syndrome.

11      Mr. Dhiab is -- is concerned that the reason his right

12  leg is weak is because a jinn has inhabited his leg; again,

13  another example of a culturally-bound syndrome.

14  Q.      Would taking a wheelchair away from someone who

15  complained of these symptoms help to treat those symptoms?

16  A.      Actually, that's completely inappropriate and cruel to

17  withhold a wheelchair from somebody who is not able to walk,

18  whatever the reason that they're not able to walk is.

19  Q.      And is your answer the same with respect to boxer shorts

20  and socks?

21  A.      Again, I have no explanation for the boxer shorts or

22  socks.

23  Q.      Let's look at paragraph 11.  The current SMO states,

24  "Dr. Crosby takes issue with the alleged absence of radiologic

25  data to evaluate Mr. Dhiab's condition."

1       She then -- oh, I'm sorry.

2       The current SMO then goes on to state that, "CT scans

3   were performed on September 11th, 2014.  Another CT scan was

4   performed on September 22nd, 2014.  Mr. Dhiab's lumbar spine was

5   imaged on July 7th, 2009, and he had multiple x-rays on

6   September 22nd, 2014."

7       Can you remind us when you visited -- when you examined

8   Mr. Dhiab and wrote your report?

9   **A.**    I visited Mr. Dhiab on September 2nd, 3rd and 4th and

10  submitted my report following that -- that visit.

11  **Q.**    So all of these tests, with the exception of the July

12  7th, 2009 CT scan, were performed after you submitted your

13  report in this case?

14  **A.**    Yes.  And I'm actually happy to see these tests have been

15  done because these are tests that I recommended in my report,

16  although it would be important to see the actual scans.

17  **Q.**    And were you provided with the CT scans that were

18  performed on July 7th, 2009 before you examined Mr. Dhiab?

19  **A.**    Um, I don't believe so.  I -- and I'm trying to qualify

20  that.  During the actual physical examination, there were

21  several CT images on a computer screen that were just not

22  adequate at all for any diagnosis, and they were older and I

23  don't recall what the date of those was, but they were not

24  helpful in making a diagnosis or ruling out a diagnosis.

25  **Q.**    And why is that?

1   A.      There were only a few images on the available -- on the

2   screen.  There -- it was not a complete set of scans.

3          THE COURT:  Let me ask you this:  If the most recent scan,

4   September 22nd of this year, showed normal -- let me back up --

5   showed no nerve root compression, is it likely that there would

6   have been such nerve root compression back in 2009?

7          THE WITNESS:  Your Honor, I -- to evaluate nerve root

8   compression, you would need to do an MRI.

9          THE COURT:  Don't they usually get worse in time?

10         THE WITNESS:  Disc disease and nerve root compression can

11  actually spontaneously get better with time or worse.

12         THE COURT:  Okay.

13         THE WITNESS:  So we don't have a -- it's great we have the

14  head CT, and it's great we have the abdominal CT, but we really

15  don't have an accurate imaging study of his spine.

16         THE COURT:  Okay.

17  BY MS. MARVIN:

18  Q.      Do you know if there's an MRI machine at the hospital in

19  Guantanamo?

20  A.      I've been told that there is not.

21  Q.      Paragraph -- should there be an MRI machine at the

22  hospital in Guantanamo?

23  A.      I mean, I would say yes.  And I think part of the

24  difficulty here is that patients are getting older, they're

25  presenting with complex medical problems, and it requires

1    sophisticated care, including radiologic studies, MRI machines,

2    cath labs, and it's only going to get worse as the population

3    ages, so yes, there should be.

4    **Q.**    Is it your view that to adequately treat Mr. Dhiab, an

5    MRI should be performed on his spine?

6    **A.**    Yes, and that would be the standard.

7    **Q.**    In paragraph 12 of the declaration, the current SMO

8    comments on your opinion that Mr. Dhiab may be at risk for

9    osteoporosis.  The current SMO says, "I disagree with her on

10   that matter.  Men with clinical manifestations of low bone mass,

11   such as radiographic osteo-" -- I'm sorry, this copy is bad --

12   "osteopenia, or a history of non-traumatic fractures may warrant

13   testing."

14        The current SMO is stating that Mr. Dhiab is not at risk

15   for osteoporosis?

16   **A.**    To be thorough, a man who is malnourished, as Mr. Dhiab

17   is, who does not have access to a lot of sunlight and is very

18   sedentary would be at risk.  And this is something that we

19   evaluate in our underweight anorexia patients.  So normally it

20   would be very rare for a man in his 40s to have osteoporosis,

21   except these are different conditions.  And just to be thorough,

22   it's something you would have to consider that he might be at

23   risk for fracture.  And this, obviously, has implications for

24   forced cell extractions which might put him at risk for bone

25   trauma.

1    Q.    And moving on to paragraph 13, "The current SMO

2    discusses -- stated that Mr. Dhiab has had two urology consults

3    in the past year to address complaints of testicular pain,

4    frequency of urination, nocturia, and inability to empty his

5    bladder.

6          Were you provided with any medical records in respect to

7    those consults?

8    A.    I recall seeing one note from a urologist, and the

9    urologist had recommended some test.  I did not see any further

10   results of those tests or any additional workup.  So to the best

11   of my knowledge, with the information I have, no, I did not see

12   a complete evaluation.

13   Q.    Was there ever any diagnosis for Mr. Dhiab's complaint

14   that there was blood in his urine?

15   A.    At one time there was a working diagnosis of a kidney

16   stone, although, that's not been documented.  You know, the

17   standard of care, especially in a man over 40, would be to do a

18   cystoscopy as well, which is to actually look into the bladder

19   to make sure there's no bleeding lesions.

20   Q.    And as far as you're aware, even based on what the SMO

21   states in paragraph 13, those tests have not been completed?

22   A.    Not to my knowledge, not that I've seen.

23   Q.    In paragraph 14, the current SMO states that, "Mr. Dhiab

24   had an EKG on June 10th, 2014."

25         Would that -- were the records of that EKG provided to

1   you before your visit?

2   **A.**     I've not seen any EKGs on Mr. Dhiab.

3   **Q.**     Would it have been useful?

4   **A.**     It would have been useful in the context of the -- in

5   determining if he had any complications from malnutrition

6   because of his hunger strike.  Yes, in that context it would

7   have been helpful.

8   **Q.**     Do you believe that this is a legitimate disagreement

9   about the proper medical care for Mr. Dhiab?

10  **A.**     I think -- yes, I think there are legitimate concerns.

11  Again, I think it would also be very helpful to actually speak

12  with the physicians involved in his care and discuss these

13  concerns and hopefully come to a consensus.

14  **Q.**     Do you believe that the primary concern is that the

15  decisions that are being made are being made based on security

16  concerns rather than medical concerns?

17  **A.**     Based on speaking with Mr. Dhiab and the medical records,

18  I am very concerned that physicians, orders and treatment are --

19  have blurred into disciplinary concerns, and that is undermining

20  the doctor-patient relationship.

21       MS. MARVIN:  Your Honor, that concludes our direct of

22  Dr. Crosby.  There are a few items in Dr. Crosby's testimony that

23  involve classified matters -- I think less than five minutes --

24  that we would like to address briefly later in the closed

25  session.

1        THE COURT:  Before cross-examination?

2        MS. MARVIN:  We are -- we're happy to do it after -- we

3    can -- whatever the Court prefers.

4        THE COURT:  Well, I indicated that the government could

5    make a decision as to whether it wanted to do open-court cross --

6    which we certainly have time to do this morning -- and naturally

7    retain its cross on classified information for later, or do all

8    of its cross together in the afternoon, obviously.

9        So what is the government's response?

10       MR. WALTHALL:  Your Honor, we have no -- we have no

11   confidential information with respect to --

12       THE COURT:  I'm sorry, could you talk louder?

13       MR. WALTHALL:  We have no -- we have no confidential

14   information that we're going to cross-examine on, so --

15       THE COURT:  So you're ready to cross now?

16       MR. WALTHALL:  Yes, we can cross.

17       THE COURT:  Yes, I'd like to proceed with

18   cross-examination, then.

19       MS. MARVIN:  Thank you, Your Honor.

20       MR. WALTHALL:  Your Honor, Timothy Walthall for the United

21   States.

22       THE COURT:  Go ahead, please.

23                CROSS-EXAMINATION OF SONDRA CROSBY

24   BY MR. WALTHALL:

25   Q.    Good morning, Dr. Crosby.

1    A.    Morning.

2    Q.    Now, Dr. Crosby, your clinical practice focuses on the

3    care of asylum seekers and refugees; is that correct?

4    A.    Yes, that's the focus.

5    Q.    And your forensic work is focused on what you call

6    survivors of torture; isn't that right?

7    A.    War trauma, abuse, sexual assault, yes.

8    Q.    Survivors of torture?  Is that a "yes"?

9    A.    Yes.

10   Q.    And you evaluated hunger strikers, as we heard on your

11   direct examination, from Guantanamo and elsewhere?

12   A.    Yes, I have.

13   Q.    And in your work you have written over 300 affidavits?

14   A.    Yes, I have.

15   Q.    And you have filed numerous affidavits on behalf of

16   Guantanamo detainees, you said that on direct examination?

17   A.    Yes.

18   Q.    And all of those cases were on behalf of the detainees;

19   isn't that correct?

20   A.    Are you referring to the Guantanamo detainees?

21   Q.    The Guantanamo detainees.

22   A.    Yes.

23   Q.    And none of them have been on the behalf of any

24   correctional organizations?

25   A.    I've not been asked to write any reports on behalf of a

1    correctional organization.

2    Q.    And so the answer's no?

3    A.    No.

4    Q.    And none of them have been on behalf of any military

5    detention facility?

6    A.    No.

7    Q.    And in this case you've testified that you reviewed

8    Petitioner's medical records provided to you by Petitioner's

9    counsel, correct?

10   A.    I have, although not a complete set of medical records.

11   Q.    Now, you've reviewed records from April 2013 to August

12   2014, right?

13   A.    Roughly that time span.

14   Q.    And you talked to the Petitioner?

15   A.    Yes, I have.

16   Q.    And you're aware that he is a law of war detainee who you

17   would agree has a strong motive to get out of detention?

18   A.    Yes.

19   Q.    And under your -- in your practice, it is important that

20   a hunger striker should be protected from coercion; isn't that

21   correct?

22   A.    Yes.  That is one of the fundamental principles of Malta,

23   the World Medical Association guidelines for hunger strikers.

24   Q.    And you took the Petitioner's word at face value that he

25   was not coerced into maintaining his hunger strike?

1    **A.**    No, I -- I don't think that's exactly accurate.

2    **Q.**    Did you discuss whether his hunger strike was voluntary?

3    **A.**    His -- his hunger strike has been off and on.  Currently

4    my understanding from the Petitioner, Mr. Dhiab, is that his

5    hunger strike is voluntary.

6    **Q.**    Right.

7    **A.**    He did describe times in the past where he felt pressure

8    from -- from others.

9    **Q.**    From other detainees?

10    **A.**    Yes.

11    **Q.**    And your physical examination consisted of one day?

12    **A.**    The physical examination was about 90 minutes.

13    **Q.**    90 minutes.

14         And you interviewed him on two other occasions?

15    **A.**    Yes.  So for a total of approximately 14 hours with

16    interviews and the examination.

17    **Q.**    And based on that, your recommendation to this Court is

18    that the Petitioner requires a multidisciplinary treatment team

19    which is independent of the GTMO staff?

20    **A.**    That recommendation is based on my --

21    **Q.**    That is the --

22    **A.**    Right.

23    **Q.**    That is your recommendation?

24    **A.**    That is my recommendation --

25    **Q.**    Thank you.

1   **A.**      -- based on my evaluation.

2   **Q.**      Thank you.

3          And I believe on direct examination you said that the

4   Petitioner was suffering from neuropsychic disease?

5   **A.**      Psychosomatic.

6   **Q.**      Psychosomatic?

7   **A.**      Potential psychosomatic symptoms.

8   **Q.**      Okay.  Would that constitute neuropsychic disease?

9   **A.**      I don't know --

10  **Q.**      Is that a --

11  **A.**      -- exactly what --

12  **Q.**      -- neuropsychic disease?

13         THE COURT:  One at a time, everybody.  Ask the question,

14  please.

15  BY MR. WALTHALL:

16  **Q.**   Was your testimony -- I'm trying to get at your testimony

17  on direct examination.

18         And was it in your evaluation of Mr. Dhiab that he

19  suffered from neuropsychic disease?

20  **A.**      I don't know what neuropsychic disease is exactly.

21  **Q.**      All right.

22  **A.**      So I'm not sure what you're asking.  I --

23  **Q.**      Okay.  So you don't know what -- what it is?

24  **A.**      Well, I'm not sure what you're referring to.  What I

25  think I said on direct examination is I believe Mr. Dhiab has

1    some physical disease.  I also believe he has a component of

2    psychosomatic disease --

3    **Q.**    Psychosomatic.

4    **A.**    -- which is physiological expression of psychological

5    distress.

6    **Q.**    Okay.

7    **A.**    I think it's a complex combination, which makes him very

8    difficult to treat.

9    **Q.**    In your testimony you said that the diagnosis of

10   culturally-bound syndrome was not accurate?

11   **A.**    No, that's -- that's not exactly what I meant.  I think

12   that Mr. Dhiab does have an element of culturally-bound syndrome

13   by the fact that he said he thought that perhaps jinns were

14   causing the weakness in his leg.  But the burden is to rule out

15   all other structural organic causes that could be contributing,

16   such as nerve root impingement in his spine; and it's probably a

17   combination of both things.

18   **Q.**    And I believe you say in your report that the medical

19   staff is not equipped to understand the cultural aspects of

20   Petitioner's medical condition?

21   **A.**    I did say that, and that is based on my conversations

22   with Mr. Dhiab.

23   **Q.**    And -- but you're not familiar with the particulars of

24   the training the medical staff receives before coming down

25   Guantanamo, are you?

1    A.      I'm not familiar with the -- with the specifics.

2    Q.      And you talked on direct examination about osteoporosis,

3    and you were read a portion of Exhibit 37, and I am just going

4    to redirect you to that at paragraph 12.

5    A.      I'm sorry, sir, which declaration?

6    Q.      It's declaration 37 by the SMO --

7    A.      Okay.

8    Q.      -- in paragraph 12.  And it's also highlighted on your

9    screen if you --

10   A.      Okay.

11   Q.      -- have trouble reading the copy in front of you.

12   A.      I have it.

13   Q.      And you read the first -- you read a part of the sentence

14   that says, "Mr. Dhiab has multiple radiological studies, none of

15   which have noted evidence of decreased bone mineralization."

16           Do you see that?

17   A.      That -- yes, I did see that, although, I've not seen the

18   actual films or studies --

19   Q.      Right.

20   A.      -- which would be important, and it would have been a

21   helpful piece of information.

22   Q.      And his sentence goes on, though, or the next sentence

23   reads, "Additionally, he has no evidence of nontraumatic

24   fracture on his spine, which has been extensively imaged.  The

25   hip is the most vulnerable fracture in patients with

1    osteoporosis, and an x-ray of Mr. Dhiab's hip completed on

2    September 22nd shows that no bone mineralization -- that bone

3    mineralization is normal."

4         Do you see that language?

5    **A.**    I see that language; I have not seen the films.

6    **Q.**    All right.

7    **A.**    So that's actually good news.

8    **Q.**    And you talked about -- you talked about urology

9    examinations, and I think you fault the Petitioner's treatment

10   of the hematuria and urinary retention?

11   **A.**    I stated that I did not see evidence of a full

12   evaluation.

13   **Q.**    Now, you acknowledge that urologist has seen the

14   Petitioner, right?

15   **A.**    Yes, I have.

16   **Q.**    And but you state -- and you're saying now that there's

17   no evidence that an evaluation was completed; is that correct?

18   Is that your testimony?

19   **A.**    That is my testimony.

20   **Q.**    But there -- in fact, Petitioner has had two urology

21   consults in the past year, and there's evidence of it in the

22   record.  Let me ask you to turn to -- and I'm going refer to the

23   medical records as Respondents' Exhibit Number 1, and refer to

24   the Bates numbers that -- I'm going to refer you to Respondents'

25   Exhibit Number 1, Bates Number 261.  You have that up on your

1    screen, I believe, and you also, I believe, have those records?

2    **A.**    Is there a copy of it I can look at?  It's very hard to

3    read on the screen.

4    **Q.**    Let me just see.

5         MR. WALTHALL:  Excuse me a moment, Your Honor.  Let me see

6    if I can get a hard copy of that.

7         Your Honor, I only have one hard copy.  May I approach the

8    witness?

9         THE COURT:  Well, are you still working with what is on

10   our screen?

11        MR. WALTHALL:  Yes.

12        THE COURT:  All right.  Go ahead, please.  Okay.  She said

13   she couldn't read it.

14        THE WITNESS:  I can do my best.

15   BY MR. WALTHALL:

16   **Q.**    All I want to ask you about that is, isn't that -- that

17   is a record of a urology consult on October 21st, 2013, is it

18   not?

19   **A.**    I don't know.  I don't see anything at the top that

20   indicates it's a urology consult.  I mean, I'm taking your word

21   for it, so -- but I don't see a signature or any identifying

22   information.

23   **Q.**    All right.  Well, it does address in the first paragraph

24   there reports of intermittent urinary frequency, nocturia, and

25   those are urologic disorders, aren't they?

1    **A.**    Right, but any SMO or any physician would also take that

2    history.

3    **Q.**    All right.

4    **A.**    I mean, I'm taking your word for it, but...

5    **Q.**    Well, let me turn your attention to Respondents' Exhibit

6    Number 1, Bates Number 961.  And this is a medical record of

7    another neurological consult, isn't it, dated August 18th, 2014?

8    **A.**    Again, I don't -- it's -- it looks like an order for a CT

9    scan of the abdomen and pelvis for urinary protocols, so that

10   would be a test, a scan to assess for the blood in the urine.

11   **Q.**    And then referring you to 963, Respondents' Exhibit

12   Number 1, Bates 963, a specific reference to a urology consult,

13   is it not?

14   **A.**    Let me read it.  So, yes, that's a -- it seems like an

15   affirmation that the patient was seen by a urologist.  So I had

16   not seen this second -- this particular urology consult.  I had

17   seen an earlier one in my review of the notes.

18   **Q.**    You had not seen what we're describing as Bates 963?  You

19   had not seen this?

20   **A.**    No.

21   **Q.**    This was in the records that were produced to you from

22   Respondents.  You're aware of that?

23   **A.**    No, I'm not aware of it, but I will take your word for

24   it.  I did not see this when I saw a previous one.  However --

25   and this is great -- the CT scan is ordered.  There still isn't

1    any mention of a cystoscopy or a -- kind of a differential

2    diagnosis of potential other causes of the hematuria.

3    **Q.**     Now, I think you testified that Petitioner's case is

4    medically complex?

5    **A.**     Yes, it is.

6    **Q.**     And confusing and complicated symptoms?

7    **A.**     Yes.

8    **Q.**     And difficult to treat?

9    **A.**     Yes.

10   **Q.**     And you admit that his medical care is further

11   complicated by the cultural and language barriers; isn't that

12   right?

13   **A.**     Yes, it is.

14   **Q.**     And it's also complicated by the challenges inherent in a

15   prison environment --

16   **A.**     Yes.

17   **Q.**     -- correct?

18          And you also recognize the Petitioner's situation is

19   challenging from a caregiver's perspective; isn't that right?

20   **A.**     Yes.

21   **Q.**     But you don't believe that this reflects upon the

22   intentions of the medical competence of the current medical

23   staff there, do you?

24   **A.**     I think it reflects a system that is not equipped to care

25   for such complex patients, and I am not impugning any individual

1   physicians.  I think it's a system that's not set up to care for

2   complex patients like Mr. Dhiab.

3   **Q.**     It reflects the complex circumstances of a challenging

4   situation?

5   **A.**     Yes.

6   **Q.**     Now, Dr. Crosby, you testified on direct examination that

7   you're familiar with the nasogastric method of enteral feeding,

8   correct?

9   **A.**     Yes, I am.

10  **Q.**     And, in fact, nasogastric feeding is the preferred method

11  of refeeding someone who has not had nourishment and cannot or

12  will not eat, isn't it?

13  **A.**     It is the least invasive method.  And, yes, in my

14  clinical practice that -- that is the normal method of feeding

15  somebody.

16  **Q.**     And there are fewer risks associated with nasogastric

17  feeding than other methods?

18  **A.**     For instance, it certainly is preferred to intravenous

19  feeding, which comes with a high rate of complications.

20  **Q.**     And in your opinion, Doctor, in most cases nasogastric

21  feeding does not cause a great deal of pain; isn't that right?

22  **A.**     No, I can't really agree to that.  I think it depends on

23  the context and the situation.

24  **Q.**     Well, in general, nasogastric tube placement does not

25  cause a great deal of pain; isn't that right?

1    **A.**    I've had -- I've done hundreds and hundreds of

2    nasogastric tubes in my almost 20 years as a doctor.  Sometimes

3    it's painful; other times it's not.  Certainly, if there's a

4    forcible cell extraction in restraints it's going to be much

5    more uncomfortable than a willing, cooperative patient.

6    **Q.**    But overall, it does not cause a great deal of pain?

7    That's your opinion, isn't it?

8    **A.**    Again, it depends on the context and the situation.  I've

9    seen instances where it does cause pain.  I've seen instances

10   where it is relatively benign.

11        THE COURT:  But in your general experience dealing with

12   a -- an individual who is your patient in a straightforward

13   hospital situation, is it your impression that use of the

14   nasogastric tube ordinarily causes pain or ordinarily does not?

15        THE WITNESS:  Your Honor, I -- again, I've had cases where

16   it doesn't.  If people have any altered anatomy in their

17   nasopharynx, just by standing -- by a happenchance you hit a

18   nerve and it causes pain, it can cause -- it can be a very

19   uncomfortable procedure, and I believe that that's also been

20   documented in the literature.

21        But, again, there are times with cooperative patients and

22   the procedure goes well, where it's fairly comfortable, and

23   usually those are non-adversarial settings and not associated

24   with force and restraint and that sort of thing.

25        But again, it's not a benign procedure, and it certainly

1   can cause pain.

2   BY MR. WALTHALL:

3   **Q.**    Well, it's a well-tolerated procedure, is it not?

4   **A.**    It can be a well-tolerated procedure.

5   **Q.**    Now, you've testified with regard to nasogastric feeding

6   in other cases, have you not?

7   **A.**    I have in one other case.

8   **Q.**    Yeah, so now let's -- you told us about some of the

9   courts have you been qualified before as a witness, but one of

10  the courts you didn't mention was a Superior Court of the

11  District of Hartford, Connecticut; isn't that right?

12  **A.**    I did mention the Connecticut case, yes, actually on

13  direct exam.

14  **Q.**    I don't remember hearing it in your direct examination,

15  but maybe it's in your --

16  **A.**    I did mention it.

17  **Q.**    You think it's in the curriculum vitae submitted today?

18  **A.**    Yes.

19  **Q.**    Yes.  And that was *Lantz versus Coleman*?

20  **A.**    Yes.

21  **Q.**    And that was in February of 2009?

22  **A.**    Yes.

23  **Q.**    And that was in a case involving a hunger striker.  And

24  you testified in that case that, in your opinion, in most cases

25  nasogastric feeding does not cause a great deal of pain.

1    **A.**     Again, it depends on the context.

2    **Q.**     That's not what you said in your testimony in Hartford,

3    is it, Doctor?

4    **A.**     I would have to review it.  I don't recall.

5          MR. WALTHALL:  Your Honor, we have previously marked

6    Exhibit Number 95, Respondents' Exhibit Number 95.  Let the

7    record reflect that I'm handing a copy to counsel, and I will

8    give a -- send up two copies to the Court, and I will give you a

9    copy.

10         THE WITNESS:  Thank you.

11   BY MR. WALTHALL:

12   **Q.**     And, specifically, Dr. Crosby, if you would refer to page

13   88 of that deposition testimony.

14         MR. WALTHALL:  For the record, Government's Exhibit 95 for

15   identification is the testimony of Sondra Crosby in *Lantz versus*

16   *William B. Coleman*, Superior Court of District -- of Hartford,

17   February 10, 2009.

18         THE COURT:  Page 88?

19         MR. WALTHALL:  I'm sorry?

20         THE COURT:  Page 88?

21         MR. WALTHALL:  Yes, page 88 -- I'm sorry, page 87.

22         THE WITNESS:  Okay.

23   BY MR. WALTHALL:

24   **Q.**     Did you have an opportunity to review that?

25   **A.**     I did read that.  I did review it and --

1    **Q.**      Hold on a second.  I just wanted to refresh your

2    recollection.

3            Without looking at that now, can you tell me whether in

4    that case you testified that, in your opinion, in most cases

5    nasogastric feeding does not cause a great deal of pain?  That

6    was your testimony, wasn't it?

7    **A.**      Sir, it depends on the context.

8    **Q.**      That's not what you said there, though, is it, Doctor?

9    **A.**      (No response.)

10   **Q.**      Is it?

11   **A.**      I don't recall the context of that exact testimony,

12   but --

13   **Q.**      It was a hunger striker, wasn't it?

14   **A.**      No.  That -- I was talking in general in that sentence.

15   I was not talking about a hunger striker, at least that's what

16   it appears to me from looking at that briefly.

17   **Q.**      And it is your opinion that it is a -- overall a

18   well-tolerated procedure, isn't it?

19   **A.**      Again, it depends on the context.

20   **Q.**      Okay.  But you did not qualify that in your previous

21   testimony, did you?

22   **A.**      I -- I don't know what the context of that question was.

23   I don't recall.

24   **Q.**      Now, you also testified in that case that it may not be

25   comfortable, but it's not painful; isn't that right?

1    **A.**    I don't think I said it wasn't painful.

2    **Q.**    Well, let me just --

3    **A.**    Or if I did, that was an error.  It can be painful.  In

4    some cases it's well-tolerated, as I said here; in other cases

5    it can be painful.  And there's medical literature supporting

6    that, but it depends on the situation.

7    **Q.**    Well, isn't it a fact, Doctor, that at that hearing, at

8    that trial, you were asked this question and you gave this

9    answer:  "And generally placing a nasogastric tube in someone

10   who is cooperative" -- I'm sorry, page 87, lines 14 through 23.

11         "And generally, placing a nasogastric tube in someone who

12   is cooperative in the procedure would not report -- there would

13   not be a report by the patient of a high amount of pain

14   typically, correct?

15         "Answer:" -- by the doctor -- "In general, I would agree

16   that nasogastric tube placement does not cause a great deal of

17   pain.  It's not comfortable.  It may cause discomfort, and many

18   patients, many patients or some patients may be more sensitive

19   to the placement of nasogastric tube, but in general, yes, it is

20   a well-tolerated procedure."

21         MR. LEWIS:  Your Honor, may I ask for the sake of context

22   that Respondent read the answer.

23         THE COURT:  Well, you'll get a chance on redirect.

24         MR. LEWIS:  Okay.

25         THE WITNESS:  Is there a question?

1        THE COURT:  No, not yet.

2   BY MR. WALTHALL:

3   Q.     Well, that was your testimony?

4   A.     Yes, sir.

5   Q.     And in your report, you say that, "The internationally

6   accepted guidelines for management of hunger strikers are

7   established by the World Medical Association in its declaration

8   of Malta?

9   A.     Yes.

10  Q.     And you also state that, "The policies of Guantanamo are

11  in contradiction to those standards," don't you?

12  A.     Yes.

13  Q.     But the World Medical Association is not a licensing or a

14  regulatory agency, is it?

15  A.     No, but it is probably the most authoritative ethical

16  guidelines for physicians managing hunger strikers, and

17  internationally accepted.

18  Q.     And the declaration of Malta is not a regulation, is it?

19  A.     No, it isn't.

20  Q.     And you're aware that the declaration of Malta does not

21  supply the legal standards governing enteral feeding in the

22  United States?

23  A.     I'm not a lawyer.

24  Q.     But you are aware of that, aren't you?

25  A.     Yes.  It provides ethical --

1   Q.      Because you, in fact, wrote --

2   A.      -- guidelines as a physician.

3   Q.      I'm sorry, I'm sorry.

4           In fact, you wrote an article on that, did you not?

5   A.      I've written several articles; three articles in total on

6   hunger strikes.

7   Q.      And you're aware that the standards of the declaration of

8   Malta do not apply to United States military detention

9   facilities?

10  A.      I am aware of that.

11  Q.      Now, Doctor, this is a case of forced feeding -- I'm

12  sorry, enteral feeding, and you yourself have enterally fed a

13  patient of your own against that patient's will, haven't you?

14  A.      I have.

15  Q.      And you said you went to a judge and you got a court

16  order to feed the patient, did you not?

17  A.      Yes, I did.

18  Q.      And the patient had her own attorney in that case, didn't

19  she?

20  A.      Yes, she did.

21  Q.      And a psychiatrist testified on her behalf, correct?

22  A.      That is correct.

23  Q.      The psychiatrist testified that your patient was

24  competent to refuse care, didn't he?

25  A.      That was the psychiatric testimony --

1    Q.      Yeah.

2    A.      -- opinion.

3    Q.      And you dis- -- I'm sorry?

4    A.      That was the -- that was the opinion of the consulting

5    psychiatrist, yes.

6    Q.      And you disagreed with the psychiatrist that testified in

7    that case, didn't you?

8    A.      I disagreed with the psychiatrist, yes.

9    Q.      But you're not a psychiatrist?

10   A.      I'm a licensed doctor and I make competency and capacity

11   decisions on a daily basis.

12   Q.      But you're not a psychiatrist?

13   A.      I'm not a psychiatrist.

14   Q.      And there was no psychiatrist that testified in favor of

15   enterally feeding your patient, was there?

16   A.      There was a -- yes, actually, the ethics board at my

17   hospital agreed that the patient did not have capacity to make a

18   decision, and did testify.

19   Q.      But no psychiatrist testified to that?

20   A.      Not that I recall.

21   Q.      And that patient would have been considered competent in

22   all other aspects of her life, correct?

23   A.      Except for the fact that she had anorexia and had no

24   insight or decision-making capacity about food and eating.

25   Q.      Other than that she would have been competent?

**A.**     Yes.

**Q.**     And you felt you were acting in the best interest of your

patient to enterally feed her against her will?

**A.**     Yes.

**Q.**     So you believe that intervention was necessary in that

case to prevent your patient's death?

**A.**     Yes, I did.  And I felt she did not have the

decision-making capacity to make an informed decision for

herself.

**Q.**     And you believed that intervention was necessary in that

case to prevent serious harm from becoming her?

**A.**     Yes.

        MR. LEWIS:  Your Honor, may I enter an objection?  I think

we're going rather far afield.  We're talking about an anorexic

patient that was --

        THE COURT:  The objection's overruled.  Go ahead, please.

BY MR. WALTHALL:

**Q.**     You may answer the question.

**A.**     I'm sorry, can you repeat the question?

**Q.**     Yes.  So you believe that intervention was necessary in

that case to prevent serious harm to your patient?

**A.**     I do and I did, and I took it to court to a judge.

**Q.**     And so overall you will agree with me that there's no

blanket rules for dealing with people on hunger strikes?

**A.**     There are guidelines, but I believe every case needs to

1   be individualized.

2   Q.      Thank you.

3           MR. WALTHALL:  I have no further questions of this

4   witness, Your Honor.

5           THE COURT:  Okay.  Redirect, please.

6           MS. MARVIN:  Your Honor, just a few brief questions on

7   redirect.

8                 REDIRECT EXAMINATION OF SONDRA CROSBY

9   BY MS. MARVIN:

10  Q.      Dr. Crosby, why is a cystoscopy important?

11          MR. WALTHALL:  Objection, Your Honor, that's beyond the

12  scope of the cross-examination.

13          THE COURT:  Let me hear the question again, please.

14          MS. MARVIN:  You referred to medical records.

15          THE COURT:  Counsel, do not speak to each other, please.

16          MS. MARVIN:  I'm sorry, Your Honor.

17          THE COURT:  What was the question?

18          MS. MARVIN:  Why is a cystoscopy important?  It's part of

19  the urological exams.

20          THE COURT:  The objection's overruled.  Go ahead.

21          THE WITNESS:  A cystoscopy is a standard part of

22  evaluating blood in the urine, especially in somebody over 40

23  years old, when you must consider the possibility of a

24  malignancy.

25  BY MS. MARVIN:

1   Q.     And is that why you recommended that Mr. Dhiab have the

2   cystoscopy?

3   A.     I did, yes.

4   Q.     You spoke about the complexity of Mr. Dhiab's case.

5          Given the complexity, does Mr. Dhiab's treatment meet the

6   standard of care, his current treatment?

7   A.     I think it does not for the reasons I've already

8   discussed.

9   Q.     Would reinsertion of the nasogastric feeding tube

10  multiple times a day exacerbate any pain that may be felt?

11  A.     It's possible.

12  Q.     You were asked at length about your anorexic patient.

13  Are anorexia and hunger striking related if the treatment of

14  care for such patient's related?

15  A.     No.  A patient with anorexia nervosa has a specific

16  disorder, and in many cases people with anorexia lose

17  decision-making capacity around the issues of food, are unable

18  to have insight.  That is different than a hunger striker who,

19  by definition, does have capacity to make decisions for

20  themselves and is not impaired by a mental illness or other --

21  anything else that might impair their decision-making capacity.

22  Q.     Do you think Mr. Dhiab has anorexia or is he a hunger

23  striker?

24  A.     According to my conversations with him, Mr. Dhiab is

25  hunger striking.  He is protesting in the only way he knows how.

1  He's protesting what he feels is disrespect and inhuman

2  treatment.

3  **Q.**    Dr. Crosby, do you still have the Government's Exhibit 95

4  in front of you?

5  **A.**    I don't know.  Which one is that?

6       MS. MARVIN:  Strike that, Your Honor.  No further

7  questions.

8       THE COURT:  This is a long testimony, past of the

9  testimony, I gather, that you gave in the Connecticut case.

10      THE WITNESS:  Oh, I don't have it.

11      MS. MARVIN:  No further questions.

12      THE COURT:  All right.  There is no recross at this point,

13 for good reason, because there was nothing brought up on redirect

14 that hadn't been adequately explored in cross.

15      You may step down.

16      Let me make sure with counsel.  Can this witness now be

17 completely excused if she wishes?

18      MR. LEWIS:  I think we have a very few minutes that we

19 would like.

20      THE COURT:  Come forward, please.

21      MR. LEWIS:  Sorry.  Eric Lewis.  Sorry, Your Honor.  I

22 think we have, perhaps, five minutes of testimony that we would

23 need to undertake in a closed courtroom, which we can do now or

24 we can do later with respect to the videotapes.

25      THE COURT:  Well, I don't really understand.  When are you

1    going to call her, then?

2         MR. LEWIS:  Well, we were -- thought we could do it either

3    directly after lunch or Dr. Crosby will be here --

4         THE COURT:  All right.

5         MR. LEWIS:  -- tomorrow as well.

6         THE COURT:  I see.  Well, that's fine.  We will do it

7    directly after lunch, and then you will be calling your second

8    witness this afternoon?

9         MR. LEWIS:  Yes, Dr. Xenakis.

10        THE COURT:  And I would hope we could get through the

11   second witness this afternoon or try to.

12        MR. LEWIS:  Yes.

13        THE COURT:  All right.  Everybody, 2:00, please.

14        MR. LEWIS:  Thank you, Your Honor.

15        (Thereupon, a luncheon recess was had beginning at

16   12:55 p.m.)

17

18              **AFTERNOON SESSION, OCTOBER 6, 2014**

19   (2:28 p.m.)

20        THE COURT:  We're back on the record again, and now the

21   courtroom is totally open for our next witness.  And this is, of

22   course, CA-05-1457, and all counsel are present.

23        MR. WALTHALL:  Your Honor, may I just do one more

24   housekeeping matter with respect to the testimony of the last

25   witness?

1          THE COURT:  All right.

2          MR. WALTHALL:  And that is to introduce into the record

3     the page of the deposition that was read under rule --

4          THE COURT:  I'm sorry, say that again.

5          MR. WALTHALL:  The page of the deposition that was read

6     under Rule 801, it comes in as substantive evidence.  We prepared

7     an exhibit with just that page.

8          THE COURT:  All right.  Well, let me hear if the

9     plaintiffs have any -- the plaintiffs have any -- Petitioner has

10    any exception and objection?

11         MR. LEWIS:  Your Honor, we'd like to just add the next two

12    pages to put in for context so that it's a complete sequence of

13    questioning.

14         MR. WALTHALL:  Well, they can put that in as a separate

15    exhibit of their own, Your Honor.

16         MR. LEWIS:  We can do that.

17         THE COURT:  All right.  That's fine.  All right.

18         Would Petitioner please call his next witness.

19         MS. PRADHAN:  Your Honor, Petitioner would like to call

20    General Stephen Xenakis to the stand.

21         THE COURT:  All right.

22         MS. PRADHAN:  Thank you.  Your Honor, just two quick

23    logistical points.  The binder that we just handed to you is a

24    group of all of the paper exhibits that we intend to rely on

25    during the examination, the direct examination of Dr. Xenakis.

1          THE COURT:  So this should be easier?

2          MS. PRADHAN:  This should be easier, yeah.  They're in

3   order and there is a table of contents at the front, so I hope

4   that that makes it easier.

5          THE COURT:  All right.  Thank you.

6          MS. PRADHAN:  If you have any questions, of course.

7          THE COURT:  Sir, would you step up, please.

8          MS. PRADHAN:  Your Honor, the government has declined to

9   stipulate General Xenakis as a medical expert, so we will --

10          THE COURT:  You're going to have to talk into the mic,

11   please.

12          MS. PRADHAN:  Sure.  I'll spend a few minutes qualifying

13   General Xenakis because the government has declined to stipulate

14   him.

15          THE COURT:  That's fine.

16          (STEPHEN XENAKIS, PETITIONER'S WITNESS, SWORN)

17                DIRECT EXAMINATION OF STEPHEN XENAKIS

18   BY MS. PRADHAN:

19   Q.     Could you please state your full name and title for the

20   record.

21   A.     Dr. Stephen Nicholas Xenakis, Brigadier General (ret)

22   U.S. Army.

23   Q.     Thank you.  And the city and state of residence?

24   A.     Arlington, Virginia.

25   Q.     General Xenakis, could you tell the Court about your

1    educational background, beginning with your undergraduate

2    degree?

3    **A.**      I graduated Princeton with honors in 1970; and then

4    University of Maryland School of Medicine, 1974; a general

5    medicine surgery internship at Letterman Army Medical Center;

6    residency in psychiatry at Letterman Army Medical Center in the

7    city of San Francisco.

8         THE COURT:   And Dr. Xenakis, I know you've probably done

9    this several times, but our court reporter needs to keep up with

10   you, so would you slow down, please?

11        THE WITNESS:   Yes.   Yes, ma'am.   Thank you.

12        Um, and then a fellowship in child and adolescent

13   psychiatry at Letterman and at the University of California, San

14   Francisco.

15   BY MS. PRADHAN:

16   **Q.**      General Xenakis, are you board certified?

17   **A.**      I am board certified in general psychiatry, 1980, and

18   then child and adolescent psychiatry in 1982.

19   **Q.**      And are these certifications and were -- is your

20   educational background, were those concurrent with your military

21   service?

22   **A.**      Yes.   I was commissioned as a second lieutenant, Medical

23   Service Corps in 1970, and then transferred to the Medical Corps

24   in 1974 when I graduated medical school.

25   **Q.**      And how many years did you spend in the military, sir?

**A.**      I had 28 years on active duty, and then I had four years

as a ROTC and cadet before then.

**Q.**      And where are you licensed as a medical doctor?

**A.**      I'm licensed in Virginia, the District of Columbia,

Maryland, and Texas.

**Q.**      General Xenakis, could you describe the different

positions that you've held within the Army?

**A.**      Sure.  From 1980 to '82 I was the chief of psychiatry at

Fort Hood, Texas.  From 1982 to '84 I was the division surgeon

for the 1st Cavalry Division at Fort Hood, Texas.  That is the

senior chief medical officer responsible for all the healthcare

of that division:  15,000 soldiers, armored calvary soldiers.

And I attended the Armed Forces Staff College.  From that I went

to Eisenhower Army Medical Center in the Medical College of

Georgia.  I started a fellowship training program in child and

adolescent psychiatry.  I held that position until 1986, when I

was promoted to be the deputy commander for clinical services or

the chief medical officer for Eisenhower Army Medical Center.

It's a 400-bed teaching hospital.  I did that until 1989, and

then I went to the Army War College, and then I was the

commander of the hospital at Fort Campbell, Kentucky from 1990

to '93 during the first Gulf War and deployed our medical forces

in support of the 101st Airborne Division.  And then I returned

to Eisenhower, and after that was promoted to commanding general

and was commanding general for Eisenhower Army Medical Center in

1    the Southeast Regional Army Medical Command until 1987, and then

2    I had a short tour as the Assistant Surgeon General and then I

3    retired.

4    Q.    General Xenakis, during the course of your military

5    career, who comprised the bulk of your patients?

6    A.    Well, I mean, my patients were active duty military,

7    family members, retired military, and family members.

8    Q.    Were you involved at all in administrative duties?

9    A.    For much of that time I was -- I had both clinical,

10   administrative, some research and teaching responsibilities.

11   Q.    Could you describe your teaching responsibilities during

12   your military career?

13   A.    Well, I was on the faculty at Eisenhower and -- where we

14   were training psychiatrists and fellows or special --

15   subspecialists in child and adolescent psychiatry, but I also

16   taught at the Medical College of Georgia, and I've had -- I have

17   ongoing appointment as an adjunct professor at the Uniform

18   Services University of Health Sciences where I teach in some

19   courses in psychiatry and in ethics.

20   Q.    General Xenakis, do you hold a security clearance?

21   A.    I do.

22   Q.    And since when have you held that clearance?

23   A.    I think I was first officially cleared at the secret

24   level in 1974 when I started my internship.  And then in 1982

25   was cleared at the top secret level when I moved into the job of

1    division surgeon, and I've held a top secret clearance since

2    that time.

3    Q.    Just to clarify, you currently have a top secret security

4    clearance?

5    A.    Currently, yes, I do.

6    Q.    Dr. Xenakis, have you published any articles or other

7    materials?

8    A.    Sure.  I have a variety of publications in what we call

9    referee journals, peer-reviewed journals, on a number of

10   subjects on ranging from the treatment of soldiers in the

11   chemical, biological environment to child and adolescent

12   psychiatry, treatment of psychotherapy research, effectiveness

13   of psychotherapy research, to post-traumatic stress disorder,

14   traumatic brain injury, a host of things, ethics.

15         MS. PRADHAN:  Your Honor, we have previously submitted

16   General Xenakis' curriculum vitae, which you should have a copy

17   of it, I believe, Respondents.

18         THE COURT:  And this is Plaintiff's 63; is that right?

19         MS. PRADHAN:  Plaintiff's 63, that's correct, Your Honor.

20   Thank you.

21   BY MS. PRADHAN:

22   Q.    General Xenakis, do you have any professional

23   associations outside of the military?

24   A.    I belong to the American Psychiatric Association, to the

25   American Academy of Child and Adolescent Psychiatry.

1    **Q.**     And do you currently practice medicine?

2    **A.**     I do.  I see patients and I do research and I do

3    consulting as well.

4    **Q.**     Is there any aspect of your practice that touches upon

5    physical symptoms?

6    **A.**     Well, I'd say most of it does, because we're in an area

7    now of reconceptualizing what we do in the area of

8    neurobehavioral, neuropsychiatric conditions.  And, clearly,

9    what physical injuries and illnesses that people have is a major

10   factor of how they present in their -- for any behavioral or

11   emotional condition.

12   **Q.**     Do you have any experience with ethnic or cultural

13   diversity amongst your patients?

14   **A.**     Sure, considerable -- I feel, considerable experience,

15   and because even form the military, we had a variety of people

16   from different ethnic, cultural, racial backgrounds.  I've

17   specifically been interested in it for some time, from my

18   fellowship, because I'm Greek American and speak fairly fluent

19   Greek and understand, hopefully, the culture.  I would be

20   referred a number of Greek American patients at the time.

21   **Q.**     Have you ever treated patients abroad, apart from your

22   military service?

23   **A.**     Yes, I have.  I mean, I've gone and evaluated and

24   assisted in the treatment of patients in Israel and the

25   Palestinian territories, in Bahrain, Kyrgyzstan, just a couple

```
 1   countries.
 2   Q.    Okay.  Have you ever treated patients who have been the
 3   victims of abuse or torture?
 4   A.    Yes, many, many patients.  I mean, including the children
 5   and adolescents who were victims of abuse from the time that I
 6   was a fellow, but even before that, as a resident physician in
 7   psychiatry, we received at Letterman the first waive of
 8   prisoners of war from Vietnam, and so I saw a number of soldiers
 9   who had been detained as POWs.
10   Q.    Have you ever trained junior medical officers regarding
11   the treatment of prisoners of war?
12   A.    Yes.  And I was particularly responsible for the policies
13   and procedures while I was a division surgeon for the 1st Cav
14   because we would be deploying and be doing exercises in a
15   simulated training combat environment, and then obviously later
16   when I was at Fort Campbell and we were deploying medical forces
17   to the Middle East in support of the first Gulf War.
18   Q.    General Xenakis, when did you first become involved with
19   Guantanamo Bay?
20   A.    I was first contacted about cases, I think, in 2005 or
21   2006.
22   Q.    And in what capacity?
23   A.    I was asked to advise the attorneys and the Court on the
24   treatment of hunger strikers, on policies and procedures
25   regarding the treatment of hunger strikers.
```

1    **Q.**    Did that involve the evaluation of specific patients at

2    Guantanamo Bay?

3    **A.**    At that time I reviewed the case, but I did not evaluate

4    the person specifically.

5    **Q.**    Okay.  Have you previously evaluated patients at

6    Guantanamo Bay?

7    **A.**    I have, a number of people, probably close to a dozen.

8    I've spent many months at Guantanamo, equivalent to about five

9    months there, and I've evaluated cases for -- in the military

10   commissions for the defense, in habeas for the defense, and also

11   for the Courts.

12   **Q.**    And just to clarify, these patients that you've seen,

13   those are detainees at Guantanamo Bay?

14   **A.**    Yes.

15   **Q.**    Could you give an example of the type of diagnoses you've

16   made of Guantanamo Bay patients?

17   **A.**    I mean, it's covered from no diagnosis to post-traumatic

18   stress disorder, to post-concussion syndrome, to major

19   depression, to -- you know, I guess principally those are the

20   diagnosis that we have.

21   **Q.**    And have you done specific -- evaluation of specific

22   detainees on hunger strike at Guantanamo Bay?

23   **A.**    Yes.

24        MS. PRADHAN:  Your Honor, Petitioner would like to offer

25   Dr. Xenakis as an independent expert at this time in the field of

1     diagnosis and treatment of psychiatric disorders, the appropriate

2     standard of medical care in patients with such disorders and in

3     military medicine.

4          THE COURT:  Any questions from the government?

5          MR. WILTSIE:  Yes, Your Honor.  You may want to take a

6     seat.

7                VOIR DIRE EXAMINATION OF STEPHEN XENAKIS

8     BY MR. WILTSIE:

9     Q.    Good afternoon, Dr. Xenakis.  I'm Ron Wiltsie for the

10    government.  Doctor, I apologize we have to put you through this

11    on the qualification issues, but you didn't attach your CV to

12    your expert report.

13         Now, you've been an expert in a number of cases, haven't

14    you?

15    A.    Yes.

16    Q.    And normally you attach a CV to an expert report?

17    A.    No, I don't.

18    Q.    You don't?

19    A.    Usually when I'm asked, I send it separately.  I've sent

20    it before, and I don't particularly do that.

21    Q.    But you have attached it in the past to expert reports?

22    A.    When asked, yeah.

23    Q.    And it would be counsel that would have asked you?

24    A.    Usually counsel or the government, yeah.

25    Q.    And the counsel here didn't ask you?

1    **A.**     No, they had my CV.

2    **Q.**     They have it now, and we --

3    **A.**     They had it before.

4    **Q.**     They had it before?  Okay.

5          Doctor, you mentioned that you were the division surgeon

6    for the 1st Armored Cavalry Unit.

7          They were not involved in combat while you were the

8    division surgeon?

9    **A.**     No.

10   **Q.**     Okay.  So there were no detainees actually detained by

11   that division during your time as the division surgeon?

12   **A.**     No.

13   **Q.**     And for the 101st when you were at Fort Campbell, you

14   never deployed overseas?

15   **A.**     I did not.

16   **Q.**     You did?

17   **A.**     I did not.

18   **Q.**     You did not.

19         And when you were there, you were not in charge of the

20   treatment of any detainees who the 101st captured overseas?

21   **A.**     They didn't bring any detainees back to Fort Campbell --

22   **Q.**     Correct.

23   **A.**     -- that I recall.  But we had prisoners, and I was --

24   **Q.**     The 101st had prisoners?

25   **A.**     Well, and we had prisoners at Fort Campbell.  And my -- I

1  was the director of health services, which is that I was

2  responsible for anything that involved clinical care by the --

3  including veterinary care, on Fort Campbell and any of the other

4  installations, and so I was responsible for all the healthcare

5  to the jail, to the brig, to any place that, in fact, was under

6  the responsibility of our Fort Campbell -- the commander at Fort

7  Campbell, who also was the commander of the 101st Airborne

8  Division.

9  Q.    Well, let's be clear, Doctor.  This is a case about

10  detainees who were captured in combat.

11         You were not in charge of any detainees at Fort Campbell

12  who had been captured in combat?

13  A.    I don't remember who was in the jail, to be honest with

14  you.

15  Q.    So what you're saying is that we might have brought back

16  some enemy prisoners of war?

17  A.    We may have.  I don't remember who was --

18  Q.    And we didn't tell anybody that they were there?

19  A.    No, no, I didn't say that at all.  What I said was I was

20  responsible for the healthcare.

21  Q.    Okay.

22  A.    And that's -- you know, this is all about healthcare.

23  Q.    Do you remember sitting here today whether you treated

24  any detainees who were captured in combat?

25  A.    I don't remember.

1  **Q.**    -- in Fort Campbell?

2  **A.**    I don't remember.

3        THE REPORTER:  Please repeat the ending of your question

4  and the answer, please.

5  BY MR. WILTSIE:

6  **Q.**    The question is:  Does he remember today whether he

7  treated any detainees at Fort Campbell who were captured in

8  battle?

9  **A.**    I don't remember specifically.

10  **Q.**    Doctor, I note from your CV that you have no hospital

11  affiliations since 2007; is that correct?

12  **A.**    Right.

13  **Q.**    Okay.  What's the extent of your practice in the sense

14  of -- give me a sense of the numbers of patients you've treated

15  since 2007.

16  **A.**    Oh, I mean, I don't know, maybe 100 patients.

17  **Q.**    100 a year?

18  **A.**    No, no.  I have in my practice at any time -- I see

19  patients about 10 to 12 hours a week.

20  **Q.**    And your specialty, as I recall, is child and adolescent

21  psychiatry?

22  **A.**    It's one of my specialty areas, yeah.

23  **Q.**    That's the only one you're board certified in?

24  **A.**    I'm board certified in it as a subspecialty, right.

25  **Q.**    As a subspecialty.

1          Are your patients children and adolescents?

2   A.     Some.

3   Q.     Give me a percentage.

4   A.     Um, maybe a quarter.

5   Q.     So the rest are adults?

6   A.     Adults, right.

7   Q.     And you're treating them as a general psychiatrist?

8   A.     Right.

9   Q.     Doctor, I'd like you to take a look at your report.  Do

10  you have it there?  It's Petitioner's Exhibit 26, I think.

11  A.     Okay.

12  Q.     And I'm sorry, Doctor, should I call you doctor or

13  general?  Which do you prefer?

14  A.     Whatever you pick.

15  Q.     Okay.  Doctor, on page 2 of your report, you list a

16  number of cases?

17  A.     Right.

18  Q.     Okay.  I'll tell you the ones I recognize as detainee

19  cases.  The first one, Musab al-Mudwani?

20  A.     Right.

21  Q.     The third one, Adnan Farhan Abdul Latif?

22  A.     Right.

23  Q.     The next one, Hail Aziz Ahmed al Maythali?

24  A.     Right.

25  Q.     And then I think that's all of them; is that right?

1    **A.**     Right, on that list.

2    **Q.**     So you said you'd been involved in 12 detainee cases?

3    **A.**     Right.

4    **Q.**     Were the other -- were the others -- the other nine prior

5    to the last five years?

6    **A.**     Codder was, Al-Oda was.  There were several that I was

7    involved in before and there's -- what I listed was testimony or

8    ex- -- you know, I said expert consultancy, depending on the

9    depth of my involvement in those cases.

10   **Q.**     So, just so I'm clear and the Court's clear, what you're

11   saying is, if you filed a piece of paper in court, it's listed

12   here?

13   **A.**     Yeah.

14   **Q.**     If you didn't file a piece of paper in court it's not

15   listed here?

16   **A.**     It's not listed.

17   **Q.**     Okay.

18   **A.**     Because we don't have -- I don't know what happened.

19   **Q.**     All right.  Doctor, let's walk through these -- well,

20   I'll tell you what, why don't you go through these cases -- this

21   would be the quickest way of doing it -- and tell me which of

22   these you testified for the government or for the plaintiff?

23   **A.**     I mean, of the ones that are relevant to Guantanamo?

24   **Q.**     No, all of them.

25   **A.**     Well, I testified in Mudwani and I testified in Jones.  I

1   sent a report in Latif --

2   **Q.**    Oh, I'm sorry, Doctor, I don't mean testified.

3          Who were you providing information for?  Which side were

4   you supporting?

5   **A.**    In Mudwani was the defense; Jones, defense; Latif was the

6   Petitioner; Maythali was to the Court; Winfield was defense;

7   Robalino, defense; Flury was to the Court in a guarded child

8   custody; Haggerton, defense; Samereu, defense; Esco, defense.

9   That was the 1st versus U.S. Government.  I don't know how that

10  typo happened.  Gutierrez, defense; Smith is defense; Russell

11  was, I guess, defense to the Court; Jones, defense; Thomas,

12  defense; Hammond, defense; Gafe, defense; Jadoo, defense;

13  Wesley, we haven't had the hearing yet, and that'll be defense;

14  Graves is closed, I didn't testify; Franks hearing has not

15  occurred, and it's going to be an article 32; Kraft, there was

16  no testimony, I provided a report to the defense.

17  **Q.**    Okay.  And in Frank's, which side are you working with?

18  **A.**    With a Lieutenant Franks with the defense.

19  **Q.**    Okay.  Thank you, Doctor.

20         Now, in -- now comes the question that I put to you

21  earlier which I should have pulled back from, which is:  In

22  which of these cases have you actually testified and qualified

23  as an expert?

24  **A.**    Well, I testified in Mudwani, Jones, Maythali, Winfield,

25  Robalino, Haggerton, Samereu, Escew, Esco, Gutierrez, Russell as

1    a material witness, Jones, Thomas, Gafe, Jadoo.  I know those

2    I've testified in.

3    **Q.**    There was a -- you testified in Jadoo?  You were on the

4    stand?

5    **A.**    Yes.

6    **Q.**    Okay.  Just checking.

7        And in any of these cases were you not qualified as an

8    expert?

9    **A.**    No.

10   **Q.**    The Court refused to qualify you?

11   **A.**    No.

12   **Q.**    Doctor, you said you've had a security clearance

13   constantly since 1974?

14   **A.**    Well, I mean, I think -- yeah, I guess.  I mean, it's

15   been reinstated at times.  I mean, there may have been -- it was

16   never -- it may have lapsed, but more or less since '74, yeah.

17   **Q.**    So there were gaps in that period?

18   **A.**    When I retired, I mean, I had to reapply for my

19   clearance.

20   **Q.**    We've been in the same boat, Doctor.

21   **A.**    Yeah.

22   **Q.**    All right.

23       MR. WILTSIE:  Two more questions, I think, Your Honor.

24   BY MR. WILTSIE:

25   **Q.**    Doctor, in your report you note that there was no

1    psychiatric diagnosis?

2    **A.**    Right.

3    **Q.**    Does that mean that you didn't reach a diagnosis or that

4    there is no diagnosis to be reached?

5    **A.**    At this point in time, I don't see a diagnosis.

6    **Q.**    You do not see a diagnosis?

7    **A.**    Yeah.

8    **Q.**    All right.

9          THE COURT:  Is that because you don't believe that there

10   is any diagnosis to be made, or is that because you haven't yet

11   reached an opinion?

12         THE WITNESS:  At this point I don't feel there's a

13   diagnosis to be made, but I -- my practice is to revisit that

14   issue with every interaction with a patient.

15   BY MR. WILTSIE:

16   **Q.**    And lastly, Doctor, forgive me, but I have to ask this

17   question.

18         Because we invoked the rule, did anyone talk to you

19   during the break about Dr. Crosby's testimony?

20   **A.**    No.

21   **Q.**    Okay.

22         MR. WILTSIE:  Your Honor, we have no further questions.

23         THE COURT:  No objection, I gather?  Excuse me, no

24   objection to the witness being deemed an expert?

25         MR. WILTSIE:  No, Your Honor.

1        THE COURT:  All right.  And the witness is considered to

2  be an expert.

3        MS. PRADHAN:  Thank you, Your Honor.

4              CONTINUED DIRECT EXAMINATION OF STEPHEN XENAKIS

5  BY MS. PRADHAN:

6  Q.    How long did you serve in the military, General Xenakis?

7  A.    I was on active duty 28 years.

8  Q.    And when did you reach the rank of brigadier general?

9  A.    I was promoted in 1994, November '94.

10  Q.    You held that rank for how many years?

11  A.    Well, I held it officially for three years.

12  Q.    So you have no objection to my calling you General

13  Xenakis?

14  A.    No.

15  Q.    Great.  Thank you.

16        General Xenakis, were you involved -- just let me repeat

17  for the Court's benefit.

18        Were you ever involved in the training of junior medical

19  officers regarding the treatment of detainees?

20  A.    Sure.  I mean, that was a responsibility, my

21  responsibility as a division surgeon for the 1st Cav from '82 to

22  '84.  We had these exercises called REFORGER, return of forces

23  to Germany.  We would fight and exercise as if we were fighting

24  the Soviet troops and part of it was how we were going to, you

25  know, conduct and support any prisoners of war that we captured.

1   And then after that, as I trained and prepared our medical

2   forces to deploy during the first Gulf War, that was a major,

3   you know, piece of training that we had to provide.

4   Q.    Are you familiar with the standard of care provided --

5   the statutory standard of care provided at Guantanamo Bay?

6   A.    Yes.

7   Q.    All right.  When did you become involved in Mr. Dhiab's

8   case?

9   A.    In early 2014.

10  Q.    Okay.  And what was the nature of that involvement?

11  A.    I was contacted to review and comment on what seemed to

12  be the procedures for his enteral feedings at the time.

13  Q.    Do you recall the content of that statement that you

14  made?

15  A.    I don't, really.

16  Q.    Okay.  When were you then further engaged on Mr. Dhiab's

17  case?

18  A.    Probably by -- in July or so.

19  Q.    All right.  And what was -- and how did you become more

20  involved Mr. Dhiab's case following that?

21  A.    I was asked to also advise on the procedures for his

22  medical care, including the enteral feedings, as an in-general

23  what were the conditions of his confinement.

24  Q.    Pursuant to this Court's order of August 12th, what were

25  you asked to do?

1    **A.**     My reading was that I was asked to provide the Court --

2    and I was insistent that I would be here as a consultant to the

3    Court -- specifically to -- on what I thought was the

4    appropriateness and the effectiveness of the medical care that

5    he was receiving, as well as some of the other procedures that

6    he was being subjected to.

7    **Q.**     And what materials did you review?

8    **A.**     I reviewed whatever medical records were provided to me.

9    I reviewed the information provided by Reprieve, the statements

10   by attorneys and his own statement of his condition and

11   complaints, and anything else -- I'm trying to recall what else

12   I had available at the time.

13   **Q.**     General Xenakis, did you at any point review the

14   government's briefs?

15   **A.**     I don't think I had them.  I don't know if I did.

16   **Q.**     Okay.  Regarding the government's arguments about -- on

17   Mr. Dhiab's treatment at Guantanamo?

18   **A.**     I did.  I reviewed some documents that said that it was

19   appropriate.

20   **Q.**     Just quickly, General, are you proud of your military

21   service?

22   **A.**     Yes, of course.

23   **Q.**     And yet you're here testifying against the military?

24   **A.**     I'm not.  I don't see myself doing that.  I mean, I'd --

25   I would -- you know, there was a reason I was insistent on not

1    being just identified as a defense expert.  I mean, I believe my

2    responsibility, and I feel strongly about it, is to continue to

3    provide the best consulting expert testimony and advice I can to

4    secure the defense of our country and to make sure that we're

5    safe and that we're doing what we think is in the best eyes for

6    that to maintain our position, our posture as a world power.  So

7    I'm here, and I find it as an extension of my military service,

8    and I feel very strongly about that.

9    **Q.**    As an overview, do you -- as an overview having evaluated

10   Mr. Dhiab, do you feel that his treatment contributes to the

11   security of the United States?

12   **A.**    I do not.

13   **Q.**    Okay.  General Xenakis, do you understand the differences

14   between the classified, protected and unclassified information

15   that you reviewed?

16   **A.**    Yes.

17   **Q.**    And will you indicate at any point if I ask you a

18   question that requires you to answer with classified or

19   protected information?

20   **A.**    Yes.

21   **Q.**    Thank you.

22        MS. PRADHAN:  Your Honor, I'd like to refer to some of the

23   medical records now, which you should have in front of you.  The

24   first is PX50.  This is Bates Number 343.

25   BY MS. PRADHAN:

1   **Q.**     General Xenakis, can you see that on your screen?

2   **A.**     Well, I need a magnifying glass, but I think I can.  Let

3   me see.  Let me close this up and move it closer.

4   **Q.**     Okay.  You may be able to also find it in Volume 2 of the

5   binders in front of you.

6   **A.**     Oh yeah, that's easier.  All right.

7   **Q.**     Okay.

8           THE COURT:  It's very small print.  That's why he's having

9   trouble.

10          MS. PRADHAN:  Your Honor, do you have a hard copy or would

11  you like another hard copy?

12          THE COURT:  I think you can enlarge it.

13          MS. PRADHAN:  Okay.  We'll make it --

14          THE COURT:  I'm sure you can if you're on the ELMO.

15          THE WITNESS:  Yeah, yeah, that's better.

16  BY MS. PRADHAN:

17  **Q.**     How's that?  Okay.

18          I'd like to call your attention, General Xenakis, to the

19  paragraph towards the end of this document that says

20  "diagnoses."

21  **A.**     Yes.

22  **Q.**     Axis I says, "Depressive disorder, NOS, by history, R/O

23  conversion disorder versus culture-bound syndrome versus

24  malingering."

25          My first question, General Xenakis, is:  What are the

1    differences in the Axis here?

2    **A.**     So this was a classification from the previous diagnostic

3    manual, so that mental -- the field of psychiatry and psychology

4    since 1980 have used a, what -- the DSM or Diagnostic and

5    Statistical Manual to list what they think are suitable

6    diagnoses.  And in this version, which was version IV, the

7    routine was to establish -- to note diagnoses by Axis I, II,

8    III, IV and V, that you see here.  And Axis I generally

9    regarded -- referred to serious mental illnesses, and by serious

10   mental illnesses are those psychotic conditions such as

11   schizophrenia, bipolar disorder with psychotic features,

12   paranoid delusional disorder.  That is those conditions that at

13   this time one could also see had an organic etiology or basis to

14   them.

15        THE COURT:  Excuse me.  Is it correct from the explanation

16   you've just given that malingering is included in Axis I?

17        THE WITNESS:  You know, I didn't -- I apologize.  I'm

18   surprised, but I think it -- I think it is.

19        THE COURT:  Along with depressive disorder?  I just want

20   to make sure that's right.

21        THE WITNESS:  No, I'd have to look at the old manual.  I

22   apologize.  I should have checked that before.

23        THE COURT:  That's all right.

24   BY MS. PRADHAN:

25   **Q.**     General Xenakis, this record is -- just for the record,

1    this is from September 19th, 2013.

2    **A.**    Um-hmm.

3    **Q.**    Could you explain the differences between conversion

4    disorder, culture-bound syndrome and malingering?

5    **A.**    So conversion disorder refers to a condition where a

6    patient manifests physical symptoms, and they can be in terms of

7    paralysis, sometimes pain or other functions, some swallowing,

8    you have a number of sub symptoms for which there seems to be no

9    organic -- identified organic cause and, therefore, the best way

10    to understand it or the proposed way to understand it is that

11    there's a psychological reason that causes the problem; and

12    because it's psychological it's considered a conversion of a

13    psychological state of mind to a medical or physical condition

14    as it presents.

15    **Q.**    Does conversion disorder present with physical symptoms,

16    then?

17    **A.**    They do.

18    **Q.**    So would there be physical symptoms to treat an

19    association with conversion disorder?

20    **A.**    Well, that's one approach that is to -- because the

21    patients are, in fact -- and if they've had the problems for a

22    long time, in order to be able to effectively connect with a

23    patient, you might -- you would start treating it in a way that

24    the patient sees their problem, and treat it physically, in

25    fact.  I mean, it's a very common way of trying to help these

1    people.

2    Q.    And then culture-bound syndrome, General Xenakis, could

3    you explain that?

4    A.    So that referred to a group of diagnoses of what we would

5    recognize in the western world as problems, let's say, a brief

6    psychotic episode, that is a serious problem, lasts for days,

7    but where a person can appear bizarre and their thinking is

8    really unintelligible, but it has a characteristic that is

9    specifically attributed to the culture that the person comes

10   from.  Lots -- many of these conditions where we would bring

11   in -- put in the category of post-traumatic stress disorder, and

12   there used to be diagnosis of hysterical reaction.  A classic

13   one was called "run amuck" that we'd see.  We had that influence

14   somewhat after Vietnam.

15        So again, it's -- it has to do that -- it's a -- it is a

16   disease that we -- or a condition that we can appreciate, but it

17   has its -- its presentation is very much unique to the culture

18   or ethnic background of the individual.

19   Q.    In your evaluation of Mr. Dhiab, did you find the

20   diagnoses either of conversion disorder or culture-bound

21   syndrome to be appropriate?

22   A.    No, not at this time.

23   Q.    Could you give your reasons why?

24   A.    Well, first of all, I consider a conversion disorder what

25   we call a diagnosis of exclusion.  I mean, essentially, in

1    making that diagnosis, we're saying, look, I can't find an

2    organic reason for these patients' symptoms, and because I can't

3    pinpoint what the organic cause may be, I'm going to call it

4    psychological.  And the patient very often says, these are real,

5    I have real problems here, and just because you can't find what

6    the cause is, doesn't mean that I don't have a real disease and

7    I want to be treated for my real disease.  And, in fact, with

8    Mr. Dhiab we don't know what the cause is of his muscle

9    weakness, his paralysis, his paresis and his other neurological

10   symptoms that we saw when we examined him.  So I don't think

11   it's appropriate at this time to at all approach it as a

12   conversion disorder because we haven't done all the diagnostic

13   tests that we need to do.  He's got some physical signs that are

14   really much more consistent with a physical or organic problem,

15   and you're -- you're not being appropriately, you know,

16   trustworthy with him if you start to say, look, it's all in your

17   head.  So I don't feel that that's the case.

18        The culture-bound syndromes, he did speak about some

19   cultural issues to explain his symptoms, but that's, you know --

20   I didn't feel he had a syndrome that would be attributable to

21   his culture.

22   Q.    What were the -- what were the cultural elements that he

23   mentioned to you?

24   A.    Well, he, in fact, recognized that his symptoms,

25   particularly his pain and his muscle weakness and some of the

1   sensory kinds of changes, had a psychological component.  In

2   fact, he at one point in the record, you can see where he talked

3   about psychological spasm.  So he saw that there's an interplay

4   here, and he said, you know, in my culture we called these

5   jinns, that there's a kind of spirit that gets in you and sort

6   of influences how you think and how you approach things.  And so

7   I can best explain it from my cultural background, totally

8   appropriate.  I mean, it happens all the time in lots of

9   different patients that we see.  So it's not a culture-bound

10  syndrome.  He's got a problem.  I mean, he's got what might be,

11  let's say, nerve damage that we've not diagnosed because we've

12  never done the right tests on him, and maybe that's what's

13  causing his pain.  He knows that when he's in pain there's a

14  psychological manifestation of it.

15  Q.   So just to be clear, with regards to the conversion

16  disorder, you did find physical symptoms?

17  A.   I found physical symptoms when I examined him, yes.

18  Q.   Okay.  Regarding the culture-bound syndrome, does the

19  indication of jinns necessarily dismiss any aspect of physical

20  symptoms?

21  A.   No.  It's just a metaphor.  It's just a way of people

22  trying to explain themselves.

23  Q.   And one more question regarding conversion disorder,

24  General Xenakis.  You mentioned that the diagnostic tests

25  haven't been done to accurately pinpoint?

1    **A.**    Right.

2    **Q.**    What diagnostic tests would he need?

3    **A.**    He needs an MRI and probably an MRI with contrast of his

4    back because he's -- you know, he had a back injury 20 years

5    ago.  He had another injury that may have aggravated it when he

6    was being transported to Guantanamo.  He's under these

7    conditions where he can't ambulate.  I mean, who knows what

8    might be -- I mean, he's 43 years old.  A lot of people have

9    arthritic -- you know, even some arthritic degeneration at 43,

10   so he needs something where we can see what the nerve

11   impingement is.  There's -- one x-ray said that they thought

12   that there was some bulging of the disc at L5-S1, but that was a

13   CT and that really isn't -- you know, it just sort of opens the

14   door in terms of doing more evaluation.

15   **Q.**    So have you seen any MRI reports for Mr. Dhiab?

16   **A.**    No.  There's not been an MRI at Guantanamo.  I mean,

17   there was supposed to be one sent down there a year ago and it

18   never got there.

19   **Q.**    So the equipment necessary to properly diagnose him

20   doesn't -- is not present at Guantanamo?

21   **A.**    It's not there.

22   **Q.**    Okay.  General Xenakis, could you -- just finely, could

23   we discuss the issue of malingering.

24          What is your understanding of malingering?

25   **A.**    Well, malingering is a descriptor that's used that a

1    person is faking or feigning their symptoms because they've got

2    some other purpose that they think there will be some

3    compensation or some other, you know, reward for what's

4    happened.

5    Q.    And that's listed here under Axis I, which means that it

6    was considered seriously --

7    A.    Right.

8    Q.    -- if I understand what you said earlier.

9    A.    Right.

10   Q.    Is it your view that any part of Mr. Dhiab's complaints

11   could be malingering?

12   A.    No.  I didn't see -- you know, look, I've -- in my

13   military career, starting from the time I came in during the

14   Vietnam War, when we had a draft Army and we had a lot of young

15   men who didn't want to be in the Army at that time, and clearly

16   didn't want to go to Vietnam, you know, we saw a lot of people

17   who were, quote-unquote, malingering.  And periodically through

18   my 28 years that issue came up, and so I've seen a lot of young

19   soldiers -- I didn't see those signs with him.

20   Q.    What do you look for when -- what do you look for in

21   malingering when that's a suspicion?

22   A.    Well, I mean, the -- you know, the symptoms, the

23   expression of the symptoms is really not consistent with what

24   might be the cause, what would you think would be a reasonable

25   diagnosis.  There's inconsistencies in the way that the person

1    talks about their symptoms and complaints.  You can identify

2    what might be the -- the reenforcement of those symptoms.  You

3    can see that they're going to get compensation or they're

4    getting support in other ways or they're lots of times getting

5    out of duty, they didn't want to deploy.  You know, there's lots

6    of things you could see where there would be a basis for why a

7    person would malinger.

8    Q.    Okay.  But in your view, is Mr. Dhiab malingering?

9    A.    I didn't -- I wouldn't give him that diagnosis.

10   Q.    Okay.  Before -- just one last question about this record

11   as a whole.

12        Given the different -- the four different diagnoses under

13   Axis I, is it your understanding that there is any narrowing

14   down of what's, perhaps, ailing Mr. Dhiab?  Have they come to

15   any conclusions that override any others?

16   A.    No.  I mean, he's not been -- he's not had an extensive

17   interview, so I don't think that there's a basis for being able

18   to really, you know, propose a good diagnosis.

19   Q.    Are you aware, General Xenakis that Mr. Dhiab has

20   occasionally -- has sometimes refused to attend appointments at

21   the Behavioral Health Unit?

22   A.    Sure.

23   Q.    And could you explain why Mr. Dhiab might attend medical

24   appointments but not appointments at the Behavioral Health Unit?

25   A.    My --

1          MR. WILTSIE:  Your Honor, I have to object.  How can he

2     know what Mr. Dhiab is thinking?

3          THE COURT:  Well, that's what --

4          MR. WILTSIE:  He's not a --

5          THE COURT:  Excuse me.  That's what he's here to talk

6     about.  Go ahead.  Objection's overruled.

7          MS. PRADHAN:  Thank you.

8     BY MS. PRADHAN:

9     Q.   General Xenakis, just to repeat the question:  What is

10    your understanding of why Mr. Dhiab would attend an appointment

11    at the medical facility but not at the Behavioral Health Unit?

12    A.   Well, a couple.  I mean, one he indicated -- which I've

13    seen in other men from that part of the world -- that

14    psychiatrists treat people with serious mental illnesses, with

15    psychotic conditions, with bizarre symptoms, and it's very

16    stigmatizing.  So being in the culture which people grow up

17    seeing a psychiatrist really puts you in that sort of cohort, in

18    that group of people.  So I think that there's some shame and

19    stigma, as there is often in -- you know, our country here, and

20    with our military.

21         Second is he has a skepticism, perhaps a distrust of the

22    medical system in general, but he thinks that it really is --

23    it's more the way the behavioral practitioners, healthcare

24    practitioners approach things, and he's very skeptical that he's

25    going to get -- really be treated fairly and thoughtfully.

1    **Q.**    Did he describe to you the approach of the behavioral

2    health staff members?

3    **A.**    Yes.  And he described it in a way that seemed to be

4    rather -- a little more than perfunctory, but not really very

5    personal and not in a way that clearly would bring him out and

6    suitably engage him.

7    **Q.**    And do you have any -- do you have any personal knowledge

8    of the procedures of the Behavioral Health Unit versus the

9    procedures of the medical facility at Guantanamo?

10   **A.**    Some in terms of what I've observed, and that the

11   behavioral health people come around to the cells respectively

12   and will say to the detainee, behavioral health here, do you

13   want to be seen?  And, of course, most of the detainees say they

14   do not want to be seen.

15   **Q.**    Thank you.  I'd like to turn now to still Petitioner's

16   Exhibit 50, but pages 250 and 2, beginning with -- this is the

17   the Bates Number 250.  This is a record from -- we're not

18   actually sure when it's from because it says at the top November

19   14th, 2013, but it also says late entry.  So it's some time in

20   early to mid-November.

21        The highlighted portion, General Xenakis, says that, "The

22   ISN stated that because of his back, he could not feed in the

23   classroom in the restraint chair.  He stated that it is

24   extremely painful.  ISN requested to feed in an AV room with a

25   soft chair or in the classroom in a wheelchair.  The ISN stated

1    he will drink in the a.m., and that he would like his p.m.

2    E-feed around 1530 to 1600.  The ISN requested this so that he

3    would not overwhelm the night shift."

4           Now, I'm going to take this away for a second and I'm

5    going to put on page 2, Bates Number 2, of Exhibit 50.  And this

6    is also from November, as you can see at the top, early November

7    2013, around the same time.  And here it says -- this is an

8    enteral feeding order from, I assume, the Joint Medical Group at

9    Guantanamo Bay.  And here you have the number of cans that he's

10   being fed, instructions regarding the nasogastric tube.

11          Now, number 7 under miscellaneous orders says, "May

12   receive enteral feeds in media space on his block."

13          You'll note that that's crossed out.  And then there's a

14   redacted portion at the end, but the writing that's not redacted

15   says "DC," which I understand to be discontinued, and then at

16   the very end, here (indicating), it says JDG.

17          General Xenakis, what does JDG stand for?

18   A.     Joints Detention Group.

19   Q.     Joint Detention Group.

20          So what is your understanding of these two documents

21   taken together?

22   A.     Well, it looks to me like the Joint Detention Group

23   over -- overread the recommended procedures from the Joint

24   Medical Group that had -- had -- you know, had allowed him to

25   receive his feeds in the media space.

1    Q.    Do you see any reason for that overriding on this sheet?

2    A.    No.

3    Q.    Did you see a reason for allowing him to feed in a media

4    chair on the previous record?  And I'll put that record back up

5    for your --

6    A.    No, absolutely.  I mean, look, here's a man who says he's

7    willing to do that, he's cooperating, he understands what the

8    burden is on the staff that is working with him, he's opening up

9    to make it as easy on everybody and make sure that no one -- you

10   know, no one gets hurt and no one's put out.  This is a very

11   reasonable request that he's made.

12   Q.    General Xenakis, in your view, is it appropriate for the

13   Joint Detention Group to be overriding a medical order like

14   this?

15   A.    No, it's not.

16   Q.    What reasons could you -- what reasons or what

17   explanation might you have for an overriding of a medical order,

18   as a senior medical -- from a senior medical officer as

19   yourself?

20   A.    Well, I mean, the question would be -- I would ask, all

21   right, so what's the basis?  What's the reason?  Is there

22   something having to do with security?  Is there some other

23   reason that we don't know about that -- about the facility or

24   availability of staff, things that I might not know as the

25   senior medical officer?  But I think this is what's indicated

1   medically.  It's in everybody's best interest to do it

2   medically.  You know, there better be a very strong reason for

3   not doing it.

4   Q.    Okay.  During your evaluation of Mr. Dhiab, what was his

5   demeanor?

6   A.    Oh, it's very pleasant, very appropriate, you know.

7   Q.    Did you view his interactions at any point with the

8   guards?

9   A.    I did.

10  Q.    And what were those interactions like?

11  A.    I thought that they were very decent, very appropriate.

12  Q.    In what way were they decent?

13  A.    Well, I thought he was very personal in the way that he

14  talked to them.  I thought he acknowledged them in a, you know,

15  understandable way.  I didn't see any tension between the guards

16  and him.

17  Q.    Did you observe his interactions at all with the medical

18  staff at Guantanamo?

19  A.    Well, there was a medic who came in, I think, at one

20  point -- no, maybe it wasn't.  That was another visit.  I

21  apologize.

22        No -- well, no, because we did have an interaction

23  when -- at the medical clinic, but the nurse would not go in and

24  talk with him.

25  Q.    Are you referring, General Xenakis, to -- in your report,

1    you offer an anecdote.

2          MS. PRADHAN:  And let me find the paragraph number for

3    Your Honor.

4          THE WITNESS:  While you're doing that I'm going to --

5          MS. PRADHAN:  Page 5 of your report.

6          THE COURT:  Do you need water?

7          THE WITNESS:  Yeah, I was going to get some water.

8          THE COURT:  All right.

9    BY MS. PRADHAN:

10   **Q.**    At page 5 of your report, General Xenakis -- I'll let you

11   turn to it.

12   **A.**    Okay.

13   **Q.**    There's a paragraph, the third paragraph down states,

14   "Dr. Crosby and I observed interactions with healthcare

15   providers during one session when Mr. Dhiab complained of severe

16   back pain.  Mr. Dhiab appropriately requested analgesic

17   medication for his pain in a form he would have been able to

18   ingest but was refused by the nurse provider.  Furthermore, the

19   nurse and accompanying assistant judge advocate reported that

20   the attending physician refused to see Mr. Dhiab to discuss

21   treatment of his pain and prescription of medications.  The

22   nurse and staff claimed they were abiding by standard operating

23   procedures, stipulating the terms of interactions with

24   detainees."

25          Is that accurate?

1   **A.**      Yeah.  I wrote it, hopefully.

2   **Q.**      Are you aware, General Xenakis, that the current senior

3   medical officer submitted a declaration on September 29th in

4   which she addresses this story about this antidote that --

5   **A.**      Yes.  Yes, I am.

6       MS. PRADHAN:  That is -- I apologize.  That is

7   Respondents' Exhibit 37A, Your Honor, the SMO declaration dated

8   September 29th, 2014, at paragraph 8.

9   BY MS. PRADHAN:

10  **Q.**      I'll give you a moment.  You have the Petitioner's --

11  **A.**      Where is it?

12  **Q.**      I'll put it on the --

13  **A.**      Okay.

14  **Q.**      I'll put it on here for you.  There we go.

15      Paragraph 8 of the declaration of the current senior

16  medical officer, who I understand has been at Guantanamo since

17  mid-September, states that Dr. Xenakis went -- oh, excuse me,

18  that "Dr. Xenakis informed the nurse that Mr. Dhiab required

19  additional pain medication, and upon checking Mr. Dhiab's

20  medication administration chart, the nurse determined that

21  Mr. Dhiab could receive Ultram for his pain."

22      I'm going to skip forward to the highlighted portion

23  which says, "Dr. Xenakis went back into the cell and spoke to

24  Mr. Dhiab, after which Dr. Xenakis returned and informed the

25  nurse that Mr. Dhiab would not take the Ultrum because the pill

1    would have to be crushed.  At no time during this interaction

2    did Mr. Dhiab speak to the nurse, nor did Mr. Dhiab ask to see a

3    doctor."

4         General Xenakis, what is your impression of the

5    discrepancy?

6    **A.**    Well, as I recall what happened, was we came into the

7    area where he was seated, and was on the bed.  He looked really

8    fatigued.  He had not slept well the night before, and he had

9    more back pain, and certainly that -- you know, you could tell

10   that he was nowhere near as comfortable.  And we asked him, had

11   he received medication, and he said he'd received, I think, some

12   Roxicet early in the morning but it had not really relieved his

13   pain, and asked him did he want something else.  He said, yes,

14   he had -- I think -- I think he had asked and been told he

15   couldn't have something.  And I said, well, let me see if we can

16   get -- it's going to be difficult for us to examine you if

17   you're in pain like this, and all of that, we're just going to

18   make it worse.  So I signaled the camera.  The assistant SJA

19   came in.  I said, look, the man's in pain, can we get some other

20   medication?  They -- the nurse came in and I said, look, he's in

21   pain, can we get some more meds?  Do you want to see him?  She

22   said, no -- I think, as I recall -- and I'll check the order

23   sheet.

24        So they said he could have Ultram and we'll crush it and

25   put it in water.  I told him -- he said, I can't -- I don't -- I

1    can't take it.  I can't swallow.  He told us the day before he'd

2    been having some swallowing problems, and it really was around

3    the water and sometimes the way the meds were used.  And I asked

4    why was it crushed?  Well, it's now SOP because of the suicide

5    concerns, I assumed myself that having reviewed the Latif case

6    that it was all derivative of the Latif case.  And I said, well,

7    is there a way we could give it to him differently?  I went

8    back.  He said, look, I don't -- I'll take it crushed if I can

9    take it in a little bit of Ensure.  And I said, well, that makes

10   sense.  And I went back.  They said, no, no, the SOP says only

11   water.  And I think she said I'll check.  And she checked

12   whoever was the attending medical officer.  And she says, no,

13   the SOP says only water.  And I said, look, SOPs are just

14   guidelines.  I mean, they're just advice about what we should

15   do.  I mean, I've written hundreds of SOPs in my career.  I even

16   said, look, I've written hundreds of them.  Why don't we just

17   give it to him in a little Ensure?  And she said, well, I'll

18   check again.  I said, could you -- I went back with him, and I

19   said, could you maybe get the doctor in here and maybe the

20   doctor could come in and examine him and discuss this with him,

21   because if he's got issues that he's suicidal or, you know, he

22   may not feel that it's believable about the water and the

23   crushed, you know, then he can come in and he can talk to the

24   detainee and he can talk to us.  She said, no, he won't -- she

25   went out, she came back, she says, no, he won't come in.  So I

1     said, he won't come in and you won't give the medicine in

2     Ensure?

3     **Q.**     Did she give you a reason why the doctor wouldn't come

4     in?

5     **A.**     No.  She just said he won't come in.

6     **Q.**     Was it your understanding that the standard operating

7     procedure that she was referring to was medical or detention

8     related?

9     **A.**     I asked -- I couldn't clear that up.  I don't know if it

10    was medical or detention related.

11    **Q.**     In your professional opinion, what would individualized

12    medical care of Mr. Dhiab have prescribed in that situation?

13    **A.**     Look, the right thing to do was to give him the medicine

14    in a form that he was willing to take, and that would include

15    even if in the pill, but if he was willing to take it crushed in

16    Ensure, then just give it to him.  Help relieve him of his pain.

17    Show him that you care about him, and let's kind of go about

18    this in an adult way.

19    **Q.**     And you mentioned that your understanding for the reason

20    for that standard operating protocol was suicide concerns based

21    off of the --

22    **A.**     That was just my assumption, having looked at a bunch of

23    things.

24    **Q.**     Right.  Based on your evaluation of Mr. Dhiab, does he

25    show any suicidal tendencies?

1    **A.**    No.

2    **Q.**    How would you describe his psychiatric outlook?

3    **A.**    Well, I mean, I think, he can get very sad at times.  I

4    mean, he's worried, understandably, about is he going to be

5    transferred or not.  He's had some hardships, family members who

6    have died.  He's been there a long time.  He's not -- you know,

7    in his own mind he doesn't think it's justified.  He thinks that

8    he's not being treated fairly, so his mood goes up and down.

9    But he's a man who, you know, tries to be realistic about what's

10   going on here, and --

11   **Q.**    Did you form an opinion about his concern about the state

12   of his own health?

13   **A.**    Yes.  I mean, I think he wants to stay healthy.  He wants

14   to be as healthy as he can be.  He's worried about how healthy

15   he will be if and when he is reunited with his family.

16   **Q.**    And how do you -- how do you compare or contrast that

17   with the fact that he's on a hunger strike currently?

18   **A.**    Well, I mean, the hunger strike is the only means of

19   expression that he has for how he's been treated, which he

20   regards as very demeaning and shaming and really not considerate

21   of what his certain reasons -- you know, what his reasoning is

22   and the basis for why he objects to his confinement.

23   **Q.**    But again, General Xenakis, your understanding of him, do

24   you understand that -- is he concerned about his health

25   currently or is he -- is it your understanding that his hunger

1    strike is unto death?

2    **A.**    No, I do not think he wants to die.  And I don't think

3    it's a hunger strike until death.  He's very concerned about his

4    health.  He wants to be healthy.

5    **Q.**    Based on your psychiatric evaluation of Mr. Dhiab, is it

6    possible that he's being coerced in his current hunger strike?

7    **A.**    He's being provoked.

8    **Q.**    By who?

9    **A.**    I believe by the way that the policies and procedures and

10   some of the tactics by the guards, staff.  And I'm very

11   concerned about that.  I don't think he's being coerced by other

12   detainees.  I mean, I think that this is a complex problem for

13   detainees and how they somehow maintain a sense of solidarity

14   and esteem as a group of people who are confined under those

15   conditions.

16   **Q.**    I'd like to direct your attention now to exhibit -- this

17   is PX50, the medical records again, Bates Number 444.  I'll put

18   that up here.  So this is a memorandum from Camp 5 and 6 Medical

19   to the Joint Operations Center.  And the first sentence of that

20   memorandum says, "This is a medical recommendation that detainee

21   ISN 722 be issued/allowed wheelchair use, appointments only, and

22   the diagnosis is leg weakness."

23         The memorandum -- it says that, "The memorandum will

24   expire on the 3rd of February, 2015."  This memorandum is dated

25   February 4th, 2014.

1        General Xenakis, what is your understanding of the word

2    "appointments" there?

3    **A.**      Actually, I thought it was vague.  I wasn't sure what

4    they were meaning by that.

5    **Q.**      As a former senior medical officer would you qualify

6    enteral feeding or force-feeding as an appointment?

7    **A.**      Sure.  It's a medical procedure, you know, and therefore

8    you have to have an appointment to have a medical procedure.

9    **Q.**      So based on your reading of this memorandum, would you

10   allow wheelchair use for force-feeding?

11   **A.**      Oh, absolutely.

12   **Q.**      And is it your understanding -- what is your

13   understanding of the duration of time from this memorandum that

14   this is meant to be in effect?

15   **A.**      Well, it's a year, like, I'm sure -- like a lot of the --

16   often in these commands you'll publish a memo and it's good for

17   a year.

18   **Q.**      Is there any indication to you in this memorandum that

19   the recommendation is subject to interruptions of any sort?

20   **A.**      Well, not from this line, I mean, or for anything else,

21   you know, no.

22   **Q.**      Okay.  I'd like to jump forward, if I may, to a record

23   from -- excuse me, April 25th, 2014.  The Bates number is 542.

24   Now, this is two months after the record that we just looked at.

25   The highlighted portion says, "ISN 722 wants wheelchair and

1    crutches.  ISN 722 notified that his DISC status" -- I will

2    assume that that means disciplinary status -- "and guard force

3    is affecting his ability to have a wheelchair.  722 insists it

4    is a medical thing."

5         General Xenakis, based on the memorandum that you just

6    saw, what is your understanding of this document?

7    A.    So, I mean, do I understand the document?  The document

8    is he's asked appropriately for a wheelchair.  He wants to use a

9    wheelchair and crutches.  All that's good.  We want to see that

10   in a man who we want to have some progress and get healthier and

11   may be more cooperative and get out of this routine of forced

12   enteral feedings, and now it's being denied, evidently, by the

13   guard forces overriding what the medical recommendation is.

14   Q.    And I want to call your attention, again, to the top of

15   this document which says it's a nurse cell visit.  So it's a

16   nursing vote?

17   A.    Yes.

18   Q.    So this is someone from -- do you understand this is

19   someone from the Joint Medical Group or --

20   A.    I would assume that it's from the JMG.

21   Q.    Okay.  Is it appropriate, in your view, for medical staff

22   to be basing medical treatment on disciplinary status?

23   A.    No.  I mean, so this is where it's complicated because,

24   you know, the -- we have very comprehensive, broad-based

25   programs, most I think probably clearly represented in

1   residential treatment centers for disturbed adolescents, and so

2   you have to put out, as practitioners, as clinicians -- over

3   time you have to develop these somewhat more sophisticated

4   behavioral management plans with medical treatment and therapy

5   and support and school and activities.  But, you know, this man

6   is in a program for enteral feeding, for nourishment, to help

7   him stay as healthy as he can, identify prospectively for

8   transfer.  So this is a medical program, and I don't see a

9   strictly disciplinary punishment to be exercised unless it's a

10  part of a much more comprehensive plan.

11  **Q.**    I see.  And what is your understanding, if any, of his

12  current disciplinary status?

13  **A.**    I don't -- I mean, we never got a guideline on what his

14  disciplinary status was.  I mean, we asked the government for

15  all the information they had in terms of how they saw him.  We

16  wanted to know what the picture was, any other information, and

17  we didn't get any information, so I don't know what his

18  disciplinary status is.

19  **Q.**    Again, based on your psychiatric evaluation of Mr. Dhiab,

20  is Mr. Dhiab a violent personality?

21  **A.**    No, no, he's not violent.  I put in my memos -- I mean,

22  in my report he's not violent or aggressive.

23  **Q.**    Does he have the capacity to be physically aggressive?

24  **A.**    I don't think so, at all.

25  **Q.**    Does he have the capacity to be -- to intend to harm

1    other people?

2    **A.**    I mean, he's not expressed any intention to do that.  I

3    mean, what can happen 20, 30, 40 years from now, I mean, who

4    knows.  But I don't see it, and I don't see it in his history

5    before he came to Guantanamo.  I don't see it in any

6    information, although we weren't given much information in terms

7    of what his conduct's been while he's been detained.

8    **Q.**    If you were presented evidence of disciplinary

9    violations, what would your best explanation be for those?

10   **A.**    Well, it depends on what they are, but you know that in a

11   setting like this, I mean, you go back to the classic experiment

12   by Philip Zimbardo at Stanford, there's going to be occasionally

13   disciplinary violations.  I mean, there will be violations on

14   both sides because staff and guard being provocative and

15   patient -- and detainees can be responsive and reactive and they

16   can be provocative.  So, I mean, there's some stuff that you

17   sort of expect commonly will happen.

18   **Q.**    Is it your understanding that -- does Mr. Dhiab -- in

19   your view, does he have an angry personality?

20   **A.**    No.  I don't see him vindictive.  I don't see him

21   vengeful.  I don't see him expressing any intent to hurt

22   anybody.  There's nothing that he indicated that he's

23   anti-American or anti-western.  I mean, he was very clear.  He

24   wants to just get out, be with his family, live his life in a

25   plain, simple way, provide for his family, and, you know -- and

1    be able to reestablish those relationships.

2    **Q.**    What would your best explanation be if you were told, for

3    instance, that he threatened a guard?

4    **A.**    Well, I mean, until you know the context of it you can't

5    really give any explanation.  I mean, how did -- how did it

6    happen?  Was he in severe pain?  Had he been awake all night

7    because he hadn't had any sleep?  Was he forced to be put in a,

8    you know, restraint chair and he was -- I mean, who knows?  I

9    mean, it -- people can say things.

10   **Q.**    Is Mr. Dhiab physically capable of assaulting a guard?

11   **A.**    I don't -- I don't think so at all.  I mean, I -- I

12   wouldn't consider him dangerous, at all, and I've been -- I've

13   been punched by patients, so I look for it.

14   **Q.**    I want to move on to one more record.  Now, this is

15   from -- this is from May 23rd, 2014.  The Bates number is 653.

16   This is from the Behavioral Health Unit at Camp 5.

17          So, in this document it starts under

18   identifying/background information by saying "per available

19   records," and then goes into a history, if you will, of

20   Mr. Dhiab.

21          At the bottom, it states under subjective/objective,

22   "This provider attempted to see the patient as a routine

23   follow-up to ensure standard of care, not at the patient's

24   request.  The patient refused the appointment."

25          And then if you look at the actual evaluation, it appears

1    to be a chronological assessment of his health records thus far

2    from his time at Guantanamo.

3          What is your understanding of the validity of this

4    report?

5    **A.**     I don't know about validity.  I wouldn't --

6          MR. WILTSIE:  Objection.

7          THE WITNESS:  -- give it a lot of weight.

8          THE COURT:  Excuse me, just a minute.  What's the

9    objection?

10          MR. WILTSIE:  Foundation.  How can he have any

11    understanding on the basis of the report?  He didn't write it.

12          THE COURT:  I'm not even clear on -- is this a report

13    about Mr. Dhiab?

14          MS. PRADHAN:  Yes, Your Honor.  This is a report -- it

15    says -- states at the top "ISN 722," so this is a -- what's

16    called an outpatient progress note about Mr. Dhiab.

17          THE COURT:  And do we even know the date that it was made?

18          MS. PRADHAN:  Yes, Your Honor.  It is says May 23rd, 2014.

19          THE COURT:  And your question was?

20          MS. PRADHAN:  My question is -- I'll rephrase the

21    question, Your Honor.

22          THE COURT:  All right.

23          MS. PRADHAN:  My question is:  It starts by saying "per

24    available records," and then at the bottom, Your Honor, it says

25    that "the patient refused a follow-up appointment."

1    BY MS. PRADHAN:

2    Q.    Is it your understanding that this evaluation is based on

3    a face-to-face meeting with Mr. Dhiab?

4    A.    No, it's not based on a face to face because the

5    subjective objective says he attempted to see him and Mr. Dhiab,

6    the patient, refused to have the conversation.

7    Q.    Okay.  And what would you expect to see in what they call

8    an outpatient progress note?  Is it typical to see the history

9    of a patient dating back to 2003 in a progress note?

10   A.    Well, so much of it now with the electronic medical

11   records we have is cut and paste, that, in fact, that is

12   something that is common, not terribly useful.  Because the last

13   notation of new information is April 2010, so that's over four

14   years before this appointment occurred, so we're missing the

15   most recent information that would be useful in deciding, you

16   know, what his state of health is.

17   Q.    Well, but yet, General Xenakis, in the first paragraph

18   under identifying background information, it states, the

19   highlighted portion, "It appears that he has a history of

20   sustained nonreligious fasting, feigning injuries and performing

21   rituals to heal physical concerns."

22         The feigning injuries and performing rituals sort of

23   harkens back to the September 19th record we looked at where --

24   that had malingering and other disorders listed on there.

25         Is it -- in your view, does this sort of overview of the

1    summary, without a face-to-face appointment, meet the standard

2    of care?

3          MR. WILTSIE:  Objection, Your Honor.  If he refused to see

4    the patient, how can it a question of standard of care?

5          THE COURT:  The objection is sustained.

6          Do you know who put this report together?

7          THE WITNESS:  As I recall, I thought this was the

8    behavioral scientist -- the behavioral specialist.  They have

9    technicians, health technicians, that will visit the detainees

10   and write reports, observations.  Sometimes it's an officer or

11   more senior clinician.

12         THE COURT:  And you used the term "health technicians."

13   What does that mean?  What kind of educational background does a

14   health technician have?

15         THE WITNESS:  They're corpsmen.  They're enlisted and they

16   go to courses at military health academies.  They're usually

17   weeks to months, and they're taught basic interview skills and

18   reporting, how to make observations.

19         THE COURT:  All right.  Go ahead.  Do you have any other

20   questions?

21         MS. PRADHAN:  I have a couple more questions, Your Honor.

22   BY MS. PRADHAN:

23   Q.   General Xenakis, in your view is it appropriate to write

24   a summary like this when you haven't seen a patient face to

25   face?

1   **A.**     I would advise the person not to write this kind of

2   summary.

3   **Q.**     Okay.

4          THE COURT:  "By this kind," are you criticizing the fact

5   that it wasn't done face to face or are there additional

6   criticisms?

7          THE WITNESS:  Um, there are additional criticisms in that

8   I think that it'd be more useful if you had other ancillary

9   information as a behavioral health technician that you could get

10  to give something that's more current about this person's status.

11         THE COURT:  Is it fair to say that -- and, again, it's

12  hard to read it just this way, and I haven't seen this before,

13  this particular document, but is it safe to say that this

14  document is not exactly a rousing memo in his favor in terms of

15  being considered for transfer out?

16         THE WITNESS:  Yes.  I think it'd be considered negatively

17  because it memorializes all that other information before of the

18  problems that he had, and I don't think it appropriately talks

19  about what his current state of mind is.

20         THE COURT:  I'd like over the evening recess to get just a

21  single page -- a single page of this because I haven't seen this

22  particular page.  Of course, I have not gone through all of the

23  medical records, everybody.  I don't want anybody to think I have

24  been able to do that.

25         MS. PRADHAN:  I understand, Your Honor.

1        THE COURT:  Go ahead, please.

2        MS. PRADHAN:  You actually -- there should be a copy of it

3  in the binder, in the small binder.

4        THE COURT:  In your big binder?

5        MS. PRADHAN:  No, in the small one, actually, that we gave

6  you at the beginning of this direct.

7        THE COURT:  All right.  Let's see if we can find it, then.

8        MS. PRADHAN:  And if that's not the case, we'll be happy

9  to get you a copy.

10        THE COURT:  Okay.

11  BY MS. PRADHAN:

12  **Q.**    I'd like to look at one last record, General Xenakis.

13  This is Bates Number 817.  I apologize, I don't have this

14  highlighted, but I've been told that I can do something like

15  this, but it's not really working, so I'm not going to do that.

16  Let me clear it up.

17        Okay.  So in the -- in the third entry, the 21st of June,

18  2014, it states, "Detainee was willing to go to E-feed

19  compliantly, but 508 states that wheelchair is to and from

20  appointments only, so detainee will be FCE'd for E-feed.  Can

21  the 508 be changed so that detainee can use wheelchair to go to

22  and from E-feeds?  MO, please advise."

23        General Xenakis, do you understand what a forcible cell

24  extraction consists of?

25  **A.**    Yes.

1    **Q.**    And what is your understanding of that?

2    **A.**    I mean, it's -- you know, it is a team of military who

3    come in, in protective gear, that -- and bind -- you know, tie

4    up the -- not tie up, but bind the detainee.

5          MR. WILTSIE:  Your Honor, we're getting awful close to the

6    line.

7          MS. PRADHAN:  Your Honor --

8          THE COURT:  You may withdraw the question.  You may ask it

9    when we go into closed session, but I think it's correct that

10   we're close to the line.

11         THE WITNESS:  Okay.  I apologize.

12         I'll rephrase the question, Your Honor.

13   BY MS. PRADHAN:

14   **Q.**    General Xenakis, understanding that you have -- have you

15   ever ordered a forcible extraction --

16   **A.**    Yes.

17   **Q.**    -- from your time in the military?

18   **A.**    Yes.

19   **Q.**    And under what circumstances?

20   **A.**    Thought the person was going to kill himself, and he had

21   tied him -- locked himself into a -- backed himself into a

22   corner, and the only way we were going to get to him was to

23   bring in a team to do that, and I requested support from the

24   military police.  And, in fact, we extracted the person, saved

25   his life.

1    **Q.**    What would you say is the standard for deciding when to

2    use a forcible cell extraction?

3    **A.**    Well, first when everything else has failed.

4         MR. WILTSIE:  Your Honor, I object.  He's not an expert in

5    penological institutional procedures.

6         MS. PRADHAN:  Your Honor, General Xenakis has been

7    qualified in military medicine, and he has --

8         THE COURT:  No.  Objection's sustained.

9         MS. PRADHAN:  Thank you, Your Honor.

10   BY MS. PRADHAN:

11   **Q.**    General Xenakis, recalling the order of February 4th that

12   we -- the medical recommendation, that I'd be happy to put back

13   up, that states that 722, Mr. Dhiab be allowed wheelchair use

14   for appointments for one year expiring on February 3rd, 2015,

15   what's your understanding of the consistency with which this

16   recommendation has been applied?

17   **A.**    Well, I mean, this is a violation of that memo.  It

18   contradicts it.

19   **Q.**    And per the other medical records that you reviewed, is

20   it your understanding that the recommendation was applied

21   consistently otherwise?

22   **A.**    I just -- I mean, was it -- the use of the wheelchairs?

23   **Q.**    Yes.  Let me be clearer, General Xenakis.

24        Is it your understanding that this incident on June 21st,

25   2014, when he was not allowed a wheelchair, when he was told

1    that he would have to be FCE'd, is your understanding based on

2    your evaluation of him and your review of the medical records

3    that this is the only time that this happened?

4    **A.**    No, I think it happened many other times.

5    **Q.**    Thank you.  So just to summarize, General Xenakis, what

6    did your review of the medical records tell you about

7    Mr. Dhiab's state of health and treatment at Guantanamo?

8    **A.**    That it is not -- he's not had the evaluation that he

9    should have, either medically, neurologically or for pain

10   conditions, so we really don't know what the cause is of his

11   pain or his muscle weakness or paresis, partial paralysis, that

12   we do not appreciate that there's not been an adequate

13   evaluation of his mental state, particularly as it contributes

14   to his conduct, and that would be when he refuses to eat, and

15   because there's not an evaluation, there's not what I would

16   consider a comprehensive or integrated plan about how to support

17   him, treat him and get him into the best possible health so that

18   he can be transferred when the time comes.

19   **Q.**    General Xenakis, did you review any of the standard

20   operating procedures that the government produced?

21        THE COURT:  How much more direct do you have?

22        MS. PRADHAN:  Apology?

23        THE COURT:  How much more direct do you have?

24        MS. PRADHAN:  I would say another 10 to 15 minutes, Your

25   Honor, if that's acceptable.

1      THE COURT:  I'm going to take a break now because I know

2  our court reporter's been sitting for a long time, as has

3  everybody.

4      MS. PRADHAN:  Okay.

5      THE COURT:  Let's try for ten minutes, everybody.

6      (Thereupon, a break was had from 3:50 p.m. until

7  4:05 p.m.)

8      THE COURT:  We're back on the record, everybody.  And I

9  really hope you'll only be 15 minutes.  We've got to get going.

10  We're nowhere near finished with this witness.  Go ahead, please.

11      MS. PRADHAN:  I'll try to be shorter than 15 if I can,

12  Your Honor.

13  BY MS. PRADHAN:

14  Q.    General Xenakis, did you review any of the standard

15  operating protocols?

16  A.    I did.

17  Q.    Did you review Standard Operating Protocols 33 and 38?

18  A.    Yes.

19  Q.    Okay.  I'd like to show you a couple of selections from

20  SOP 38.  The first at page 7 states that, "The detainee may be

21  FCE'd to the" -- and it's blacked out -- "restraint chair upon

22  approval from the commander of the Joint Task Force."

23      Now, General Xenakis, did Mr. Dhiab speak to you about

24  the FCEs?

25  A.    Yes.

1    **Q.**    And what did he tell you about them?

2    **A.**    They're painful and demeaning, and he felt they were

3    unnecessary.

4    **Q.**    And in your experience, what are psychiatric effects of

5    frequent forcible cell extractions?

6    **A.**    Well, anything that you do like that disrupts the

7    relationship and any chance of having a positive constructive

8    relationship.  Any time something like that occurs, it's going

9    to disrupt it and make it more difficult, and if you do that

10   over a long period of time, then you've essentially almost

11   negated the chance that you're going to have of positive, you

12   know, interaction, you know, with your -- with your detainee or

13   subject or patient.

14   **Q.**    Now, elsewhere in SOP 38 --

15        MS. PRADHAN:  And this is Respondents' Exhibit 19A, Your

16   Honor, and it is in the binder that we gave to you, so I hope

17   that it's available, but it's also up here on the screen.

18   BY MS. PRADHAN:

19   **Q.**    It states, "The restraint chair" -- and we understand

20   this to be a five-point restraint chair from Mr. Dhiab's

21   testimony -- "will be use utilized for all enteral feeding

22   procedures except compliant enteral feeding detainees as

23   directed by the commander of the Joint Detention Group."

24        It also says, "C, if the compliant enteral fed detainee

25   becomes noncompliant with feed procedures they will be fed in

```
1    the restraint chair."
2          Now, that's SOP 38 which is from May 15th, 2014.
3          I'd like to call your attention to SOP 33, which is dated
4    May 30th, 2014, so about two weeks later.
5          THE COURT:  Wait a minute.  Dated may May 30th 2014.
6    Okay.  Go ahead.
7          MS. PRADHAN:  Yes.  SOP 38, Your Honor, is dated, and this
8    is exhibit -- Respondents' Exhibit 19A is dated May 15th, 2014.
9    That's the one I just put up.  The one I'm about to put up is
10   Respondents' Exhibit 18A.  That's SOP 33.  That's dated May 30th,
11   2014, two weeks later.
12   BY MS. PRADHAN:
13   Q.    And that states on page 3 that, "The restraint chair is
14   used when all lower levels of restraint have failed.  The
15   restraint chair is used to gain compliance when other means of
16   restraint are not practical or available.  Forcing a forced cell
17   move, a detainee may be placed in the restraint chair to ensure
18   the safety of the guard force personnel working with him."
19         General Xenakis, what's your understanding of the seating
20   discrepancy between these two SOPs?
21   A.    Well, I mean, the first SOP doesn't at all refer to a
22   sort of systematic way of how you impose restraints on a
23   detainee.  I mean, it's a very broad-brush policy.
24         MR. WILTSIE:  Your Honor, I have to object.  His
25   understanding as to what these SOPs mean is irrelevant to these
```

1   proceedings.  He's no longer in command of any troops in the

2   United States Army.

3        THE COURT:  The objection is sustained.  Besides which the

4   language is pretty plain, so I don't think we need expert

5   testimony on it.  Go ahead, please.

6   BY MS. PRADHAN:

7   **Q.**    General Xenakis, according to SOP 38, then, the restraint

8   chair is used for all force-fed detainees with, apparently, a

9   small subset accepted occasionally.

10       In your medical opinion is that appropriate?

11  **A.**    No.

12  **Q.**    For what reason?

13  **A.**    Because it's not individualized, and I think that you'd

14  want to be able -- in terms of getting compliance over time, I

15  think you want to have some individualized approach.

16  **Q.**    Did Mr. Dhiab speak to you about the use of the

17  five-point restraint chair?

18  **A.**    Yes.

19  **Q.**    And what did he say to you?

20  **A.**    It's uncomfortable.  It's demeaning.  He doesn't feel

21  it's necessary.  He agrees to either drinking the nutrient, the

22  supplements on his own.  The times that he needs to have enteral

23  feedings he doesn't feel that he's going to be causing any

24  trouble or that he would be opposing it.

25  **Q.**    And in your position should Mr. Dhiab be placed in a

1    five-point restraint chair for his feedings?

2    **A.**      No.  I mean, no.  I mean, in general, no.

3    **Q.**      And what is the basis for that conclusion?

4    **A.**      Because he's compliant.  Because he wants to get healthy.

5    He wants to be better.  He agrees to the feedings.  He agrees to

6    be able to take whatever nutrition he needs to stay healthy.

7    **Q.**      What would you recommend in terms of restraints during

8    his force feedings?

9    **A.**      I wouldn't recommend any restraints.

10   **Q.**      General Xenakis --

11          THE COURT:  Is that opinion based on knowledge, all of

12   which is written down by employees or -- well, employees at

13   Guantanamo Bay?  But if you had access to all of that

14   information, would your view that no restraints should be used

15   continue to be the same if you learned that there had been a

16   number of inappropriate incidents with Mr. Dhiab varying in

17   degrees of seriousness?  I know that's a very long sentence I

18   just asked you.  If you need it repeated, I'll ask the court

19   reporter.

20          THE WITNESS:  No.  I think the issue is, I would look at

21   what those incidents were.  I'd review them.  I'd think about how

22   they occurred or did not occur.  You know, we have -- all the

23   time, issues of compliance are fundamental to good medical care,

24   and one has to take -- so a Petitioner has to take them into

25   account all the time.  So it really is the devil's in the detail

1  here of what those incidents are and how they occurred.

2       THE COURT:  Okay.  Go ahead.

3  BY MS. PRADHAN:

4  Q.    General Xenakis, I have two more questions for you.  I'd

5  like to refer to you Respondents' Exhibit 8-A, Colonel Bogdan's

6  answers to the Court questions dated September 4th, 2014.  The

7  pertinent sentence here is, "I have sat in the restraint chair

8  while fully secured.  It was padded, comfortable and felt like a

9  normal chair."

10      General Xenakis, having evaluated -- having performed a

11  full psychiatric evaluation of Mr. Dhiab, what is the pertinence

12  of the sentence to Mr. Dhiab's experience with the five-point

13  restraint chair?

14  A.    I don't think it's pertinent at all.

15  Q.    Why not?

16  A.    I mean, look, what general -- what Colonel Bogdan does,

17  and under the circumstances he sits in the chair and it's not

18  particularly relevant to what the experience is to Mr. Dhiab.

19  And we saw similar things that people said when they'd been

20  waterboarded and they didn't feel it was frightening.

21  Q.    Does it matter that Colonel Bogdan doesn't seem to have

22  felt any pain in the restraint chair?

23  A.    Not particularly.  I mean, he's a fit man.  He's a

24  colonel.  You know, he's able to do physical exercise.  I mean,

25  he's a completely different individual under different

1   circumstances.

2   Q.    And in your view, is Mr. Dhiab's claim that the restraint

3   chair is painful, is that valid?

4   A.    Well, particularly -- look, this man's 6-foot-5.  He

5   weighs 150 pounds, plus or minus.  He's really emaciated.  He's

6   got chronic pain.  I think that to be more than likely that it

7   is painful and uncomfortable for him.

8   Q.    General Xenakis, in your expert report you state that the

9   treatment of Mr. Dhiab is at times abusive.  Could you -- could

10  you provide examples of that?

11  A.    Well, I mean, we've seen -- I mean, I think that denying

12  him the wheelchair when he's willing to use the wheelchair and

13  he's also said he's willing to use the crutches to -- any time

14  he's out of his cell to go to feedings, appointments, rec area,

15  all those -- denying those because of unspecified disciplinary

16  problems, I think, is abusive and provocative.

17        THE COURT:  Unspecified, so far as you know, correct?

18        THE WITNESS:  Right.  I mean, and I -- and because I asked

19  for the information, you know, I -- I lean toward the side

20  that -- I have to say that if it was there, I would have -- I

21  would believe it would have been shown.

22        MS. PRADHAN:  Your Honor, petitioners have no further

23  direct examination at this time.

24        THE COURT:  All right.  And can the government give me,

25  hopefully, an accurate estimate of how long you're going to be on

```
1    the direct that will take place in the open courtroom?
2         MR. WILTSIE:  Your Honor, you're asking a trial lawyer the
3    worst question on the planet, which is how long is he going to
4    talk?
5         THE COURT:  Well, if the trial lawyer doesn't give me a
6    good answer, then he will hear the answer from me.
7         MR. WILTSIE:  Yes, ma'am.
8         THE COURT:  Go ahead.
9         MR. WILTSIE:  I suspect that the outer limit is an hour
10   and a half.
11        THE COURT:  Oh, my gosh.  Well, go ahead.
12        MR. WILTSIE:  It may be quicker.  It obviously depends on
13   how much the witness --
14        THE COURT:  It was a long direct.  Go ahead, please.
15   We'll start.
16             CROSS-EXAMINATION OF STEPHEN XENAKIS
17   BY MR. WILTSIE:
18   Q.   Doctor, I want you to assume you're in your office and
19   you have a client who looks -- who has the same conditions
20   you're seeing in Mr. Dhiab physically.  So you write your notes,
21   you write your report, which is very similar to the report
22   you've written here today, and then you look out the window as
23   you're leaving and you see him walking to his car.
24        It causes you to create some doubt in your mind that he
25   has a real problem with his leg, doesn't it?
```

1    A.      True.

2    Q.      Now, you and Dr. Crosby were together with Mr. Dhiab for

3    14 hours over three days?

4    A.      Yes.

5    Q.      Okay.  You conducted the interviews together?

6    A.      Yes.

7    Q.      And you conducted the physical -- the physician portion,

8    the 90-minute physical portion together.

9            I assume you've read each other's reports?

10   A.      Yes.

11   Q.      And probably read the drafts as they were being done.

12           Now, you say there's no psychiatric diagnosis to be had?

13   A.      Right.

14   Q.      Dr. Crosby testified that she thinks he may have a

15   somatic disorder.

16   A.      Okay.

17   Q.      That's a psychiatric disease?

18   A.      Yes.

19   Q.      If you thought that he had it, you would have noted it in

20   your report?

21   A.      If I thought he definitely had it, yes.

22   Q.      Okay.  You didn't think he had it?  You do not think he

23   has it?

24   A.      I don't -- as I said at this point, yeah, no diagnosis at

25   this point.

1    **Q.**     Okay.  So there's a disagreement between the two of you

2    on that point?

3    **A.**     I don't think so.  I mean, I don't know exactly.  I mean,

4    she thought, -- as I saw it, she considered that as a diagnosis.

5    I mean, I think that we both considered it as a diagnosis, but I

6    didn't feel in the way I read her report that she had -- that

7    she had, you know, confirmed it in her mind.

8    **Q.**     Okay.  Well, she testified that she thinks that he has

9    it, so that'd be --

10   **A.**     Okay.

11   **Q.**     There would be a disagreement if she made that testimony?

12   **A.**     Could be.

13   **Q.**     Okay.

14   **A.**     I'd have to hear it.

15   **Q.**     Turning to malingering, Doctor, can you pull up 343,

16   please?  This is Exhibit 1, page 343.  Down there, that's it,

17   right there.

18   **A.**     Okay.

19   **Q.**     Two things:  Malingering, Dr. Crosby also testified about

20   malingering, and she agreed with you on the general

21   definition --

22   **A.**     Okay.

23   **Q.**     -- which was that faking a symptom for some other

24   purpose.

25   **A.**     Okay.

1   **Q.**     You both agree on that.

2          She noted that one of those purposes could be seeking

3   narcotics.

4   **A.**     Okay.

5   **Q.**     You agree with that?

6   **A.**     Well, I mean, it's always a possibility.

7   **Q.**     Okay.  Now, looking at Axis I here, there was a lot of

8   discussion from counsel about what conversion disorder was and

9   culturally-bound syndrome was and malingering.

10  **A.**     Right.

11  **Q.**     I want to focus on the two letters before that, R/O,

12  means rule out?

13  **A.**     Right.

14  **Q.**     There's no diagnosis here that he's got a conversion

15  disorder?

16  **A.**     Right.

17  **Q.**     There's no diagnosis he's got a culturally-bound

18  syndrome?

19  **A.**     Right.

20  **Q.**     And there's no diagnosis he's malingering?

21  **A.**     Right.

22  **Q.**     They're considering it?

23  **A.**     Right.  It's part of what we call differential.

24  **Q.**     Okay.  Now, Doctor, while we're on the subject of

25  culturally-bound syndrome, you dismiss that out of hand in your

1  report.  You basically said it's not even a diagnosis anymore in

2  DSM-5.

3  **A.**    Well, I don't know if I dismissed it out of hand.  I say

4  cultural factors are always at play here and they need to be

5  considered.

6  **Q.**    Okay.  Well, I want you --

7  **A.**    It is not a diagnosis --

8  **Q.**    -- to put --

9  **A.**    -- under --

10      THE COURT:  Excuse me.  Let the witness finish his

11  sentence, please.

12      THE WITNESS:  Under DSM-5 now, it is in the appendix as an

13  issue.  It is not a diagnosis as, say, schizophrenia or

14  delusional disorder.

15      THE COURT:  When did DSM-5 come out?

16      THE WITNESS:  This year.

17      THE COURT:  Of course, they change the DSM pretty often,

18  don't they?

19      THE WITNESS:  Well, about every ten years or so.

20      THE COURT:  Okay.  Go ahead.

21      MR. WILTSIE:  It came out in 2013, Your Honor.

22      THE COURT:  Um-hmm.

23      MR. WILTSIE:  And it noted that it just -- it removed the

24  term "culturally-bound syndrome" --

25      THE WITNESS:  Right.

1      MR. WILTSIE:  -- but it split it into three different

2   diagnoses.

3      THE WITNESS:  There's a whole section in the appendix

4   about what those kinds of conditions could be.

5   BY MR. WILTSIE:

6   Q.   All right.  Doctor, let's just put this up so you can see

7   what I'm talking about.

8      MR. WILTSIE:  And, Your Honor, it's starting to look like

9   an hour and a half may be a better estimate.

10  BY MR. WILTSIE:

11  Q.   What we have here is, in the highlighted portion of

12  DSM-5, "This construct has been replaced by three concepts:

13  Cultural syndrome, cultural idiom, and cultural explanation or

14  perceived cause."

15  A.   Right.

16  Q.   Okay.  So when you said in your report that there wasn't

17  a diagnosis in DSM-5, you just neglected on tell the Court it

18  was a diagnosis in DSM-IV?

19  A.   Look, that's not fair.  A concept is not a diagnosis.  A

20  concept is a concept that informs the way we approach things.  A

21  diagnosis is schizophrenia, paranoid delusional disorder, major

22  depressive disorder.  And if you look through the manual you

23  will not find it as diagnosis.  So let's make it clear to the

24  Court that it is a concept that is used to inform how patients

25  are characterized.

1  Q.     All right.  Doctor, let's make something else clear to

2  the Court.

3        THE COURT:  But I understand your strong statement that

4  it's not a diagnosis, but wasn't it listed as a condition that

5  should be considered under Axis I?

6        THE WITNESS:  In DSM-IV it was.

7        THE COURT:  In DSM-IV.

8        THE WITNESS:  In DSM-IV.

9        THE COURT:  Was it considered a, quote, diagnosis,

10  unquote, in DSM-IV?

11        THE WITNESS:  It was a qualifier, a descriptor.

12        THE COURT:  Okay.

13  BY MR. WILTSIE:

14  Q.     Doctor, you testified you obtained the rank of brigadier

15  general in 1994?

16  A.     Yes.

17  Q.     You were then appointed in 1995 to be commanding general

18  of the Southeast Regional Medical Command?

19  A.     Yes.

20  Q.     That was in Fort Gordon?

21  A.     Yes.

22  Q.     You were in charge of six hospitals scattered around the

23  country?

24  A.     Well, mostly in the Southeast.

25  Q.     Southeast, correct.

1          Um, 18 months later you were relieved of command?

2    A.     I voluntarily gave up command.

3    Q.     You voluntarily gave up command, but the Army announced

4    that you were relieved of command?

5    A.     But I sent a letter and I voluntarily gave up command.

6    Q.     And the Army announced that you were relieved of command?

7    A.     The Army announced that.

8    Q.     You were -- were you relinquished or relieved of your

9    command, however you wish to consider it, after an investigation

10   into alleged improper conduct?

11   A.     Yes.

12          MS. PRADHAN:  Objection, Your Honor.  There is --

13          THE COURT:  Oh, objection's overruled.  This is

14   cross-examination.  Go ahead, please.

15   BY MR. WILTSIE:

16   Q.     During that investigation you were allowed to present

17   your side to the investigators?

18   A.     Yes.

19   Q.     And you denied wrongdoing?

20   A.     Yes.

21   Q.     And you were relieved anyways?

22   A.     Well, the timing was -- the investigation went on after I

23   relinquished command.

24   Q.     But you -- you gave your -- you gave your -- you gave

25   your information to the investigators before you were relieved?

1   **A.**      I gave some information.

2   **Q.**      The relief was very public?  It was in the *New York*

3   *Times*, the New York -- the *Chicago Tribune?*

4   **A.**      Right.

5   **Q.**      And shortly -- a year later you retired?

6   **A.**      I did.

7   **Q.**      You never had another command in the Army?

8   **A.**      No.

9   **Q.**      And you retired in 1998?

10  **A.**      I did, May 1st, 1998.  I had my record cleared.  I sued

11  the Army for improper conduct, and they cleared my record and I

12  retired with full honors and privileges as brigadier general.

13  **Q.**      You sued the Army because it was alleged that they had

14  used a taped conversation in their investigation?

15  **A.**      That was illegally acquired.

16  **Q.**      And you settled that lawsuit?

17  **A.**      I did.

18  **Q.**      All right.  You thought that -- you thought that the

19  Army's conduct was unfair?

20  **A.**      I thought it was improper.

21  **Q.**      And it was unfair?

22  **A.**      It was unfair.

23  **Q.**      And in your lawsuit -- in your lawsuit you admitted that

24  there were ten -- there were ten charges against you?

25  **A.**      As I recall.  I haven't looked --

1   **Q.**     And you admitted one --

2   **A.**     -- at it in a while.

3   **Q.**     -- of them was --

4          THE COURT:  Counsel, you're doing it again.  Let the

5   witness get his answer out.  Go ahead, please.

6          THE WITNESS:  As I recall.

7   BY MR. WILTSIE:

8   **Q.**     Okay.  And you admitted that one of them was grounded?

9   **A.**     Pardon me?

10  **Q.**     You admitted that one of them was founded, that it was --

11  there were actually grounds for the charge?

12  **A.**     I don't remember.  I will tell you, actually, I've not

13  looked at that in such a long time.  I do not recall.

14  **Q.**     All right.  Let's jump ahead five years, Doc, to year

15  2004.

16  **A.**     All right.

17  **Q.**     The end of President Bush's first term, beginning of his

18  second or its coming up.

19  **A.**     Right.

20  **Q.**     You were being considered for a post with the Department

21  of Defense?

22  **A.**     Right, the principal deputy, assistant secretary of

23  defense for health.

24  **Q.**     All right.  A very prestigious post?

25  **A.**     Yes.

1    **Q.**    You were honored to be nominated?

2    **A.**    Absolutely.

3    **Q.**    Okay.  And you wanted the job?

4    **A.**    Yes.

5    **Q.**    Okay.  And during the nomination process you were asked

6    your opinion about the Abu Ghraib scandal that was breaking?

7    **A.**    Yes.

8    **Q.**    And you gave that opinion?

9    **A.**    Yes.

10   **Q.**    And you were not nominated?

11   **A.**    I was not nominated.

12   **Q.**    And then shortly thereafter, you authored a op-ed piece

13   in the *Washington Post*?

14   **A.**    Right.

15   **Q.**    That was titled, "From the Medics:  Unhealthy Silence"?

16   **A.**    Right.

17   **Q.**    And in that op-ed you criticized the apparent inaction of

18   military medicine with regard to the interrogation of --

19   **A.**    I did.

20   **Q.**    -- detainees?

21         You've got to wait until I stop because --

22   **A.**    I'm sorry.

23   **Q.**    -- he can't take us both down at the same time.

24         MR. WILTSIE:  That's -- actually, this -- I'm holding

25   Plaintiff's Exhibit 63, Your Honor, which is his CV.  We had done

1   some serious research, but had only come up with a CV that was

2   about four years old.

3          THE COURT:  What page are you on?

4   BY MR. WILTSIE:

5   Q.    Doctor, you've written a lot of articles since --

6          THE COURT:  Wait.  What page are you on?

7          MR. WILTSIE:  Oh, I'm sorry, page 10, Your Honor.  Let me

8   put it up here for the Court to see.  I'm afraid it's going to

9   become an eye chart, Your Honor.

10  BY MR. WILTSIE:

11  Q.    Anyway, Doctor, by my count -- well, before February of

12  2005, most of your articles, as we see here, were telemedicine

13  in the burn center, when managed care learns about telemedicine,

14  topics that were common to general psychiatry?  Would that be

15  accurate?

16  A.    True.

17  Q.    And then after 2005, we start to see a lot of articles

18  like the one you just talked about, military medical ethics

19  calling for leadership, medical ethics in the age of torture,

20  and I could go on.  There are actually --

21         MR. WILTSIE:  I'm sorry, I counted in a hurry, Your Honor,

22  and I may be inaccurate.

23  BY MR. WILTSIE:

24  Q.    There are 45 articles listed after the 2005 article, and

25  of those, by my estimation, 23, or roughly half, Doctor, have

1    to deal with criticizing military medicine; is that right?

2    **A.**    No.  I don't see this as a criticism.  I see this as

3    trying to clarify and what I think are appropriate ethical

4    practices, the same kinds of things that I teach at Uniform

5    Services University.  It's a matter of affirming what are the

6    ethical principles in medicine in healthcare.

7    **Q.**    The point would be, Doctor, that those ethical principles

8    you're trying to teach are not being currently followed by

9    military medicine.  That's what your article says?

10   **A.**    No, that's not what I'm -- that's not a fair reading of

11   those articles and what I'm arguing.  Because I think there's a

12   lot that's very good about it because the other half are about

13   military medicine and an advocate, and during this time I was

14   the senior advisor to the chairman of the Joint Chiefs of Staff,

15   Admiral Mullen, on psychiatric -- on psychological health and

16   traumatic brain injury, and I -- the intent -- I mean, my

17   purpose for working on his staff was to do what we needed to do

18   to make sure we delivered the best healthcare to our soldiers

19   and families and didn't repeat some of the problems we had in

20   Vietnam.  It's all about lessons learned --

21   **Q.**    All right, Doctor.

22   **A.**    -- and proceeding accordingly.

23   **Q.**    All right.  So let's review some of the titles.  I was

24   hoping to avoid this, but "Doctors must be healers not

25   interrogators."  You wrote that?

1    **A.**     There's nothing critical about that.

2          THE COURT:  Now, what page that is on?

3          MR. WILTSIE:  On page 11, Your Honor.

4          THE WITNESS:  That's about clarifying the role of doctors.

5    That's to help.  I mean, that's how you -- where you write SOPs

6    and regulations.  You clarify respectively what the roles are of

7    your professional people that are on your team.

8    BY MR. WILTSIE:

9    **Q.**     Next, Doctor, is, "Moderator First Do No Harm, Session 3,

10   National Guantanamo Teaching."

11   **A.**     All right.  First, do no harm's straight from the

12   hypocratic oath.

13   **Q.**     And a couple down, "Our Duty to War Detainees."  Down

14   below that, "Protecting War Detainees."  Below that, "Military

15   Torture in Medicine," some other language.  A couple more down

16   below that, "Weaponized Medicine."

17         Doctor, what I'm getting at is you're an advocate for a

18   point of view about how military medicine should proceed in this

19   war?

20   **A.**     I'm an advocate, right, for certain -- right, for

21   practice, the best practice of military medicine.  That's what

22   I'm an advocate for.

23   **Q.**     And your advocacy isn't limited to just public opinion,

24   you have lobbied the executive and legislative branches on these

25   same topics?

1   **A.**      I'm not a lobbyist, and I don't lobby.

2   **Q.**      I didn't say you're a lobbyist, but --

3   **A.**      Well, lobbyist, you used the word.

4   **Q.**      Okay.  You have advocated to the executive and

5   legislative branch directly on these same topics?

6        THE COURT:  Nobody in Washington calls themselves a

7   lobbyist.  Okay.  Go ahead.

8        MR. WILTSIE:  All right.

9   BY MR. WILTSIE:

10  **Q.**      You've signed an open letter to the president last year?

11  **A.**      Right.

12  **Q.**      And in it you -- in it, that letter, which you signed --

13  with several hundreds others, I admit.

14  **A.**      Yeah.

15  **Q.**      It advocated that the president order a stop to enteral

16  feeding at Guantanamo Bay?

17  **A.**      Right.

18  **Q.**      You testified last year before the Senate Judiciary

19  Committee?

20  **A.**      Yes.

21  **Q.**      And in that testimony you testified that they should take

22  action to stop enteral feeding at Guantanamo Bay?

23  **A.**      Right.

24  **Q.**      Doctor, you were a member of a task force put together by

25  the Institute of Medicine as a Profession?

1   A.      Yes.

2   Q.      Do you remember that?

3   A.      Yes.

4   Q.      And they issued a report, "Ethics Abandoned," "Medical

5   Professionalism and Detainee Abuse on the War on Terror"?

6   A.      Right.

7           MR. WILTSIE:  Let's see here.  May I approach the witness,

8   Your Honor?

9           THE COURT:  Yes, you may.  What article are we on now?

10          MR. WILTSIE:  It's coming up.

11          THE COURT:  Oh, okay.

12          MR. WILTSIE:  This has been marked for identification as

13  plaintiff's -- I'm sorry, Respondents' Exhibit 116, Your Honor.

14          (Respondents' Exhibit 116 marked for identification.)

15  BY MR. WILTSIE:

16  Q.      Doctor, do you recognize that?

17  A.      Yes, I do.

18  Q.      Okay.  Now, Doctor, I want you to turn to page 95.

19  A.      All right.  Let me get there.  All right.

20  Q.      And, of course, it would help if I had it.  I'll get it.

21          Down there at the very bottom of the page it says, "The

22  physician, of course, must attend to the prisoner's medical

23  needs, but also defer to the prisoner's wishes if he is

24  competent and his decisions are not made under duress.  The

25  declaration of Malta is clear that it can be preferable and

1    ethical to allow a prisoner to die with dignity, if it is

2    clearly the individual's stated wish to refuse any treatment,

3    rather than requiring him to submit to repeated interventions

4    against his will."

5         Do you see that?

6    A.    Yes.

7    Q.    You agreed with that statement when it was written?

8    A.    Yes.

9    Q.    This is referring to an early feeding of hunger strikers

10   in any detention setting?

11   A.    Yes.

12   Q.    And the gist of this, Doctor, is that the detainee

13   authority should respect the autonomy to decide to risk death by

14   the hunger strike?

15   A.    Yes.

16   Q.    And even if they -- and even if in the end they do die?

17   A.    Standard medical practice.

18   Q.    And this report notes, just -- I'll read -- I'll just

19   state for the Court, on page 85 -- that 10 hunger strikers did

20   die in Northern Ireland in the late 1980s?

21   A.    It was 1981.

22   Q.    In 1981?  And the British -- I'm sorry, not -- the

23   medical authorities did not intervene in that case?

24   A.    Right.

25   Q.    And, similarly, that -- over 100 Turkish citizens died in

1      a hunger strike in the early 1990s, early 2000s?

2      **A.**      Right.

3      **Q.**      And, again, medical personnel did not intervene to stop

4      the hunger strike?

5      **A.**      Right.

6      **Q.**      Now, Doctor, we talked about you have experience as an

7      expert.  You've written over ten reports for Courts?

8      **A.**      Probably.

9      **Q.**      And when you do so, you know the Court is relying on your

10     expertise?

11     **A.**      Yeah.

12     **Q.**      And on your skill?

13     **A.**      Yes.

14     **Q.**      And on your knowledge?

15     **A.**      Right.

16     **Q.**      And you've been an expert enough to know that evidence is

17     evaluated by a legal term of art; we call it weight?

18     **A.**      Yes.

19     **Q.**      Okay.  If the evidence is believable the judge or the

20     jury will give it a lot of weight?

21     **A.**      Right.

22     **Q.**      And if it's not believable they give it no weight?

23     **A.**      Absolutely.

24     **Q.**      Okay.  Now, you testified as an expert in the case of

25     *United States v. Abu Ghaith*?

1    **A.**    Yes.

2    **Q.**    That was a terrorism trial in the Southern District of

3    New York?

4    **A.**    Right.

5    **Q.**    You testified for the defense?

6    **A.**    Right.

7    **Q.**    And you testified at an evidentiary hearing?

8    **A.**    Yes.

9    **Q.**    And the parties stipulated to your expertise, I believe?

10   **A.**    Yes.

11   **Q.**    The issue was the voluntariness of a confession?

12   **A.**    Right.

13   **Q.**    Just like here, you knew the Court was looking to you for

14   your expertise?

15   **A.**    Right.

16   **Q.**    Okay.

17           MR. WILTSIE:  Your Honor, may I approach the witness?

18           THE COURT:  You may.

19           MR. WILTSIE:  Your Honor, I'm handing the witness what's

20   been marked for identification as Government's Exhibit 110.  This

21   is the opinion of Judge Kaplan in the Abu Ghaith matter.  And I

22   want to direct the Court and the witness's attention to page 518.

23   BY MR. WILTSIE:

24   **Q.**    And you see there, Doctor, that Judge Kaplan's opinion

25   states, "The Court affords minimal weight to Dr. Xenakis's

```
1    testimony."
2          THE COURT:  Excuse me, what page is that on?
3          MR. WILTSIE:  518, Your Honor.  It's in the second column
4    of 518.
5          THE COURT:  508?
6          MR. WILTSIE:  518.
7          THE COURT:  Oh, sorry.  Go ahead.
8    BY MR. WILTSIE:
9    Q.    And it -- Judge Kaplan states, "The Court affords minimal
10   weight to Dr. Xenakis' testimony.  Dr. Xenakis never examined or
11   met Abu Ghaith, relying instead on hearsay concerning Abu
12   Ghaith's time in Iran, Abu Ghaith's affidavit, witness testimony
13   and the FBI agents' transfer log in reaching his conclusions.
14   He was obviously partisan and expressed opinions with little
15   basis, relying predominantly on secondhand accounts and
16   theoretical possibilities."
17         You've read that before, Doctor?
18   A.    I don't think I have, actually.
19   Q.    All right.  Thank you, Doctor.
20         Okay.  Doctor, here you were asked to perform a
21   psychiatric medical examination of Mr. Dhiab?
22   A.    Right.
23   Q.    And you knew you had to write a report, and you knew the
24   Court would -- a court order had required it?
25   A.    Right.
```

1    Q.    And you knew it had to be -- it would be used in court?

2    A.    Right.

3    Q.    You knew it had to be thorough?

4    A.    Right.

5    Q.    You knew it had to be accurate?

6    A.    Right.

7    Q.    Now, when you get an assignment like this, I assume

8    several things you want to have information on?

9    A.    Right.

10   Q.    You want his medical records?

11   A.    Right.

12   Q.    How many pages of medical records did you review?

13   A.    I don't know.  Before I got down there, I don't know if I

14   had 100 pages.  I'm not sure how many pages I had.

15   Q.    How many were given to you by counsel?  Just -- a

16   ballpark's good.  100?

17   A.    I mean, I reviewed all the records that were given to me

18   by counsel.  I don't remember exactly how many that was when I

19   got there.

20   Q.    All right, Doctor.

21         Did it look like this?

22         MR. WILTSIE:  For the record, I'm holding up two 2-inch

23   binders, maybe 3-inch binders full of medical records.

24         THE WITNESS:  Well, I think I got them all on pdf.  A lot

25   of them were pdf.

BY MR. WILTSIE:

Q.      So how many -- how big were the pdf files?

A.      Pretty extensive.  I don't remember.  It was extensive.
I don't -- I mean, I know that I had a lot of records to look
at.

Q.      There are 1,004 pages.  Did you look at all of them?

A.      I doubt that I looked at 1,000 pages of medical records.

Q.      Did you look at 100?

A.      Probably.

Q.      Did you look at 200?

A.      Probably.

Q.      Ballpark for me, Doctor.

A.      I mean, a couple hundred.  I've looked at so many records
in this case, medical records and nurses notes, that, you know,
I -- to be honest -- I'm trying to be honest with the Court.  I
don't know how many hundreds of pages or dozens I've looked at.
I've just looked at a lot of records.

Q.      Now, you also, when you were getting ready to do this
report you wanted to talk to Mr. Dhiab?

A.      Yes.

Q.      You insisted that you had to talk to him over three days?

A.      Well, I wanted to have several -- yeah, I wanted to have
quite a few days to interview him.

Q.      Okay.  Now, you're aware that -- I mean, it's obvious
Mr. Dhiab is a detainee at Guantanamo Bay?

1    A.     Yes.

2    Q.     He is not happy about being a detainee at Guantanamo Bay?

3    A.     Sure.

4    Q.     He has a motive to fabricate things to get -- to lessen

5    his time at Guantanamo Bay?

6    A.     I don't think we can say that until we've got the

7    information from him.  I mean, that's -- you're impugning him in

8    a way that you don't have data to -- or basis for that

9    statement.

10   Q.     No, I wasn't trying to impugn Mr. Dhiab.

11   A.     You said he has a motive to, you know, misrepresent

12   his --

13   Q.     Were you concerned that he might have a motive?

14   A.     Of course.  I'm concerned that you might have a motive.

15   Q.     Oh, don't be concerned about it, Doctor.  I do have a

16   motive.

17   A.     Okay.  So let's get it straight that in these structured

18   situations there's always an overriding motive for what people

19   say and why they do it.  It's hard to discern.  It's important

20   to discern it, and there's ways of trying to figure out what's

21   factual.

22   Q.     Did you question anything that Mr. Dhiab told you?

23   A.     Of course I did.

24   Q.     The things you reported -- for example, you reported

25   Mr. Dhiab suffered from a motor vehicle accident back in the

1   '80s or '90s?

2   A.    Right.

3   Q.    You couldn't verify that?

4   A.    Can't.  I mean, that's just a report.  I think I put

5   it -- I said he reported.  I have no basis for that.  I have no

6   facts.

7   Q.    So the statements that you attribute to Mr. Dhiab in your

8   report, you have no basis to know whether they're true or false?

9   A.    Well, that's any time you get a history from a patient.

10  When a patient comes in, they give you a history, all you can do

11  is take their word at it.  Standard medical practice.

12  Q.    Okay.  One of your complaints in your report, Doctor, is

13  that he has not been evaluated by certain specialists?

14  A.    Right.

15  Q.    All right.  Some of those -- one of those specialties is

16  neurology?

17  A.    Right.

18  Q.    Now, you -- and here's the reason I was asking the

19  question about how many pages of medical records you looked at,

20  Doctor:  The -- you failed to note that his providers have

21  consistently recommended that he receive a neurology consult?

22  A.    No.

23  Q.    It's nowhere in your report, Doctor.

24  A.    Why would I want to say it?  He still hadn't had a

25  neurological eval.  The issue was did he have a neurological

1    eval, and what are the findings we had from a neurological eval

2    that would somehow inform us what the basis of his pain was and

3    muscle weakness.  We don't have that data.  He's not had a

4    neurological evaluation.  We don't know.

5    Q.    So it was not important to the Court that you note that

6    he's been recommended for a neurology evaluation?

7    A.    I mean, I could have written 1,000 pages -- I didn't --

8    of what I chose to inform the Court.  I decided that was not a

9    priority item.

10   Q.    And I'm sure you know, Doctor, that as of a couple of

11   weeks ago, the neurologist was at Guantanamo and Mr. Dhiab

12   refused to see him?

13   A.    Yes.  It's good that they finally sent him down after we

14   visited him.

15   Q.    It's rather unfortunate Mr. Dhiab refused to see him?

16   A.    He probably had his reasons.

17   Q.    Doctor, you've been a doctor for over 35 years?

18   A.    I graduated medical school 40 years ago.

19   Q.    Treated hundreds of patients?

20   A.    Probably.

21   Q.    Admitted many to hospitals?  Familiar with hospital

22   nursing procedures?

23   A.    Yes.

24   Q.    One of the nurses in corpsman -- hospital corpsman's the

25   most important job you -- I'm sorry.

1            One of the nurses or hospital corpsman's most important

2      jobs is giving patients medications -- giving the medications

3      ordered by a doctor?

4      A.      Yes.

5      Q.      And they need to make sure they give only the prescribed

6      medication?

7      A.      Yes.

8      Q.      Give the prescribed dose?

9      A.      Yes.

10     Q.      At the prescribed time?

11     A.      Sure.

12     Q.      To state the obvious, drug overdoses can have very

13     serious consequences?

14     A.      Sure.

15     Q.      They can have fatal consequences?

16     A.      Sure.

17     Q.      And overdoses can occur if a dose is too large?

18     A.      It's an overdose.

19     Q.      Yeah.  Overdose can also occur if doses are given too

20     close together?

21     A.      Okay.

22     Q.      That's also an overdose?

23     A.      Right.

24     Q.      To prevent that, nurses and corpsman log when they give a

25     drug and how much they give?

1    **A.**      There should be a log.

2    **Q.**      Okay.  They record the time and they record the dose?

3    **A.**      Sure.

4    **Q.**      And doctors review those logs?

5    **A.**      Hopefully.

6    **Q.**      Now, Doctor, you reviewed medical records for many of the

7    detainees at Guantanamo Bay?

8    **A.**      Sure.

9    **Q.**      You -- we've talked about it.  We're not sure how many

10   pages you reviewed of Mr. Dhiab's.

11           You're aware that Guantanamo Bay follows this procedure?

12   **A.**      I mean, that they log what they do?

13   **Q.**      Yeah.

14   **A.**      Yeah, sure.

15   **Q.**      You're aware that on those logs the doctors prescribe

16   what drugs a detainee may receive?

17   **A.**      Well, they -- in the orders, the nurses transcribe the

18   orders to the log.

19   **Q.**      Thank you.  That's precise.  That's very good, Doctor.

20           For what reason that the detainee may receive the drug?

21   **A.**      Sometimes they put the indication on the log.

22   **Q.**      Okay.  And then the dose goes on --

23   **A.**      The dose and the time and when it was administered.

24   **Q.**      Okay.  All right.

25           Doctor, I want to show you what's been marked as

1    Government's Exhibit 109.

2          (Respondents' Exhibit 109 marked for identification.)

3    BY MR. WILTSIE:

4    Q.    And I'm hoping, given the wonders of modern

5    telecommunications, if you'll be able to see what this says on

6    the screen.  Yeah, I'm sorry.

7          All right.  Doctor, now this is -- you're familiar with

8    this kind of form?

9    A.    Sure.

10   Q.    This is a form that's used at Guantanamo Bay?

11   A.    Sure.

12   Q.    Okay.  You see there that this form has the information

13   we discussed.  Let's take a look at the third entry down -- or

14   the -- the last entry, let's take a look at the last entry.  I'm

15   putting this on the screen.  I hope you can see it.  I apologize

16   for the quality of the document.

17         This says, "Roxicet, 5 milligrams, 325 milligrams/5

18   milliliters."

19         That's the dose?

20   A.    Right.

21   Q.    The second line is, "5 milliliters, PO."

22         It's by mouth?

23   A.    Yes.

24   Q.    "Q8 hours" is every eight hours?

25   A.    Right.

1   Q.      "PRN" is as-needed --

2   A.      Right.

3   Q.      -- for pain?

4   A.      Right.

5   Q.      Okay.  If you look over on the second page at the top,

6   there's a similar entry for Tylenol?

7   A.      Right.

8   Q.      And, really, all we need to see there is the "Q6 hours."

9           That's every six hours?

10  A.      Right.

11  Q.      Okay.  Now, you examined Mr. Dhiab on the morning of the

12  3rd of September?

13  A.      Right.

14  Q.      Okay.  And it was in the morning?  It was, like, 9:00,

15  10:00?

16  A.      Wait.  In the behavioral -- in the medical clinic?

17  Q.      Yes.

18  A.      I thought we examined him on Thursday the 4th.  I don't

19  remember.  I forget.  I thought we examined him on the day we

20  left, on the 4th, Thursday.

21  Q.      On the day you left, Doctor?

22  A.      No, maybe we didn't.  We examined him on Thursday.

23  Q.      It was the 3rd, but we can look at the 4th, too.

24  A.      No -- all right.  All right.

25  Q.      The 3rd?

1  **A.**     Yeah.

2  **Q.**     You agree the 3rd?

3  **A.**     All right.

4  **Q.**     Okay.  So it's the 3rd.  So let's look.  I've highlighted

5  one entry under Roxicet there at the very bottom?

6  **A.**     Right.

7  **Q.**     It's 3 September?

8  **A.**     Right.

9  **Q.**     I didn't highlight anything else because I was afraid of

10  obscuring it.

11  **A.**     Right.

12  **Q.**     So that's a dose of Roxicet on 3 September.  It looks

13  like it's 04 something?

14  **A.**     He told us he got it about 4, 4:30 in the morning.

15  **Q.**     Yeah, 4 or 4:30?

16  **A.**     Yes.

17  **Q.**     And he got 5 milliliters?

18  **A.**     Right.

19  **Q.**     Okay.  And he couldn't get any more for eight more hours?

20  **A.**     Right, by order.

21  **Q.**     By order?

22  **A.**     Right.

23  **Q.**     So he would be due for another dose at somewhere around

24  noon?

25  **A.**     Right.

1  **Q.**     If he needed it?

2  **A.**     Right.

3  **Q.**     And then on the second page, we have the Tylenol?

4  **A.**     Right.

5  **Q.**     And he got that at 0645?

6  **A.**     Right.

7  **Q.**     And so, again, that's six hours later he would get a

8  dose, so somewhere around 12:45 he could have some more Tylenol?

9  **A.**     Right.

10 **Q.**     All right.  Now, Doctor --

11         MR. WILTSIE:  Can we pull up Petitioner's Exhibit 26.

12 BY MR. WILTSIE:

13 **Q.**     This is your report.  And turn to page 5, please, and

14 it's the -- it's that third paragraph down.

15         You went over this with Ms. Pradhan on direct?

16 **A.**     Right.

17 **Q.**     You say here, "He appropriately requested analgesic

18 medication for his pain."

19         So if he turned -- if by that you meant Tylenol, it was

20 still too soon to have more Tylenol?

21 **A.**     No, no.  I mean, look, he had medication.  He said he had

22 some medicine.  He -- he may have had some relief.  He was

23 obviously in pain.  He was saying can I get something else for

24 my pain.

25 **Q.**     Okay.

1    **A.**     And I thought that was an appropriate request because he

2    appeared to be appropriate -- you know, he appeared to be in

3    pain.

4    **Q.**     You agreed with me that he couldn't have Roxicet?

5    **A.**     You know, I -- I have not prescribed -- I'd have to check

6    it.

7    **Q.**     No, I mean, by -- he'd already had his dose in the

8    morning, and he couldn't have another one for 24 hours?

9    **A.**     Well, I don't know if that's a good order or not, you

10   know.  I mean, I don't know what the max dosages are.  I've not

11   used it in my practice a lot.  I'm not familiar with how the

12   doses -- I mean, I don't know if that's a good order.

13   **Q.**     Okay.

14   **A.**     If that's an appropriate order.  I mean --

15   **Q.**     But a --

16   **A.**     -- it would have been something to look at.

17   **Q.**     My fault.

18   **A.**     Yeah.

19   **Q.**     A nurse has no choice but to follow the doctor's orders?

20   **A.**     Right.  I mean --

21   **Q.**     So if the doctor says every eight hours, she's got to

22   wait or he's got to wait --

23   **A.**     Yeah.  She has to --

24   **Q.**     -- until 12:45 or 12:00 or so?

25   **A.**     But the request was that she go to the doctor and ask him

1    to examine the patient and -- and assess for himself if,

2    perhaps, other analgesic medication could be administered or

3    even if a dose of that could be administered.

4    Q.    And when she came back with was Ultram?

5    A.    Yes.

6    Q.    She had an order from a doctor that would allow him to

7    take Ultram?

8    A.    Yes.

9    Q.    And when you proposed that, Mr. Dhiab said, no, because I

10   don't want to drink it with water?

11   A.    He said it's hard for me to drink it with water.  It's

12   hard for me to swallow it.  I cough it back up.

13   Q.    Okay.  During your interviews with Mr. Dhiab, you're

14   aware that Dr. Crosby noted he was eating nuts?

15   A.    Yes.

16   Q.    Did he have any trouble swallowing the nuts?

17   A.    No, but he had told us before that for some reason he was

18   having problems with water, so you have to go with what the

19   patient says.

20   Q.    Okay, Doctor.

21   A.    If the patient tells you that, he made a reasonable

22   request for it to be an Ensure -- I mean, I think that the --

23   you know, the, you know, good practice would be, well, if you

24   could take it with Ensure, then let's give it to you in Ensure.

25   Q.    To state the obvious, you're not his treating physician?

1    **A.**     Absolutely.

2    **Q.**     And you don't know whether day in and day out he actually

3    has trouble drinking water?

4    **A.**     I only know what he told me the day before and that day.

5    **Q.**     Okay.

6    **A.**     And even if he did, it wouldn't make a difference.  He's

7    in pain, why not give him the medication in a form that will

8    help his pain.

9         THE COURT:  Were you -- well, finish your sentence, and

10   then I have a question.

11        THE WITNESS:  There's no reason not to.  I mean, there's

12   no adverse consequence.

13        THE COURT:  Were you aware at that point that Mr. Dhiab

14   had been drinking Ensure, either totally voluntarily on and off

15   or at enteral feeding on and off, for a substantial period of

16   time?

17        THE WITNESS:  Yes.  And that's why I thought it was a

18   reasonable request.

19   BY MR. WILTSIE:

20   **Q.**     But you still, Doctor, had no way of knowing that he was

21   having any real problem drinking anything with water or taking

22   anything with water?

23   **A.**     He never drank water while we were with him, so I -- when

24   he said it was a problem, I took him at his word.

25   **Q.**     Doctor, it's important that medical professionals

1    accurately record details in their medical records?

2    **A.**    Yes.

3    **Q.**    You're trained from that from day one in medical school?

4    **A.**    Yes.

5    **Q.**    When you make notations in medical records, they're

6    accurate?

7    **A.**    No, not always.  I try to make them accurate.

8    **Q.**    Okay.

9    **A.**    You know, look, I make mistakes like everybody does.

10   **Q.**    Interesting confession, Doctor.

11         You assume that the records you review are accurate?

12   **A.**    No.

13   **Q.**    You make no assumption as to their accuracy?

14   **A.**    I don't.

15   **Q.**    Okay.

16   **A.**    I agree that people have probably made their best effort

17   in recording what they think they saw or what their testing

18   showed.

19   **Q.**    Okay.  I want to review two statements in your report,

20   Doctor.  This is Petitioner's 26 at page 11.

21         MR. WILTSIE:  The second paragraph, would you highlight

22   that, please, the first full one.

23   BY MR. WILTSIE:

24   **Q.**    Doctor, you stated, "Mr. Dhiab does not exhibit a

25   neuropsychic condition and demonstrates the effect and behavior

1    of an individual subjected to extreme stress and conditions of

2    confinement.  Mr. Dhiab suffers neurological and musculoskeletal

3    impairments that preclude him from presenting any harm or danger

4    to staff or guards.  He lacks mobility, motor strength, control

5    of his extremities to act aggressively or violently.  I have not

6    encountered a patient over the last 40 years with the

7    neurological and musculoskeletal impairments he exhibits,

8    including psychogenic disorders, who has acted out aggressively

9    or violently towards staff."

10   **A.**    Yes.

11   **Q.**    Okay.  To be clear, what you're saying is he's physically

12   incapable of being violent?

13   **A.**    Yes.

14   **Q.**    Now, as a psychiatrist on this independent medical exam,

15   his physical abilities were not your area of expertise?

16   **A.**    No, not fair.  I mean, I'm a general physician, as well

17   as a psychiatrist.  I treat a lot of conditions that have

18   both -- in fact, a good deal of my practice is in Tickborne

19   diseases that manifest with problems in thinking and anxiety and

20   depression, so I spend a lot of time with that and medical

21   conditions including sleep disorders.

22   **Q.**    Okay.  But it's fair to say that your report didn't

23   include a detailed analysis of his physical condition?

24   **A.**    I deferred that to Dr. Crosby.

25   **Q.**    Dr. Crosby was tasked with assessing his physical

1    abilities?

2    **A.**     Right.

3    **Q.**     All right.  And you read her report?

4    **A.**     I read the first draft.

5    **Q.**     Okay.  She does not say that he's physically incapable of

6    violence.

7    **A.**     Okay.

8    **Q.**     She did note a significant loss of strength in the right

9    leg.

10   **A.**     Okay.

11   **Q.**     And you saw that?

12   **A.**     Sure.

13   **Q.**     But she curiously noted that the muscle tone was normal

14   in the --

15   **A.**     Right.

16   **Q.**     So there was no atrophy in that leg?

17   **A.**     Right.

18   **Q.**     And she noted reduced arm strength in the right arm?

19   **A.**     Right.

20   **Q.**     But she also noted he used it to eat and write and shake

21   hands?

22   **A.**     Right.

23   **Q.**     She does not mention any diminished strength in the left

24   arm.  Do you remember that?

25   **A.**     Right.

1   **Q.**     Or the left leg?

2   **A.**     Right.

3   **Q.**     So other than his right leg, she doesn't mention any

4   motor problems with the other three limbs?

5   **A.**     Well, you just said that she -- there was some muscle

6   weakness in the right, low diminished strength in the right arm.

7   **Q.**     But he could still use it?

8   **A.**     Well, that's -- you know.

9   **Q.**     Shook hands?

10  **A.**     The issue is there was diminished strength.  She also

11  didn't note a couple other things that I noted, that he asked me

12  to examine and touch him, which was there are clear differences

13  in temperature and skin color between his right and left side,

14  which are often indications of some underlying neurological

15  disease.

16  **Q.**     Okay.  Now, you're aware he actually has acted violently?

17  **A.**     No, I'm not aware of that.  And I asked the government

18  specifically for a detailed report so I could look at it and

19  understand it, and I never got it.

20  **Q.**     So, counsel --

21  **A.**     So from my perspective, unless I've seen it, it did not

22  happen, to go back to the points you were making.

23  **Q.**     Okay.  So counsel didn't tell you that in response --

24  when we opposed your request to see him unshackled, we filed a

25  declaration from the Joint Detention Group commander, and he

1    noted that he had -- that Mr. Dhiab had committed five assaults

2    since April 14th -- or since April 2014?

3    A.    She informed us that that was reported.  We asked for the

4    details.  We never got any information.

5    Q.    Okay.  So when he says -- when he said in his

6    declaration -- they didn't pass this to you -- that --

7          THE COURT:  Which declaration are you referring to?  One,

8    we did -- which did go into more detail than the first one about

9    alleged violence was filed, I believe, three days ago.

10         MR. WILTSIE:  No, Your Honor.

11         THE COURT:  Are you talking about that one or one that was

12   filed much, much earlier than that?

13         MR. WILTSIE:  Much earlier, Your Honor.  It's our

14   Exhibit 14, Your Honor.

15         THE COURT:  When was it?

16         MR. WILTSIE:  August 26th, Your Honor.

17         THE COURT:  August 26th.  Okay.

18         MR. WILTSIE:  August 26th.

19         THE COURT:  That was the early one?

20         MR. WILTSIE:  It was the early one, yes, Your Honor.

21         THE COURT:  I'm going to ask -- actually, Doctor, you may

22   step down for now.  I'd like counsel to approach the bench a

23   minute to talk about some logistic issues.  We'll do it on the

24   record, of course, but I'd like to do it at the bench.  Everyone

25   may remain because by the time we finish our discussion, which

1    should not be a lengthy one, I'll be able to give the people in

2    the audience a better idea of what our schedule will be tomorrow.

3    So if counsel -- do I need all counsel?

4            (Following sidebar discussion had on the record:)

5            THE COURT:  Okay.  Questions, how much more in-court cross

6    will the government have?

7            MR. WILTSIE:  About -- I should be done within 10 to 15

8    minutes, but 20 at the outside.  Just give me a little leeway.

9    I'm horrible with time estimates, Your Honor.

10           THE COURT:  And how long do you think you're going to be

11   on redirect?

12           MS. PRADHAN:  I would say about ten minutes, Your Honor.

13           THE COURT:  And will that redirect be in-court or out of

14   court -- I don't mean in-court or out of court.  Will it be

15   classified or not?

16           MS. PRADHAN:  No, it won't be classified, Your Honor.

17           THE COURT:  And I didn't ask that question about the rest

18   of your cross.  Is that going to be in-court?

19           MR. WILTSIE:  Um-hmm.  Yes, Your Honor.

20           THE COURT:  All right.  So we're not going to have any

21   classified?

22           MR. WILTSIE:  They have a brief -- they want to question

23   Dr. Xenakis in a brief closed session which can be today or

24   tomorrow.  I mean, I don't know when --

25           THE COURT:  It will be after today.

1      MS. MARVIN:  Five to ten minutes.

2      MS. PRADHAN:  Similar to Dr. Crosby's, Your Honor.  It'll

3   be very, very short.

4      THE COURT:  Well, I never believe lawyers on timing, on

5   timing.  Let me emphasize that.

6      MS. PRADHAN:  We'll make every effort.

7      THE COURT:  And then, of course, the government needs to

8   respond to it, if it needs to.  I would hope, then, that we would

9   get to Petitioner's third witness by mid-morning.  Does that

10  sound reasonable?

11     MS. PRADHAN:  Assuming we don't necessarily finish with

12  Dr. Xenakis today, that would be --

13     MS. MARVIN:  Dr. Miles does not have a security

14  classification, so we don't have --

15     THE COURT:  All right.  That will all be in open court?

16     MS. MARVIN:  Right.

17     THE COURT:  I guess we'll have to take a break even in

18  this witness's testimony.  I'm trying to keep things as together

19  as I can in terms of what's in-court and what's out of court, but

20  it sounds to me like you will -- well, can you do your

21  classified, which would be direct, and you do your cross and

22  redirect and then come back and -- and we would do it in a

23  different courtroom that we've located already, and then come

24  back to this courtroom where everybody would be able to stay for

25  the rest of the day?

1      MS. MARVIN:  Tomorrow?

2      MS. PRADHAN:  You mean today or tomorrow?

3      THE COURT:  No, I don't mean today, everybody.  It's after

4  5:00.

5      MS. PRADHAN:  Sure.

6      MS. MARVIN:  Tomorrow.

7      MR. WILTSIE:  Well, eventually at some point we're going

8  to get to our direct.

9      THE COURT:  Well, sure.

10      MR. WILTSIE:  Well, a chunk of that's going to be closed.

11      THE COURT:  Right, but then that's on --

12      MR. WILTSIE:  Oh, no, no, no, no.  And so, when you said

13  for the rest of the day, I think we may end up back in that other

14  courtroom at some point.

15      THE COURT:  Oh, that's all right.  That's all right.

16      MR. WILTSIE:  Yes.

17      THE COURT:  The final thing I want to know, again, other

18  than for pure curiosity, but truly and seriously for logistical

19  purposes:  Has anyone made any decisions about some other things?

20  Anybody else?

21      MS. PRADHAN:  Do you want to appeal?

22      THE COURT:  If you haven't made a decision, that's fine.

23      MR. WILTSIE:  You understand the appellate process for us,

24  Your Honor.

25      THE COURT:  Well, that's true, but it would get very

```
1   complicated if I don't know anything and we finish this entire

2   hearing, and I guess it won't be that complicated if the public

3   will just never -- oh, well, it's very complicated.

4        MR. WILTSIE:  It becomes complicated, but we can keep you

5   informed when a decision is made.

6        THE COURT:  All right.  For now I'm going to operate on

7   the assumption that I should go forward with an opinion for you

8   all.

9        MS. MARVIN:  Will Your Honor set a date for compliance or

10  will you wait until --

11       THE COURT:  Let's wait a little bit, everybody.  Let me

12  inform everybody.

13       (Sidebar discussion concluded.)

14       THE COURT:  This is what we're going to do tomorrow

15  morning, everybody.  And, again, I am trying to do things so as

16  to inconvenience people as little as possible.  We are going to

17  start tomorrow morning in a different courtroom and get a modest

18  amount of classified testimony taken in that courtroom.  Then

19  when we come back to this courtroom -- and I'll give you a

20  projected period of time or a potential period of time -- when we

21  come back to this courtroom, then we will have a whole other

22  witness, direct, cross and redirect, who can testify in open

23  court.  I would anticipate -- you can't hold me to this,

24  everybody, but certainly not before 11 back in this courtroom,

25  somewhere between 11 and 11:30.  That's as specific as I can be,
```

1    everyone.  But as I say, after that, then everything's going to

2    be in this courtroom for quite a period of time.

3         And I'm going to ask Mr. Smith to let counsel know where

4    the other courtroom's going to be while everybody else leaves

5    this courtroom at this time.  All right.  The parties may be

6    excused.

7         (Proceedings adjourned at 5:08 p.m.)

8                    **C E R T I F I C A T E**

9

10                   I, Scott L. Wallace, RDR-CRR, certify that
         the foregoing is a correct transcript from the record of
11       proceedings in the above-entitled matter.

12

13       ----------------------------       ----------------
         **Scott L. Wallace, RDR, CRR**            **Date**
14          **Official Court Reporter**

15

16

17

18

19

20

21

22

23

24

25

1

## I N D E X

2

3

**EXAMINATIONS**                                              **Page**

4

   OPENING STATEMENT ON BEHALF OF THE PETITIONER      8
5  OPENING STATEMENT ON BEHALF OF THE RESPONDENTS     18

6  DIRECT EXAMINATION OF SONDRA CROSBY                31
   BY MS. MARVIN:
7  CROSS-EXAMINATION OF SONDRA CROSBY                 72
   BY MR. WALTHALL:
8  REDIRECT EXAMINATION OF SONDRA CROSBY              93
   BY MS. MARVIN:
9
   DIRECT EXAMINATION OF STEPHEN XENAKIS             98
10 BY MS. PRADHAN:
   VOIR DIRE EXAMINATION OF STEPHEN XENAKIS          106
11 BY MR. WILTSIE
   CONTINUED DIRECT EXAMINATION OF STEPHEN XENAKIS   115
12 BY MS. PRADHAN:
   CROSS-EXAMINATION OF STEPHEN XENAKIS              160
13 BY MR. WILTSIE:

14

## EXHIBITS

15

**DESCRIPTION**

16
   Petitioner's Exhibit 62 marked for identification     34
17 Petitioner's Exhibit 27 marked for identification     39
   Petitioner's Exhibit 50A marked for identification    44
18 Petitioner's Exhibit 62 admitted into the record      44

19 Petitioner's Exhibit 27 admitted into the record      44
   Petitioner's Exhibit 50B marked for identification    49
20 Respondents' Exhibit 116 marked for identification    175
   Respondents' Exhibit 109 marked for identification    187

21

22

23

24

25

**'**

**'74** [1] - 113:16
**'80s** [1] - 183:1
**'82** [2] - 100:8; 115:21
**'84** [2] - 100:9; 115:22
**'90s** [1] - 183:1
**'93** [1] - 100:22
**'94** [1] - 115:9

**0**

**011** [2] - 1:24
**04** [1] - 189:13
**05-1457** [2] - 1:4; 54:21
**0645** [1] - 190:5
**0AY** [1] - 1:23

**1**

**1** [10] - 1:9; 12:12; 16:24; 32:6, 16; 79:23, 25; 81:6, 12; 162:16
**1,000** [2] - 181:7; 184:7
**1,004** [1] - 181:6
**1,300** [2] - 40:16; 64:18
**10** [11] - 8:23; 17:23; 22:7; 65:21; 86:17; 109:19; 152:24; 171:7; 176:19; 199:7
**10-foot-6** [1] - 17:23
**100** [6] - 109:16; 176:25; 180:14, 16; 181:8
**101st** [5] - 100:23; 107:13, 20, 24; 108:7
**106** [1] - 204:10
**109** [3] - 187:1; 204:20
**10:00** [2] - 1:6; 188:15
**10:04** [1] - 4:2
**10th** [2] - 11:8; 70:24
**11** [5] - 66:23; 173:3; 194:20; 202:24
**110** [1] - 178:20
**110-centimeter** [1] - 8:19
**111** [1] - 24:19
**115** [1] - 204:11
**116** [3] - 175:13; 204:20
**11:26** [1] - 54:18
**11:30** [1] - 202:25
**11:45** [1] - 54:19
**11th** [2] - 60:9; 67:3
**12** [8] - 8:12; 17:24; 23:1; 69:7; 78:4, 8; 109:19; 111:2
**1200** [1] - 2:8
**12:00** [1] - 191:24
**12:45** [2] - 190:8; 191:24
**12:55** [1] - 96:16
**12th** [1] - 116:24
**13** [2] - 70:1, 21
**14** [6] - 39:14; 70:23; 75:15; 88:10;

161:3; 198:14
**14th** [3] - 45:2; 129:19; 198:2
**15** [8] - 18:4; 28:22; 54:16; 152:24; 153:9, 11; 199:7
**15,000** [1] - 100:12
**15-minute** [1] - 54:16
**150** [1] - 159:5
**152** [1] - 19:25
**1530** [1] - 130:2
**15th** [2] - 155:2, 8
**160** [1] - 204:12
**1600** [1] - 130:2
**175** [1] - 204:20
**18** [2] - 167:1; 204:5
**187** [1] - 204:20
**1899** [3] - 1:14, 18; 2:3
**18A** [1] - 155:10
**18th** [1] - 81:7
**1970** [3] - 2:8; 99:3, 23
**1974** [4] - 99:4, 24; 101:24; 113:13
**1980** [3] - 99:17; 100:8; 120:4
**1980s** [1] - 176:20
**1981** [2] - 176:21
**1982** [3] - 99:18; 100:9; 101:24
**1986** [1] - 100:16
**1987** [1] - 101:1
**1989** [1] - 100:19
**1990** [1] - 100:21
**1990s** [1] - 177:1
**1994** [2] - 115:9; 166:15
**1995** [3] - 34:20, 25; 166:17
**1998** [2] - 168:9
**19A** [2] - 154:15; 155:8
**19th** [2] - 63:23; 121:1; 146:23
**1st** [6] - 100:10; 104:13; 107:6; 112:9; 115:21; 168:10

**2**

**2** [5] - 110:15; 119:4; 129:16; 130:5
**2-inch** [1] - 180:22
**20** [11] - 2:13, 22; 3:3, 8; 23:2; 52:21; 61:4; 84:2; 125:4; 143:3; 199:8
**200** [1] - 181:10
**20001** [1] - 3:14
**20006** [3] - 1:15, 19; 2:4
**2000s** [1] - 177:1
**2003** [2] - 40:12; 146:9
**2004** [3] - 40:12; 65:13; 169:15
**20044** [1] - 2:18
**2005** [5] - 23:23; 104:20; 171:12, 17, 24
**2006** [2] - 9:8; 104:21
**2007** [2] - 109:11, 15
**2009** [8] - 24:17; 29:3; 67:5, 12, 18; 68:6; 85:21; 86:17
**2010** [1] - 146:13
**2013** [12] - 15:20; 23:16; 56:21; 57:5; 60:9; 63:23; 74:11; 80:17; 121:1;

129:19; 130:7; 164:21
**2014** [28] - 1:5; 4:1; 36:19; 39:10; 45:2; 50:1; 67:3, 6; 70:24; 74:12; 81:7; 96:18; 116:9; 134:8; 139:25; 140:23; 144:15; 145:18; 149:18; 151:25; 155:2, 4-5, 8, 11; 158:6; 198:2
**2015** [2] - 28:14; 139:24; 151:14
**202** [13] - 1:19; 2:5, 14, 19, 23; 3:4, 10
**202-466-5738** [1] - 2:5
**202.354.3196** [1] - 3:14
**20530** [2] - 2:13; 3:4, 9
**20530-0001** [1] - 2:22
**207** [2] - 1:23
**21st** [3] - 80:17; 149:17; 151:24
**22** [1] - 1:23
**2230** [1] - 60:15
**224** [2] - 58:18; 60:3
**22nd** [4] - 67:4, 6; 68:4; 79:2
**23** [2] - 88:10; 171:25
**237** [2] - 56:17; 59:6
**23rd** [2] - 144:15; 145:18
**24** [1] - 191:8
**248** [2] - 63:20
**250** [2] - 129:16
**25th** [2] - 50:1; 140:23
**26** [3] - 110:10; 190:11; 194:20
**261** [1] - 79:25
**26th** [3] - 198:16
**27** [6] - 38:25; 39:2; 44:17, 19; 204:17, 19
**28** [3] - 100:1; 115:7; 126:18
**28th** [2] - 56:21; 57:5
**29th** [3] - 65:13; 134:3, 8
**2:00** [1] - 96:13
**2:28** [1] - 96:19
**2nd** [2] - 39:9; 67:9

**3**

**3** [4] - 155:13; 173:9; 189:7, 12
**3-inch** [1] - 180:23
**30** [1] - 143:3
**30-second** [1] - 59:16
**300** [1] - 73:13
**305-0692** [1] - 2:19
**305-0879** [1] - 3:4
**305-2685** [2] - 2:14, 19
**307-1401** [1] - 2:23
**30th** [3] - 155:4, 10
**31** [1] - 204:6
**32** [1] - 112:15
**325** [1] - 187:17
**33** [5] - 16:12, 14; 153:17; 155:3, 10
**34** [1] - 204:16
**343** [3] - 118:24; 162:15
**35** [1] - 184:17
**353** [2] - 1:24
**37** [2] - 78:3, 6
**37A** [2] - 65:16; 134:7

**38** [7] - 16:14; 153:17, 20; 154:14; 155:2, 7; 156:7
**39** [1] - 204:17
**3:50** [1] - 153:6
**3rd** [9] - 39:9; 67:9; 139:24; 151:14; 188:12, 23, 25; 189:2, 4

## 4

**4** [2] - 189:14
**40** [7] - 19:17; 45:4; 70:17; 93:22; 143:3; 184:18; 195:6
**400-bed** [1] - 100:19
**40s** [1] - 69:20
**419** [1] - 45:1
**43** [2] - 125:8
**44** [5] - 1:24; 204:17
**444** [1] - 139:17
**45** [1] - 171:24
**452-2581** [1] - 2:9
**452-3277** [1] - 2:10
**4641** [1] - 1:24
**466-5738** [1] - 1:20
**49** [1] - 204:19
**4:05** [1] - 153:7
**4:30** [1] - 189:14
**4th** [8] - 39:9; 67:9; 139:25; 151:11; 158:6; 188:18, 20, 23

## 5

**5** [9] - 12:11; 133:5, 10; 139:18; 144:16; 187:17, 21; 189:17; 190:13
**50** [15] - 32:16; 42:9, 12; 43:2, 22-23, 25; 44:20; 49:18, 20; 55:8; 58:18; 63:20; 129:16; 130:5
**508** [3] - 149:19, 21; 179:5
**508s** [1] - 57:8
**50A** [4] - 44:1; 49:20; 55:8; 204:17
**50B** [3] - 49:21, 23; 204:19
**51** [1] - 32:17
**510** [2] - 2:9
**5100** [1] - 3:9
**514-4107** [1] - 3:10
**518** [4] - 178:22; 179:3, 6
**52742** [1] - 1:22
**542** [1] - 140:23
**596** [1] - 24:19
**5:00** [1] - 201:4
**5:08** [1] - 203:7
**5th** [2] - 15:16; 28:12

## 6

**6** [5] - 1:5; 4:1; 17:23; 96:18; 139:18
**6-foot-5** [1] - 159:4
**60** [1] - 35:10

**600** [3] - 1:14, 18; 2:4
**61** [1] - 32:17
**614-804-2561** [1] - 1:15
**616-5084** [1] - 2:14
**616-8470** [3] - 2:23; 3:5, 10
**62** [9] - 32:1, 19; 34:8; 44:11, 13; 204:16, 18
**63** [4] - 38:21; 102:18; 170:25
**6503** [1] - 3:13
**653** [1] - 144:15

## 7

**7** [2] - 130:11; 153:20
**72** [1] - 204:7
**722** [10] - 50:7, 9-10, 12; 139:21; 140:25; 141:1, 3; 145:15; 151:13
**7th** [3] - 67:5, 12, 18

## 8

**8** [4] - 8:23; 134:8, 15; 204:4
**8-A** [1] - 158:5
**8-ounce** [1] - 22:24
**801** [1] - 97:6
**817** [1] - 149:13
**833-8900** [2] - 1:19; 2:5
**85** [1] - 176:19
**87** [2] - 86:21; 88:10
**88** [4] - 86:13, 18, 20
**883** [1] - 2:18

## 9

**90** [3] - 39:15; 75:12
**90-minute** [1] - 161:8
**93** [1] - 204:8
**94612** [1] - 2:9
**95** [5] - 86:6, 14; 95:3; 175:18
**961** [1] - 81:6
**963** [3] - 81:11, 18
**98** [1] - 204:9
**9:00** [1] - 188:14

## A

**a.m** [5] - 1:6; 4:2; 54:18; 130:1
**Aamer** [2] - 13:4, 13
**abandoned** [1] - 9:24
**Abandoned** [1] - 175:4
**abdomen** [2] - 51:14; 81:9
**abdominal** [3] - 41:18; 53:25; 68:14
**Abdul** [1] - 110:21
**abiding** [1] - 133:22
**abilities** [2] - 195:15; 196:1
**ability** [3] - 16:2; 50:12; 141:3
**able** [23] - 37:7; 38:15; 39:7; 41:15;

43:2; 48:8; 51:18; 58:10; 66:17; 119:4; 121:22; 127:17; 133:17; 144:1; 148:24; 156:14; 157:6; 158:24; 187:5; 199:1; 200:24
**abnormalities** [2] - 45:11, 13
**abnormality** [1] - 45:6
**above-entitled** [1] - 203:11
**abroad** [1] - 103:21
**absence** [1] - 66:24
**absent** [4] - 13:5; 19:19; 20:3; 27:24
**absolutely** [9] - 48:20; 55:10; 58:5; 61:23; 131:6; 140:11; 170:2; 177:23; 193:1
**ABU** [1] - 1:3
**Abu** [9] - 4:6; 8:11; 18:3; 170:6; 177:25; 178:21; 179:11
**abuse** [6] - 10:18; 35:23; 36:13; 73:7; 104:3, 5
**Abuse** [2] - 37:12; 175:5
**abusing** [1] - 19:7
**abusive** [4] - 17:1; 25:11; 159:9, 16
**academies** [1] - 147:16
**Academy** [1] - 102:25
**accept** [4] - 19:5; 63:3, 6, 15
**acceptable** [2] - 55:21; 152:25
**accepted** [6] - 23:14; 37:18; 44:8; 89:6, 17; 156:9
**access** [5] - 17:8; 49:10; 58:14; 69:17; 157:13
**accident** [2] - 40:3; 182:25
**accompanying** [1] - 133:19
**accomplish** [2] - 6:6, 17
**according** [2] - 94:24; 156:7
**accordingly** [1] - 172:22
**account** [1] - 157:25
**accounts** [1] - 179:15
**accuracy** [1] - 194:13
**accurate** [11] - 55:5; 68:15; 75:1; 77:10; 133:25; 159:25; 171:15; 180:5; 194:6, 11
**accurately** [3] - 26:4; 124:25; 194:1
**acknowledge** [1] - 79:13
**acknowledged** [1] - 132:14
**acquired** [1] - 168:15
**act** [1] - 195:5
**acted** [2] - 195:8; 197:16
**acting** [1] - 92:2
**Action** [1] - 1:4
**action** [3] - 10:9; 48:22; 174:22
**active** [5] - 24:13; 36:24; 100:1; 101:6; 115:7
**actively** [1] - 61:17
**activities** [2] - 48:13; 142:5
**actual** [4] - 67:16, 20; 78:18; 144:25
**Adahi** [4] - 24:18, 24; 29:3
**add** [2] - 57:14; 97:11
**addition** [5] - 5:3; 10:24; 22:6; 24:3; 39:15
**additional** [8] - 10:5; 22:7, 25; 24:22;

70:10; 134:19; 148:5, 7
**Additionally** [1] - 78:23
**address** [5] - 12:20; 14:5; 70:3; 71:24; 80:23
**addresses** [1] - 134:4
**adequate** [2] - 67:22; 152:12
**adequately** [6] - 15:25; 47:24; 49:7; 53:20; 69:4; 95:14
**adjourned** [1] - 203:7
**adjunct** [1] - 101:17
**administer** [1] - 20:11
**administered** [3] - 186:23; 192:2
**administration** [2] - 22:21; 134:20
**administrative** [2] - 101:8, 10
**Admiral** [1] - 172:15
**admission** [2] - 16:22; 44:7
**admit** [2] - 82:10; 174:13
**admitted** [11] - 44:11, 14, 18-19; 168:23; 169:1, 8, 10; 184:21; 204:18
**Adnan** [1] - 110:21
**Adolescent** [1] - 102:25
**adolescent** [6] - 99:12, 18; 100:16; 101:15; 102:11; 109:20
**adolescents** [3] - 104:5; 110:1; 142:1
**adult** [2] - 21:9; 137:18
**adult-sized** [1] - 21:9
**adults** [2] - 110:5
**advance** [2] - 6:12; 33:6
**adversarial** [1] - 84:23
**adverse** [1] - 193:12
**advice** [2] - 118:3; 136:14
**advise** [4] - 104:23; 116:21; 148:1; 149:22
**advisor** [1] - 172:14
**advocacy** [1] - 173:23
**advocate** [5] - 133:19; 172:13; 173:17, 20, 22
**advocated** [2] - 174:4, 15
**affect** [1] - 64:7
**affecting** [2] - 50:11; 141:3
**affiant** [1] - 15:16
**affidavit** [4] - 14:1, 4; 54:7; 179:12
**affidavits** [3] - 27:1; 73:13, 15
**affiliations** [1] - 109:11
**affirmation** [1] - 81:15
**affirming** [1] - 172:5
**affords** [2] - 178:25; 179:9
**afield** [1] - 92:14
**afraid** [2] - 171:8; 189:9
**AFTERNOON** [1] - 96:18
**afternoon** [9] - 5:15, 22; 6:5, 18; 7:9; 72:8; 96:8, 11; 106:9
**age** [1] - 171:19
**agency** [1] - 89:14
**agents'** [1] - 179:13
**ages** [2] - 21:8; 69:3
**aggravated** [1] - 125:5
**aggressive** [1] - 142:22
**aggressively** [2] - 195:5, 8

**ago** [8] - 11:7, 9; 14:1; 125:5, 17; 184:11, 18; 198:9
**agree** [11] - 45:10, 20; 50:14; 74:17; 83:22; 88:15; 92:23; 163:1, 5; 189:2; 194:16
**agreed** [6] - 11:13; 43:13; 91:17; 162:20; 176:7; 191:4
**agrees** [3] - 156:21; 157:5
**ahead** [28] - 24:23; 28:24; 33:10; 46:17; 56:12; 57:2; 58:21; 62:23; 72:22; 80:12; 92:16; 93:20; 128:6; 147:19; 149:1; 153:10; 155:6; 156:5; 158:2; 160:8, 11, 14; 164:20; 167:14; 169:5, 14; 174:7; 179:7
**Ahmed** [1] - 110:23
**aided** [1] - 3:16
**ailing** [1] - 127:14
**air** [2] - 22:4, 6
**Airborne** [2] - 100:23; 108:7
**airway** [2] - 21:22; 22:10
**Al** [6] - 24:18, 24; 29:3; 36:6; 111:6
**al** [3] - 1:7; 110:19, 23
**Al-Adahi** [4] - 24:18, 24; 29:3
**al-Mudwani** [1] - 110:19
**Al-Nashiri** [1] - 36:6
**Al-Oda** [1] - 111:6
**Aladdin's** [1] - 12:2
**alerted** [2] - 6:11
**Alka** [1] - 1:13; 4:12; 54:23
**alka.pradhan@reprieve.org** [1] - 1:16
**ALL** [1] - 4:4
**allegations** [1] - 20:22
**alleged** [4] - 66:24; 167:10; 168:13; 198:9
**alleging** [1] - 35:23
**allow** [3] - 140:10; 176:1; 192:6
**allowed** [10] - 10:25; 14:24; 26:4; 27:2; 28:10, 21; 130:24; 151:13, 25; 167:16
**allowing** [4] - 26:24; 28:6, 10; 131:3
**allows** [2] - 13:7; 28:12
**almost** [3] - 52:21; 84:2; 154:10
**alter** [2] - 18:25; 28:3
**altered** [1] - 84:16
**alternative** [5] - 9:11; 12:19; 26:23; 27:5, 15
**alternatives** [4] - 9:19, 23; 18:7; 26:17
**ambulate** [2] - 58:10; 125:7
**ambulating** [1] - 51:6
**ambulation** [1] - 57:21
**American** [6] - 10:12; 102:24; 103:18, 20; 143:23
**amount** [6] - 16:10, 13; 22:10; 26:18; 88:13; 202:18
**amuck** [1] - 122:13
**analgesic** [3] - 133:16; 190:17; 192:2
**analysis** [1] - 195:23
**anatomy** [1] - 84:16
**ancestors** [1] - 66:8
**ancillary** [1] - 148:8

**Andrew** [4] - 2:11; 4:19; 18:19; 55:25
**andrew.warden@usdoj.gov** [1] - 2:15
**anecdote** [1] - 133:1
**anesthetic** [1] - 21:13
**angry** [1] - 143:19
**animal** [1] - 8:17
**ankle** [2] - 15:21; 57:11
**announced** [3] - 167:3, 6
**anorexia** [6] - 69:19; 91:23; 94:13, 15-16, 22
**anorexic** [2] - 92:14; 94:12
**Answer** [1] - 88:15
**answer** [10] - 46:18; 66:19; 88:9, 22; 92:18; 109:4; 118:18; 160:6; 169:5
**answer's** [1] - 74:2
**answers** [2] - 33:9; 158:6
**anti** [1] - 143:23
**anti-American** [1] - 143:23
**anti-western** [1] - 143:23
**anticipate** [2] - 7:16; 202:23
**antidote** [1] - 134:4
**anxiety** [1] - 195:19
**anyway** [2] - 41:10; 171:11
**anyways** [1] - 167:21
**apart** [1] - 103:21
**apologize** [9] - 34:6; 106:10; 120:17, 22; 132:21; 134:6; 149:13; 150:11; 187:15
**apology** [1] - 152:22
**apparent** [1] - 170:17
**appeal** [1] - 201:21
**Appeals** [2] - 9:16; 13:4
**appear** [1] - 122:7
**APPEARANCES** [3] - 1:12; 2:1; 3:1
**appeared** [1] - 191:2
**appellate** [1] - 201:23
**appendix** [2] - 164:12; 165:3
**applied** [3] - 16:8; 151:16, 20
**apply** [1] - 90:8
**appointed** [1] - 166:17
**appointment** [8] - 101:17; 128:10; 140:6, 8; 144:24; 145:25; 146:14; 147:1
**appointments** [16] - 15:8, 19; 27:12, 14; 47:8, 12, 16; 127:20, 24; 139:21; 140:2; 149:20; 151:14; 159:14
**appreciate** [2] - 122:16; 152:12
**approach** [13] - 53:9, 12; 80:7; 121:20; 123:11; 124:6; 128:24; 129:1; 156:15; 165:20; 175:7; 178:17; 198:22
**appropriate** [20] - 7:3; 19:12; 20:17; 22:20; 25:12; 106:1; 117:19; 122:21; 123:11; 124:8; 131:12; 132:6, 11; 141:21; 147:23; 156:10; 172:3; 191:1, 14
**appropriately** [6] - 21:12; 123:15; 133:16; 141:8; 148:18; 190:17
**appropriateness** [1] - 117:4
**approval** [1] - 153:22
**approve** [1] - 15:11

**approved** [2] - 15:6, 12
**April** [6] - 50:1; 74:11; 140:23; 146:13; 198:2
**Arab** [3] - 42:4; 46:6
**area** [5] - 103:6; 135:7; 159:14; 195:15
**areas** [2] - 7:18; 109:22
**argue** [1] - 10:21
**arguing** [1] - 172:11
**argument** [1] - 17:16
**arguments** [1] - 117:16
**Arlington** [1] - 98:24
**arm** [8] - 40:24; 41:15; 51:17, 19; 196:18, 24; 197:6
**Armed** [1] - 100:13
**Armored** [1] - 107:6
**armored** [1] - 100:12
**Army** [18] - 98:22; 99:5; 100:7, 14, 18, 20, 25; 101:1; 126:14; 156:2; 167:3, 6-7; 168:7, 11, 13
**Army's** [1] - 168:19
**arrival** [1] - 40:4
**arrive** [2] - 8:3; 15:12
**arrived** [1] - 15:17
**art** [1] - 177:17
**arthritic** [2] - 125:9
**article** [5] - 90:4; 112:15; 171:24; 172:9; 175:9
**articles** [9] - 35:12; 90:5; 102:6; 171:5, 12, 17, 24; 172:11
**as-needed** [1] - 188:1
**ascertain** [1] - 54:3
**ascribes** [1] - 41:16
**aspect** [2] - 103:4; 124:19
**aspects** [2] - 77:19; 91:22
**asphyxiate** [1] - 24:6
**assault** [1] - 73:7
**assaulted** [1] - 25:9
**assaulting** [2] - 19:7; 144:10
**assaults** [1] - 198:1
**assert** [1] - 20:22
**assess** [2] - 81:10; 192:1
**assessing** [1] - 195:25
**assessment** [2] - 62:16; 145:1
**assignment** [1] - 180:7
**assist** [2] - 22:25; 57:20
**assistant** [3] - 133:19; 135:18; 169:22
**Assistant** [1] - 101:2
**assisted** [1] - 103:24
**assistive** [2] - 41:3; 49:11
**associate** [3] - 31:22; 34:13
**associated** [3] - 40:25; 83:16; 84:23
**Association** [4] - 74:23; 89:7, 13; 102:24
**association** [1] - 121:19
**associations** [1] - 102:23
**assume** [8] - 38:11; 130:8; 141:2, 20; 160:18; 161:9; 180:7; 194:11
**assumed** [1] - 136:5
**assuming** [1] - 200:11

**assumption** [3] - 137:22; 194:13; 202:7
**asylum** [3] - 35:9; 36:2; 73:3
**ate** [4] - 14:10; 63:8
**athletic** [2] - 15:21; 57:9
**atrophy** [1] - 196:16
**attach** [2] - 106:11, 16
**attached** [1] - 106:21
**attacks** [1] - 18:4
**attempt** [1] - 19:10
**attempted** [2] - 144:22; 146:5
**attempts** [1] - 19:7
**attend** [7] - 15:8; 27:12; 47:15; 127:20, 23; 128:10; 175:22
**attended** [2] - 35:2; 100:13
**attending** [4] - 31:23; 34:15; 133:20; 136:12
**attention** [9] - 29:25; 45:3; 60:8; 81:5; 119:18; 139:16; 141:14; 155:3; 178:22
**attentive** [2] - 20:19; 29:21
**Attorney** [4] - 2:11, 16, 21; 3:6
**attorney** [2] - 3:2; 90:18
**attorneys** [2] - 104:23; 117:10
**attributable** [1] - 123:20
**attribute** [1] - 183:7
**attributed** [1] - 122:9
**audience** [3] - 5:7, 13; 199:2
**August** [6] - 74:11; 81:7; 116:24; 198:16
**auscultation** [1] - 22:3
**authored** [1] - 170:12
**authoritative** [1] - 89:15
**authorities** [2] - 21:11; 176:23
**authority** [1] - 176:13
**authorize** [1] - 13:17
**autonomy** [3] - 8:15; 24:2; 176:13
**AV** [1] - 129:24
**availability** [1] - 131:24
**available** [8] - 14:8; 18:7; 68:1; 117:12; 144:18; 145:24; 154:17; 155:16
**Ave** [2] - 1:14, 18
**Avenue** [5] - 2:3, 13, 22; 3:3, 8
**average** [1] - 23:2
**avoid** [2] - 61:22; 172:24
**awake** [1] - 144:6
**aware** [21] - 11:20; 47:7, 10; 52:3; 70:20; 74:16; 81:22; 89:20, 24; 90:7, 10; 127:19; 134:2; 181:24; 186:11, 15; 192:14; 193:13; 197:16
**awful** [1] - 150:5
**Axis** [9] - 119:22; 120:1, 7-8, 16; 126:5; 127:13; 163:7; 166:5
**Aziz** [1] - 110:23

## B

**Baach** [3] - 4:10, 12; 31:4
**BAACH** [3] - 1:13, 17; 2:3
**backed** [1] - 150:21

**background** [6] - 99:1, 20; 122:18; 124:7; 146:18; 147:13
**backgrounds** [1] - 103:16
**bad** [2] - 58:15; 69:11
**badly** [2] - 17:20
**bag** [1] - 56:9
**Bahrain** [1] - 103:25
**balanced** [1] - 61:25
**ballpark** [1] - 181:12
**ballpark's** [1] - 180:16
**bar** [1] - 29:11
**Barack** [1] - 4:7
**BARACK** [1] - 1:6
**barriers** [1] - 82:11
**based** [31] - 7:15; 13:20; 47:13; 51:3; 52:3, 17, 21; 57:15; 60:22; 65:4, 7-8; 66:5; 70:20; 71:15, 17; 75:17, 20; 76:1; 77:21; 137:20, 24; 139:5; 140:9; 141:5, 24; 142:19; 146:2, 4; 152:1; 157:11
**basic** [2] - 15:9; 147:17
**basing** [1] - 141:22
**basis** [20] - 18:23; 22:15; 23:14; 28:15; 46:14; 66:6; 91:11; 120:13; 127:6, 17; 131:21; 138:22; 145:11; 157:3; 179:15; 182:8; 183:5, 8; 184:2
**batch** [3] - 43:7, 18
**Bates** [14] - 55:17, 20; 79:24; 81:6, 12, 18; 118:24; 129:17; 130:5; 139:17; 140:23; 144:15; 149:13
**battle** [1] - 109:8
**Bay** [36] - 18:23; 19:10, 21; 20:4, 8, 17; 21:4, 9, 12, 20; 22:1; 25:10, 18; 28:3, 9; 29:4, 6, 16, 20; 104:19; 105:2, 6, 13, 16, 22; 116:5; 130:9; 157:13; 174:16, 22; 181:25; 182:2, 5; 186:7, 11; 187:10
**become** [6] - 36:16; 40:12; 104:18; 116:7, 19; 171:9
**becomes** [2] - 154:25; 202:4
**becoming** [1] - 92:11
**bed** [1] - 135:7
**BEFORE** [1] - 1:10
**began** [2] - 11:6; 40:24
**begin** [2] - 5:16; 8:6
**beginning** [7] - 23:10; 25:17; 96:15; 99:1; 129:16; 149:6; 169:17
**begins** [2] - 22:5, 9
**BEHALF** [4] - 8:9; 18:18; 204:4
**behalf** [9] - 4:10; 18:20; 73:15, 18, 23, 25; 74:4; 90:21
**behavior** [1] - 194:25
**behavioral** [10] - 110:3; 128:23; 129:1, 11-12; 142:4; 147:8; 148:9; 188:16
**Behavioral** [6] - 47:9; 127:21, 24; 128:11; 129:8; 144:16
**beliefs** [2] - 66:5
**believable** [3] - 136:22; 177:19, 22
**believes** [3] - 41:6; 45:6, 23
**belong** [1] - 102:24
**below** [5] - 19:17; 51:15; 173:14, 16

**bench** [2] - 198:22, 24
**benefit** [3] - 5:7; 47:4; 115:17
**benign** [2] - 84:10, 25
**best** [17] - 10:9; 11:8; 59:25; 70:10; 80:14; 92:2; 118:3, 5; 121:9; 124:7; 132:1; 143:9; 144:2; 152:17; 172:18; 173:21; 194:16
**better** [6] - 68:11; 119:15; 132:2; 157:5; 165:9; 199:2
**between** [9] - 9:10; 29:14; 118:14; 121:3; 132:15; 155:20; 162:1; 197:13; 202:25
**beyond** [1] - 93:11
**big** [2] - 149:4; 181:2
**bilateral** [3] - 57:10
**bind** [2] - 150:3
**binder** [4] - 38:14, 16; 97:23; 149:3; 154:16
**binders** [7] - 37:25; 38:6, 13; 55:20; 119:5; 180:23
**biological** [1] - 102:11
**bipolar** [1] - 120:11
**bit** [4] - 4:16; 24:1; 136:9; 202:11
**bizarre** [2] - 122:7; 128:15
**blacked** [1] - 153:21
**bladder** [4] - 41:22; 54:2; 70:5, 18
**blanket** [1] - 92:24
**bleeding** [4] - 54:3; 64:4, 11; 70:19
**bleeds** [1] - 64:5
**block** [1] - 130:12
**blood** [7] - 15:2; 41:20; 53:17, 24; 70:14; 81:10; 93:22
**blunt** [1] - 51:11
**blurred** [2] - 48:23; 71:19
**board** [7] - 35:4; 91:16; 99:16; 109:23
**boat** [1] - 113:20
**bodily** [4] - 12:8; 13:18, 22; 14:17
**body** [8] - 19:18; 42:4; 46:4; 61:13, 25; 66:8
**Bogdan** [6] - 15:23; 16:8, 16, 20; 158:16, 21
**Bogdan's** [3] - 9:14; 16:22; 158:5
**bone** [5] - 69:10, 24; 78:15; 79:2
**BOP** [2] - 10:4; 13:13
**borne** [1] - 24:8
**Boston** [10] - 31:23; 34:13, 15-16, 18-19; 35:8, 21; 36:1
**bottom** [12] - 42:25; 43:4; 45:1; 50:4; 51:23; 55:18; 56:16; 59:6; 144:21; 145:24; 175:21; 189:5
**bound** [17] - 65:24; 66:2, 10, 13; 77:10, 12; 119:23; 121:4; 122:2, 20; 123:18; 124:9, 18; 163:9, 17, 25; 164:24
**Box** [2] - 1:22; 2:18
**box** [1] - 50:4
**boxer** [6] - 15:22; 57:10; 58:24; 59:19; 66:19, 21
**boy** [2] - 18:3, 5

**brace** [3] - 57:12, 23; 58:9
**braces** [2] - 15:22; 57:11
**brain** [2] - 102:14; 172:16
**branch** [1] - 174:5
**Branch** [3] - 2:12, 21; 3:8
**branches** [1] - 173:24
**Brandeis** [1] - 10:8
**break** [11] - 33:24; 54:15, 18; 56:15, 25; 57:2; 114:19; 153:1, 6; 200:17
**breaking** [1] - 170:6
**breath** [1] - 22:13
**brief** [10] - 5:17; 14:21; 26:21; 27:18; 54:24; 93:6; 122:5; 199:22
**briefly** [5] - 17:3; 20:23; 27:21; 71:24; 87:16
**briefs** [4] - 57:10; 58:24; 59:19; 117:14
**brig** [1] - 108:5
**brigadier** [3] - 115:8; 166:14; 168:12
**Brigadier** [1] - 98:21
**bring** [6] - 28:10; 29:24; 107:21; 122:10; 129:5; 150:23
**British** [1] - 176:22
**broad** [3] - 53:12; 141:24; 155:23
**broad-based** [1] - 141:24
**broad-brush** [1] - 155:23
**Broadway** [1] - 2:8
**brothers** [1] - 45:9
**brought** [3] - 10:21; 95:13; 108:15
**brush** [1] - 155:23
**bulging** [1] - 125:12
**bulk** [1] - 101:5
**bunch** [1] - 137:22
**burden** [2] - 77:14; 131:8
**Bureau** [7] - 10:3; 13:7, 10; 16:9; 62:7, 12, 17
**Burke** [1] - 2:16
**burn** [1] - 171:13
**Bush's** [1] - 169:17
**but..** [1] - 81:4
**BY** [74] - 31:19; 34:10; 37:21; 39:3; 44:24; 46:20; 49:24; 56:14; 57:3; 60:2, 7; 62:24; 65:18; 68:17; 72:24; 76:15; 80:15; 85:2; 86:11, 23; 89:2; 92:17; 93:9, 25; 98:18; 99:15; 102:21; 106:8; 109:5; 113:24; 114:15; 115:5; 118:25; 119:16; 120:24; 128:8; 133:9; 134:9; 146:1; 147:22; 149:11; 150:13; 151:10; 153:13; 154:18; 155:12; 156:6; 158:3; 160:17; 165:5, 10; 166:13; 167:15; 169:7; 171:4, 10, 23; 173:8; 174:9; 175:15; 178:23; 179:8; 181:1; 187:3; 190:12; 193:19; 194:23; 204:6-8, 10

**C**

**CA** [1] - 2:9
**CA-05-1457** [2] - 4:7; 96:22
**cadet** [1] - 100:2
**California** [1] - 99:13

**calvary** [1] - 100:12
**camera** [1] - 135:18
**camp** [1] - 39:13
**Camp** [2] - 139:18; 144:16
**Campbell** [11] - 100:21; 104:16; 107:13, 21, 25; 108:3, 6-7, 11; 109:1, 7
**cannot** [2] - 10:18; 14:24; 57:18; 83:11
**cans** [1] - 130:9
**capable** [1] - 144:10
**capacity** [11] - 51:7; 91:10, 17, 24; 92:8; 94:17, 19, 21; 104:22; 142:23, 25
**capital** [1] - 45:5
**captured** [6] - 107:20; 108:10, 12, 24; 109:7; 115:25
**car** [1] - 160:23
**care** [45] - 10:7; 14:15; 18:22; 19:3; 20:9, 11, 19; 24:13; 28:3; 29:4, 10, 21; 35:6, 9; 36:13; 40:7; 50:17, 19, 23; 53:4; 69:1; 70:17; 71:9, 12; 73:3; 82:10, 24; 83:1; 90:24; 94:6, 14; 106:2; 108:2; 116:4, 22; 117:4; 137:12, 17; 144:23; 147:2, 4; 157:23; 171:13
**career** [4] - 101:5, 12; 126:13; 136:15
**careful** [1] - 22:2
**carefully** [1] - 56:7
**caregiver's** [1] - 82:19
**caring** [4] - 35:13; 36:9; 48:14; 52:11
**carried** [1] - 9:3
**case** [51] - 4:6; 5:9; 7:7; 9:17; 10:21; 12:2, 17; 13:13; 20:7; 21:24; 23:15; 24:18, 24; 29:1, 3, 17; 36:4, 17; 40:6; 46:25; 67:13; 74:7; 82:3; 85:7, 12, 23-24; 87:4, 24; 90:11, 18; 91:7; 92:6, 11, 21, 25; 94:4; 95:9; 105:3; 108:9; 116:8, 17, 20; 123:17; 136:5; 149:8; 176:23; 177:24; 181:14
**cases** [22] - 20:10; 27:14; 36:2; 73:18; 83:20; 84:15; 85:6, 24; 87:4; 88:4; 94:16; 104:20; 105:9; 106:13; 110:16, 19; 111:2, 9, 20; 112:22; 113:7
**Castle** [1] - 12:2
**CAT** [1] - 53:25
**category** [1] - 122:11
**cath** [1] - 69:2
**catheterization** [1] - 17:9
**caused** [3] - 10:5; 41:6; 64:10
**causes** [7] - 46:4; 77:15; 82:2; 84:14, 18; 121:11; 160:24
**causing** [8] - 10:16; 54:3; 61:11, 18; 63:1; 77:14; 124:13; 156:23
**Cav** [2] - 104:13; 115:21
**Cavalry** [1] - 100:10; 107:6
**cell** [28] - 8:17; 9:3; 11:1; 12:10; 25:15, 22; 26:1, 16; 27:8; 40:14, 16; 47:21; 49:3; 63:10, 17; 64:13; 65:10; 69:24; 84:4; 134:23; 141:15; 149:23; 151:2; 154:5; 155:16; 159:14
**Cell** [1] - 49:25
**cells** [1] - 129:11
**Center** [11] - 31:24; 34:16, 19; 35:9,

22; 99:5; 100:14, 18, 25; 139:19
   **center** [1] - 171:13
   **centers** [1] - 142:1
   **central** [1] - 16:22
   **certain** [8] - 9:23; 17:20; 46:6; 138:21; 173:20; 183:13
   **certainly** [20] - 6:4, 12; 7:25; 22:15; 28:4; 30:14; 33:5; 38:13; 39:25; 41:10; 51:4; 53:7; 61:1, 18; 72:6; 83:18; 84:3, 25; 135:9; 202:24
   **certifications** [2] - 35:4; 99:19
   **certified** [5] - 35:5; 99:16; 109:23
   **certify** [1] - 203:10
   **cervical** [4] - 15:3; 57:11, 23; 58:3
   **cessation** [1] - 11:24
   **chair** [35] - 8:18; 9:1; 12:12; 16:4, 6, 17, 19, 24; 24:15, 17, 20, 25; 25:11, 20; 129:23, 25; 131:4; 144:8; 153:21; 154:19; 155:1, 13, 15, 17; 156:8, 17; 157:1; 158:7, 9, 13, 17, 22; 159:3
   **chair's** [1] - 25:1
   **chairman** [1] - 172:14
   **challenge** [2] - 24:16; 29:3
   **challenged** [3] - 9:21; 11:24; 21:19
   **challenges** [2] - 29:6; 82:14
   **challenging** [4] - 19:3; 20:12; 82:19; 83:3
   **chance** [5] - 52:10; 53:21; 88:23; 154:7, 11
   **change** [6] - 12:4; 30:8, 15; 62:5, 10; 164:17
   **changed** [1] - 149:21
   **changes** [3] - 11:18; 12:18; 124:1
   **changing** [1] - 61:9
   **character** [1] - 41:5
   **characteristic** [1] - 122:8
   **characterized** [2] - 52:5; 165:25
   **charge** [4] - 107:19; 108:11; 166:22; 169:11
   **charges** [1] - 168:24
   **chart** [2] - 134:20; 171:9
   **check** [6] - 22:7; 26:10; 135:22; 136:11, 18; 191:5
   **checked** [2] - 120:22; 136:11
   **checking** [2] - 113:6; 134:19
   **chemical** [1] - 102:11
   **Chicago** [1] - 168:3
   **chief** [3] - 100:8, 11, 18
   **Chiefs** [1] - 172:14
   **child** [8] - 99:12, 18; 100:15; 101:15; 102:11, 25; 109:20; 112:7
   **children** [3] - 21:8; 104:4; 110:1
   **choice** [3] - 9:10; 18:10; 191:19
   **chooses** [2] - 27:12; 28:19
   **chose** [1] - 184:8
   **chosen** [1] - 9:12
   **chronic** [6] - 15:1; 40:17; 51:5; 64:23; 65:2; 159:6
   **chronological** [1] - 145:1

   **chunk** [1] - 201:10
   **circumstances** [7] - 13:5; 20:12; 39:11; 83:3; 150:19; 158:17; 159:1
   **citizens** [1] - 176:25
   **city** [3] - 12:1; 98:23; 99:7
   **City** [2] - 12:1; 34:18
   **Civil** [4] - 1:4; 2:17; 3:3, 7
   **claim** [2] - 26:16; 159:2
   **claimed** [1] - 133:22
   **claiming** [1] - 62:8
   **claims** [2] - 22:17; 29:9
   **clarification** [1] - 54:25
   **clarified** [1] - 45:18
   **clarify** [4] - 102:3; 105:12; 172:3; 173:6
   **clarifying** [1] - 173:4
   **classic** [2] - 122:12; 143:11
   **classification** [2] - 120:2; 200:14
   **classified** [18] - 5:11; 6:13, 20; 7:5, 18, 25; 32:14, 18; 37:1; 71:23; 72:7; 118:14, 18; 199:15, 21; 200:21; 202:18
   **classroom** [2] - 129:23, 25
   **clear** [22] - 7:23; 9:16; 12:21; 16:6; 17:4; 27:23; 29:17; 33:10; 52:9; 108:9; 111:10; 124:15; 137:9; 143:23; 145:12; 149:16; 165:23; 166:1; 175:25; 195:11; 197:12
   **clearance** [9] - 36:23-25; 101:20, 22; 102:1, 4; 113:12, 19
   **cleared** [5] - 18:4; 101:23, 25; 168:10
   **clearer** [1] - 151:23
   **clearly** [6] - 5:5; 103:8; 126:15; 129:5; 141:25; 176:2
   **clerk** [1] - 38:20
   **client** [1] - 160:19
   **clinic** [2] - 132:23; 188:16
   **clinical** [9] - 12:7; 14:16; 52:21; 69:10; 73:2; 83:14; 100:17; 101:9; 108:2
   **clinician** [1] - 147:11
   **clinicians** [1] - 142:2
   **close** [9] - 6:10; 7:4; 18:11; 31:13; 105:7; 119:3; 150:5, 10; 185:20
   **closed** [10] - 6:18; 7:17, 20; 71:24; 95:23; 112:14; 150:9; 199:23; 201:10
   **closer** [1] - 119:3
   **Codder** [1] - 111:6
   **codirector** [1] - 35:20
   **coerced** [2] - 74:25; 139:6, 11
   **coercion** [1] - 74:20
   **coercive** [2] - 9:11; 16:23
   **cofounder** [1] - 35:20
   **cohort** [1] - 128:17
   **Coleman** - 85:19; 86:16
   **collar** [3] - 57:12, 23; 58:4
   **collected** [1] - 43:1
   **College** [4] - 100:13, 20; 101:16
   **colonel** [1] - 158:24
   **Colonel** [9] - 9:14; 15:23; 16:8, 16, 20, 22; 158:5, 16, 21

   **color** [1] - 197:13
   **COLUMBIA** [1] - 1:1
   **Columbia** [1] - 100:4
   **column** [1] - 179:3
   **comatose** [1] - 24:12
   **combat** [5] - 104:15; 107:7; 108:10, 12, 24
   **combative** [1] - 61:17
   **combination** [3] - 53:2; 77:7, 17
   **comfort** [2] - 22:22; 61:10
   **comfortable** [5] - 84:22; 87:25; 88:17; 135:10; 158:8
   **comfortably** [1] - 31:12
   **coming** [5] - 40:1; 66:8; 77:24; 169:18; 175:10
   **Command** [2] - 101:1; 166:18
   **command** [10] - 156:1; 167:1-6, 9, 23; 168:7
   **Commander** [1] - 9:8
   **commander** [8] - 13:15; 100:17, 21; 108:6; 153:22; 154:23; 197:25
   **commanding** [3] - 100:24; 166:17
   **commands** [1] - 140:16
   **comment** [3] - 9:3; 58:23; 116:11
   **comments** [1] - 69:8
   **Commission** [1] - 36:5
   **commissioned** [1] - 99:22
   **commissions** [1] - 105:10
   **committed** [1] - 198:1
   **Committee** [1] - 174:19
   **common** [8] - 21:3; 42:4; 66:3; 121:25; 146:12; 171:14
   **commonly** [2] - 17:7; 143:17
   **Commonwealth** [1] - 34:22
   **compare** [1] - 138:16
   **compensation** [2] - 126:3; 127:3
   **competence** [1] - 82:22
   **competency** [1] - 91:10
   **competent** [7] - 12:6; 53:10; 61:18; 90:24; 91:21, 25; 175:24
   **complain** [1] - 53:18
   **complained** [5] - 51:15; 60:17; 64:4; 66:15; 133:15
   **complains** [2] - 40:17; 41:16
   **complaint** [7] - 40:23; 41:10; 46:12, 22, 24; 53:18; 70:13
   **complaints** [12] - 21:15; 40:5, 9, 22; 49:9; 53:16; 64:9; 70:3; 117:11; 126:10; 127:1; 183:12
   **complete** [5] - 37:7; 68:2; 70:12; 74:10; 97:12
   **completed** [3] - 70:21; 79:1, 17
   **completely** [6] - 21:24; 48:21; 51:6; 66:16; 95:17; 158:25
   **completion** [2] - 23:9; 34:24
   **complex** [10] - 20:12; 40:6; 48:17; 68:25; 77:7; 82:4, 25; 83:2; 139:12
   **complexity** [2] - 94:4
   **compliance** [4] - 155:15; 156:14;

157:23; 202:9
**compliant** [3] - 154:22, 24; 157:4
**compliantly** [1] - 149:19
**complicated** [10] - 40:8; 42:1; 82:6, 11, 14; 141:23; 202:1
**complication** [1] - 61:11
**complications** [4] - 20:5; 62:2; 71:5; 83:19
**complied** [1] - 10:7
**component** [3] - 52:25; 77:1; 124:1
**comprehensive** [3] - 141:24; 142:10; 152:16
**compression** [4] - 68:5, 8, 10
**comprised** [1] - 101:5
**computer** [4] - 3:16; 4:13, 16; 67:21
**computer-aided** [1] - 3:16
**concept** [4] - 165:19, 24
**concepts** [1] - 165:12
**concern** [3] - 12:22; 71:14; 138:11
**concerned** [9] - 12:24; 66:11; 71:18; 138:24; 139:3, 11; 182:13
**concerning** [1] - 179:11
**concerns** [10] - 21:17; 24:8; 71:10, 13, 16, 19; 136:5; 137:20; 146:21
**conclude** [1] - 6:4
**concluded** [2] - 24:19; 202:13
**concludes** [1] - 71:21
**conclusion** [2] - 25:1; 157:3
**conclusions** [3] - 51:3; 127:15; 179:13
**concurrent** [1] - 99:20
**concussion** [1] - 105:18
**condition** [15] - 10:22; 15:2; 56:6; 58:16; 66:25; 77:20; 103:11; 117:10; 121:5, 13; 122:16; 166:4; 194:25; 195:23
**conditions** [15] - 69:21; 103:8; 116:23; 120:10, 12; 122:10; 125:7; 128:15; 139:15; 152:10; 160:19; 165:4; 195:1, 17, 21
**conduct** [5] - 115:25; 152:14; 167:10; 168:11, 19
**conduct's** [1] - 143:7
**conducted** [6] - 20:17; 21:1; 25:16; 50:24; 161:5, 7
**confer** [1] - 53:22
**confession** [2] - 178:11; 194:10
**confidence** [1] - 49:13
**confidential** [2] - 72:11, 13
**confined** [1] - 139:14
**confinement** [3] - 116:23; 138:22; 195:2
**confirm** [3] - 15:25; 21:14, 20
**confirmed** [3] - 53:23; 61:2; 162:7
**confirming** [1] - 21:18
**confirms** [1] - 22:14
**confiscated** [1] - 63:11
**confusing** [4] - 38:23; 41:25; 55:12; 82:6
**connect** [1] - 121:22

**Connecticut** [3] - 85:11; 95:9
**consensus** [1] - 71:13
**consequence** [1] - 193:12
**consequences** [2] - 185:13, 15
**consider** [7] - 26:15; 69:22; 93:23; 122:24; 144:12; 152:16; 167:9
**considerable** [2] - 103:14
**considerate** [1] - 138:20
**considered** [16] - 9:22; 19:1; 20:11; 29:3; 91:21; 115:1; 121:12; 126:6; 148:15; 162:4; 164:5; 166:5, 9; 169:20
**considering** [2] - 29:6; 163:22
**consisted** [1] - 75:11
**consistency** [1] - 151:15
**consistent** [6] - 17:12; 50:19, 22; 51:11; 123:14; 126:23
**consistently** [4] - 19:5; 20:10; 151:21; 183:21
**consists** [1] - 149:24
**constantly** [2] - 41:12; 113:13
**constitute** [2] - 24:20; 76:8
**construct** [1] - 165:12
**constructive** [1] - 154:7
**consult** [7] - 53:23; 80:17, 20; 81:7, 12, 16; 183:21
**consultancy** [1] - 111:8
**consultant** [2] - 35:19; 117:2
**consulting** [3] - 91:4; 103:3; 118:3
**consults** [3] - 70:2, 7; 79:21
**consume** [2] - 25:4, 23
**consumes** [2] - 22:23; 23:2
**consuming** [2] - 26:8, 11
**Cont** [2] - 2:1; 3:1
**contacted** [2] - 104:20; 116:11
**content** [1] - 116:13
**contention** [1] - 63:13
**contentious** [1] - 48:5
**contents** [2] - 24:4; 98:3
**context** [16] - 24:18, 25; 29:7; 46:24; 71:4, 6; 83:23; 84:8; 86:1; 87:7, 11, 19, 22; 88:21; 97:12; 144:4
**continue** [3] - 28:7; 57:13; 63:12; 118:2; 157:15
**CONTINUED** [2] - 115:4; 204:11
**contradicted** [1] - 14:25
**contradiction** [1] - 89:11
**contradicts** [1] - 151:18
**contraindications** [1] - 61:19
**contrary** [1] - 19:1
**contrast** [2] - 125:3; 138:16
**contributes** [2] - 118:10; 152:13
**contributing** [1] - 77:15
**control** [3] - 16:11; 45:7; 195:4
**controlled** [1] - 27:16
**controls** [1] - 16:15
**controversial** [1] - 61:23
**convenient** [2] - 9:9; 56:2
**conversation** [3] - 5:15; 146:6; 168:14
**conversations** [3] - 65:8; 77:21; 94:24

**conversion** [13] - 119:23; 121:3, 5, 12, 15, 19; 122:20, 24; 123:12; 124:15, 23; 163:8, 14
**conviction** [1] - 29:9
**convincing** [1] - 17:4
**cooperating** [1] - 131:7
**cooperative** [8] - 15:25; 51:7; 63:3; 84:5, 21; 88:10, 12; 141:11
**copies** [3] - 38:1; 54:11; 86:8
**copy** [19] - 38:19; 43:16; 56:23; 60:4, 6; 65:17; 69:11; 78:11; 80:2, 6-7; 86:7, 9; 102:16; 119:10; 149:2, 9
**Cori** [1] - 1:21
**cori@reprieve.org.uk** [1] - 1:25
**Corie** [1] - 4:12
**corner** [4] - 42:25; 43:4; 59:6; 150:22
**Corps** [2] - 99:23
**corpsman** [2] - 184:24; 185:24
**corpsman's** [2] - 184:24; 185:1
**corpsmen** [1] - 147:15
**correct** [27] - 14:2; 28:23; 38:11; 43:8; 50:25; 53:17; 54:6; 64:18; 73:3, 19; 74:9, 21; 79:17; 82:17; 83:8; 88:14; 90:21; 91:22; 102:19; 107:22; 109:11; 120:15; 150:9; 159:17; 166:25; 203:10
**correctional** [2] - 73:24; 74:1
**correctly** [3] - 6:1; 21:21; 22:2
**corroborated** [3] - 47:18; 48:6; 53:19
**cotton** [2] - 57:9; 59:19
**cough** [2] - 22:13; 192:12
**coughing** [1] - 22:11
**counsel** [36] - 4:7, 11, 21, 24; 5:14; 6:12; 7:22; 8:10; 13:25; 33:8, 14, 17, 23; 39:13; 54:21; 55:23; 74:9; 86:7; 93:15; 95:16; 96:22; 106:23-25; 163:8; 169:4; 180:15, 18; 197:20, 23; 198:22; 199:3; 203:3
**count** [1] - 171:11
**counted** [1] - 171:21
**countering** [1] - 14:2
**countries** [2] - 35:10; 104:1
**country** [3] - 118:4; 128:19; 166:23
**couple** [12] - 11:7; 14:1; 65:15; 103:25; 128:12; 147:21; 153:19; 173:13, 15; 181:13; 184:10; 197:11
**course** [1] - 5:10, 18; 6:2, 11; 7:7; 23:2; 26:11; 32:13; 96:22; 98:6; 101:4; 117:22; 129:13; 148:22; 164:17; 175:20, 22; 182:14, 23; 198:24; 200:7
**courses** [2] - 101:19; 147:16
**Court** [57] - 3:12; 7:19; 9:16; 10:21; 11:23, 25; 12:4; 13:3, 13; 14:22; 17:12; 18:12, 24; 23:12; 26:15; 36:2; 37:24; 38:4, 24; 46:2; 51:2; 52:7; 55:2; 56:5; 72:3; 75:17; 85:10; 86:8, 16; 98:25; 104:23; 112:6, 11; 113:10; 117:1, 3; 158:6; 165:17, 24; 166:2; 171:8; 176:19; 177:9; 178:13, 22, 25; 179:9, 24; 181:15; 184:5, 8; 203:14
**court** [38] - 4:24; 5:5, 19, 21; 6:2; 7:1,

4; 10:11; 11:18; 28:15; 29:5; 32:8, 13;
35:25; 54:15; 72:5; 90:15; 92:22; 99:9;
111:11, 14; 153:2; 157:18; 179:24;
180:1; 199:5, 13-14, 18; 200:15, 19;
202:23
 **Court's** [6] - 11:20; 12:22; 29:24;
111:10; 115:17; 116:24
 **courthouse** [1] - 6:23
 **Courthouse** [1] - 3:13
 **courtroom** [17] - 4:5; 6:10; 8:3; 30:1;
95:23; 96:21; 160:1; 200:23; 201:14;
202:17-19, 21, 24; 203:2, 5
 **courtroom's** [1] - 203:4
 **Courts** [2] - 105:11; 177:7
 **courts** [4] - 20:10; 29:8; 85:9
 **cover** [2] - 7:5; 20:24
 **covered** [1] - 105:17
 **Craddock** [1] - 9:8
 **create** [1] - 160:24
 **creatures** [1] - 42:3
 **Crider** [2] - 1:21; 4:12
 **criminal** [1] - 29:14
 **critical** [1] - 173:1
 **criticism** [1] - 172:2
 **criticisms** [2] - 148:6
 **criticized** [1] - 170:17
 **criticizing** [2] - 148:4; 172:1
 **Crosby** [49] - 5:21, 24; 13:23; 14:6;
30:11, 18; 31:7, 15, 20, 22, 25; 34:11;
36:16; 37:10, 22; 39:4; 42:13; 44:25;
45:22; 47:7; 49:16, 25; 50:24; 56:13,
15; 57:4; 59:3; 60:8; 63:21; 64:12;
65:12, 23; 66:24; 71:22; 72:25; 73:2;
83:6; 86:12, 15; 93:10; 95:3; 96:3;
133:14; 161:2, 14; 162:19; 192:14;
195:24
 **CROSBY** [7] - 31:9, 18; 72:23; 93:8;
204:6
 **Crosby's** [6] - 32:2, 24; 44:3; 71:22;
114:19; 200:2
 **CROSS** [4] - 72:23; 160:16; 204:7, 12
 **cross** [24] - 5:22; 6:3, 11, 13; 7:2, 5,
17, 19; 72:1, 5, 7-8, 14-16, 18; 93:12;
95:14; 167:14; 199:5, 18; 200:21;
202:22
 **CROSS-EXAMINATION** [4] - 72:23;
160:16; 204:7, 12
 **cross-examination** [9] - 6:11, 13; 7:3,
5, 17; 72:1, 18; 93:12; 167:14
 **cross-examine** [2] - 7:2; 72:14
 **crossed** [1] - 130:13
 **CRR** [3] - 3:12; 203:10, 13
 **cruel** [1] - 66:16
 **crush** [1] - 135:24
 **crushed** [5] - 135:1; 136:4, 8, 23;
137:15
 **crutches** [9] - 15:21; 16:1; 49:11;
50:10; 57:21; 58:11; 141:1, 9; 159:13
 **cry** [1] - 18:9
 **CT** [10] - 67:2, 12, 17, 21; 68:14; 81:8,

25; 125:13
 **cultural** [13] - 47:1; 66:5; 77:19; 82:11;
103:12, 16; 123:19, 22; 124:7; 164:4;
165:13
 **culturally** [13] - 19:12; 53:10, 13;
65:24; 66:2, 10, 13; 77:10, 12; 163:9,
17, 25; 164:24
 **culturally-bound** [10] - 65:24; 66:2,
10, 13; 77:10, 12; 163:9, 17, 25; 164:24
 **culture** [14] - 42:4; 103:19; 119:23;
121:4; 122:2, 9, 17, 20; 123:18, 21;
124:4, 9, 18; 128:16
 **culture-bound** [7] - 119:23; 121:4;
122:2, 20; 123:18; 124:9, 18
 **cultures** [2] - 46:6
 **curiosity** [1] - 201:18
 **curiously** [1] - 196:13
 **current** [21] - 15:5; 34:11, 17; 40:5;
65:14, 22; 66:23; 67:2; 69:7, 9, 14;
70:1, 23; 82:22; 94:6; 134:2, 15; 139:6;
142:12; 148:10, 19
 **curriculum** [9] - 32:2; 33:18, 20, 22;
34:7; 44:3, 8; 85:17; 102:16
 **cushion** [1] - 57:12
 **custody** [1] - 112:8
 **cut** [1] - 146:11
 **CV** [7] - 35:16; 106:11, 16; 107:1;
109:10; 170:25; 171:1
 **cystoscopy** [7] - 54:2; 70:18; 82:1;
93:10, 18, 21; 94:2

## D

 **D.C** [2] - 1:7; 3:14
 **daily** [2] - 23:14; 91:11
 **damage** [1] - 124:11
 **danger** [1] - 195:3
 **dangerous** [2] - 13:20; 144:12
 **data** [4] - 14:8; 66:25; 182:8; 184:3
 **date** [7] - 11:5; 28:13; 57:7; 67:23;
145:17; 202:9
 **Date** [1] - 203:13
 **dated** [14] - 28:11; 45:2; 50:1; 57:4;
63:23; 81:7; 134:7; 139:24; 155:3, 5,
7-8, 10; 158:6
 **dating** [1] - 146:9
 **Davis** [2] - 3:2; 4:22
 **DAY** [1] - 1:9
 **days** [8] - 9:20; 12:15; 14:1; 122:6;
161:3; 181:21, 23; 198:9
 **DC** [9] - 1:15, 19; 2:4, 13, 18, 22; 3:4,
9; 130:15
 **dead** [1] - 18:2
 **deal** [8] - 83:21, 25; 84:6; 85:25; 87:5;
88:16; 172:1; 195:18
 **dealing** [3] - 19:21; 84:11; 92:24
 **death** [12] - 12:7, 23; 13:6, 18, 22;
14:17; 19:14; 20:6; 92:6; 139:1, 3;
176:13

 **decent** [2] - 132:11
 **decide** [1] - 176:13
 **decided** [7] - 9:8; 15:4; 29:1, 10;
43:12, 16; 184:8
 **deciding** [3] - 13:11; 146:15; 151:1
 **decision** [12] - 13:14, 16; 24:9; 72:5;
91:18, 24; 92:8; 94:17, 21; 201:22;
202:5
 **decision-making** [4] - 91:24; 92:8;
94:17, 21
 **decisions** [6] - 20:11; 71:15; 91:11;
94:19; 175:24; 201:19
 **declaration** [21] - 15:6, 10; 54:8;
65:14, 19-21; 69:7; 78:5; 89:7, 18, 20;
90:7; 134:3, 7, 15; 175:25; 197:25;
198:6
 **declined** [4] - 9:24; 47:7; 98:8, 13
 **decreased** [4] - 51:16, 20, 25; 78:15
 **deemed** [1] - 114:24
 **defendant's** [1] - 11:24
 **Defense** [2] - 18:21; 169:21
 **defense** [24] - 105:10; 112:5-8, 10-13,
16, 18; 118:1, 4; 169:23; 178:5
 **defer** [2] - 20:10; 175:23
 **deferred** [1] - 195:24
 **definitely** [1] - 161:21
 **definition** [2] - 94:19; 162:21
 **degeneration** [1] - 125:9
 **degenerative** [1] - 15:2
 **degrading** [5] - 9:11; 10:10; 13:4;
47:22; 49:3
 **degree** [1] - 99:2
 **degrees** [1] - 157:17
 **deliberate** [2] - 29:1; 52:13
 **deliberative** [2] - 24:20; 29:19
 **delivered** [1] - 172:18
 **delusional** [3] - 120:12; 164:14;
165:21
 **demaning** [3] - 138:20; 154:2; 156:20
 **demeanor** [1] - 132:5
 **demonstrates** [1] - 194:25
 **demonstrative** [1] - 22:19
 **demonstratively** [1] - 15:11
 **denied** [4] - 48:2, 4; 141:12; 167:19
 **denying** [2] - 159:11, 15
 **departed** [1] - 53:25
 **DEPARTMENT** [4] - 2:12, 17; 3:2, 7
 **Department** [5] - 4:20; 18:20; 55:25;
169:20
 **departure** [1] - 23:14
 **deploy** [2] - 116:2; 127:5
 **deployed** [2] - 100:22; 107:14
 **deploying** [2] - 104:14, 16
 **deposition** [3] - 86:13; 97:3, 5
 **depression** [2] - 105:19; 195:20
 **Depressive** [1] - 119:22
 **depressive** [2] - 120:19; 165:22
 **deprive** [1] - 11:25
 **depth** [1] - 111:9

**deputy** [2] - 100:17; 169:22
**derivative** [1] - 136:6
**descending** [1] - 17:7
**describe** [11] - 41:4; 46:2; 48:24; 52:7; 66:1; 75:7; 100:6; 101:11; 129:1; 138:2
**described** [13] - 41:18, 20; 47:22; 48:6; 49:4; 51:20; 61:1; 64:15, 24-25; 129:3
**describes** [1] - 41:1
**describing** [1] - 81:18
**DESCRIPTION** [1] - 204:15
**descriptor** [2] - 125:25; 166:11
**designed** [4] - 22:18; 23:7; 25:12; 27:16
**despite** [1] - 63:11
**detail** [3] - 30:16; 157:25; 198:8
**detailed** [2] - 195:23; 197:18
**details** [3] - 20:25; 194:1; 198:4
**detained** [3] - 104:9; 107:10; 143:7
**detainee** [29] - 13:11; 25:22; 29:8; 60:17, 19; 64:2, 4; 74:16; 110:18; 111:2; 129:12; 136:24; 139:20; 149:20; 150:4; 153:20; 154:12, 24; 155:17, 23; 176:12; 181:25; 182:2; 186:16, 20
**Detainee** [3] - 64:2; 149:18; 175:5
**detainees** [47] - 8:18; 9:10, 15; 10:6, 8; 16:18, 25; 20:13; 21:13; 23:5, 22; 24:1, 4-5, 13; 25:2, 4, 6; 36:20-22; 64:15; 73:16, 18, 20-21; 75:9; 105:13, 22; 107:10, 20-21; 108:10, 24; 109:7; 115:19; 129:13; 133:24; 139:12; 143:15; 147:9; 154:22; 156:8; 170:20; 186:7
**Detainees** [2] - 173:13
**detainees'** [1] - 24:3
**detection** [1] - 22:14
**Detention** [7] - 52:4; 130:18, 22; 131:13; 154:23; 197:25
**detention** [11] - 8:14; 23:11; 24:10; 29:7; 39:16; 74:5, 17; 90:8; 137:7, 10; 176:10
**deteriorated** [1] - 24:3
**determination** [4] - 16:7; 19:20; 20:4; 27:10
**determinations** [1] - 23:6
**determine** [3] - 11:25; 13:19; 41:17
**determined** [1] - 134:20
**determines** [1] - 13:8
**determining** [1] - 71:5
**develop** [1] - 142:3
**deviated** [1] - 10:4
**devices** [2] - 41:3; 49:11
**devil's** [1] - 157:25
**DHIAB** [2] - 1:3; 4:6
**Dhiab** [164] - 4:6; 8:6, 11; 9:6; 10:10, 14, 20, 24; 11:3, 13, 16; 12:5, 9, 23; 13:21; 14:6, 9, 22; 17:18; 18:6, 22; 19:3, 11, 17; 20:10, 13, 18; 21:24; 22:15, 22; 23:7; 25:8, 15, 25; 26:8, 24; 27:2, 7, 9; 28:7, 17; 29:20; 30:11; 37:4,

23; 39:5, 8-9, 13, 21, 24; 40:7; 41:4, 25; 45:10; 47:3, 7, 15, 17; 48:6; 50:14, 25; 51:4; 52:17, 20; 53:7, 16; 57:16; 59:11, 24; 60:23, 25; 62:25; 63:2, 15; 64:16; 65:4, 8; 66:11; 67:8, 18; 69:4, 8, 14, 16; 70:2, 23; 71:2, 9, 17; 75:4; 76:18, 25; 77:12, 22; 78:14; 83:2; 94:1, 22, 24; 118:10; 122:19; 123:8; 125:15; 127:8, 14, 19, 23; 128:2, 10; 132:4; 133:15, 20; 134:18, 21, 24-25; 135:2; 137:12, 24; 139:5; 142:19; 143:18; 144:10, 20; 145:13, 16; 146:3, 5; 151:13; 153:23; 156:16, 25; 157:16; 158:11, 18; 159:9; 160:20; 161:2; 179:21; 181:19, 25; 182:10, 22, 25; 183:7; 184:11, 15; 188:11; 192:9, 13; 193:13; 194:24; 195:2; 198:1
**Dhiab's** [34] - 11:20; 12:24; 21:14; 22:20, 22; 25:17; 36:16; 39:17; 46:25; 47:13; 52:3, 5; 53:14; 58:4, 12; 60:22; 64:21; 66:25; 67:4; 70:13; 79:1; 94:4; 116:7, 16, 20; 117:17; 126:10; 134:19; 152:7; 154:20; 158:12; 159:2; 186:10
**diagnose** [1] - 125:19
**diagnosed** [1] - 124:11
**diagnoses** [9] - 45:14; 105:15; 119:20; 120:6; 122:4, 20; 127:12; 165:2
**diagnosis** [42] - 4:6; 65:23; 67:22, 24; 70:13, 15; 77:9; 82:2; 105:17, 20; 106:1; 114:1, 3-6, 10, 13; 122:12, 25; 123:1; 126:25; 127:9, 18; 139:22; 161:12, 24; 162:4; 163:14, 17, 20; 164:1, 7, 13; 165:17-19, 21, 23; 166:4, 9
**diagnostic** [4] - 120:2; 123:12; 124:24; 125:2
**Diagnostic** [1] - 120:4
**dictated** [1] - 22:21
**die** [5] - 9:6; 139:2; 176:1, 16, 20
**died** [3] - 18:3; 136:8; 176:25
**difference** [1] - 193:6
**differences** [4] - 118:13; 120:1; 121:3; 197:12
**different** [15] - 5:9; 30:19; 69:21; 94:18; 100:6; 103:16; 124:9; 127:12; 158:25; 165:1; 200:23; 202:17
**differential** [2] - 82:1; 163:23
**differentiates** [1] - 21:10
**differently** [1] - 136:7
**difficult** [8] - 17:15; 40:21; 41:2, 21; 77:8; 82:8; 135:16; 154:9
**difficulties** [1] - 26:5
**difficulty** [1] - 68:24
**dignity** [2] - 8:16; 176:1
**diminished** [3] - 196:23; 197:6, 10
**DIRE** [2] - 106:7; 204:10
**DIRECT** [6] - 31:18; 98:17; 115:4; 204:6, 9, 11
**direct** [29] - 5:19; 6:25; 7:19, 23; 45:3; 56:11; 71:21; 73:11, 16; 76:3, 17, 25;

78:2; 83:6; 85:13; 97:25; 139:16; 149:6; 152:21, 23; 159:23; 160:1, 14; 178:22; 190:15; 200:21; 201:8; 202:22
**directed** [1] - 154:23
**directly** [4] - 31:13; 96:3, 7; 174:5
**director** [1] - 108:1
**dis** [1] - 91:3
**disability** [1] - 52:16
**disagree** [2] - 45:19; 69:9
**disagreed** [2] - 91:6, 8
**disagreement** [5] - 29:14; 71:8; 162:1, 11
**DISC** [2] - 50:10; 141:1
**disc** [6] - 15:2; 41:13; 45:17; 50:10; 68:10; 125:12
**discern** [2] - 182:19
**disciplinary** [17] - 16:2; 18:9; 48:19, 22; 50:11, 18; 59:21; 71:19; 141:2, 22; 142:9, 12, 14, 18; 143:8, 13; 159:15
**discomfort** [5] - 21:5; 41:4, 12; 64:8; 88:17
**discontinue** [6] - 57:8, 19, 25; 58:24; 59:19; 60:1
**discontinued** [2] - 10:23; 130:15
**discrepancy** [2] - 135:5; 155:20
**discuss** [6] - 47:2; 71:12; 75:2; 125:23; 133:20; 136:20
**discussed** [2] - 94:8; 187:13
**discusses** [1] - 70:2
**discussion** [4] - 163:8; 198:25; 199:4; 202:13
**Discussion** [1] - 38:18
**disease** [18] - 41:13; 45:17, 20-21; 46:10; 68:10; 76:4, 8, 12, 19-20; 77:1; 122:16; 123:6; 161:17; 197:15
**diseases** [1] - 195:19
**disinfectant** [1] - 10:9
**dismiss** [2] - 124:19; 163:25
**dismissed** [1] - 164:3
**disorder** [24] - 94:16; 102:13; 105:18; 119:22; 120:11, 19; 121:4, 15, 19; 122:11, 20, 24; 123:12; 124:16, 23; 161:15; 163:8, 15; 164:14; 165:21
**disorders** [6] - 80:25; 106:1; 146:24; 195:8, 21
**dispute** [1] - 27:7
**disregard** [1] - 29:13
**disrespect** [2] - 63:5; 95:1
**disrupt** [1] - 154:9
**disrupted** [1] - 25:7
**disruption** [1] - 5:13
**disrupts** [1] - 154:6
**distinction** [1] - 48:23
**distress** [2] - 52:23; 77:5
**distribution** [1] - 51:18
**DISTRICT** [3] - 1:1, 10
**District** [5] - 23:15; 85:11; 86:16; 100:4; 178:2
**distrust** [1] - 128:21

**disturbed** [1] - 142:1
**diversity** [1] - 103:13
**Division** [6] - 2:17; 3:3, 7; 100:10, 23; 108:8
**division** [9] - 100:9, 12; 102:1; 104:13; 107:5, 8, 11; 115:21
**Doc** [1] - 169:14
**doctor** [40] - 5:25; 12:6; 13:15; 48:3; 57:17, 25; 71:20; 84:2; 88:15; 91:10; 100:3; 106:10; 107:5; 109:10; 110:9, 12, 15; 113:12, 25; 135:3; 136:19; 137:3; 160:18; 166:14; 171:5; 173:17; 174:24; 175:16; 179:20; 184:17; 185:3; 191:21, 25; 192:6; 193:25; 194:24
**Doctor** [45] - 83:20; 86:3; 87:8; 88:7; 90:11; 108:9; 110:12; 111:19; 112:2, 19; 113:20; 114:16; 162:15; 163:24; 165:6; 166:1; 171:11, 25; 172:7, 21; 173:9; 175:18; 176:12; 177:6; 178:24; 179:17, 19; 180:20; 181:12; 182:15; 183:12, 20, 23; 184:10; 186:6, 19, 25; 187:7; 188:21; 190:10; 192:20; 193:20; 194:10, 20; 198:21
**doctor's** [4] - 57:14; 59:18, 20; 191:19
**doctor-patient** [1] - 71:20
**doctors** [14] - 15:1; 20:11; 21:20; 40:6; 48:14, 16, 18, 21; 49:2; 52:11; 63:1; 173:4; 186:4, 15
**Doctors** [1] - 172:24
**document** [15] - 39:4; 42:25; 43:3, 15; 45:1; 56:17; 119:19; 141:6, 15; 144:17; 148:13; 187:16
**documentary** [1] - 6:8
**documentation** [1] - 37:3
**documented** [3] - 63:16; 70:16; 84:20
**documents** [3] - 28:11; 117:18; 130:20
**done** [19] - 10:19; 14:18; 15:14; 17:7; 32:24; 42:21; 44:4; 54:9; 67:15; 84:1; 99:8; 105:21; 123:12; 124:12, 25; 148:5; 161:11; 170:25; 199:7
**door** [1] - 125:14
**dosages** [1] - 191:10
**dose** [11] - 185:8, 17; 186:2, 22-23; 187:19; 189:12, 23; 190:8; 191:7; 192:3
**doses** [2] - 185:19; 191:12
**doubt** [2] - 160:24; 181:7
**down** [26] - 8:19; 9:3, 25; 22:12; 41:19; 54:16; 77:24; 95:15; 99:10; 125:17; 127:14; 133:13; 138:8; 157:12; 162:16; 170:23; 173:13, 15; 175:21; 180:13; 184:13; 187:13; 190:14; 198:22
**dozen** [1] - 105:7
**dozens** [1] - 181:16
**Dr** [91] - 5:20, 24-25; 6:24; 8:3; 13:18, 23; 14:2, 6, 9, 11, 15; 29:25; 30:4, 10-11, 13, 18, 20; 31:7, 20, 25; 32:2, 24; 33:18, 20, 22; 34:11; 36:16; 37:9, 22; 39:4, 12; 42:13; 44:3, 25; 45:22; 47:7, 25; 49:16, 25; 50:24; 56:13, 15; 57:4; 59:3; 60:8; 63:8, 21; 64:12; 65:12,

22-23; 66:24; 71:22; 72:25; 73:2; 83:6; 86:12; 93:10; 95:3; 96:3, 9; 97:25; 98:21; 99:8; 102:6; 105:25; 106:9; 114:19; 133:14; 134:17, 23-24; 161:2, 14; 162:19; 178:25; 179:10; 192:14; 195:24; 199:23; 200:2, 12
**draft** [2] - 126:14; 196:4
**drafts** [1] - 161:11
**dragged** [1] - 8:16
**drainage** [1] - 17:8
**drank** [1] - 193:23
**drastic** [1] - 27:22
**drastically** [1] - 28:3
**draw** [1] - 60:8
**drift** [1] - 7:18
**drink** [5] - 23:1; 60:19; 130:1; 192:10
**drinking** [5] - 63:7; 156:21; 193:3, 14, 21
**dropped** [1] - 64:25
**drug** [3] - 185:12, 25; 186:20
**drugs** [1] - 186:16
**DSM** [7] - 120:4; 164:17; 165:18; 166:6-8, 10
**DSM-5** [5] - 164:2, 12, 15; 165:12, 17
**DSM-IV** [5] - 165:18; 166:6-8, 10
**due** [2] - 15:10; 189:23
**duration** [1] - 140:13
**duress** [1] - 175:24
**during** [24] - 20:15, 24; 23:6, 25; 33:24; 39:24; 41:11; 67:20; 97:25; 100:22; 101:4, 11; 107:11; 114:19; 116:2; 126:13; 132:4; 133:15; 135:1; 157:7; 167:16; 170:5; 172:13; 192:13
**duties** [1] - 101:8
**duty** [4] - 100:1; 101:6; 115:7; 127:5
**Duty** [1] - 173:13

### E

**E-feed** [3] - 130:2; 149:18, 20
**E-feeds** [1] - 149:22
**ear** [1] - 23:20
**early** [9] - 116:9; 129:20; 130:6; 135:12; 176:9; 177:1; 198:19
**easier** [10] - 4:25; 5:2; 38:1, 20; 52:12; 55:23; 98:1, 4; 119:6
**easily** [1] - 24:6
**East** [1] - 104:17
**easy** [1] - 131:9
**eat** [11] - 10:15; 14:10, 12; 19:4, 12; 25:22; 63:12; 65:6; 83:12; 152:14; 196:20
**eating** [5] - 19:18; 63:8, 10; 91:24; 192:14
**EC4Y** [1] - 1:23
**echo** [2] - 39:13
**ed** [2] - 170:12, 17
**educational** [3] - 99:1, 20; 147:13
**effect** [2] - 140:14; 194:25

**effecting** [1] - 16:2
**effectively** [1] - 121:22
**effectiveness** [2] - 102:12; 117:4
**effects** [1] - 154:4
**effort** [2] - 194:16; 200:6
**eight** [3] - 187:24; 189:19; 191:21
**Eisenberg** [2] - 2:7; 4:13
**Eisenhower** [5] - 100:14, 18, 24-25; 101:13
**either** [8] - 7:8; 26:13; 66:5; 96:2; 122:20; 152:9; 156:21; 193:14
**EKG** [2] - 70:24
**EKGs** [1] - 71:2
**electronic** [1] - 146:10
**element** [4] - 45:19; 52:22; 77:12
**elements** [1] - 123:22
**Elizabeth** [4] - 2:2; 4:11; 31:1, 4
**elizabeth.marvin@lewisbaach.com** [1] - 2:6
**ELMO** [1] - 119:14
**elsewhere** [2] - 73:11; 154:14
**emaciated** [1] - 159:5
**Email** [10] - 1:16, 20, 25; 2:6, 10, 15, 20, 24; 3:5, 11
**emergency** [1] - 17:7
**emotional** [1] - 103:11
**emphasize** [1] - 200:5
**employees** [2] - 157:12
**empty** [2] - 41:21; 70:4
**encountered** [1] - 195:6
**end** [12] - 45:7, 23; 50:15; 52:14; 65:2, 24; 119:19; 130:14, 16; 169:17; 176:16; 201:13
**end-quote** [1] - 65:24
**ending** [1] - 109:3
**enemy** [1] - 108:16
**engage** [1] - 129:6
**engaged** [2] - 25:8; 116:16
**engaging** [1] - 51:7
**enjoin** [3] - 12:9, 11; 18:12
**enlarge** [1] - 119:12
**enlarged** [1] - 41:23
**enlisted** [1] - 147:15
**ensure** [8] - 21:5; 22:2, 20; 25:3, 5, 12; 144:23; 155:17
**Ensure** [11] - 14:12; 64:4; 136:9, 17; 137:2, 16; 192:22, 24; 193:14
**enter** [1] - 92:13
**enteral** [40] - 16:17; 19:19; 20:3, 9, 16, 22; 21:1, 3; 22:18; 23:10; 24:17, 25; 25:16, 25; 26:1, 10, 12; 27:8; 28:18; 46:15; 63:3, 6, 15; 83:7; 89:21; 90:12; 116:12, 22; 130:8, 12; 140:6; 141:12; 142:6; 154:21, 24; 156:22; 174:15, 22; 193:15
**enterally** [7] - 19:16; 22:23; 65:6, 10; 90:12; 91:15; 92:3
**entered** [1] - 30:1
**entertained** [1] - 24:16

entire [2] - 6:16; 202:1
entitled [2] - 6:11; 203:11
entry [12] - 56:20; 57:7; 60:9, 12; 63:23; 129:19; 149:17; 187:13; 188:6; 189:5
environment [5] - 17:15; 24:11; 82:15; 102:11; 104:15
episode [2] - 48:1; 122:6
equipment [1] - 125:19
equipped [2] - 77:19; 82:24
equivalent [1] - 105:8
Eric [4] - 1:17; 4:9; 8:10; 95:21
eric.lewis@lewisbaach.com [1] - 1:20
eroded [3] - 48:13; 49:1, 12
error [1] - 88:3
Escew [1] - 112:25
Esco [2] - 112:8, 25
especially [6] - 45:15; 47:8; 54:15; 57:19; 70:17; 93:22
Esq [2] - 1:13, 17, 21; 2:2, 7
essential [1] - 8:16
essentially [5] - 10:2; 28:2; 29:13; 122:25; 154:10
establish [2] - 48:16; 120:7
established [2] - 5:12; 89:7
establishing [1] - 20:16
esteem [1] - 139:14
estimate [2] - 159:25; 165:9
estimated [1] - 40:14
estimates [1] - 199:9
estimation [1] - 171:25
et [1] - 1:7
ethical [6] - 89:15, 25; 172:3, 6-7; 176:1
ethics [6] - 48:21; 91:16; 101:19; 102:14; 171:18
Ethics [1] - 175:4
ethnic [3] - 103:12, 16; 122:18
etiology [1] - 120:13
eval [3] - 183:25; 184:1
evaluate [4] - 66:25; 68:7; 69:19; 105:3
evaluated [8] - 73:10; 103:23; 105:5, 9; 118:9; 158:10; 177:17; 183:13
evaluating [1] - 93:22
Evaluation [1] - 35:21
evaluation [26] - 51:7; 54:4; 63:2, 14; 70:12; 76:1, 18; 79:12, 17; 105:1, 21; 122:19; 125:14; 132:4; 137:24; 139:5; 142:19; 144:25; 146:2; 152:2, 8, 13, 15; 158:11; 184:4, 6
evaluations [1] - 35:22
eve [1] - 11:14
evening [1] - 148:20
event [1] - 22:1
eventually [1] - 201:7
evidence [23] - 6:8; 9:20; 12:17; 14:22; 16:5; 17:19; 20:16; 21:23; 23:25; 26:19; 29:22; 38:6; 44:4, 9; 78:15, 23; 79:11,

17, 21; 97:6; 143:8; 177:16, 19
evidentiary [1] - 178:7
evidently [1] - 141:12
ex [1] - 111:8
exacerbate [4] - 58:4, 6, 16; 94:10
exacerbated [3] - 17:10; 64:22; 65:2
exact [2] - 26:10; 87:11
exactly [7] - 75:1; 76:11, 20; 77:11; 148:14; 162:3; 180:18
exam [4] - 51:14; 52:2; 85:13; 195:14
examination [41] - 5:19; 6:11, 13; 7:1, 3, 5, 17, 23; 36:19; 37:23; 39:16, 24; 42:12; 50:24; 51:3, 8; 52:17; 57:15; 60:23; 65:4; 67:20; 72:1, 18; 73:11, 16; 75:11, 16; 76:3, 17, 25; 78:2; 83:6; 85:14; 93:12; 97:25; 159:23; 167:14; 179:21
EXAMINATION [14] - 31:18; 72:23; 93:8; 98:17; 106:7; 115:4; 160:16; 204:6
examinations [1] - 79:9
EXAMINATIONS [1] - 204:3
examine [6] - 7:2; 72:14; 135:16; 136:20; 192:1; 197:12
examined [11] - 36:20; 67:7, 18; 123:10; 124:17; 179:10; 188:11, 18-19, 22
examining [2] - 37:4; 39:5
example [9] - 21:6; 23:5; 59:10; 64:8; 66:6, 9, 13; 105:15; 182:24
examples [1] - 159:10
exams [1] - 93:19
except [4] - 9:23; 69:21; 91:23; 154:22
exception [3] - 16:19; 67:11; 97:10
exceptional [1] - 13:5
exceptions [2] - 16:16; 61:19
excessive [4] - 22:18; 26:19; 27:17; 29:13
excluded [3] - 30:1, 7, 20
exclusion [1] - 122:25
excuse [3] - 4:10; 13:24; 56:22; 58:20; 80:5; 114:23; 120:15; 128:5; 134:17; 140:23; 145:8; 164:10; 179:2
excused [2] - 95:17; 203:6
executive [2] - 173:24; 174:4
exercise [2] - 115:23; 158:24
exercised [1] - 142:9
exercises [2] - 104:14; 115:22
exhibit [16] - 32:1, 5, 9-10, 22-23; 33:2; 42:10; 55:14; 56:15; 65:13; 97:7, 15; 139:16; 155:8; 194:24
Exhibit [53] - 32:1, 6, 19; 34:9; 38:25; 39:2; 42:9, 12; 43:2; 44:1, 11, 13, 17, 19; 49:18, 23; 58:18; 63:20; 65:16; 78:3; 79:23, 25; 81:5, 11; 86:6, 14; 95:3; 110:10; 129:16; 130:5; 134:7; 154:15; 155:8, 10; 158:5; 162:16; 170:25; 175:13; 178:20; 187:1; 190:11; 198:14; 204:16
exhibiting [1] - 52:25

EXHIBITS [1] - 204:14
exhibits [15] - 32:7, 13-14, 16, 18; 33:1, 21; 37:25; 38:2, 24; 54:25; 55:12; 97:24; 195:7
expect [2] - 143:17; 146:7
experience [9] - 19:21; 52:21; 84:11; 103:12, 14; 154:4; 158:12, 18; 177:6
experienced [1] - 35:10
experiment [2] - 16:21; 143:11
expert [29] - 7:15; 31:16; 35:24; 36:3, 7, 9, 12; 97:10, 19; 98:9; 105:25; 106:12, 16, 21; 111:8; 112:23; 113:8; 114:24; 115:2; 118:1, 3; 151:4; 156:4; 159:8; 177:7, 16, 24
expertise [4] - 177:10; 178:9, 14; 195:15
experts [1] - 29:15
expiration [1] - 28:13
expire [1] - 139:24
expires [1] - 28:14
expiring [1] - 151:14
explain [7] - 59:23; 121:3; 122:3; 123:19; 124:7, 22; 127:23
explained [2] - 47:11, 17
explanation [8] - 66:6, 21; 120:15; 131:17; 143:9; 144:2, 5; 165:13
explanatory [4] - 42:2; 46:10; 66:4
explored [1] - 95:14
express [1] - 8:15
expressed [2] - 143:2; 179:14
expressing [1] - 143:21
expression [4] - 52:23; 77:4; 126:23; 138:19
extend [1] - 9:25
extended [3] - 23:21; 40:24; 62:10
extends [1] - 40:18
extension [1] - 118:7
extensive [6] - 24:9; 42:22; 62:16; 127:16; 181:3
extensively [1] - 78:24
extent [1] - 109:13
extra [3] - 57:9, 22; 58:3
extracted [4] - 26:1; 49:5; 65:11; 150:24
extraction [9] - 11:2; 26:16; 63:18; 64:13; 84:4; 149:24; 150:15; 151:2
extractions [6] - 40:14, 16; 47:21; 49:4; 69:24; 154:5
extraordinary [2] - 18:24; 27:22
extreme [1] - 195:1
extremely [3] - 12:22; 16:5; 129:24
extremities [1] - 195:5
eye [1] - 171:9
eyes [1] - 118:5

# F

F.Supp.2d [1] - 24:19
fabricate [1] - 182:4

**face** [16] - 9:3; 20:5; 41:1; 51:17, 21; 74:24; 146:3; 147:1, 24-25; 148:5
**face-to-face** [2] - 146:3; 147:1
**facilities** [3] - 62:7, 9; 90:9
**facility** [4] - 74:5; 128:11; 129:9; 131:23
**facing** [1] - 13:6
**fact** [28] - 7:19; 9:22; 25:8; 26:14; 27:9; 47:25; 48:15; 49:7; 54:9; 63:8; 77:13; 79:20; 83:10; 88:7; 90:1, 4; 91:23; 108:5; 121:21, 25; 123:7, 24; 124:2; 138:17; 146:11; 148:4; 150:24; 195:18
**factor** [1] - 103:10
**factors** [1] - 164:4
**facts** [2] - 30:19; 183:6
**factual** [2] - 18:23; 182:21
**faculty** [3] - 34:20, 25; 101:13
**failed** [4] - 26:18; 151:3; 155:14; 183:20
**fainting** [1] - 52:14
**fair** [6] - 15:23; 148:11; 165:19; 172:10; 195:16, 22
**fairly** [5] - 48:15; 84:22; 103:18; 128:25; 138:8
**faith** [2] - 19:10; 47:19
**faking** [4] - 52:13-15; 53:1; 126:1; 162:23
**false** [3] - 15:11; 22:19; 183:8
**familiar** [7] - 77:23; 78:1; 83:7; 116:4; 184:21; 187:7; 191:11
**families** [1] - 172:19
**family** [6] - 101:7; 138:5, 15; 143:24
**far** [5] - 17:16; 70:20; 92:14; 145:1; 159:17
**Farhan** [1] - 110:21
**fashion** [1] - 20:17
**fast** [1] - 16:18
**faster** [1] - 23:3
**fasting** [1] - 146:20
**fatal** [1] - 185:15
**fatigued** [1] - 135:8
**fault** [2] - 79:9; 191:17
**favor** [2] - 91:14; 148:14
**Fax** [9] - 1:20, 24; 2:5, 10, 14, 19, 23; 3:5, 10
**FBI** [1] - 179:13
**FCE** [3] - 26:23; 64:14, 20
**FCE'd** [7] - 11:4; 14:23; 64:18; 65:6; 149:20; 152:1; 153:21
**FCE'g** [1] - 12:9
**FCEs** [2] - 27:4; 153:24
**features** [1] - 120:11
**February** [11] - 15:16; 28:14, 22; 45:2; 85:21; 86:17; 139:24; 151:11, 14; 171:11
**feces** [1] - 25:10
**fed** [11] - 9:1; 12:6; 13:12; 22:23; 65:6, 10; 90:12; 130:10; 154:24; 156:8
**Federal** [6] - 2:12, 21; 3:7; 11:25;

23:12; 36:3
**feed** [14] - 13:5, 14; 19:16; 23:10; 60:19; 90:16; 92:3; 129:22, 24; 130:2; 131:3; 149:18, 20; 154:25
**feeding** [59] - 9:7, 14; 10:25; 12:15, 20-21; 13:1, 7, 17; 17:11; 19:19; 20:3, 9, 16, 22; 21:1-3; 22:5, 8, 18; 24:17, 25; 25:16, 25; 26:1; 27:8; 46:16; 47:22; 49:4; 60:24; 61:7; 62:4; 63:15; 83:7, 10, 14, 17, 19, 21; 85:5, 25; 87:5; 89:21; 90:11; 91:15; 94:9; 130:8; 140:6, 10; 142:6; 154:21; 174:16, 22; 176:9; 193:15
**feedings** [16] - 11:4; 14:23; 16:17; 26:6, 10, 12; 63:4, 6; 116:12, 22; 141:12; 156:23; 157:1, 5, 8; 159:14
**feeds** [4] - 28:19; 130:12, 25; 149:22
**feet** [1] - 51:24
**feigning** [2] - 126:1; 146:20, 22
**fellow** [2] - 10:11; 104:6
**fellows** [1] - 101:14
**fellowship** [3] - 99:12; 100:15; 103:18
**felt** [11] - 48:8, 12; 49:11; 75:7; 92:2, 7; 94:10; 154:2; 158:8, 22
**fetching** [1] - 4:13
**few** [4] - 24:22; 27:20; 68:1; 71:22; 93:6; 95:18; 98:12; 181:23
**fewer** [1] - 83:16
**field** [4] - 37:10, 19; 105:25; 120:3
**fields** [2] - 36:7, 12
**fight** [1] - 115:23
**fighting** [1] - 115:23
**figure** [2] - 19:23; 182:20
**file** [2] - 14:1; 111:14
**filed** [9] - 32:8, 15; 65:13; 73:15; 111:11; 197:24; 198:9, 12
**files** [1] - 181:2
**films** [2] - 78:18; 79:5
**final** [1] - 201:17
**finally** [6] - 6:6; 25:14; 26:21; 27:18; 28:25; 184:13
**findings** [5] - 51:2, 8, 22; 52:1; 184:1
**fine** [5] - 42:19; 96:6; 97:17; 98:15; 201:22
**finely** [1] - 125:22
**finish** [6] - 41:7; 164:10; 193:9; 198:25; 200:11; 202:1
**finished** [1] - 153:10
**fire** [1] - 60:17
**fire-like** [1] - 60:17
**firewalled** [1] - 48:22
**First** [1] - 173:9
**first** [39] - 4:6; 5:16, 20; 7:15; 12:20; 13:14; 21:1; 29:25; 30:4; 31:6; 32:25; 34:23; 45:3; 59:12; 60:11; 78:13; 80:23; 100:22; 101:23; 104:7, 17-18, 20; 110:19; 116:2; 118:24; 119:25; 122:24; 139:19; 146:17; 151:3; 153:20; 155:21; 169:17; 173:11; 194:22; 196:4; 198:8
**fit** [1] - 158:23

**five** [16] - 14:20; 16:4, 6; 18:4; 63:18; 71:23; 95:22; 105:8; 111:5; 154:20; 156:17; 157:1; 158:12; 169:14; 198:1; 200:1
**five-point** [7] - 16:4, 6; 63:18; 154:20; 156:17; 157:1; 158:12
**flank** [2] - 41:16; 51:13
**flatly** [1] - 14:25
**floor** [1] - 9:3
**fluent** [1] - 103:18
**Flury** [1] - 112:7
**focus** [4] - 20:7; 35:8; 73:4; 163:11
**focused** [1] - 73:5
**focuses** [1] - 73:2
**follow** [5] - 6:25; 30:23; 144:23; 145:25; 191:19
**follow-up** [1] - 144:23; 145:25
**followed** [1] - 172:8
**following** [2] - 67:10; 116:20
**Following** [1] - 199:4
**follows** [1] - 186:11
**food** [9] - 10:15; 14:12; 25:23; 63:8, 10-12; 91:24; 94:17
**foot** [3] - 17:23; 65:1
**FOR** [1] - 1:1
**Force** [1] - 153:22
**force** [32] - 9:1, 7, 14; 11:4; 12:6, 20-21; 13:1, 5, 7, 12, 14, 17; 16:2, 10, 13; 26:18, 20; 27:17; 47:22; 49:4; 50:11; 60:24; 84:24; 140:6, 10; 141:2; 155:18; 156:8; 157:8; 174:24
**force-fed** [4] - 9:1; 12:6; 13:12; 156:8
**force-feed** [2] - 13:5, 14
**force-feeding** [12] - 9:7, 14; 12:20; 13:1, 7, 17; 47:22; 49:4; 60:24; 140:6, 10
**forced** [10] - 9:2; 26:16; 40:16; 49:3; 63:17; 69:24; 90:11; 141:11; 144:7; 155:16
**forceful** [1] - 63:16
**forces** [5] - 100:22; 104:16; 115:22; 116:2; 141:13
**Forces** [1] - 100:13
**forcible** [10] - 11:1; 40:14; 47:21; 64:12, 14; 84:4; 149:23; 150:15; 151:2; 154:5
**forcibly** [3] - 25:25; 27:15; 65:10
**forcing** [2] - 18:25; 155:16
**foregoing** [1] - 203:10
**foreign** [2] - 61:13, 24
**Forensic** [1] - 35:20
**forensic** [2] - 35:22; 73:5
**forget** [1] - 188:19
**forgive** [1] - 114:16
**form** [11] - 21:3, 25; 23:19; 103:15; 133:17; 137:14; 138:11; 187:8, 10, 12; 193:7
**former** [2] - 34:19; 140:5
**formerly** [1] - 34:19

**forms** [1] - 66:6
**Fort** [14] - 100:9, 21; 104:16; 107:13, 21, 25; 108:3, 6, 11; 109:1, 7; 166:20
**forward** [9] - 5:8; 12:25; 29:22; 33:16; 37:15; 95:20; 134:22; 140:22; 202:7
**foundation** [1] - 145:10
**founded** [1] - 169:10
**four** [7] - 11:9; 36:22; 100:1; 127:12; 146:13; 171:2
**fracture** [4] - 17:8; 69:23; 78:24
**fractures** [1] - 69:12
**Francisco** [2] - 99:7, 14
**Frank's** [1] - 112:17
**Franks** [2] - 112:14, 18
**free** [1] - 17:25
**frequency** [2] - 70:4; 80:24
**frequent** [1] - 154:5
**frequently** [1] - 36:1
**Friday** [1] - 5:15
**frightening** [1] - 158:20
**front** [6] - 39:4; 55:19, 21; 56:18; 78:11; 95:4; 98:3; 118:23; 119:5
**full** [12] - 4:5; 6:9; 34:24; 50:7; 51:6; 54:4; 79:11; 98:19; 158:11; 168:12; 180:23; 194:22
**fully** [2] - 63:2; 158:8
**function** [2] - 59:21
**functions** [1] - 121:7
**fundamental** [2] - 74:22; 157:23
**furthermore** [1] - 133:18

### G

**Gafe** [2] - 112:12; 113:1
**gagging** [1] - 22:11
**gain** [2] - 16:11; 155:15
**gaps** [1] - 113:17
**gastric** [1] - 17:3
**gather** [2] - 95:9; 114:23
**gear** [1] - 150:3
**general** [23] - 83:24; 84:11; 87:14; 88:15, 19; 99:4, 17; 100:24; 110:7, 13; 115:8; 116:22; 128:22; 140:1; 157:2; 158:16; 162:20; 166:15, 17; 168:12; 171:14; 195:16
**General** [55] - 97:20; 98:9, 13, 21, 25; 99:16; 100:6; 101:2, 4, 20; 102:16, 22; 104:18; 115:6, 12, 16; 117:13, 20; 118:13; 119:1, 18, 25; 120:25; 122:2; 124:24; 125:22; 127:19; 128:9; 129:21; 130:17; 131:12; 132:25; 133:10; 134:2; 135:4; 138:23; 141:5; 146:17; 147:23; 149:12, 23; 150:14; 151:6, 11, 23; 152:5, 19; 153:14, 23; 155:19; 156:7; 157:10; 158:4, 10; 159:8
**generally** [3] - 88:9, 11; 120:8
**genies** [2] - 45:7, 23
**gentlemen** [1] - 4:3
**Georgia** [2] - 100:15; 101:16

**Germany** [1] - 115:23
**get-tough** [1] - 9:25
**Ghaith** [3] - 177:25; 178:21; 179:11
**Ghaith's** [2] - 179:12
**Ghraib** [1] - 170:6
**gist** [1] - 176:12
**given** [13] - 11:21; 15:19; 27:11; 63:21; 94:5; 120:16; 127:12; 143:6; 180:15, 17; 185:19; 187:4
**glad** [2] - 6:17; 48:9
**GLADYS** [1] - 1:10
**glass** [1] - 119:2
**goal** [2] - 9:18, 22
**Gordon** [1] - 166:20
**gosh** [1] - 160:11
**governing** [1] - 89:21
**Government** [1] - 112:9
**government** [58] - 4:18; 5:17, 21; 6:2, 10; 7:1, 25; 9:10, 22-23; 10:2, 7, 18-19, 23; 11:11, 15-16, 18, 22; 12:4, 9, 11, 14; 14:1, 24; 18:15; 20:15; 31:15; 32:20; 33:5; 38:8, 14; 42:8, 24; 43:9, 13; 44:5; 55:13, 16, 20; 62:8; 72:4; 98:8, 13; 106:4, 10, 24; 111:22; 142:14; 152:20; 159:24; 197:17; 199:6; 200:7
**Government's** [4] - 86:14; 95:3; 178:20; 187:1
**government's** [9] - 7:7; 28:5; 33:12; 43:10; 55:17; 61:21; 72:9; 117:14, 16
**graduated** [3] - 99:3, 24; 184:18
**granted** [1] - 25:18
**gratuitous** [1] - 10:5
**Graves** [1] - 112:14
**great** [10] - 68:13; 81:25; 83:21, 25; 84:6; 85:25; 87:5; 88:16; 115:15
**Greek** [3] - 103:18
**grievous** [1] - 14:17
**ground** [1] - 9:2
**grounded** [1] - 169:8
**grounds** [2] - 44:6; 169:11
**Group** [13] - 35:21; 52:4, 10; 65:25; 130:8, 18-19, 22, 24; 131:13; 141:19; 154:23; 197:25
**group** [5] - 35:21; 97:24; 122:4; 128:18; 139:14
**groups** [1] - 35:18
**grow** [1] - 128:16
**GTMO** [3] - 13:15; 16:12; 75:19
**Guantanamo** [86] - 8:12; 9:7, 13; 11:16; 12:25; 15:13; 17:14; 18:23, 25; 19:6, 10, 21; 20:4, 8, 16; 21:4, 9, 12, 20; 22:1; 23:22, 25; 25:10, 18; 28:3, 9, 21; 29:4, 6-7, 15, 20; 30:18; 36:5, 20-21; 37:1; 40:2, 4, 11; 47:19; 48:16; 53:22, 25; 54:10; 64:16; 65:14; 68:19, 22; 73:11, 16, 20-21; 77:25; 89:10; 104:19; 105:2, 6, 8, 13, 16, 22; 111:23; 116:5; 117:17; 125:6, 16, 20; 129:9; 130:9; 132:18; 134:16; 143:5; 145:2; 152:7; 157:13; 173:10; 174:16, 22;

181:25; 182:2, 5; 184:11; 186:7, 11; 187:10
**guarantee** [1] - 11:17
**guard** [10] - 16:2; 26:18; 50:11; 59:21; 141:2, 13; 143:14; 144:3, 10; 155:18
**guarded** [1] - 112:7
**guards** [9] - 9:4; 24:7; 25:6; 63:9; 64:24; 132:8, 15; 139:10; 195:4
**guess** [6] - 6:1; 105:19; 112:11; 113:14; 200:17; 202:2
**guideline** [1] - 142:13
**guidelines** [6] - 74:23; 89:6, 16; 90:2; 92:25; 136:14
**Gulf** [3] - 100:22; 104:17; 116:2
**gun** [1] - 16:22
**Gutierrez** [2] - 112:10, 25

### H

**habeas** [1] - 105:10
**Haggerton** [2] - 112:8, 25
**Hail** [1] - 110:23
**half** [4] - 160:10; 165:9; 171:25; 172:12
**Hammond** [1] - 112:12
**hand** [8] - 31:25; 33:8; 38:1; 42:25; 43:4; 59:6; 163:25; 164:3
**handed** [3] - 44:25; 56:15; 97:23
**handful** [1] - 26:13
**handing** [3] - 49:20; 86:7; 178:19
**hands** [3] - 41:16; 196:21; 197:9
**happenchance** [1] - 84:17
**happy** [6] - 53:24; 67:14; 72:2; 149:8; 151:12; 182:2
**hard** [11] - 38:19; 48:16; 80:2, 6-7; 119:10; 148:12; 182:19; 192:11
**hardships** [1] - 138:5
**harkens** [1] - 146:23
**harm** [10] - 12:8; 13:18, 22; 14:17; 19:15; 29:13; 92:11, 21; 142:25; 195:3
**Harm** [1] - 173:9
**harm's** [1] - 173:11
**harming** [1] - 13:1
**harsh** [1] - 17:1
**Hartford** [3] - 85:11; 86:2, 16
**Hatim** [1] - 9:16
**head** [2] - 68:14; 123:17
**headaches** [2] - 40:19; 45:7
**heal** [1] - 146:21
**healer** [3] - 47:1, 4
**healers** [2] - 53:13; 172:24
**health** [32] - 12:24; 13:1, 8, 20; 19:4, 11; 20:5; 23:19; 24:3; 25:13; 31:23; 34:14; 64:21; 101:18; 108:1; 129:2, 11-12; 138:12, 24; 139:4; 145:1; 146:16; 147:9, 12, 14, 16; 148:9; 152:7, 17; 169:23; 172:15
**Health** [7] - 34:15; 47:9; 127:21, 24; 128:11; 129:8; 144:16

**healthcare** [8] - 100:11; 108:4, 20, 22; 128:23; 133:14; 172:6, 18
**healthier** [1] - 141:10
**healthy** [7] - 138:13; 139:4; 142:7; 157:4, 6
**hear** [8] - 6:23; 14:22; 33:9; 48:9; 93:13; 97:8; 160:6; 162:14
**heard** [3] - 4:15; 61:4; 73:10
**HEARING** [1] - 1:9
**hearing** [10] - 5:9; 11:14; 20:15; 43:19; 85:14; 88:7; 112:13; 178:7; 202:2
**hearsay** [1] - 179:11
**heavy** [1] - 64:5
**held** [8] - 11:23; 21:7; 100:7, 16; 101:22; 102:1; 115:10
**help** [9] - 57:22; 58:12; 66:15; 121:25; 137:16; 142:6; 173:5; 175:20; 193:8
**helped** [1] - 57:24
**helpful** [6] - 45:15; 58:10; 67:24; 71:7, 11; 78:21
**helps** [1] - 59:22
**hematuria** [2] - 79:10; 82:2
**Henry** [2] - 3:6; 4:21
**herself** [1] - 92:9
**high** [5] - 18:21; 29:11, 21; 83:19; 88:13
**high-quality** [1] - 29:21
**highlight** [2] - 189:9; 194:21
**highlighted** [8] - 78:8; 129:21; 134:22; 140:25; 146:19; 149:14; 165:11; 189:4
**highlights** [1] - 52:1
**himself** [5] - 10:14; 150:20; 192:1
**hip** [2] - 78:25; 79:1
**history** [15] - 9:7; 19:6; 39:17, 21; 40:10; 41:8; 69:12; 81:2; 119:22; 143:4; 144:19; 146:8, 19; 183:9
**hit** [1] - 84:17
**hmm** [3] - 121:2; 164:22; 199:19
**hoarseness** [1] - 22:13
**hold** [5] - 7:3; 36:23; 87:1; 101:20; 202:23
**holding** [5] - 8:23; 38:9; 56:9; 170:24; 180:22
**holds** [1] - 25:1
**honest** [3] - 108:13; 181:15
**Honor** [146] - 4:4, 9, 19; 7:13, 21; 8:2, 7, 24; 14:5; 17:22; 18:17, 21; 19:4, 9, 11, 20; 20:3, 7, 15, 23; 21:1, 6, 18; 22:17; 23:8, 23; 24:2, 15-16; 25:14; 26:7, 21; 27:6, 18; 28:25; 29:2, 18, 24; 30:3, 10, 17, 24; 31:14; 32:21; 33:13, 20; 34:2, 6; 37:9, 14, 17, 20; 42:8, 24; 44:2, 6; 46:13; 49:18; 54:23; 55:10; 56:10; 59:3; 60:4; 68:7; 71:21; 72:10, 19-20; 80:5, 7; 84:15; 86:5; 88:21; 92:13; 93:4, 6, 11, 16; 95:6, 21; 96:14, 23; 97:11, 15, 19, 22; 98:8; 102:15, 19; 105:24; 106:5; 113:23; 114:22, 25; 115:3; 118:22; 119:10; 128:1; 133:3; 134:7; 145:14, 18, 21, 24; 147:3, 21;

148:25; 150:5, 7, 12; 151:4, 6, 9; 152:25; 153:12; 154:16; 155:7, 24; 159:22; 160:2; 164:21; 165:8; 167:12; 170:25; 171:7, 9, 21; 173:3; 175:8, 13; 178:17, 19; 179:3; 198:10, 13-14, 16, 20; 199:9, 12, 16, 19; 200:2; 201:24; 202:9
**Honor's** [1] - 10:12
**HONORABLE** [1] - 1:10
**honored** [1] - 170:1
**honors** [2] - 99:3; 168:12
**Hood** [2] - 100:9
**hope** [8] - 5:12; 7:11; 96:10; 98:3; 153:9; 154:16; 187:15; 200:8
**hopeful** [1] - 7:8
**hopefully** [5] - 5:13; 71:13; 103:19; 134:1; 159:25; 186:5
**hoping** [3] - 6:6; 172:24; 187:4
**horrible** [1] - 199:9
**Hospital** [1] - 34:18
**hospital** [7] - 21:10; 24:11; 25:21; 28:18; 39:16; 61:8; 62:3; 68:18, 22; 84:13; 91:17; 100:19, 21; 109:10; 184:21, 24; 185:1
**hospitals** [2] - 166:22; 184:21
**host** [1] - 102:14
**hour** [2] - 160:9; 165:9
**hours** [12] - 39:14; 75:15; 109:19; 161:3; 187:24; 188:8; 189:19; 190:7; 191:8, 21
**housekeeping** [2] - 7:13; 96:24
**Human** [1] - 35:20
**human** [3] - 8:16; 9:7; 42:3
**humane** [2] - 9:11; 20:17; 65:10
**humanity** [1] - 18:9
**humiliating** [1] - 13:3
**hundred** [1] - 181:13
**hundreds** [7] - 84:1; 136:15; 174:13; 181:16; 184:19
**hunger** [47] - 8:12; 9:9, 15; 10:1, 11; 13:2; 16:25; 18:8; 20:13; 23:24; 35:7, 13; 36:14; 71:6; 73:10; 74:20, 23, 25; 75:2, 5; 85:23; 87:13, 15; 89:6, 16; 90:6; 92:24; 94:13, 18, 22, 25; 104:24; 105:22; 138:17, 25; 139:3, 6; 176:9, 14, 19; 177:1, 4
**Hunger** [1] - 37:11
**hurry** [1] - 171:21
**hurt** [3] - 17:20; 131:10; 143:21
**hydration** [1] - 22:25
**hygiene** [1] - 15:9
**hypocratic** [1] - 173:12
**hysterical** [1] - 122:12

**I**

**idea** [4] - 4:23; 7:10; 51:12; 199:2
**ideal** [1] - 19:17
**identification** [15] - 34:9; 39:2; 44:1;

49:23; 86:15; 175:12, 14; 178:20; 187:2; 204:16, 19
**identified** [2] - 118:1; 121:9
**identify** [3] - 4:7; 127:1; 142:7
**identifying** [2] - 80:21; 146:18
**identifying/background** [1] - 144:18
**idiom** [1] - 165:13
**II** [1] - 120:7
**III** [1] - 120:8
**illegally** [1] - 168:15
**Illinois** [1] - 23:16
**illness** [2] - 46:24; 94:20
**illnesses** [5] - 40:1; 103:9; 120:9; 128:14
**imaged** [2] - 67:5; 78:24
**images** [2] - 67:21; 68:1
**imagine** [1] - 17:22
**imaging** [1] - 68:15
**immediate** [5] - 12:7; 15:5; 19:14; 22:11, 14
**immediately** [1] - 13:9
**Immigration** [1] - 36:2
**immigration** [1] - 29:9
**imminent** [1] - 14:8
**impact** [2] - 11:2; 53:3
**impacted** [1] - 64:21
**impair** [1] - 94:21
**impaired** [1] - 94:20
**impairments** [2] - 195:3, 7
**impingement** [2] - 77:16; 125:11
**implement** [1] - 16:23
**implemented** [1] - 10:2
**implications** [1] - 69:23
**important** [15] - 10:4; 13:14; 17:15; 39:25; 59:9; 67:16; 74:19; 78:20; 93:10, 18; 182:19; 184:5, 25; 185:1; 193:25
**impose** [2] - 46:13; 155:22
**impression** [3] - 59:22; 84:13; 135:4
**improper** [3] - 167:10; 168:11, 20
**improve** [1] - 19:11
**impugn** [1] - 182:10
**impugning** [2] - 82:25; 182:7
**in-court** [6] - 5:21; 199:5, 13-14, 18; 200:19
**in-general** [1] - 116:22
**inability** [1] - 70:4
**inaccurate** [1] - 171:22
**inaction** [1] - 170:17
**inactive** [1] - 24:12
**inadequate** [2] - 29:4, 10
**inappropriate** [2] - 66:16; 157:16
**incapable** [2] - 195:12; 196:5
**incentive** [4] - 15:8, 14; 16:21
**incentivize** [3] - 10:19; 16:18, 20
**incentivizing** [1] - 9:15
**incident** [1] - 151:24
**incidents** [5] - 26:5; 27:3; 157:16, 21; 158:1
**include** [3] - 53:10; 137:14; 195:23

**included** [1] - 120:16
**including** [7] - 64:16; 69:1; 104:4;
108:3; 116:22; 195:8, 21
**inconsistencies** [1] - 126:25
**inconvenience** [1] - 202:16
**indeed** [2] - 14:10; 27:11
**indefinite** [1] - 8:14
**independent** [4] - 35:22; 75:19;
105:25; 195:14
**indicate** [3] - 14:8; 47:3; 118:17
**indicated** [10] - 6:17, 19; 12:16, 18;
15:7; 63:3; 72:4; 128:12; 131:25;
143:22
**indicates** [1] - 80:20
**indicating** [2] - 51:25; 130:16
**indication** [3] - 124:19; 140:18; 186:21
**indications** [1] - 197:14
**indicia** [1] - 63:1
**indifference** [2] - 24:20; 29:20
**indifferent** [1] - 29:2
**individual** [11] - 5:1; 46:23; 62:13, 15,
19, 21; 82:25; 84:12; 122:18; 158:25;
195:1
**individual's** [1] - 176:2
**individualized** [5] - 16:7; 93:1; 137:11;
156:13, 15
**infant** [1] - 21:8
**infection** [4] - 23:19; 61:13, 22, 24
**infections** [1] - 24:2
**inference** [1] - 15:23
**inflict** [3] - 22:19; 23:7; 25:2
**influence** [1] - 122:13
**influences** [1] - 124:6
**inform** [5] - 7:19; 165:24; 184:2, 8;
202:12
**informed** [5] - 92:8; 134:18, 24; 198:3;
202:5
**informs** [1] - 165:20
**ingest** [1] - 133:18
**inhabit** [1] - 42:4
**inhabited** [1] - 66:12
**inhabiting** [1] - 66:8
**inhabits** [1] - 46:4
**inherent** [1] - 82:14
**inhuman** [3] - 47:23; 63:5; 95:1
**inhumane** [2] - 18:13; 49:3
**initiated** [1] - 13:9
**injunction** [5] - 18:25; 27:25; 28:5, 16
**Injunction** [1] - 27:22
**injunctions** [1] - 27:25
**injunctive** [1] - 21:25
**injured** [1] - 9:4
**injuries** [4] - 40:1; 103:9; 146:20, 22

**injury** [10] - 12:23; 20:6; 27:24; 40:2;
51:11; 52:15; 102:14; 125:4; 172:16
**inmate** [2] - 13:6; 16:11
**inmate's** [1] - 13:8
**inmates** [1] - 16:11
**insert** [2] - 24:9; 62:4
**inserted** [3] - 17:11; 61:5; 64:6
**inserting** [4] - 23:8, 10, 13; 64:8
**insertion** [5] - 17:5, 9; 21:13; 60:24;
62:2
**insertions** [1] - 61:11
**insight** [2] - 91:24; 94:18
**insisted** [1] - 181:21
**insistent** [2] - 117:2, 25
**insists** [2] - 50:12; 141:3
**installations** [1] - 108:4
**instance** [4] - 45:14; 61:8; 83:18;
144:3
**instances** [3] - 48:11; 84:9
**instead** [4] - 12:12; 34:4; 60:20;
179:11
**instinctive** [1] - 10:15
**Institute** [1] - 174:25
**institutional** [1] - 151:5
**instruction** [1] - 31:10
**instructions** [1] - 130:10
**instrument** [1] - 51:23
**insurance** [1] - 52:15
**integrated** [1] - 152:16
**intend** [4] - 7:24; 33:21; 97:24; 142:25
**intent** [2] - 143:21; 172:16
**intention** [1] - 143:2
**intentions** [1] - 82:22
**interact** [1] - 24:7
**interaction** [4] - 114:14; 132:22; 135:1;
154:12
**interactions** [5] - 132:7, 10, 17;
133:14, 23
**interest** [3] - 59:25; 92:2; 132:1
**interested** [2] - 42:6; 103:17
**interesting** [3] - 30:19; 51:14; 194:10
**intermittent** [1] - 80:24
**internal** [3] - 35:5; 36:12; 37:10
**internationally** [2] - 89:5, 17
**internist** [1] - 36:10
**internists** [1] - 53:12
**internship** [2] - 99:5; 101:24
**interplay** [1] - 124:3
**interrogation** [1] - 170:18
**interrogators** [1] - 172:25
**interrupt** [1] - 24:21
**interruptions** [1] - 140:19
**interval** [1] - 62:5
**intervene** [2] - 176:23; 177:3
**intervention** [4] - 19:14; 92:5, 10, 20
**interventions** [1] - 176:3
**interview** [4] - 39:12; 127:17; 147:17;
181:23
**interviewed** [1] - 75:14

**interviews** [4] - 41:11; 75:16; 161:5;
192:13
**intimately** [1] - 47:21
**intravenous** [1] - 83:18
**introduce** [6] - 6:7; 33:15, 17, 21; 97:2
**introduction** [1] - 32:22
**intubation** [2] - 17:8; 62:1
**invasive** [1] - 83:13
**investigation** [4] - 167:9, 16, 22;
168:14
**investigators** [2] - 167:17, 25
**invoke** [2] - 8:4; 30:4
**invoked** [1] - 114:18
**involve** [4] - 6:13, 20; 71:23; 105:1
**involved** [17] - 4:24; 36:16; 47:21;
48:12, 18; 49:2; 71:12; 101:8; 104:18;
107:7; 108:2; 111:2, 7; 115:16, 18;
116:7, 20
**involvement** [2] - 111:9; 116:10
**involving** [1] - 85:23
**Iran** [1] - 179:12
**Ireland** [1] - 176:20
**irrelevant** [1] - 155:25
**irreparable** [1] - 27:24
**Islamic** [3] - 47:1, 4; 53:13
**ISN** [13] - 16:1; 50:7, 9-10; 129:22,
24-25; 130:2; 139:21; 140:25; 141:1;
145:15
**ISO** [6] - 15:21; 57:10, 22; 58:3, 7, 14
**ISO-MAT** [6] - 15:21; 57:10, 22; 58:3,
7, 14
**Israel** [1] - 103:24
**issue** [19] - 5:10; 21:2, 18; 23:8; 24:15;
25:14, 17; 48:7; 55:11; 65:23; 66:24;
114:14; 125:23; 126:18; 157:20;
164:13; 178:11; 183:25; 197:10
**issue's** [1] - 26:2
**issued** [1] - 175:4
**issued/allowed** [1] - 139:21
**issues** [10] - 11:22; 12:3; 20:7; 21:16;
94:17; 106:11; 123:19; 136:21; 157:23;
198:23
**issuing** [1] - 18:24
**it'd** [4] - 30:18; 32:9; 148:8, 16
**it'll** [1] - 200:2
**item** [1] - 184:9
**items** [13] - 15:24; 57:17, 19, 25; 58:2,
6, 12, 15; 59:15; 60:1; 71:22
**itself** [2] - 15:16; 50:16
**IV** [7] - 120:6, 8; 165:18; 166:6-8, 10

**J**

**Jadoo** [3] - 112:12; 113:1, 3
**jail** [2] - 108:5, 13
**jailer** [1] - 13:16
**jammed** [1] - 60:18
**JDG** [2] - 130:16
**jeisenberg@horvitzlevy.com** [1] -

2:10
**Jevity** [1] - 64:3
**JIHAD** [1] - 1:3
**jinn** [2] - 46:2; 66:12
**jinns** [9] - 42:3; 45:24; 46:8, 12, 22; 77:13; 124:5, 19
**JMG** [1] - 141:20
**job** [3] - 101:25; 170:3; 184:25
**jobs** [1] - 185:2
**Joint** [14] - 52:4, 10; 65:24; 130:8, 19, 22-23; 131:13; 139:19; 141:19; 153:22; 154:23; 172:14; 197:25
**joint** [1] - 57:22
**joints** [2] - 57:23; 130:18
**Jon** [1] - 2:7
**Jones** [5] - 111:25; 112:5, 11, 24; 113:1
**journals** [2] - 102:9
**JTF** [2] - 9:8; 13:15
**JTF-GTMO** [1] - 13:15
**Judge** [4] - 65:12; 178:21, 24; 179:9
**JUDGE** [1] - 1:10
**judge** [5] - 29:5; 90:15; 92:22; 133:19; 177:19
**judgment** [5] - 12:7; 13:10; 14:16; 19:2; 64:7
**Judiciary** [1] - 174:18
**July** [5] - 26:1; 67:5, 11, 18; 116:18
**jump** [2] - 140:22; 169:14
**June** [7] - 15:20; 36:19; 56:20; 57:5; 70:24; 149:17; 151:24
**junior** [2] - 104:10; 115:18
**juror** [1] - 23:13
**jury** [2] - 30:10; 177:20
**JUSTICE** [4] - 2:12, 17; 3:2, 7
**justice** [1] - 10:8
**Justice** [3] - 4:20; 18:20; 56:1
**justification** [2] - 27:4; 30:12
**justified** [1] - 138:7

## K

**Kaplan** [2] - 178:21; 179:9
**Kaplan's** [1] - 178:24
**Karachi** [1] - 36:3
**keep** [10] - 7:25; 15:18; 23:17, 21; 61:15; 62:9, 20; 99:9; 200:18; 202:4
**keeping** [1] - 61:12
**Kentucky** [1] - 100:21
**kept** [1] - 23:25
**KESSLER** [1] - 1:10
**Kessler** [1] - 65:12
**kicked** [1] - 25:9
**kidney** [3] - 15:2; 41:17; 70:15
**kill** [1] - 150:20
**kind** [11] - 17:17, 19; 18:8; 48:5; 82:1; 124:5; 137:17; 147:13; 148:1, 4; 187:8
**kinds** [3] - 124:1; 165:4; 172:4
**knee** [2] - 51:16; 57:10

**knowing** [2] - 29:12; 193:20
**knowledge** [10] - 11:8; 53:21; 54:4; 62:6, 16; 70:11, 22; 129:7; 157:11; 177:14
**known** [1] - 64:14
**knows** [4] - 94:25; 124:13; 125:7; 143:4; 144:8
**Kraft** [1] - 112:15
**Kyrgyzstan** [1] - 103:25

## L

**L5-S1** [1] - 125:12
**labs** [1] - 69:2
**lacks** [1] - 195:4
**ladies** [1] - 4:3
**language** [6] - 25:11; 79:4; 82:11; 156:4; 173:15
**Lantz** [2] - 85:19; 86:15
**lapsed** [1] - 113:16
**large** [2] - 23:24; 185:17
**largely** [1] - 47:18
**last** [19] - 6:21; 12:21; 19:25; 26:11, 17, 23; 32:9, 15; 39:10; 96:24; 111:5; 127:10; 146:12; 149:12; 174:10, 18; 187:14; 195:6
**lastly** [1] - 114:16
**lasts** [1] - 122:6
**late** [4] - 4:16; 7:8; 54:6; 129:19; 176:20
**Latif** [5] - 110:21; 112:1, 5; 136:5
**latter** [1] - 9:12
**law** [5] - 12:21; 26:21; 27:18; 29:17; 74:16
**lawsuit** [4] - 11:2; 168:16, 23
**lawyer** [3] - 89:23; 160:2, 5
**lawyers** [1] - 200:4
**lead** [1] - 20:5
**leadership** [3] - 25:18; 28:9; 171:19
**lean** [1] - 159:19
**learned** [2] - 157:15; 172:20
**learns** [1] - 171:13
**least** [8] - 4:25; 7:10; 12:15; 63:14; 83:13; 87:15
**leave** [4] - 12:14, 25; 22:16; 62:5
**leaves** [1] - 203:4
**leaving** [3] - 61:19, 24; 160:23
**leeway** [1] - 199:8
**left** [14] - 14:20; 17:13; 18:10; 27:15; 51:24; 54:10; 56:9; 62:15; 64:5; 188:20; 196:23; 197:1, 13
**leg** [17] - 40:24; 41:1, 6, 14; 51:6, 15, 19; 53:9; 66:12; 77:14; 139:22; 160:25; 196:9, 16; 197:1, 3
**legal** [4] - 18:23; 28:16; 89:21; 177:17
**legality** [1] - 11:25
**legislative** [2] - 173:24; 174:5
**legitimate** [4] - 9:18, 21; 71:8, 10
**length** [1] - 94:12

**lengthy** [1] - 199:1
**lesions** [2] - 54:3; 70:19
**Leslie** [1] - 1:17
**less** [5] - 9:9, 24; 16:23; 71:23; 113:16
**lessen** [1] - 182:4
**lessons** [1] - 172:20
**letter** [3] - 167:5; 174:10, 12
**Letterman** [4] - 99:5, 13; 104:7
**letters** [2] - 45:5; 163:11
**letting** [1] - 49:10
**level** [2] - 101:24
**levels** [1] - 155:14
**levity** [1] - 64:3
**LEWIS** - 1:13, 17; 2:3; 4:9; 8:7, 10, 24; 9:1; 11:8, 12; 14:4, 13, 15, 22; 18:12; 30:10, 22; 88:21, 24; 92:13; 95:18, 21; 96:2, 5, 9, 12, 14; 97:11, 16
**Lewis** [10] - 1:17; 4:9-11; 8:10; 18:11; 21:7; 30:17; 31:4; 95:21
**license** [1] - 34:24
**licensed** [6] - 34:21-23; 91:10; 100:3
**licensing** [1] - 89:13
**Lieutenant** [1] - 112:18
**lieutenant** [1] - 99:22
**life** [5] - 13:8; 14:8; 91:22; 143:24; 150:25
**light** [1] - 10:10
**likelihood** [1] - 27:23
**likely** [3] - 45:20; 68:5; 159:6
**limbs** [1] - 197:4
**limit** [1] - 160:9
**limited** [1] - 173:23
**line** [4] - 140:20; 150:6, 10; 187:21
**lines** [1] - 88:10
**lipoid** [1] - 10:22
**list** [5] - 32:16; 110:15; 111:1; 120:5
**listed** [9] - 35:15; 111:7, 11, 15-16; 126:5; 146:24; 166:4; 171:24
**listens** [1] - 22:6
**listing** [2] - 32:12
**literature** [4] - 17:4, 6; 84:20; 88:5
**litigation** [1] - 43:17
**live** [1] - 143:24
**lobbied** [1] - 173:24
**lobby** [1] - 174:1
**lobbyist** [4] - 174:1-3, 7
**located** [1] - 200:23
**location** [4] - 25:16, 25; 27:8
**locked** [1] - 150:21
**locus** [1] - 61:13
**log** [6] - 179:13; 185:24; 186:1, 12, 18, 21
**logistic** [1] - 198:23
**logistical** [2] - 97:23; 201:18
**logs** [2] - 186:4, 15
**London** [1] - 1:23
**long-standing** [1] - 40:10
**look** [46] - 15:15; 29:22; 38:14; 59:24; 65:21; 66:23; 70:18; 80:2; 110:9;

120:21; 123:1, 16; 126:12, 20; 131:6;
135:19; 136:8, 13, 16; 137:13; 144:13,
25; 149:12; 157:20; 158:16; 159:4;
160:22; 165:8, 19, 22; 180:21; 181:4, 6,
8, 10; 187:13; 188:5, 23; 189:4; 190:21;
191:16; 194:9; 197:18

**looked** [11] - 135:7; 137:22; 140:24;
146:23; 168:25; 169:13; 181:7, 13,
16-17; 183:19

**looking** [7] - 12:24; 38:9; 54:2; 87:3,
16; 163:7; 178:13

**looks** [5] - 50:17; 81:8; 130:22;
160:19; 189:12

**lose** [1] - 94:16

**loss** [2] - 41:1; 196:8

**louder** [1] - 72:12

**low** [2] - 69:10; 197:6

**lower** [4] - 41:1; 51:10; 155:14

**lubricated** [1] - 21:12

**lubricating** [1] - 10:21

**lumbar** [6] - 41:13; 45:15; 57:9, 21;
58:3; 67:4

**lunch** [3] - 55:6; 96:3, 7

**luncheon** [1] - 96:15

**lung** [1] - 22:10

**lungs** [1] - 21:22

## M

**ma'am** [2] - 99:11; 160:7

**machine** [3] - 3:16; 68:18, 21

**machines** [1] - 69:1

**magnifying** [1] - 119:2

**maintain** [5] - 15:8; 28:1; 63:4; 118:6;
139:13

**maintained** [1] - 25:13

**maintaining** [2] - 28:6; 74:25

**major** [5] - 20:24; 103:9; 105:18;
116:2; 165:21

**malignancy** [1] - 93:24

**malinger** [1] - 127:7

**malingering** [22] - 52:5, 7, 13, 19-20;
53:1; 119:24; 120:16; 121:4; 125:23-25;
126:11, 17, 21; 127:8; 146:24; 162:15,
19-20; 163:9, 20

**malnourished** [2] - 13:21; 69:16

**malnutrition** [1] - 71:5

**Malta** [6] - 74:22; 89:8, 18, 20; 90:8;
175:25

**man** [8] - 69:16, 20; 70:17; 131:6;
138:9; 141:10; 142:5; 158:23

**man's** [2] - 135:19; 159:4

**managed** [1] - 171:13

**management** [2] - 89:6; 142:4

**managing** [2] - 20:13; 89:16

**manifest** [1] - 195:19

**manifestation** [1] - 124:14

**manifestations** [1] - 69:10

**manifests** [1] - 121:6

**manner** [3] - 20:8; 21:23; 25:15

**manners** [1] - 20:25

**manual** [3] - 120:3, 21; 165:22

**Manual** [1] - 120:5

**manufacturing** [1] - 52:13

**Marcus** [1] - 3:6

**mark** [2] - 42:21; 44:12

**marked** [19] - 32:1; 34:9; 39:2; 44:1,
13; 49:19, 23; 86:5; 175:12, 14; 178:20;
186:25; 187:2; 204:16, 19

**MARVIN** [75] - 30:24; 31:1, 4, 6, 14,
19; 32:3, 7, 15; 33:20, 25; 34:6, 10;
37:9, 20-21; 38:4, 7, 17, 19, 22; 39:3;
42:8, 17, 24; 43:8, 12, 15, 20, 22, 24;
44:2, 10, 13, 15, 17, 22, 24; 46:20;
49:18, 22, 24; 56:11, 13-14, 24; 57:3;
59:3, 6; 60:2, 4, 7; 62:24; 65:16, 18;
68:17; 71:21; 72:2, 19; 93:6, 9, 14, 16,
18, 25; 95:6, 11; 200:1, 13, 16; 201:1,
6; 202:9; 204:6, 8

**Marvin** [4] - 2:2; 4:11; 31:1, 4

**Maryland** [2] - 99:4; 100:5

**mass** [1] - 69:10

**Massachusetts** [5] - 2:13, 22; 3:3, 8;
34:22

**MAT** [6] - 15:21; 57:10, 22; 58:3, 7, 14

**material** [1] - 113:1

**materials** [3] - 6:14; 102:7; 117:7

**matter** [7] - 28:16; 69:10; 96:24;
158:21; 172:5; 178:21; 203:11

**matters** [2] - 48:19; 71:23

**max** [1] - 191:10

**Maythali** [3] - 110:23; 112:6, 24

**meals** [2] - 19:12

**mean** [105] - 28:6; 41:25; 48:4; 54:17;
58:12, 24; 64:8; 68:23; 80:20; 81:4;
101:6; 103:23; 104:4; 105:17; 109:16;
111:23; 112:2; 113:14, 18; 114:3;
115:20; 117:24; 118:1; 121:25; 122:25;
123:6; 124:8, 10; 125:7, 16; 126:22;
127:16; 128:12; 131:6, 20; 136:14;
138:3, 13, 18; 139:12; 140:20; 141:7,
23; 142:13, 21; 143:2, 11, 13, 16, 23;
144:4, 8-9, 11; 147:13; 150:2; 151:17,
22; 155:21, 23, 25; 157:2; 158:16,
23-24; 159:11, 18; 162:3, 5; 163:6;
172:16; 173:5; 180:17; 181:4, 13, 24;
182:7; 183:4; 184:7; 186:12; 190:21;
191:7, 10, 12, 14, 20; 192:22; 193:11;
195:16; 199:14, 24; 201:2

**meaning** [2] - 7:24; 140:4

**means** [5] - 126:5; 138:18; 141:2;
155:15; 163:12

**meant** [4] - 66:1; 77:11; 140:14;
190:19

**measure** [1] - 25:5

**measured** [1] - 27:16

**mechanic** [1] - 40:17

**media** [3] - 130:12, 25; 131:3

**medic** [1] - 132:19

**medical** [227] - 12:6; 13:16; 14:7, 25;
15:8, 17, 25; 17:4, 6, 12; 18:22, 25;
19:1, 3, 6-7, 9, 15, 20; 20:4, 8-9, 19;
21:14, 16, 20; 22:3, 20; 23:6, 14, 17,
25; 24:7; 25:6, 9; 27:7, 9-10; 28:2, 8,
12; 29:4, 6, 10, 12, 16, 21; 35:1, 8, 19;
37:5, 11; 38:10; 39:17, 21; 40:5, 8;
41:8; 42:7, 10, 15, 22; 43:1, 13; 44:21,
25; 45:1, 8, 22; 46:24; 47:8, 10-11,
14-15, 18-20; 48:7, 12-14, 21; 49:8, 13,
16, 25; 50:12, 14, 17, 19, 22-23; 52:4,
18; 53:1, 10, 14, 19; 54:12, 25; 55:11,
13, 15; 56:8, 16; 57:15, 18; 58:17, 25;
59:4, 10, 15, 22-24; 60:3, 23; 63:16,
20-21; 64:10, 20; 65:5, 8-9, 14, 22;
68:25; 70:6; 71:9, 16-17; 74:8, 10;
77:18, 20, 24; 79:23; 81:6; 82:10, 22;
88:5; 93:14; 98:9; 99:24; 100:3, 11, 18,
22; 104:10, 16; 106:2; 115:18; 116:1,
22; 117:4, 8; 118:23; 121:13; 127:23;
128:11, 22; 129:9; 131:13, 17-18, 25;
132:17, 23; 134:3, 16; 136:12; 137:7,
10, 12; 139:17, 20; 140:5, 7-8; 141:4,
13, 21-22; 142:4, 8; 146:10; 148:23;
151:12, 19; 152:2, 6; 156:10; 157:23;
171:18; 175:22; 176:17, 23; 177:3;
179:21; 180:10, 12, 23; 181:7, 14;
183:11, 19; 184:18; 186:6; 188:16;
193:25; 194:1, 3, 5; 195:14, 20

**Medical** [27] - 31:24; 34:16, 19; 35:8,
21; 52:10; 65:25; 74:23; 89:7, 13; 99:5,
22-23; 100:14, 18, 25; 101:1, 16; 130:8,
24; 139:18; 141:19; 166:18; 175:4

**medically** [9] - 12:16, 18; 15:4, 7;
20:17; 82:4; 132:1; 152:9

**medication** [10] - 133:17; 134:19;
135:11, 20; 185:6; 190:18, 21; 192:2;
193:7

**medications** [3] - 133:21; 185:2

**Medicine** [4] - 99:4; 173:15; 174:25

**medicine** [22] - 31:22; 34:13, 21, 23;
35:5; 36:13; 37:10; 48:2; 99:5; 103:1;
106:3; 137:1, 13; 151:7; 170:18; 172:1,
6, 9, 13; 173:18, 21; 190:22

**Medics** [1] - 170:15

**meds** [2] - 135:21; 136:3

**meet** [6] - 29:11, 16, 18; 39:7; 94:5;
147:1

**meeting** [7] - 39:8, 11, 17, 20; 47:4,
14; 146:3

**meetings** [1] - 30:20

**member** [2] - 35:17; 174:24

**members** [5] - 7:10; 101:7; 129:2;
138:5

**memo** [3] - 140:16; 148:14; 151:17

**memorandum** [9] - 139:18, 20, 23-24;
140:9, 13, 18; 141:5

**memorializes** [1] - 148:17

**memos** [1] - 142:21

**men** [3] - 69:10; 126:15; 128:13

**mental** [6] - 94:20; 120:3, 9-10; 128:14; 152:13
**mention** [6] - 82:1; 85:10, 12, 16; 196:23; 197:3
**mentioned** [7] - 28:9; 64:12; 65:12; 107:5; 123:23; 124:24; 137:19
**mere** [1] - 29:14
**merits** [1] - 26:15
**Mesquite** [1] - 12:1
**met** [6] - 22:21; 39:9, 13, 22; 47:3; 179:11
**metaphor** [1] - 124:21
**method** [4] - 83:7, 10, 13
**methods** [1] - 83:17
**metrics** [1] - 14:16
**mic** [2] - 5:4; 98:10
**mics** [1] - 31:11
**mid** [4] - 26:1; 129:20; 134:17; 200:9
**mid-July** [1] - 26:1
**mid-morning** [1] - 200:9
**mid-November** [1] - 129:20
**mid-September** [1] - 134:17
**Middle** [1] - 104:17
**midway** [2] - 45:4; 63:22
**might** [20] - 10:15; 40:1; 41:22; 42:2; 51:12; 57:20; 69:22, 24; 94:21; 108:15; 121:23; 124:10; 125:8; 126:24; 127:2, 23; 131:17, 24; 182:13
**migrainous** [1] - 40:20
**miles** [4] - 13:18; 14:11, 15; 200:13
**Miles** [1] - 6:24
**miles'** [3] - 14:2; 33:18, 20
**military** [31] - 74:4; 90:8; 99:20, 25; 101:4, 6-7, 12; 102:23; 103:15, 22; 105:9; 106:3; 115:6; 117:20, 23; 118:7; 126:13; 128:20; 147:16; 150:2, 17, 24; 151:7; 170:18; 171:18; 172:1, 9, 13; 173:18, 21
**Military** [4] - 36:5; 173:14
**milligrams** [1] - 187:17
**milligrams/5** [1] - 187:17
**milliliters** [4] - 22:7; 187:18, 21; 189:17
**mind** [5] - 121:13; 138:7; 148:19; 160:24; 162:7
**mindful** [1] - 12:22
**mineralization** [3] - 78:15; 79:2
**minimal** [3] - 26:18; 178:25; 179:9
**minimized** [1] - 21:5
**minimum** [1] - 5:13
**minus** [1] - 159:5
**minute** [8] - 13:24; 24:21; 38:11; 56:22; 58:20; 145:8; 155:5; 198:23
**minutes** [19] - 14:20; 23:3; 27:20; 39:15; 45:5; 54:17; 71:23; 75:12; 95:18, 22; 98:12; 152:24; 153:5, 9; 199:8, 12; 200:1
**miscellaneous** [1] - 130:11
**misplaced** [2] - 21:22; 22:10

**misplacement** [1] - 21:24
**misplacements** [1] - 22:15
**misrepresent** [1] - 182:11
**missing** [1] - 146:14
**mistakes** [1] - 194:9
**misunderstand** [1] - 43:7
**MO** [1] - 149:22
**mobility** [1] - 195:4
**model** [3] - 42:2; 46:10; 66:4
**modelled** [1] - 62:8
**moderate** [1] - 51:9
**Moderator** [1] - 173:9
**modern** [1] - 187:4
**modest** [2] - 22:21; 202:17
**moment** [3] - 28:17; 80:5; 134:10
**momentarily** [1] - 4:14
**Monday** [1] - 1:5
**monitoring** [1] - 14:7
**month** [4] - 9:5; 26:11; 39:10
**months** [11] - 11:7; 18:1; 105:8; 140:24; 147:17; 167:1
**mood** [1] - 138:8
**moot** [3] - 11:22; 25:17; 26:2
**MORNING** [1] - 4:1
**morning** [28] - 4:3, 9, 19; 6:3, 7, 9, 16, 23; 7:8; 8:7; 11:6; 30:24; 60:19; 72:6, 25; 73:1; 135:12; 188:11, 14; 189:14; 191:8; 200:9; 202:15, 17
**morning's** [1] - 5:8
**most** [24] - 13:14; 14:20; 17:6, 9; 19:21, 23; 21:3; 36:1; 40:22; 56:2; 68:3; 78:25; 83:20; 85:24; 87:4; 89:15; 103:6; 129:13; 141:25; 146:15; 171:12; 184:25; 185:1
**mostly** [2] - 40:19; 166:24
**Motion** [1] - 27:21
**MOTION** [1] - 1:9
**motive** [7] - 74:17; 182:4, 11, 13-14, 16, 18
**motor** [4] - 40:3; 182:25; 195:4; 197:4
**mouth** [1] - 187:22
**move** [7] - 27:13; 44:3; 60:3; 119:3; 144:14; 155:17
**moved** [1] - 101:25
**moving** [4] - 41:12; 42:14, 17; 70:1
**MR** [157] - 4:9, 19; 7:13, 15; 8:2, 7, 10, 22, 24; 9:1; 11:8, 12; 14:4, 13, 15, 22; 18:12, 17, 19; 19:25; 20:3; 23:23; 24:24; 26:7; 27:6, 21; 28:8, 23, 25; 29:24; 30:3, 7, 10, 17, 22; 32:21; 33:13, 17; 34:2, 4; 37:14, 17; 44:6; 46:13; 55:25; 56:4; 72:10, 13, 16, 20, 24; 76:15; 80:5, 11, 15; 85:2; 86:5, 11, 14, 19, 21, 23; 88:21, 24; 89:2; 92:13, 17; 93:3, 11; 95:18, 21; 96:2, 5, 9, 12, 14, 23; 97:2, 5, 11, 14, 16; 106:5, 8; 109:5; 113:23; 114:15, 22, 25; 128:1, 4; 145:6, 10; 147:3; 150:5; 151:4; 155:24; 160:2, 7, 9, 12, 17; 164:21, 23; 165:1, 5, 8, 10; 166:13; 167:15; 169:7; 170:24; 171:4,

7, 10, 21, 23; 173:3, 8; 174:8; 175:7, 10, 12, 15; 178:17, 19, 23; 179:3, 6, 8; 180:22; 181:1; 187:3; 190:11; 193:19; 194:21, 23; 198:10, 13, 16, 18, 20; 199:7, 19, 22; 201:7, 10, 12, 16, 23; 202:4; 204:7, 11, 13
**MRI** [10] - 45:14; 68:8, 18, 21; 69:1, 5; 125:3, 15
**MS** [145] - 30:24; 31:1, 4, 6, 14, 19; 32:3, 7, 15; 33:20, 25; 34:6, 10; 37:9, 20-21; 38:4, 7, 17, 19, 22; 39:3; 42:8, 17, 24; 43:8, 12, 15, 20, 22, 24; 44:2, 10, 13, 15, 17, 22, 24; 46:20; 49:18, 22, 24; 54:23; 55:10; 56:10, 13-14, 24; 57:3; 59:3, 6; 60:2, 4, 7; 62:24; 65:16, 18; 68:17; 71:21; 72:2, 19; 93:6, 9, 14, 16, 18, 25; 95:6, 11; 97:19, 22; 98:2, 6, 8, 12, 18; 99:15; 102:15, 19, 21; 105:24; 115:3, 5; 118:22, 25; 119:10, 13, 16; 120:24; 128:7; 133:2, 5, 9; 134:6, 9; 145:14, 18, 20, 23; 146:1; 147:21; 148:25; 149:2, 5, 8, 11; 150:7, 13; 151:6, 9-10; 152:22, 24; 153:4, 11, 13; 154:15, 18; 155:7, 12; 156:6; 158:3; 159:22; 167:12; 199:12, 16; 200:1, 6, 11, 13, 16; 201:1, 5-6, 21; 202:9; 204:6, 8, 10, 12
**Mudwani** [4] - 110:19; 111:25; 112:5, 24
**Mullen** [1] - 172:15
**multidisciplinary** [2] - 53:9; 75:18
**multiple** [8] - 11:21; 22:3; 25:9; 60:19; 61:5; 67:5; 78:14; 94:10
**Musab** [1] - 110:19
**muscle** [6] - 123:8, 25; 152:11; 184:3; 196:13; 197:5
**musculoskeletal** [2] - 195:2, 7
**Muslim** [1] - 47:5
**must** [4] - 29:12; 93:23; 172:24; 175:22
**mystifying** [1] - 40:23
**mythical** [1] - 46:3

## N

**name** [6] - 6:24; 8:10; 18:3; 31:1, 20; 98:19
**named** [1] - 5:20
**narcotics** [2] - 52:15; 163:3
**narrowing** [1] - 127:13
**nasal** [3] - 17:3; 64:4, 6
**Nashiri** [1] - 36:6
**nasogastric** [31] - 17:5, 8-9; 21:2; 22:5, 8; 23:9, 17; 25:3; 60:24; 61:5, 7; 64:9; 83:7, 10, 16, 20, 24; 84:2, 14; 85:5, 25; 87:5; 88:9, 11, 16, 19; 94:9; 130:10
**nasopharynx** [1] - 84:17
**nation** [1] - 18:14

**National** [1] - 173:10
**naturally** [1] - 72:6
**nature** [2] - 116:10
**near** [2] - 135:10; 153:10
**necessarily** [2] - 124:19; 200:11
**necessary** [11] - 15:4; 16:11, 13; 19:14; 26:19; 62:21; 92:5, 10, 20; 125:19; 156:21
**neck** [9] - 15:3; 40:18; 51:9; 57:12, 23; 58:4; 64:23; 65:3
**need** [16] - 21:25; 23:17; 29:12; 53:9; 68:8; 95:23; 119:2; 123:13; 125:2; 133:6; 156:4; 157:18; 164:4; 185:5; 188:8; 199:3
**needed** [3] - 172:17; 188:1; 190:1
**needs** [15] - 19:19; 20:20; 22:20; 24:12; 50:20; 61:7; 92:25; 99:9; 125:3, 10; 156:22; 157:6; 175:23; 200:7
**negated** [1] - 154:11
**negatively** [1] - 148:16
**neglected** [1] - 165:17
**negligence** [1] - 29:17
**Neoprene** [2] - 57:10
**nerve** [8] - 68:5-7, 10; 77:16; 84:18; 124:11; 125:10
**nervosa** [1] - 94:15
**neurobehavioral** [1] - 103:8
**neurological** [10] - 51:14; 81:7; 123:9; 183:25; 184:1, 4; 195:2, 7; 197:14
**neurologically** [1] - 152:9
**neurologist** [1] - 184:11
**neurology** [3] - 183:16, 21; 184:6
**neuropsychiatric** [1] - 103:8
**neuropsychic** [6] - 76:4, 8, 12, 19-20; 194:25
**never** [17] - 9:22; 18:5; 45:18; 50:18; 58:25; 107:14; 113:16; 124:12; 125:18; 142:13; 168:7; 179:10; 193:23; 197:19; 198:4; 200:4; 202:3
**New** [3] - 168:2; 178:3
**new** [2] - 55:3; 146:13
**news** [1] - 79:7
**next** [13] - 9:20; 22:17; 23:8, 10; 24:15; 32:8, 18; 78:22; 96:21; 97:11, 18; 110:23; 173:9
**NG** [1] - 60:20
**nice** [1] - 4:5
**Nicholas** [1] - 98:21
**night** [3] - 130:3; 135:8; 144:6
**nine** [1] - 111:4
**nobody** [1] - 174:6
**nocturia** [2] - 70:4; 80:24
**nominated** [3] - 170:1, 10
**nomination** [1] - 170:5
**non** [4] - 48:13; 63:16; 69:12; 84:23
**non-adversarial** [1] - 84:23
**non-forceful** [1] - 63:16
**non-medical** [1] - 48:13
**non-traumatic** [1] - 69:12

**noncompliant** [1] - 154:25
**none** [4] - 46:15; 73:23; 74:4; 78:14
**nonhuman** [1] - 46:3
**nonreligious** [1] - 146:20
**nontraumatic** [1] - 78:23
**noon** [1] - 189:24
**normal** [5] - 68:4; 79:3; 83:14; 158:9; 196:13
**normally** [3] - 61:7; 69:19; 106:16
**Northern** [1] - 176:20
**NOS** [1] - 119:22
**nose** [5] - 8:19; 9:2; 23:20; 60:17
**nostril** [2] - 64:5
**notation** [3] - 45:3; 63:22; 146:13
**notations** [1] - 194:5
**note** [19] - 41:14; 45:16, 25; 50:8, 16; 60:13; 70:8; 109:10; 113:25; 120:7; 130:13; 145:16; 146:8; 183:20; 184:5; 196:8; 197:11
**Note** [1] - 50:1
**noted** [10] - 78:15; 161:19; 163:2; 164:23; 192:14; 196:13, 18, 20; 197:11; 198:1
**Notes** [1] - 50:5
**notes** [4] - 81:17; 160:20; 176:18; 181:14
**nothing** [4] - 30:14; 95:13; 143:22; 173:1
**notice** [1] - 13:25
**notified** [3] - 16:1; 50:10; 141:1
**notwithstanding** [1] - 19:9; 20:20
**nourishment** [2] - 83:11; 142:6
**November** [6] - 63:23; 115:9; 129:18, 20; 130:6
**nowhere** [3] - 135:10; 153:10; 183:23
**number** [32] - 21:4; 22:2; 26:10; 32:8, 11, 18; 39:19; 40:14; 43:7, 16, 19, 21; 45:1; 48:11; 49:17; 55:4, 20; 56:17; 66:7; 102:9; 103:20; 104:8; 105:7; 106:13; 110:16; 121:8; 130:9, 11; 133:2; 140:23; 144:15; 157:16
**Number** [9] - 79:23, 25; 81:6, 12; 86:6; 118:24; 129:17; 130:5; 139:17; 149:13
**numbers** [7] - 42:25; 43:3, 11; 55:17; 56:4; 79:24; 109:14
**numbness** [1] - 40:25
**numerous** [1] - 73:15
**nurse** [14] - 48:1; 49:5; 60:18; 132:23; 133:18, 22; 134:18, 20, 25; 135:2, 20; 141:15; 191:19
**nurses** [5] - 181:14; 184:24; 185:1, 24; 186:17
**nursing** [2] - 141:16; 184:22
**Nursing** [1] - 50:1
**nutrient** [1] - 156:21
**nutrition** [5] - 13:19; 19:19; 24:12; 25:4; 157:6
**nutritional** [6] - 22:20, 24; 24:4; 25:23; 26:8; 63:7

**nuts** [3] - 14:13; 192:14, 16
**NW** [7] - 1:14, 18; 2:3, 13, 22; 3:3, 8

## O

**Oakland** [1] - 2:9
**oath** [1] - 173:12
**Obama** [2] - 4:7; 24:19
**OBAMA** [1] - 1:6
**object** [7] - 32:22; 33:1; 42:9; 44:6; 128:1; 151:4; 155:24
**objected** [1] - 36:11
**objecting** [1] - 42:11
**objection** [17] - 33:3, 12; 37:14, 17; 46:13; 92:13; 93:11; 97:10; 114:23; 115:12; 145:6, 9; 147:3, 5; 156:3; 167:12
**objection's** [6] - 46:17; 92:16; 93:20; 128:6; 151:8; 167:13
**objective** [1] - 146:5
**objects** [1] - 138:22
**obscuring** [1] - 189:10
**observation** [1] - 62:19
**observations** [3] - 41:11; 147:10, 18
**observe** [2] - 48:4; 132:17
**observed** [3] - 49:14; 129:10; 133:14
**obstacles** [2] - 19:9; 20:20
**obtain** [1] - 39:21
**obtained** [2] - 53:25; 166:14
**obvious** [4] - 6:21; 181:24; 185:12; 192:25
**obviously** [7] - 61:2; 69:23; 72:8; 104:15; 160:12; 179:14; 190:23
**occasion** [2] - 23:4; 35:6
**occasionally** [3] - 127:20; 143:12; 156:9
**occasions** [5] - 17:20; 21:16; 25:10; 27:2; 75:14
**occur** [4] - 25:7; 157:22; 185:17, 19
**occurred** [6] - 51:12; 54:6; 112:15; 146:14; 157:22; 158:1
**occurs** [1] - 154:8
**October** [2] - 1:5; 80:17
**OCTOBER** [2] - 4:1; 96:18
**Oda** [1] - 111:6
**OF** [24] - 1:1, 9; 2:12, 17; 3:2, 7; 8:9; 18:18; 31:18; 72:23; 93:8; 98:17; 106:7; 115:4; 160:16; 204:4
**offer** [2] - 37:9; 105:24; 133:1
**offered** [6] - 9:10; 19:5, 11; 21:13; 25:22; 60:19
**office** [1] - 160:18
**officer** [11] - 65:14, 22; 100:11, 18; 131:18, 25; 134:3, 16; 136:12; 140:5; 147:10
**officers** [2] - 104:10; 115:19
**Official** [2] - 3:13; 203:14
**officially** [2] - 101:23; 115:11
**often** [9] - 17:11, 24; 20:14; 24:13;

123:4; 128:19; 140:16; 164:17; 197:14
**oil** [2] - 10:22; 11:13
**old** [5] - 18:4; 93:23; 120:21; 125:8; 171:2
**older** [2] - 67:22; 68:24
**olive** [2] - 10:22; 11:13
**ON** [4] - 8:9; 18:18; 204:4
**on-the-record** [1] - 5:15
**once** [3] - 11:19; 16:9; 49:5
**one** [86] - 7:13; 9:11; 13:19; 16:16, 18; 18:2; 21:6; 22:24; 24:23; 32:14; 33:13; 37:24; 38:23; 40:22; 41:13; 42:1; 45:16; 48:1; 55:13; 56:4, 6; 58:17, 20, 22; 59:7; 62:12; 63:19; 70:8, 15; 74:22; 75:11; 76:13; 80:7; 81:17, 24; 85:7, 9; 95:5; 96:23; 109:22; 110:19, 21, 23; 120:13; 121:20; 122:13; 124:2, 23; 125:11, 17; 127:10; 128:12; 131:9; 132:19; 133:15; 144:14; 149:5, 12; 151:14; 155:9; 157:24; 163:2; 169:1, 8, 10; 171:18; 183:12, 15; 184:24; 185:1; 189:5; 191:8; 194:3, 22; 198:7, 11, 19-20; 199:1
**one's** [2] - 10:14; 131:10
**ones** [4] - 42:15, 17; 110:18; 111:23
**ongoing** [1] - 101:17
**op** [2] - 170:12, 17
**op-ed** [2] - 170:12, 17
**open** [12] - 5:19; 6:2, 16; 7:1; 72:5; 96:21; 160:1; 174:10; 200:15; 202:22
**open-court** [2] - 6:3; 72:5
**OPENING** [4] - 8:9; 18:18; 204:4
**opening** [8] - 5:16-18; 8:6; 14:21; 18:15; 30:15; 131:8
**opens** [1] - 125:13
**operate** [1] - 202:6
**operating** [5] - 133:22; 137:6, 20; 152:20; 153:15
**Operating** [3] - 16:12, 14; 153:17
**Operations** [1] - 139:19
**opine** [1] - 14:6
**opinion** [28] - 47:13; 53:1; 58:2, 11; 60:22; 62:25; 63:14; 64:20; 65:5; 69:8; 83:20; 84:7; 85:24; 87:4, 17; 91:2, 4; 114:11; 137:11; 138:11; 156:10; 157:11; 170:6, 8; 173:23; 178:21, 24; 202:7
**opinions** [1] - 179:14
**opportunity** [4] - 19:12; 20:21; 28:18; 86:24
**opposed** [1] - 197:24
**opposing** [1] - 156:24
**opposite** [1] - 29:19
**option** [2] - 7:2; 27:11
**oral** [1] - 39:21
**order** [33] - 10:12; 12:5, 14; 15:16; 17:7, 12; 28:11, 13-14, 21; 32:24; 58:24; 59:19; 63:4; 81:8; 90:16; 98:3; 116:24; 121:22; 130:8; 131:13, 17; 135:22; 151:11; 174:15; 179:24;

189:20; 191:9, 12, 14; 192:6
**ordered** [4] - 28:15; 81:25; 150:15; 185:3
**orders** [9] - 28:13; 57:14, 19; 59:25; 71:18; 130:11; 186:17; 191:19
**ordinarily** [2] - 84:14
**organic** [7] - 77:15; 120:13; 121:9; 123:2, 14
**organization** [1] - 74:1
**organizational** [1] - 56:1
**organizations** [2] - 35:17; 73:24
**orthopedics** [1] - 53:11
**osteo** [1] - 69:11
**osteopenia** [1] - 69:12
**osteoporosis** [5] - 69:9, 15, 20; 78:2; 79:1
**otherwise** [2] - 24:12; 151:21
**ounces** [1] - 23:1
**ourselves** [1] - 17:22
**outbursts** [2] - 25:7
**outer** [1] - 160:9
**outlook** [1] - 138:2
**outpatient** [2] - 145:16; 146:8
**outside** [5] - 25:21; 29:7; 30:21; 102:23; 199:8
**overall** [3] - 84:6; 87:17; 92:23
**overdose** [3] - 185:18, 22
**overdoses** [2] - 185:12, 17
**overly** [1] - 31:12
**overread** [1] - 130:23
**override** [1] - 127:15
**overriding** [5] - 131:1, 13, 17; 141:13; 182:18
**overrule** [1] - 33:4
**overruled** [5] - 46:17; 92:16; 93:20; 128:6; 167:13
**overruling** [1] - 33:11
**overseas** [2] - 107:14, 20
**overview** [3] - 118:9; 146:25
**overwhelm** [1] - 130:3
**own** [13] - 19:4; 21:14; 22:22; 27:7; 46:8; 63:7; 90:13, 18; 97:15; 117:10; 138:7, 12; 156:22

# P

**p.m** [6] - 96:16, 19; 130:1; 153:6; 203:7
**P.O** [2] - 1:22; 2:18
**padded** [1] - 158:8
**page** [39] - 50:4; 55:18; 56:23; 59:13; 63:22; 86:12, 18, 20-21; 88:10; 97:3, 5, 7; 110:15; 130:5; 133:5, 10; 148:21; 153:20; 155:13; 162:16; 171:3, 6-7; 173:2; 175:18, 21; 176:19; 178:22; 179:2; 188:5; 190:3, 13; 194:20
**Page** [1] - 204:3
**pages** [18] - 38:9, 12-13, 16; 42:21; 55:4, 7; 97:12; 129:16; 180:12, 14;

181:6, 16; 183:19; 184:7; 186:10
**pain** [74] - 11:1; 15:1, 3; 22:19; 23:7; 25:2; 40:10, 13, 17-18; 41:6, 16-18; 48:1-3; 49:7; 51:4, 9, 13; 52:14; 57:20; 58:6, 9, 12-13; 60:17, 25; 64:23; 65:3; 70:3; 83:21, 25; 84:6, 9, 14, 18; 85:1, 25; 87:5; 88:13, 17; 94:10; 121:7; 123:25; 124:13; 133:16, 21; 134:19, 21; 135:9, 13, 17, 19, 21; 137:16; 144:6; 152:9, 11; 158:22; 159:6; 184:2; 188:3; 190:18, 23-24; 191:3; 193:7
**pain's** [2] - 17:10; 47:24
**painful** [21] - 9:11; 13:3; 16:5; 17:1, 5-6, 10; 21:4; 51:23; 61:1; 64:10, 25; 84:3; 87:25; 88:1, 3, 5; 129:24; 154:2; 159:3, 7
**Palestinian** [1] - 103:25
**paper** [3] - 97:24; 111:11, 14
**paragraph** [20] - 45:4; 65:21; 66:23; 68:21; 69:7; 70:1, 21, 23; 78:4, 8; 80:23; 119:19; 133:2, 13; 134:8, 15; 146:17; 190:14; 194:21
**paralysis** [3] - 121:7; 123:9; 152:11
**paranoid** [2] - 120:12; 165:21
**pardon** [1] - 169:9
**paresis** [2] - 123:9; 152:11
**part** [21] - 9:25; 27:6; 38:23; 46:6; 47:1; 49:15, 18; 50:17, 23; 55:3; 56:16; 63:19; 68:23; 78:13; 93:18, 21; 115:24; 126:10; 128:13; 142:10; 163:23
**partial** [1] - 152:11
**particular** [3] - 81:16; 148:13, 22
**particularly** [9] - 20:12; 40:20; 104:12; 106:20; 123:25; 152:13; 158:18, 23; 159:4
**particulars** [1] - 77:23
**PARTIES** [1] - 4:4
**parties** [2] - 178:9; 203:5
**partisan** [1] - 179:14
**pass** [2] - 18:1; 198:6
**past** [8] - 15:5; 51:11; 66:9; 70:3; 75:7; 79:21; 95:8; 106:21
**paste** [1] - 146:11
**patient** [47] - 24:12; 46:11, 21, 23; 48:17; 50:20; 53:3; 61:10, 16; 71:20; 81:15; 84:5, 12; 88:13; 90:13, 16, 18, 23; 91:15, 17, 21; 92:3, 15, 21; 94:12, 15; 114:14; 121:6, 23-24; 123:4; 143:15; 144:22, 24; 145:25; 146:6, 9; 147:4, 24; 154:13; 183:9; 192:1, 19, 21; 195:6
**patient's** [4] - 90:13; 92:6; 94:14; 144:23
**Patients** [1] - 37:11
**patients** [39] - 35:14; 40:7; 46:8; 62:3; 66:4, 7; 68:24; 69:19; 78:25; 82:25; 83:2; 84:21; 88:18; 101:5; 103:2, 13, 20-21, 24; 104:2, 4; 105:1, 5, 12, 16; 106:2; 109:14, 16, 19; 110:1; 121:21; 124:9; 144:13; 165:24; 184:19; 185:2

**patients'** [1] - 123:2
**Patrick** [2] - 3:2; 4:22
**patrick.davis2@usdoj.gov** [1] - 3:5
**pdf** [3] - 180:24; 181:2
**peacefully** [2] - 8:14; 10:17
**peculiar** [1] - 40:22
**pediatric** [1] - 21:7
**peer** [1] - 102:9
**peer-reviewed** [1] - 102:9
**pelvis** [1] - 81:9
**penis** [1] - 41:19
**Pennsylvania** [3] - 1:14, 18; 2:3
**penological** [3] - 9:18, 21; 151:5
**people** [28] - 6:22; 24:22; 35:9, 22; 66:4; 84:16; 92:24; 94:16; 103:9, 15; 105:7; 122:1; 124:21; 125:8; 126:16; 128:14, 16, 18; 129:11; 139:14; 143:1; 144:9; 158:19; 173:7; 182:18; 194:16; 199:1; 202:16
**per** [3] - 144:18; 145:23; 151:19
**perceive** [1] - 65:23
**perceived** [1] - 165:14
**percentage** [1] - 110:3
**perception** [3] - 47:20, 24; 49:15
**perforation** [1] - 62:1
**perform** [1] - 179:20
**performed** [8] - 22:7; 39:12; 67:3, 12, 18; 69:5; 158:10
**performing** [2] - 146:20, 22
**performs** [1] - 35:22
**perfunctory** [1] - 129:4
**perhaps** [5] - 77:13; 95:22; 127:14; 128:21; 192:2
**period** [9] - 23:18, 22; 62:10; 113:17; 154:10; 193:15; 202:20; 203:2
**periodically** [1] - 126:17
**permanent** [1] - 20:6
**permits** [1] - 36:25
**permitted** [1] - 11:3
**person** [15] - 18:9; 24:23; 62:12, 16, 19, 21; 105:4; 122:7, 9; 126:1, 25; 127:7; 148:1; 150:20, 24
**person's** [1] - 148:10
**personal** [3] - 129:5, 7; 132:13
**personality** [2] - 142:20; 143:19
**personnel** [2] - 155:18; 177:3
**perspective** [2] - 82:19; 197:21
**pertinence** [1] - 158:11
**pertinent** [3] - 51:8; 158:7, 14
**PETITIONER** [2] - 8:9; 204:4
**Petitioner** [24] - 1:4, 13; 2:2; 4:11; 5:16; 6:7, 24; 8:11; 20:22; 28:2; 29:11; 31:2; 74:14; 75:4, 18; 76:4; 79:14, 20; 97:9, 18-19; 105:24; 112:6; 157:24
**Petitioner's** [45] - 5:20, 25; 6:12; 7:22; 13:25; 29:15; 32:1, 10; 33:8, 14, 17; 34:8; 38:21, 24; 39:2; 42:9; 43:25; 44:1, 11, 19-20; 49:23; 55:14; 58:18; 63:20; 74:8, 24; 77:20; 79:9; 82:3, 18; 110:10;

129:15; 134:10; 190:11; 194:20; 200:9; 204:16
**PETITIONER'S** [1] - 98:16
**petitioners** [3] - 21:19; 54:24; 159:22
**Philip** [1] - 143:12
**phlebotomy** [1] - 49:5
**phone** [1] - 5:15
**physical** [38] - 39:15; 42:5; 45:6, 10, 12, 19; 46:5; 50:24; 51:3, 8; 52:2, 22, 24; 53:2, 11; 64:22; 67:20; 75:11; 77:1; 103:5, 9; 121:6, 13, 15, 18; 123:13; 124:16, 19; 146:21; 158:24; 161:7; 195:15, 23, 25
**physically** [8] - 19:6; 25:9; 121:24; 142:23; 144:10; 160:20; 195:11; 196:5
**physician** [13] - 13:8, 10; 31:23; 34:16; 58:23; 81:1; 90:2; 104:6; 133:20; 161:7; 175:22; 192:25; 195:16
**Physicians** [1] - 35:19
**physicians** [6] - 29:15; 53:22; 71:12, 18; 83:1; 89:16
**physiological** [1] - 77:4
**physiotherapist** [1] - 53:11
**pick** [2] - 64:24; 110:14
**picture** [1] - 142:16
**piece** [5] - 78:21; 111:11, 14; 116:3; 170:12
**pill** [2] - 134:25; 137:15
**pillow** [5] - 15:21; 57:9, 12, 22; 58:3
**pinpoint** [2] - 123:3; 124:25
**pipe** [1] - 22:13
**place** [17] - 11:15; 12:15; 22:4; 23:18; 24:1; 28:15, 21; 61:8, 13, 15, 20, 25; 62:5, 15; 108:5; 160:1
**placed** [8] - 21:21; 22:2; 25:3, 21; 31:12; 60:20; 155:17; 156:25
**placement** [4] - 21:19; 83:24; 88:16, 19
**placing** [2] - 88:9, 11
**plain** [2] - 143:25; 156:4
**plaintiff** [1] - 111:22
**PLAINTIFF'S** [1] - 31:9
**plaintiff's** [3] - 32:1; 102:19; 175:13
**Plaintiff's** [3] - 34:8; 102:18; 170:25
**plaintiffs** [2] - 97:9
**plan** [3] - 38:7; 142:10; 152:16
**planet** [1] - 160:3
**planning** [1] - 6:15
**plans** [1] - 142:4
**play** [1] - 164:4
**played** [1] - 24:9
**pleasant** [1] - 132:6
**pleased** [1] - 11:12
**PLLC** [3] - 1:13, 17; 2:3
**plus** [2] - 30:15; 159:5
**pneumonia** [1] - 10:23
**PO** [1] - 187:21
**point** [33] - 6:9; 7:13; 12:11; 13:21; 16:4, 6, 24; 19:13; 27:18; 42:23; 54:24;

63:18; 95:12; 114:5, 12; 117:13; 118:17; 124:2; 132:7, 20; 154:20; 156:17; 157:1; 158:12; 161:24; 162:2; 172:7; 173:18; 193:13; 201:7, 14
**points** [2] - 97:23; 197:22
**police** [1] - 150:24
**policies** [5] - 11:19; 89:10; 104:12, 24; 139:9
**policy** [1] - 155:23
**political** [1] - 36:2
**population** [1] - 69:2
**portion** [10] - 43:1; 78:3; 129:21; 130:14; 134:22; 140:25; 146:19; 161:7; 165:11
**portions** [1] - 38:10
**position** [10] - 17:23; 34:12, 17, 25; 41:12; 64:23; 100:16; 118:6; 156:25
**positions** [1] - 100:7
**positive** [2] - 154:7, 11
**possibilities** [1] - 179:16
**possibility** [2] - 93:23; 163:6
**possible** [7] - 5:21; 38:12; 42:1; 94:11; 139:6; 152:17; 202:16
**Post** [1] - 170:13
**post** [7] - 29:9; 102:13; 105:17; 122:11; 169:20, 24
**post-concussion** [1] - 105:18
**post-traumatic** [3] - 102:13; 105:17; 122:11
**posture** [1] - 118:6
**potential** [4] - 21:5; 76:7; 82:2; 202:20
**potentially** [2] - 24:7; 53:12; 61:11
**pounds** [3] - 19:17, 25; 159:5
**power** [2] - 11:25; 118:6
**POWs** [1] - 104:9
**practical** [3] - 33:4, 8; 155:16
**practice** [31] - 10:24; 11:24; 12:1, 5; 17:13; 23:12, 14; 24:9; 34:21, 23; 35:6, 8; 46:8; 61:4, 14; 73:2; 74:19; 83:14; 103:1, 4; 109:13, 18; 114:13; 173:21; 176:17; 183:11; 191:11; 192:23; 195:18
**practiced** [1] - 13:1
**practices** [7] - 9:18, 21; 11:15; 16:23; 18:13; 172:4
**practitioners** [1] - 128:23; 142:2
**PRADHAN** [50] - 54:23; 55:10; 56:10; 97:19, 22; 98:2, 6, 8, 12, 18; 99:15; 102:15, 19, 21; 105:24; 115:3, 5; 118:22, 25; 119:10, 13, 16; 120:24; 128:7; 133:2, 5, 9; 134:6, 9; 145:14, 18, 20, 23; 146:1; 147:21; 148:25; 149:2, 5, 8, 11; 150:7, 13; 154:15, 18; 155:7, 12; 156:6; 158:3; 159:22; 167:12; 199:12, 16; 200:2, 6, 11; 201:2, 5, 21; 204:10, 12
**Pradhan** [4] - 1:13; 4:12; 54:23; 190:15
**precise** [1] - 186:19
**preclude** [2] - 45:6; 195:3
**predated** [1] - 40:11

**predecessor** [2] - 15:12, 14
**predominantly** [1] - 179:15
**prefer** [3] - 5:22; 56:5; 110:13
**preferable** [1] - 175:25
**preference** [1] - 22:22
**preferred** [2] - 83:10, 18
**prefers** [2] - 38:4; 72:3
**prelabeled** [1] - 38:22
**preliminary** [4] - 18:24; 21:25; 27:25; 28:5
**Preliminary** [1] - 27:22
**premark** [1] - 56:2
**premarked** [1] - 32:7
**prepare** [2] - 37:22, 24
**prepared** [3] - 39:5; 97:6; 116:1
**prescribe** [1] - 186:15
**prescribed** [5] - 137:12; 185:5, 8, 10; 191:5
**prescription** [1] - 133:21
**presence** [2] - 42:3; 53:24
**PRESENT** [1] - 4:4
**present** [12] - 12:17; 17:5; 19:17; 20:16; 21:11; 54:21; 62:25; 96:22; 103:10; 121:15; 125:20; 167:16
**presentation** [1] - 122:17
**presented** [4] - 20:7; 46:11, 21; 143:8
**presenting** [3] - 29:22; 68:25; 195:3
**presents** [3] - 17:18; 20:20; 121:14
**President** [1] - 169:17
**president** [2] - 174:10, 15
**pressure** [2] - 65:1; 75:7
**prestigious** [1] - 169:24
**presumably** [1] - 15:20
**pretrial** [2] - 29:8; 33:1
**pretty** [5] - 7:10; 63:9; 156:4; 164:17; 181:3
**prevent** [6] - 19:14; 61:10; 92:6, 11, 21; 185:24
**previous** [5] - 59:4; 81:24; 87:20; 120:2; 131:4
**previously** [8] - 32:3; 35:24; 36:7; 39:7; 60:5; 86:5; 102:15; 105:5
**pride** [1] - 18:3
**primarily** [1] - 46:14
**primary** [1] - 71:14
**Princeton** [1] - 99:3
**principal** [1] - 169:22
**principally** [1] - 105:19
**principles** [3] - 74:22; 172:6
**print** [1] - 119:8
**priority** [1] - 184:9
**prison** [2] - 17:14; 82:15
**prison's** [1] - 16:10
**prisoner** [1] - 13:2; 176:1
**prisoner's** [2] - 175:22
**prisoners** [7] - 104:8, 11; 107:23-25; 108:16; 115:25
**Prisons** [4] - 13:10; 62:7, 13, 17
**Prisons'** [3] - 10:3; 13:7; 16:9

**privileges** [1] - 168:12
**PRN** [1] - 188:1
**problem** [12] - 4:15; 18:9; 45:8; 121:11, 24; 122:6; 123:14; 124:10; 139:12; 160:25; 193:21, 24
**problems** [15] - 4:17; 23:20; 27:3; 58:4; 68:25; 121:21; 122:5; 123:5; 136:2; 148:18; 159:16; 172:19; 192:18; 195:19; 197:4
**Procedure** [2] - 16:12, 14
**procedure** [24] - 5:12; 6:25; 17:6; 21:4, 15, 20; 22:16; 23:11; 26:23; 30:8; 61:1; 64:14; 84:19, 22, 25; 85:3; 87:18; 88:12, 20; 137:7; 140:7; 186:11
**procedures** [16] - 62:8; 104:13, 24; 116:12, 21; 117:5; 129:8; 130:23; 133:23; 139:9; 151:5; 152:20; 154:22, 25; 184:22
**proceed** [4] - 7:12; 8:5; 72:17; 173:18
**proceeding** [3] - 5:8; 20:24; 172:22
**PROCEEDINGS** [1] - 1:9
**proceedings** [3] - 5:1; 156:1; 203:11
**Proceedings** [2] - 3:16; 203:7
**process** [9] - 13:4; 22:3; 23:6; 26:16; 27:16; 64:20; 170:5; 201:23
**produced** [5] - 3:16; 43:13, 16; 81:21; 152:20
**Profession** [1] - 174:25
**professional** [5] - 31:21; 35:17; 102:22; 137:11; 173:7
**professionalism** [1] - 48:21
**Professionalism** [1] - 175:5
**professionals** [1] - 193:25
**professor** [4] - 31:22; 34:13; 101:17
**profound** [1] - 12:22
**program** [3] - 100:15; 142:6, 8
**programs** [1] - 141:25
**Programs** [3] - 2:12, 21; 3:7
**progress** [5] - 16:23; 141:10; 145:16; 146:8
**progressively** [1] - 40:12
**projected** [1] - 202:20
**prolonged** [1] - 23:18
**promoted** [3] - 100:17, 24; 115:9
**promulgated** [1] - 16:14
**pronounce** [1] - 6:1
**proper** [2] - 50:19; 71:9
**properly** [4] - 14:10; 17:19; 25:4; 125:19
**propose** [1] - 127:18
**proposed** [2] - 121:10; 192:9
**prospectively** [1] - 142:7
**prostate** [1] - 41:23
**protected** [10] - 5:11; 6:14, 20; 7:5, 18, 24; 37:8; 74:20; 118:14, 19
**Protecting** [1] - 173:14
**protective** [1] - 150:3
**protest** [4] - 8:14; 10:17; 18:10; 63:4
**protesting** [2] - 94:25; 95:1

**protocol** [5] - 13:7, 13; 16:9; 137:20
**protocols** [5] - 9:24; 10:4; 13:11; 81:9; 153:15
**Protocols** [1] - 153:17
**proud** [1] - 117:20
**provide** [10] - 19:18; 24:1; 33:1; 38:19; 53:4; 116:3; 117:1; 118:3; 143:25; 159:10
**provided** [22] - 7:16; 18:21; 20:18; 24:14; 25:19; 29:20; 32:3, 23; 37:3, 5, 24; 39:19; 43:9; 67:17; 70:6, 25; 74:8; 112:16; 116:4; 117:8
**provider** [2] - 133:18; 144:22
**providers** [3] - 22:3; 133:15; 183:20
**provides** [2] - 20:9; 89:25
**providing** [2] - 19:3; 112:3
**provocative** [3] - 143:14, 16; 159:16
**provoked** [1] - 139:7
**Psychiatric** [1] - 102:24
**psychiatric** [12] - 90:25; 106:1; 114:1; 138:2; 139:5; 142:19; 154:4; 158:11; 161:12, 17; 172:15; 179:21
**psychiatrist** [14] - 90:21, 23; 91:5, 8-9, 12-14, 19; 110:7; 128:17; 195:14, 17
**psychiatrists** [2] - 101:14; 128:14
**Psychiatry** [13] - 99:6, 13, 17-18; 100:8, 16; 101:15, 19; 102:12; 104:7; 109:21; 120:3; 171:14
**Psychiatry** [1] - 102:25
**psychogenic** [1] - 195:8
**psychological** [12] - 42:5; 46:4; 52:23; 77:4; 121:11-13; 123:4; 124:1, 3, 14; 172:15
**psychology** [1] - 120:3
**psychosis** [1] - 46:5
**psychosomatic** [8] - 45:21; 52:24; 53:2; 76:5-7; 77:2
**psychotherapist** [1] - 53:11
**psychotherapy** [2] - 102:12
**psychotic** [5] - 61:16; 120:10; 122:6; 128:15
**public** [7] - 7:10; 10:13; 31:23; 34:14; 168:2; 173:23; 202:2
**Public** [1] - 34:15
**publications** [2] - 35:15; 102:8
**publish** [1] - 140:16
**published** [3] - 35:12, 15; 102:6
**pull** [4] - 42:12; 55:19; 162:15; 190:11
**pulled** [2] - 9:2; 112:21
**pulmonary** [1] - 62:1
**punched** [1] - 144:13
**punish** [1] - 10:18
**punishment** [6] - 15:24; 23:7; 25:2; 48:9, 12; 142:9
**punitive** [2] - 50:23; 58:1
**pure** [1] - 201:18
**purge** [2] - 24:4; 25:5
**purpose** [4] - 9:14; 126:2; 162:24; 172:17

**purposes** [3] - 25:19; 163:2; 201:19
**pursuant** [1] - 116:24
**pursuing** [1] - 42:6
**push** [1] - 22:4
**pushed** [1] - 22:8
**put** [38] - 8:19; 9:3; 10:14; 12:23; 17:22; 38:16; 42:7, 24; 49:16; 54:12; 55:4; 65:1; 69:24; 97:12, 14; 106:10; 112:20; 122:11; 130:5; 131:4, 10; 134:12, 14; 135:25; 139:17; 142:2, 21; 144:7; 147:6; 151:12; 155:9; 164:8; 165:6; 171:8; 174:24; 183:4; 186:21
**puts** [1] - 128:17
**putting** [2] - 41:24; 187:15
**PX50** [6] - 55:2, 16; 56:16; 118:24; 139:17

## Q

**Q6** [1] - 188:8
**Q8** [1] - 187:24
**qualification** [1] - 106:11
**qualifications** [2] - 31:16; 36:12
**qualified** [10] - 35:24; 36:1, 4, 7; 37:10; 85:9; 112:22; 113:7; 151:7
**qualifier** [1] - 166:11
**qualify** [4] - 67:19; 87:20; 113:10; 140:5
**qualifying** [2] - 31:15; 98:12
**quality** [4] - 18:22; 20:18; 29:21; 187:16
**quantity** [1] - 22:25
**quarter** [1] - 110:4
**questioning** [2] - 37:16; 97:13
**questions** [14] - 65:15; 93:3, 6; 95:7, 11; 98:6; 106:4; 113:23; 114:22; 147:20; 158:4, 6; 199:5
**quick** [1] - 97:22
**quicker** [1] - 160:12
**quickest** [1] - 111:21
**quickly** [3] - 16:5; 51:24; 117:20
**quite** [4] - 53:24; 66:3; 181:23; 203:2
**quo** [5] - 28:1, 3, 6, 8, 17
**quote** [13] - 9:9; 13:3, 6; 45:7, 23; 50:14; 65:24; 126:17; 166:9
**quote-unquote** [1] - 126:17

## R

**R/O** [2] - 119:22; 163:11
**racial** [1] - 103:16
**radiating** [1] - 41:18
**radiculopathy** [2] - 45:17
**radiographic** [1] - 69:11
**radiologic** [2] - 66:24; 69:1
**radiological** [2] - 45:18; 78:14
**raised** [1] - 21:16
**raises** [1] - 13:19

**ranging** [1] - 102:10
**rank** [4] - 15:15; 115:8, 10; 166:14
**rapid** [1] - 48:15
**rare** [3] - 21:15; 22:23; 69:20
**rate** [3] - 22:17, 21; 83:19
**rather** [5] - 71:16; 92:14; 129:4; 176:3; 184:15
**ratio** [1] - 62:3
**ray** [2] - 79:1; 125:11
**rays** [1] - 67:5
**RDR** [3] - 3:12; 203:10, 13
**RDR-CRR** [1] - 203:10
**reach** [3] - 19:13; 114:3; 115:8
**reached** [2] - 114:4, 11
**reaching** [1] - 179:13
**reaction** [3] - 10:15; 22:11; 122:12
**reactive** [1] - 143:15
**read** [23] - 11:5; 47:10; 50:8; 57:7; 60:11; 78:3, 13; 80:3, 13; 81:14; 86:25; 88:22; 97:3, 5; 148:12; 161:9, 11; 162:6; 176:18; 179:17; 196:3
**reading** [6] - 27:1; 45:16; 78:11; 117:1; 140:9; 172:10
**reads** [1] - 78:23
**ready** [7] - 8:5; 9:19, 22; 12:18; 18:6; 72:15; 181:18
**real** [7] - 14:12; 123:4-7; 160:25; 193:21
**realistic** [1] - 138:9
**really** [31] - 9:22; 40:12; 46:3; 49:20; 53:12; 54:17; 58:13; 68:14; 83:22; 95:25; 116:15; 122:8; 123:14; 125:13; 126:23; 127:18; 128:17, 22, 25; 129:4; 135:7, 12; 136:2; 138:20; 144:5; 149:15; 150:10; 153:9; 157:25; 159:5; 188:8
**reapply** [1] - 113:18
**reason** [30] - 15:20; 27:9; 31:12; 32:23; 33:4, 11; 47:15; 53:8; 57:16, 18, 24; 58:23; 66:11, 18; 95:13; 117:25; 121:11; 123:2; 131:1, 3, 21, 23; 132:2; 137:3, 19; 156:12; 183:18; 186:20; 192:17; 193:11
**reasonable** [8] - 23:13; 25:12; 49:15; 126:24; 131:11; 192:21; 193:18; 200:10
**reasonably** [1] - 18:10
**reasoning** [1] - 138:21
**reasons** [8] - 6:22; 47:20; 94:7; 122:23; 131:16; 138:21; 184:16
**rebut** [1] - 20:21
**rec** [1] - 159:14
**recalling** [1] - 151:11
**receive** [7] - 14:4; 130:12, 25; 134:21; 183:21; 186:16, 20
**received** [6] - 34:24; 54:8; 104:7; 135:11
**receives** [1] - 77:24
**receiving** [1] - 117:5
**recent** [4] - 12:5; 19:23; 68:3; 146:15
**recently** [9] - 9:16; 10:23; 11:3; 22:23;

23:11; 26:8; 27:9; 54:8; 65:13
**recess** [2] - 96:15; 148:20
**reckless** [1] - 29:12
**recklessness** [1] - 29:14
**recognize** [5] - 45:8; 82:18; 110:18; 122:5; 175:16
**recognized** [1] - 123:24
**recollection** [2] - 28:13; 87:2
**recommend** [2] - 157:7, 9
**recommendation** [11] - 15:17; 75:17, 20, 23-24; 139:20; 140:19; 141:13; 151:12, 16, 20
**recommended** [6] - 67:15; 70:9; 94:1; 130:23; 183:21; 184:6
**reconceptualizing** [1] - 103:7
**record** [62] - 4:8; 5:15; 34:7; 38:18; 42:7; 44:11, 19, 25; 45:2, 22; 47:10; 49:16, 25; 54:12, 20; 56:16, 20, 24; 57:4; 58:17, 25; 59:4; 60:3; 63:17, 19-21; 64:10; 79:22; 80:17; 81:6; 86:7, 14; 96:20; 97:2; 98:20; 120:25; 124:2; 127:10; 129:17; 131:4; 140:22, 24; 144:14; 146:23; 149:12; 153:8; 168:10; 180:22; 186:2; 194:1; 198:24; 199:4; 203:10; 204:18
**record's** [1] - 17:18
**recording** [1] - 194:17
**records** [74] - 13:21; 15:1, 25; 21:14; 37:5; 38:10; 39:19; 42:10-12, 15, 22; 43:1, 13; 44:21; 47:14, 18; 48:7; 52:4, 6, 18; 53:14, 19; 55:1, 8, 11, 13, 15, 17; 56:8; 57:15; 60:23; 61:3; 65:5, 8; 70:6, 25; 71:17; 74:8, 10-11; 79:23; 80:1; 81:21; 93:14; 117:8; 118:23; 139:17; 144:19; 145:1, 24; 146:11; 148:23; 151:19; 152:2, 6; 180:10, 12, 17, 23; 181:4, 7, 13-14, 17; 183:19; 186:6; 194:1, 5, 11
**recross** [1] - 95:12
**rectangle** [3] - 17:23; 18:1
**redacted** [2] - 130:14
**REDIRECT** [2] - 93:8; 204:8
**redirect** [9] - 78:4; 88:23; 93:5, 7; 95:13; 199:11, 13; 200:22; 202:22
**reduced** [1] - 196:18
**reduction** [1] - 17:8
**reenforcement** [1] - 127:2
**reestablish** [1] - 144:1
**refeeding** [1] - 83:11
**refer** [11] - 42:16, 18; 43:3; 55:18; 79:22-24; 86:12; 118:22; 155:21; 158:5
**referee** [1] - 102:9
**reference** [9] - 42:25; 43:3, 15; 45:1; 54:7, 9; 56:17; 81:12
**referred** [5] - 45:16; 93:14; 103:20; 120:9; 122:4
**referring** [11] - 45:25; 56:23; 59:12; 60:13; 73:20; 76:24; 81:11; 132:25; 137:7; 176:9; 198:7
**refers** [1] - 121:5

**reflect** [1] - 86:7
**reflects** [3] - 82:21, 24; 83:3
**REFORGER** [1] - 115:22
**refresh** [1] - 87:1
**refugees** [2] - 35:9; 73:3
**refusals** [1] - 19:13
**refuse** [4] - 19:13; 20:13; 90:24; 176:2
**refused** [12] - 11:17; 31:15; 113:10; 127:20; 133:18, 20; 144:24; 145:25; 146:6; 147:3; 184:12, 15
**refuses** [2] - 12:10; 14:23; 19:5; 152:14
**refusing** [3] - 19:4; 27:13
**regard** [3] - 9:13; 85:5; 170:18
**regarded** [1] - 120:9
**regarding** [11] - 20:22; 26:16; 29:10; 54:25; 104:10, 25; 115:19; 117:16; 124:18, 23; 130:10
**regards** [2] - 124:15; 138:20
**Regional** [2] - 101:1; 166:18
**regularly** [3] - 19:5; 21:14; 27:11
**regulation** [1] - 89:18
**regulations** [1] - 173:6
**regulatory** [1] - 89:14
**reidentify** [1] - 5:1
**reinsertion** [1] - 94:9
**reinstated** [1] - 113:15
**related** [4] - 94:13; 137:8, 10
**relationship** [4] - 48:5; 71:20; 154:7
**relationships** [1] - 144:1
**relatively** [1] - 84:10
**relevance** [1] - 46:14
**relevant** [2] - 111:23; 158:18
**relief** [3] - 21:25; 168:2; 190:22
**relieve** [3] - 57:20; 58:12; 137:16
**relieved** [7] - 135:12; 167:1, 4, 6, 8, 21, 25
**religious** [1] - 66:5
**relinquished** [2] - 167:8, 23
**rely** [1] - 97:24
**relying** [3] - 177:9; 179:11, 15
**remain** [3] - 11:15; 28:14; 198:25
**remaining** [1] - 12:3
**remains** [1] - 11:16
**remedy** [1] - 27:23
**remember** [14] - 85:14; 108:13, 17, 23, 25; 109:2, 6, 9; 169:12; 175:2; 180:18; 181:3; 188:19; 196:24
**remind** [1] - 67:7
**remove** [6] - 24:5, 9; 27:15; 38:13; 62:4; 63:1
**removed** [4] - 9:4; 17:11; 61:16; 164:23
**removing** [2] - 23:9, 13
**repeat** [6] - 46:19; 92:19; 109:3; 115:16; 128:9; 172:19
**repeated** [5] - 60:23; 61:10; 62:2; 157:18; 176:3
**repeatedly** [1] - 64:9

**rephrase** [2] - 145:20; 150:12
**replace** [1] - 62:22
**replaced** [1] - 165:12
**replete** [1] - 17:18
**report** [52] - 30:16; 32:24; 37:22, 24; 39:5; 40:13; 44:4, 15; 67:8, 10, 13, 15; 77:18; 88:12; 89:5; 106:12, 16; 110:9, 15; 112:1, 16; 113:25; 132:25; 133:5, 10; 142:22; 145:4, 11-12, 14; 147:6; 159:8; 160:21; 161:20; 162:6; 164:1; 165:16; 175:4; 176:18; 179:23; 181:19; 183:4, 8, 12, 23; 190:13; 194:19; 195:22; 196:3; 197:18
**reported** [7] - 3:16; 49:8; 133:19; 182:24; 183:5; 198:3
**REPORTER** [1] - 109:3
**Reporter** [3] - 3:12; 203:14
**reporter** [5] - 4:25; 5:5; 54:15; 99:9; 157:19
**reporter's** [1] - 153:2
**reporting** [1] - 147:18
**reports** [8] - 7:15; 73:25; 80:24; 106:21; 125:15; 147:10; 161:9; 177:7
**represent** [1] - 31:1
**represented** [1] - 141:25
**Reprieve** [4] - 4:12; 36:18; 117:9
**REPRIEVE** [1] - 1:22
**request** [13] - 25:18; 32:25; 48:2, 4; 63:11; 131:11; 144:24; 191:1, 25; 192:22; 193:18; 197:24
**requested** [7] - 27:24; 64:2; 129:24; 130:2; 133:16; 150:23; 190:17
**required** [5] - 6:4; 14:16; 41:3; 134:18; 179:24
**requirements** [1] - 28:5
**requires** [8] - 12:14; 14:7; 19:19; 27:23; 41:3; 68:25; 75:18; 118:18
**requiring** [1] - 176:3
**research** [5] - 101:10; 102:12; 103:2; 171:1
**reserve** [1] - 7:17
**residence** [1] - 98:23
**residency** [2] - 34:24; 99:6
**resident** [1] - 104:6
**residential** [1] - 142:1
**resist** [3] - 20:14; 24:13; 63:5
**resisting** [1] - 16:12
**resolve** [1] - 12:4
**resort** [2] - 12:21; 26:17
**respect** [10] - 10:8; 15:10; 22:16; 29:16; 66:19; 70:6; 72:11; 95:24; 96:24; 176:13
**respectively** [2] - 129:11; 173:6
**respond** [3] - 18:8; 51:24; 200:8
**responded** [1] - 17:20
**Respondent** [2] - 4:10; 88:22
**Respondents** [9] - 1:8; 2:11; 3:2; 4:20; 18:6, 20; 55:2; 81:22; 102:17
**RESPONDENTS** [2] - 18:18; 204:5
**Respondents'** [17] - 33:23; 65:16;

79:23; 81:5, 11; 86:6; 134:7; 154:15; 155:8, 10; 158:5; 175:13; 187:2; 204:20
**responds** [1] - 17:19
**response** [4] - 61:22; 72:9; 87:9; 197:23
**responsibilities** [2] - 101:10
**responsibility** [4] - 108:6; 115:20; 118:2
**responsible** [6] - 46:8; 100:11; 104:12; 108:2, 4, 20
**responsive** [2] - 21:17; 143:15
**rest** [5] - 41:7; 110:5; 199:17; 200:25; 201:13
**restate** [1] - 34:11
**restrained** [1] - 65:11
**restraint** [29] - 12:12; 16:4, 6, 24; 24:15, 17, 25; 25:20; 26:19; 84:24; 129:23; 144:8; 153:21; 154:19; 155:1, 13-17; 156:7, 17; 157:1; 158:7, 13, 22; 159:2
**restraints** [9] - 9:4; 16:17, 19; 63:18; 84:4; 155:22; 157:7, 9, 14
**restrictive** [1] - 9:24
**result** [2] - 24:8; 65:2
**resulted** [1] - 24:3
**results** [4] - 24:2; 54:1, 5; 70:10
**resume** [1] - 56:11
**ret** [1] - 98:21
**retain** [1] - 72:7
**retaliate** [1] - 10:18
**retention** [2] - 41:21; 79:10
**retired** [6] - 101:3, 7; 113:18; 168:5, 9, 12
**return** [2] - 8:16; 115:22
**returned** [2] - 100:23; 134:24
**reunited** [1] - 138:15
**review** [29] - 20:23; 37:1, 4; 39:17, 19; 47:13; 52:3, 18; 54:13; 60:22; 65:4; 81:17; 86:4, 24-25; 116:11; 117:7, 13; 152:2, 6, 19; 153:14, 17; 157:21; 172:23; 180:12; 186:4; 194:11, 19
**reviewed** [17] - 53:14, 19; 57:8; 65:20; 74:7, 11; 102:9; 105:3; 117:8, 18; 118:15; 136:5; 151:19; 180:17; 186:6, 10
**revisit** [1] - 114:13
**reward** [1] - 126:3
**rewrite** [1] - 28:2
**ride** [2] - 25:24; 28:18
**right-hand** [3] - 42:25; 43:4; 59:6
**right-sided** [2] - 40:23; 41:18
**rights** [2] - 10:16
**Rights** [1] - 35:20
**ring** [1] - 57:12
**risk** [20] - 12:7, 23; 13:6, 18, 22; 14:8, 23; 29:13; 61:12, 18, 24; 62:1, 14; 69:8, 14, 18, 23-24; 176:13
**risk/benefit** [1] - 62:3
**risks** [2] - 24:5; 83:16
**rituals** [2] - 146:21

**RN** [2] - 60:13; 64:2
**Robalino** [2] - 112:7, 25
**role** [1] - 173:4
**roles** [1] - 173:6
**Ron** [1] - 106:9
**Ronald** [2] - 2:21; 4:21
**ronald.wiltsie@usdoj.gov** [1] - 2:24
**room** [2] - 39:13; 129:24
**Room** [1] - 3:13
**rooms** [1] - 17:7
**root** [5] - 68:5-7, 10; 77:16
**ROTC** [1] - 100:2
**roughly** [2] - 74:13; 171:25
**rousing** [1] - 148:14
**routine** [3] - 120:7; 141:11; 144:22
**routinely** [2] - 29:8; 62:4
**Roxicet** [5] - 135:12; 187:17; 189:5, 12; 191:4
**rule** [9] - 8:4; 30:4, 23; 45:13; 77:14; 97:3; 114:18; 163:12
**Rule** [1] - 97:6
**rules** [1] - 92:24
**ruling** [1] - 67:24
**run** [2] - 27:19; 122:13
**Russell** [2] - 112:10, 25
**résumé** [2] - 33:5, 9

**S**

**S1** [1] - 45:17
**sad** [1] - 138:3
**safe** [3] - 25:6; 118:5; 148:13
**safely** [2] - 61:8; 62:15
**safest** [1] - 21:3
**safety** [2] - 62:14; 155:18
**sake** [1] - 88:21
**Samereu** [2] - 112:8, 25
**San** [2] - 99:7, 13
**sat** [1] - 158:7
**saved** [1] - 150:24
**saw** [14] - 14:9; 30:11; 51:5; 81:24; 104:8; 123:10; 124:3; 126:16; 141:6; 142:15; 158:19; 162:4; 194:17; 196:11
**scale** [1] - 23:24
**scan** [7] - 54:1; 67:3, 12; 68:3; 81:9, 25
**scandal** [1] - 170:6
**scans** [5] - 54:9; 67:2, 16-17; 68:2
**scar** [1] - 51:10
**scattered** [1] - 166:22
**schedule** [1] - 199:2
**schedule's** [1] - 7:11
**schizophrenia** [3] - 120:11; 164:13; 165:21
**scholarly** [1] - 35:12
**School** [2] - 34:15; 99:4
**school** [6] - 35:1; 99:24; 142:5; 184:18; 194:3
**Sciences** [1] - 101:18
**scientist** [1] - 147:8

**scope** [1] - 93:12
**Scott** [3] - 3:12; 203:10, 13
**scottlyn01@aol.com** [1] - 3:15
**screen** [1] - 55:19; 67:21; 68:2; 78:9; 80:1, 3, 10; 119:1; 154:17; 187:6, 15
**seat** [1] - 106:6
**seated** [2] - 31:11; 135:7
**seating** [1] - 155:19
**seats** [1] - 24:22
**Seattle** [1] - 35:3
**second** [9] - 5:25; 8:2; 13:17; 21:18; 32:14; 50:7; 81:16; 87:1; 96:7, 11; 99:22; 128:21; 130:4; 169:18; 179:3; 187:21; 188:5; 190:3; 194:21
**secondhand** [1] - 179:15
**secondly** [1] - 7:21
**secret** [5] - 36:24; 101:23, 25; 102:1, 3
**secretary** [1] - 169:22
**section** [1] - 165:3
**secure** [1] - 118:4
**secured** [2] - 8:17; 158:8
**security** [15] - 17:15; 24:5; 25:5; 36:23-25; 71:15; 101:20; 102:3; 113:12; 118:11; 131:22; 200:13
**sedentary** [1] - 69:18
**see** [92] - 4:5, 17; 7:9; 8:2; 10:13; 18:5; 24:22; 30:6; 33:19; 50:1, 5; 53:22-24; 57:4; 59:20; 60:9; 63:21, 25; 67:14, 16; 70:9, 11; 78:16; 79:4, 11; 80:4, 19, 21; 81:24; 96:6; 103:2; 109:18; 114:5; 117:24; 119:1, 3; 120:8, 13; 122:13; 124:2, 9; 125:10; 126:12, 19; 127:3, 6; 130:6; 131:1, 3; 132:15; 133:20; 135:2, 15, 21; 141:9; 142:8, 11; 143:4, 20-21; 144:22; 146:5, 7-8; 147:3; 149:7; 160:23; 165:6; 171:8, 12, 17; 172:2; 175:7; 176:5; 178:24; 184:12, 15; 187:5, 12, 15; 188:8; 197:24
**seeing** [3] - 70:8; 128:17; 160:20
**seek** [3] - 12:5, 11, 14
**seekers** [2] - 35:9; 73:3
**seeking** [1] - 163:2
**seem** [1] - 158:21
**sees** [1] - 121:24
**seizures** [2] - 46:5; 66:7
**selections** [1] - 153:19
**Senate** [1] - 174:18
**send** [2] - 86:8; 106:19
**senior** [12] - 40:6; 65:14, 22; 100:11; 131:18, 25; 134:2, 15; 140:5; 147:11; 172:14
**sensation** [3] - 41:1; 51:21, 25
**sense** [5] - 51:16; 109:13; 136:10; 139:13
**sensitive** [1] - 88:18
**Sensodyne** [1] - 57:13
**sensory** [1] - 124:1
**sent** [5] - 106:19; 112:1; 125:17; 167:5; 184:13
**sentence** [12] - 50:7; 60:11; 78:13, 22;

87:14; 139:19; 157:17; 158:7, 12; 164:11; 193:9
**separate** [6] - 32:12, 17; 43:6; 97:14
**separately** [2] - 38:16; 106:19
**September** [21] - 11:8; 25:17; 28:12; 39:9; 54:6; 65:13; 67:3, 6, 9; 68:4; 79:2; 121:1; 134:3, 8, 17; 146:23; 158:6; 188:12; 189:7, 12
**sequelae** [1] - 37:11
**sequence** [1] - 97:12
**serious** [10] - 10:22; 12:7, 23; 13:18, 22; 14:17; 19:15; 29:12; 92:11, 21; 120:9; 122:6; 128:14; 171:1; 185:13
**seriously** [2] - 49:9; 126:6; 201:18
**serve** [3] - 9:18, 21; 115:6
**served** [1] - 35:19
**service** [4] - 99:21; 103:22; 117:21; 118:7
**Service** [1] - 99:23
**services** [2] - 100:17; 108:1
**Services** [2] - 101:18; 172:5
**Session** [1] - 173:9
**session** [11] - 6:5, 16, 18-19; 7:20; 11:18; 71:25; 133:15; 150:9; 199:23
**SESSION** [2] - 4:1; 96:18
**sessions** [1] - 10:25
**set** [8] - 9:17; 13:13; 16:16; 56:4; 68:2; 74:10; 83:1; 202:9
**setting** [5] - 21:10; 23:11; 24:11; 143:11; 176:10
**settings** [1] - 84:23
**settled** [2] - 11:23; 168:16
**seven** [1] - 8:13
**several** [10] - 20:23; 26:12, 14; 67:21; 90:5; 99:9; 111:6; 174:13; 180:8; 181:22
**severe** [8] - 40:2, 10, 19; 51:9; 58:6, 13; 133:15; 144:6
**sexual** [1] - 73:7
**shake** [1] - 196:20
**shaking** [1] - 41:15
**shame** [1] - 128:18
**shaming** [1] - 138:20
**sheet** [2] - 131:1; 135:23
**shift** [1] - 130:3
**shoes** [2] - 15:21; 57:9
**shook** [1] - 197:9
**short** [4] - 13:18; 54:15; 101:2; 200:3
**shorter** [1] - 153:11
**shorthand** [1] - 3:16
**shortly** [2] - 168:5; 170:12
**shorts** [3] - 15:22; 66:19, 21
**show** [12] - 9:20; 20:18; 23:24; 26:19; 29:12, 19; 58:17; 63:19; 137:17, 25; 153:19; 186:25
**showed** [2] - 68:4; 194:18
**showing** [4] - 27:23; 55:1, 6
**shown** [2] - 10:10; 159:21

**shows** [2] - 9:8; 79:2
**shut** [1] - 9:25
**side** [11] - 40:19, 25; 51:13, 17; 53:8; 55:14; 112:3, 17; 159:19; 167:17; 197:13
**sidebar** [1] - 199:4
**Sidebar** [1] - 202:13
**sided** [2] - 40:23; 41:18
**sides** [2] - 56:7; 143:14
**signaled** [1] - 135:18
**signature** [1] - 80:21
**signed** [3] - 15:13; 174:10, 12
**significant** [3] - 20:5; 23:18; 196:8
**signs** [2] - 123:13; 126:19
**Silence** [1] - 170:15
**similar** [7] - 22:11; 24:16; 29:3; 158:19; 160:21; 188:6; 200:2
**similarly** [2] - 14:6; 176:25
**simple** [1] - 143:25
**simply** [2] - 13:2; 27:13
**simulated** [1] - 104:15
**single** [2] - 148:21
**sinusitis** [1] - 23:20
**sip** [1] - 22:12
**sit** [1] - 31:12
**sits** [1] - 158:17
**sitting** [2] - 108:23; 153:2
**situation** [13] - 13:20; 28:1; 48:23; 61:5; 62:14; 63:13; 82:18; 83:4, 23; 84:8, 13; 88:6; 137:12
**situations** [3] - 13:17; 61:15; 182:18
**six** [4] - 16:19; 166:22; 188:9; 190:7
**size** [4] - 8:23; 23:1
**sized** [2] - 21:7, 9
**SJA** [1] - 135:18
**skeptical** [1] - 128:24
**skepticism** [1] - 128:21
**skill** [1] - 177:12
**skilled** [1] - 40:7
**skills** [1] - 147:17
**skin** [1] - 197:13
**skip** [1] - 134:22
**sleep** [2] - 144:7; 195:21
**sleeping** [1] - 58:14
**sleeps** [2] - 58:7, 9
**Sleeve** [1] - 57:10
**sleeve** [1] - 57:12
**sleeves** [1] - 57:22
**slept** [1] - 135:8
**slow** [1] - 99:10
**slower** [1] - 23:5
**slowly** [1] - 5:4
**small** [8] - 21:11; 22:25; 43:1, 6; 119:8; 149:3, 5; 156:9
**smaller** [1] - 42:20
**Smith** [6] - 56:8, 24; 59:7; 60:5; 112:10; 203:3
**SMO** [16] - 15:5, 11-12; 65:22; 66:23; 67:2; 69:7, 9, 14; 70:1, 20, 23; 78:6;

81:1; 134:7
**smoking** [1] - 16:22
**socks** [5] - 57:9; 58:24; 59:19; 66:20, 22
**soft** [5] - 23:1; 57:11, 23; 58:3; 129:25
**soldiers** [6] - 100:12; 102:10; 104:8; 126:19; 172:18
**solely** [2] - 20:8; 33:4
**solidarity** [1] - 139:13
**somatic** [2] - 52:24; 161:15
**someone** [12] - 14:17; 17:24; 18:2; 41:12, 22; 53:7; 66:14; 83:11; 88:9, 11; 141:18
**sometimes** [7] - 46:5; 84:2; 121:7; 127:20; 136:3; 147:10; 186:21
**somewhat** [2] - 122:14; 142:3
**somewhere** [4] - 52:6; 189:23; 190:8; 202:25
**son** [1] - 18:2
**SONDRA** [7] - 31:9, 18; 72:23; 93:8; 204:6
**Sondra** [5] - 5:20; 31:7, 22; 37:9; 86:15
**soon** [3] - 10:13; 17:25; 190:20
**sooner** [1] - 4:17
**SOP** [11] - 136:4, 10, 13; 153:20; 154:14; 155:2, 7, 10, 21; 156:7
**sophisticated** [2] - 69:1; 142:3
**SOPs** [5] - 136:13, 15; 155:20, 25; 173:5
**sorry** [33] - 30:23; 38:22; 41:9; 46:19; 53:15; 59:1, 18; 67:1; 69:11; 72:12; 78:5; 86:19, 21; 88:10; 90:3, 12; 91:3; 92:19; 93:16; 95:21; 97:4; 110:12; 112:2; 170:22; 171:7, 21; 175:13; 176:22; 179:7; 184:25; 187:6
**sort** [13] - 15:14; 51:11; 63:13; 84:24; 124:5; 125:13; 128:17; 140:19; 143:17; 146:22, 25; 155:22
**sound** [2] - 40:20; 200:10
**sounds** [1] - 200:20
**southeast** [1] - 166:25
**Southeast** [3] - 101:1; 166:18, 24
**Southern** [2] - 23:15; 178:2
**Soviet** [1] - 115:24
**space** [2] - 130:12, 25
**span** [1] - 74:13
**spasm** [1] - 124:3
**speaking** [2] - 59:13; 71:17
**special** [1] - 101:14
**specialist** [1] - 147:8
**specialists** [1] - 183:13
**specialties** [1] - 183:15
**specialty** [2] - 109:20, 22
**specific** [14] - 9:18; 20:25; 21:19; 28:11, 21; 42:15, 17; 45:14; 81:12; 94:15; 105:1, 21; 202:25
**specifically** [12] - 20:9; 22:7; 23:19, 23; 58:6; 86:12; 103:17; 105:4; 109:9; 117:3; 122:9; 197:18
**specifics** [1] - 78:1

**speculation** [1] - 15:15
**spell** [1] - 7:6
**spend** [4] - 31:14; 98:12; 99:25; 195:20
**spent** [2] - 39:15; 105:8
**spinal** [1] - 40:17
**spine** [6] - 45:15; 67:4; 68:15; 69:5; 77:16; 78:24
**spirit** [1] - 124:5
**split** [1] - 165:1
**spontaneously** [1] - 68:11
**stabilize** [1] - 57:22
**Staff** [2] - 100:13; 172:14
**staff** [46] - 18:25; 19:6, 9, 15, 20; 20:4, 8, 19; 21:4, 8, 16; 22:1; 23:25; 24:7; 25:6, 9-10; 26:18; 28:9; 29:20; 47:19; 48:12; 49:8, 13; 50:23; 59:10, 23-24; 65:9; 75:19; 77:19, 24; 82:23; 129:2; 131:8, 24; 132:18; 133:22; 139:10; 141:21; 143:14; 172:17; 195:4, 9
**stand** [5] - 31:11; 54:22; 97:20; 113:4; 130:17
**Standard** [2] - 16:12; 153:17
**standard** [37] - 9:17; 13:12; 14:15; 23:11; 24:10; 25:21; 29:2, 5, 7, 11, 14, 17-18; 50:19, 22; 53:4; 61:14; 69:6; 70:17; 93:21; 94:6; 106:2; 116:4; 133:22; 137:6, 20; 144:23; 147:1, 4; 151:1; 152:19; 153:14; 176:17; 183:11
**standards** [6] - 10:3, 7; 12:20; 89:11, 21; 90:7
**standing** [2] - 40:10; 84:17
**standpoint** [1] - 64:22
**Stanford** [1] - 143:12
**start** [6] - 4:25; 121:23; 123:16; 160:15; 171:17; 202:17
**started** [9] - 26:3, 24; 32:17; 34:19, 25; 55:7; 59:13; 100:15; 101:24
**starting** [3] - 27:19; 126:13; 165:8
**starts** [3] - 50:7; 144:17; 145:23
**starving** [1] - 13:6
**state** [16] - 31:20; 67:2; 79:16; 89:10; 98:19, 23; 121:13; 138:11; 146:16; 148:19; 152:7, 13; 159:8; 176:19; 185:12; 192:25
**statement** [9] - 5:16-18; 18:16; 116:13; 117:10; 166:3; 176:7; 182:9
**STATEMENT** [4] - 8:9; 18:18; 204:4
**statements** [6] - 8:6; 14:21; 30:15; 117:9; 183:7; 194:19
**STATES** [2] - 1:1, 10
**States** [10] - 32:22; 36:4, 6; 62:7; 72:21; 89:22; 90:8; 118:11; 156:2; 177:25
**states** [24] - 15:6; 40:11; 45:4, 22; 56:17; 64:2; 65:22; 66:23; 70:21, 23; 133:13; 134:17; 144:21; 145:15; 146:18; 149:18; 151:13; 153:20; 154:19; 155:13; 178:25; 179:9
**stating** [1] - 69:14

**Statistical** [1] - 120:5
**status** [15] - 16:2; 28:1, 3, 6, 8, 17; 50:11, 18; 141:1, 22; 142:12, 14, 18; 148:10
**statutory** [1] - 116:5
**stay** [7] - 41:13; 61:9; 65:1; 138:13; 142:7; 157:6; 200:24
**staying** [1] - 6:22
**step** [6] - 18:24; 19:15; 54:15; 95:15; 98:7; 198:22
**Stephen** [3] - 5:25; 97:20; 98:21
**STEPHEN** [9] - 98:16; 106:7; 115:4; 160:16; 204:9
**steps** [2] - 21:5; 22:2
**stethoscope** [1] - 22:4
**Steven** [1] - 6:24
**stigma** [1] - 128:19
**stigmatizing** [1] - 128:16
**still** [11] - 18:1; 56:22; 59:3; 80:9; 81:25; 95:3; 129:15; 183:24; 190:20; 193:20; 197:7
**stimuli** [1] - 51:23
**stipulate** [7] - 11:15; 31:15; 38:8, 10, 15; 98:9, 13
**stipulated** [1] - 178:9
**stipulating** [1] - 133:23
**stomach** [4] - 8:22; 21:21; 22:4, 6
**stone** [1] - 70:16
**stop** [9] - 9:15; 10:16; 11:13; 16:18; 59:17; 170:21; 174:15, 22; 177:3
**story** [2] - 41:24; 134:4
**straddling** [1] - 9:4
**straight** [3] - 56:8; 173:11; 182:17
**straightforward** [1] - 84:12
**strategy** [1] - 9:25
**Street** [1] - 1:23
**strength** [6] - 195:4; 196:8, 18, 23; 197:6, 10
**stress** [4] - 102:13; 105:18; 122:11; 195:1
**strictly** [1] - 142:9
**strike** [24] - 8:12; 9:9, 15; 13:2; 16:25; 18:8; 20:13; 23:24; 71:6; 74:25; 75:2, 5; 95:6; 105:22; 138:17; 139:1, 3, 6; 176:14; 177:1, 4
**striker** [6] - 74:20; 85:23; 87:13, 15; 94:18, 23
**strikers** [11] - 10:11; 35:7; 36:14; 73:10; 74:23; 89:6, 16; 104:24; 176:9, 19
**strikes** [4] - 10:1; 35:13; 90:6; 92:24
**Striking** [1] - 37:11
**striking** [3] - 35:13; 94:13, 25
**strong** [3] - 74:17; 132:2; 166:3
**strongly** [2] - 118:2, 8
**structural** [1] - 77:15
**structured** [1] - 182:17
**studies** [3] - 69:1; 78:14, 18
**study** [2] - 45:18; 68:15

**stuff** [1] - 143:16
**style** [2] - 25:21; 28:18
**sub** [1] - 121:8
**subject** [5] - 11:1; 35:12; 140:19; 154:13; 163:24
**subjected** [1] - 117:6; 195:1
**subjective** [1] - 146:5
**subjective/objective** [1] - 144:21
**subjects** [1] - 102:10
**submit** [4] - 17:12, 17; 55:14; 176:3
**submitted** [5] - 30:16; 33:6, 21; 38:24; 43:2, 6; 55:1, 13, 16; 67:10, 12; 85:17; 102:15; 134:3
**submitting** [2] - 38:5; 55:12
**subset** [2] - 55:14; 156:9
**subspecialists** [1] - 101:15
**subspecialty** [2] - 109:24
**substance** [1] - 28:25
**substantial** [2] - 61:21; 193:15
**substantive** [1] - 97:6
**success** [1] - 27:23
**successfully** [2] - 12:13; 36:11
**sued** [2] - 168:10, 13
**suffered** [2] - 76:19; 182:25
**suffering** [2] - 10:5; 76:4
**suffers** [2] - 45:10; 195:2
**sufficient** [4] - 25:4; 29:16, 18; 58:8
**suicidal** [2] - 61:17; 136:21; 137:25
**suicide** [2] - 136:4; 137:20
**suitable** [1] - 120:5
**suitably** [1] - 129:6
**Suite** [5] - 1:14, 18; 2:4, 8; 3:9
**summarize** [2] - 51:2; 152:5
**summary** [3] - 147:1, 24; 148:2
**Suneja** [1] - 23:15
**sunlight** [1] - 69:17
**sunshine** [2] - 10:9, 20
**Superior** [2] - 85:10; 86:16
**supplement** [3] - 22:24; 25:23; 26:8
**supplements** [2] - 63:7; 156:22
**supply** [1] - 89:21
**support** [12] - 15:21; 57:9, 21; 58:3, 8; 100:23; 104:17; 115:25; 127:4; 142:5; 150:23; 152:16
**supporting** [3] - 51:22; 88:5; 112:4
**supports** [1] - 12:17
**supposed** [1] - 125:17
**Supreme** [2] - 9:17; 11:23
**surface** [1] - 58:1
**surgeon** [7] - 100:9; 102:1; 104:13; 107:5, 8, 11; 115:21
**Surgeon** [1] - 101:2
**surgery** [1] - 99:5
**surprised** [1] - 120:18
**surprising** [1] - 63:9
**survivors** [3] - 36:9; 73:6, 8
**suspect** [1] - 160:9
**suspicion** [1] - 126:21
**sustained** [5] - 40:3; 146:20; 147:5;

151:8; 156:3
**swallow** [2] - 136:1; 192:12
**swallowing** [3] - 121:7; 136:2; 192:16
**SWORN** [2] - 31:9; 98:16
**symptom** [1] - 162:23
**symptomatology** [1] - 46:9
**symptoms** [34] - 15:3; 41:25; 42:5; 46:4; 52:5, 14, 23, 25; 53:3, 20; 66:4, 15; 76:7; 82:6; 103:5; 121:6, 8, 15, 18; 123:2, 10, 19, 24; 124:16, 20; 126:1, 22-23; 127:1; 128:15
**syndrome** [19] - 65:24; 66:2, 10, 13; 77:10, 12; 105:18; 119:23; 121:4; 122:2, 21; 123:20; 124:10, 18; 163:9, 18, 25; 164:24; 165:13
**syndromes** [1] - 123:18
**Syrian** [1] - 18:4
**system** [4] - 10:17; 82:24; 83:1; 128:22
**systematic** [1] - 155:22

## T

**table** [3] - 4:11, 21; 98:3
**tactics** [1] - 139:10
**talks** [2] - 127:1; 148:18
**taped** [1] - 168:14
**Task** [1] - 153:22
**task** [1] - 174:24
**tasked** [1] - 195:25
**taught** [2] - 101:16; 147:17
**teach** [3] - 101:18; 172:4, 8
**Teaching** [1] - 173:10
**teaching** [3] - 100:19; 101:10
**team** [5] - 47:1; 75:18; 150:2, 23; 173:7
**teaspoons** [1] - 22:9
**technical** [1] - 4:17
**technicality** [1] - 30:12
**technician** [2] - 147:14; 148:9
**technicians** [3] - 147:9, 12
**telecommunications** [1] - 187:5
**telemedicine** [2] - 171:12
**temperature** [1] - 197:13
**ten** [7] - 153:5; 164:19; 168:24; 177:7; 199:12; 200:1
**tendencies** [1] - 137:25
**tension** [1] - 132:15
**term** [6] - 64:12; 66:1; 147:12; 164:24; 169:17; 177:17
**terms** [14] - 6:22; 40:5; 41:15; 53:3; 121:6; 125:14; 129:10; 133:23; 142:15; 143:6; 148:14; 156:14; 157:7; 200:19
**terribly** [1] - 146:12
**territories** [1] - 103:25
**Terror** [1] - 175:5
**terrorism** [1] - 178:2
**Terry** [2] - 3:6; 4:21
**terry.henry@usdoj.gov** [1] - 3:11
**test** [3] - 45:16; 70:9; 81:10

**testicles** [1] - 41:19

**testicular** [1] - 70:3

**testified** [30] - 30:19; 74:7; 82:3; 83:6; 85:5, 24; 87:4, 24; 90:21, 23; 91:6, 14, 19; 111:22, 25; 112:2, 22, 24; 113:2; 161:14; 162:8, 19; 166:14; 174:18, 21; 177:24; 178:5, 7

**testify** [8] - 13:19; 14:9, 15; 30:14; 91:18; 112:14; 202:22

**testifying** [3] - 55:7; 59:4; 117:23

**testimony** [36] - 5:24; 14:2; 30:15; 44:9; 46:15; 71:22; 76:16; 77:9; 79:18; 86:2, 13, 15; 87:6, 11, 21; 89:3; 90:25; 95:8, 22; 96:24; 111:7; 112:16; 114:19; 118:3; 154:21; 156:5; 162:11; 174:21; 179:1, 10, 12; 200:18; 202:18

**testing** [3] - 54:5; 69:13; 194:17

**tests** [10] - 54:9; 67:11, 14-15; 70:10, 21; 123:13; 124:12, 24; 125:2

**Texas** [3] - 100:5, 9

**that'd** [1] - 162:9

**that'll** [1] - 112:13

**themselves** [7] - 4:8; 5:1; 17:17; 24:6; 94:20; 124:22; 174:6

**theoretical** [1] - 179:16

**theory** [1] - 42:6

**therapy** [2] - 53:11; 142:4

**thereafter** [1] - 170:12

**therefore** [4] - 27:4; 49:19; 121:9; 140:7

**Thereupon** [3] - 54:18; 96:15; 153:6

**they've** [4] - 7:16; 15:4; 121:21; 126:1

**thigh** [1] - 51:17

**thin** [2] - 58:7, 14

**thinking** [4] - 6:15; 122:7; 128:2; 195:19

**thinks** [6] - 40:15; 42:1; 128:22; 138:7; 161:14; 162:8

**third** [7] - 6:24; 110:21; 133:13; 149:17; 187:13; 190:14; 200:9

**Thomas** [2] - 112:11; 113:1

**thorough** [3] - 69:16, 21; 180:3

**thoughtful** [1] - 29:21

**thoughtfully** [1] - 128:25

**threat** [1] - 17:18

**threatened** [2] - 13:9; 144:3

**three** [13] - 12:15; 15:13, 16; 19:12; 21:8; 90:5; 115:11; 161:3; 165:1, 12; 181:21; 197:4; 198:9

**threshold** [1] - 21:23

**throat** [2] - 8:19; 23:20

**throughout** [2] - 18:22; 64:10

**thrown** [1] - 25:10

**Thursday** [5] - 11:17; 20:1; 188:18, 20, 22

**Tickborne** [1] - 195:18

**tie** [2] - 150:3

**tied** [1] - 150:21

**tightly** [1] - 8:17

**timing** [3] - 167:22; 200:4

**Timothy** [4] - 2:16; 4:21; 32:21; 72:20

**timothy.walthall@usdoj.gov** [1] - 2:20

**tired** [1] - 49:6

**title** [2] - 31:21; 98:19

**titled** [2] - 49:25; 170:15

**titles** [1] - 172:23

**today** [12] - 25:1; 29:19; 64:13; 85:17; 108:23; 109:6; 160:22; 199:23, 25; 200:12; 201:2

**together** [3] - 30:11, 18; 41:24; 49:14; 72:8; 130:21; 147:6; 161:2, 5, 8; 174:24; 185:20; 200:18

**tolerated** [5] - 85:3; 87:18; 88:4, 20

**tolerates** [1] - 21:15

**tomorrow** [9] - 6:23; 96:5; 199:2, 24; 201:1, 6; 202:14, 17

**tone** [1] - 196:13

**took** [5] - 15:23; 51:22; 74:24; 92:22; 193:24

**toothpaste** [1] - 57:13

**top** [11] - 36:24; 55:17; 80:19; 101:25; 102:1, 3; 129:18; 130:6; 141:14; 145:15; 188:5

**topics** [4] - 20:24; 171:14; 173:25; 174:5

**torture** [11] - 8:18; 35:7, 11, 14, 23; 36:9, 13; 73:6, 8; 104:3; 171:19

**Torture** [2] - 37:12; 173:15

**total** [3] - 39:14; 75:15; 90:5

**totalling** [1] - 23:1

**totally** [3] - 96:21; 124:7; 193:14

**touch** [1] - 197:12

**touches** [1] - 103:4

**tough** [1] - 9:25

**tour** [1] - 101:2

**toward** [1] - 159:19

**towards** [2] - 119:19; 195:9

**trained** [1] - 104:10; 116:1; 194:3

**training** [7] - 34:18; 77:24; 100:15; 101:14; 104:15; 115:18; 116:3

**trans** [2] - 25:14, 19

**transcribe** [1] - 186:17

**transcript** [2] - 3:16; 203:10

**TRANSCRIPT** [1] - 1:9

**transcription** [1] - 3:16

**transfer** [3] - 142:8; 148:15; 179:13

**transferred** [3] - 99:23; 138:5; 152:18

**transportation** [1] - 25:20

**transported** [2] - 25:15; 125:6

**trauma** [5] - 35:11, 23; 36:10; 69:25; 73:7

**traumatic** [6] - 69:12; 102:13; 105:17; 122:11; 172:16

**travel** [1] - 36:25

**treat** [14] - 19:8; 40:21; 45:9; 46:21; 53:3; 66:15; 69:4; 77:8; 82:8; 121:18, 24; 128:14; 152:17; 195:17

**treated** [17] - 9:6; 10:11; 14:10; 17:19; 47:25; 49:8; 53:20; 103:21; 104:2; 108:23; 109:7, 14; 123:7; 128:25; 138:8, 19; 184:19

**treating** [5] - 18:7; 29:15; 110:7; 121:23; 192:25

**treatment** [36] - 13:9; 17:2; 19:1, 5, 14; 20:14; 29:16; 47:1; 49:3; 53:10; 63:5; 71:18; 75:18; 79:9; 94:5, 13; 95:2; 102:10, 12; 103:24; 104:11, 24-25; 106:1; 107:20; 115:19; 117:17; 118:10; 133:21; 141:22; 142:1, 4; 152:7; 159:9; 176:2

**trial** [4] - 88:8; 160:2, 5; 178:2

**Trial** [5] - 2:11, 16, 21; 3:2, 6

**tribunal** [1] - 35:25

**Tribune** [1] - 168:3

**tries** [1] - 138:9

**troops** [2] - 115:24; 156:1

**trouble** [8] - 10:16; 26:25; 33:7; 78:11; 119:9; 156:24; 192:16; 193:3

**troubling** [3] - 40:20; 41:10; 50:16

**true** [5] - 25:1; 161:1; 171:16; 183:8; 201:25

**truly** [1] - 201:18

**trussed** [1] - 8:17

**trust** [5] - 47:19; 48:13, 17; 59:10, 23

**trustworthy** [1] - 123:16

**try** [4] - 96:11; 153:5, 11; 194:7

**trying** [13] - 61:22; 67:19; 76:16; 117:11; 121:25; 124:22; 172:3, 8; 181:15; 182:10, 20; 200:18; 202:15

**tube** [48] - 8:19, 24; 9:2; 12:15; 17:5, 10, 13; 21:2, 7, 12, 19, 21, 23; 22:5, 8-9, 15; 23:9, 13, 17, 21; 24:4, 10; 60:18, 20, 24; 61:5, 8, 11, 15, 17, 19; 62:2, 4, 14; 64:6, 9; 83:24; 84:14; 88:9, 11, 16, 19; 94:9; 130:10

**tubes** [11] - 10:22; 17:3; 21:6, 9; 22:2; 24:1, 6; 25:3; 62:9; 84:2

**Tudor** [1] - 1:23

**Tuesday** [2] - 7:8

**Turkish** [1] - 176:25

**turn** [9] - 14:19; 16:4; 17:3; 79:22; 81:5; 129:15; 133:11; 175:18; 190:13

**turned** [2] - 55:20; 190:19

**Turner** [2] - 9:17; 13:12

**turning** [1] - 162:15

**turnover** [1] - 48:16

**twice** [1] - 17:11

**two** [22] - 9:20; 22:9; 37:25; 57:1; 70:2; 75:14; 79:20; 86:8; 97:11, 22; 113:23; 130:20; 140:24; 155:4, 11, 20; 158:4; 162:1, 19; 163:11; 180:22; 194:19

**Tylenol** [5] - 188:6; 190:3, 8, 19

**type** [1] - 105:15

**typical** [2] - 24:10; 146:8

**typically** [4] - 22:24; 28:1; 61:14; 88:14

**typo** [1] - 112:10

# U

**U.S** [7] - 2:12, 17; 3:2, 7, 13; 98:22; 112:9
**UK** [1] - 1:23
**ultimately** [1] - 42:14
**Ultram** [4] - 134:21; 135:24; 192:4, 7
**Ultrum** [1] - 134:25
**um-hmm** [3] - 121:2; 164:22; 199:19
**unable** [1] - 94:17
**unclassified** [2] - 32:16; 118:14
**uncomfortable** [4] - 84:5, 19; 156:20; 159:7
**unconstitutional** [1] - 18:13
**under** [24] - 21:8; 29:10; 55:2, 16; 74:19; 97:3, 6; 108:5; 125:6; 126:5; 127:12; 130:11; 139:14; 144:17, 21; 146:18; 150:19; 158:17, 25; 164:9, 12; 166:5; 175:24; 189:5
**undercuts** [1] - 21:25
**undergone** [1] - 54:2
**undergraduate** [1] - 99:1
**underlying** [1] - 197:14
**undermined** [2] - 59:10, 23
**undermines** [1] - 19:4
**undermining** [1] - 71:19
**understandable** [1] - 132:15
**understandably** [1] - 138:4
**undertake** [1] - 95:23
**undertaken** [1] - 13:2
**underweight** [2] - 14:7; 69:19
**undoubtedly** [1] - 6:19
**unfair** [3] - 168:19, 21
**unfortunate** [1] - 184:15
**unhealthy** [1] - 170:15
**Uniform** [2] - 101:17; 172:4
**unintelligible** [1] - 122:8
**unique** [1] - 122:17
**Unit** [7] - 47:9; 107:6; 127:21, 24; 128:11; 129:8; 144:16
**United** [10] - 32:21; 36:4, 6; 62:7; 72:20; 89:22; 90:8; 118:11; 156:2; 177:25
**UNITED** [2] - 1:1, 10
**universally** [1] - 8:18
**University** [7] - 31:23; 34:15; 35:2; 99:4, 13; 101:18; 172:5
**university** [1] - 34:14
**unknown** [1] - 31:11
**unless** [3] - 12:10; 142:9; 197:21
**unnecessary** [3] - 17:1; 18:13; 154:3
**unquote** [2] - 126:17; 166:10
**unshackled** [1] - 197:24
**unspecified** [2] - 159:15, 17
**unsubstantiated** [1] - 20:21
**unto** [1] - 139:1
**unusual** [1] - 51:18
**unworthy** [1] - 18:14

**up** [53] - 6:8; 8:17, 19, 23; 16:25; 17:11; 21:7; 23:3; 28:11; 38:1; 40:18; 49:16; 54:12; 55:19; 61:9; 64:24; 68:4; 79:25; 83:1; 86:8; 95:13; 98:7; 99:9; 119:3; 126:18; 128:16; 131:4, 8; 137:9; 138:8; 139:18; 144:23; 145:25; 149:16; 150:4; 151:13; 154:17; 155:9; 162:15; 165:6; 167:2, 5; 169:18; 171:1, 8; 175:10; 180:22; 190:11; 192:12; 201:13
**upheld** [2] - 23:12; 24:24
**urethral** [1] - 17:9
**urinary** [4] - 41:21; 79:10; 80:24; 81:9
**urinate** [1] - 41:22
**urination** [1] - 70:4
**urine** [8] - 15:2; 25:10; 41:20; 53:17, 24; 70:14; 81:10; 93:22
**urologic** [1] - 80:25
**urological** [1] - 93:19
**urologist** [5] - 53:23; 70:8; 79:13; 81:15
**urology** [8] - 53:23; 70:2; 79:8, 20; 80:17, 20; 81:12, 16
**useful** [5] - 71:3; 146:12, 15; 148:8
**uses** [1] - 26:18
**usual** [1] - 39:13
**utilize** [1] - 46:25
**utilized** [2] - 29:5; 154:21

# V

**vague** [1] - 140:3
**valid** [1] - 159:3
**validity** [2] - 145:3, 5
**value** [1] - 74:24
**variability** [1] - 61:2
**variety** [2] - 102:8; 103:15
**various** [2] - 8:12; 64:15
**varying** [1] - 157:16
**vehicle** [2] - 40:3; 182:25
**vengeful** [1] - 143:21
**verbally** [1] - 19:7
**verify** [2] - 40:15; 183:3
**version** [1] - 120:6
**versus** [12] - 4:7; 12:1; 23:15; 24:18; 36:4, 6; 85:19; 86:15; 112:9; 119:23; 129:8
**veterinary** [1] - 108:3
**viable** [1] - 12:18
**Victims** [1] - 37:11
**victims** [6] - 35:6, 13-14; 36:13; 104:3, 5
**videotapes** [4] - 10:12; 17:17; 37:7; 95:24
**Vietnam** [5] - 104:8; 122:14; 126:14, 16; 172:20
**view** [18] - 17:4; 25:16; 28:6; 37:7; 48:18; 52:17; 69:4; 126:10; 127:8; 131:12; 132:7; 141:21; 143:19; 146:25; 147:23; 157:14; 159:2; 173:18

**vigilant** [1] - 8:1
**vindictive** [1] - 143:20
**violate** [1] - 13:12
**violation** [2] - 48:20; 151:17
**violations** [3] - 143:9, 13
**violence** [3] - 11:1; 196:6; 198:9
**violent** [5] - 25:7; 142:20-22; 195:12
**violently** [3] - 195:5, 9; 197:16
**Virginia** [2] - 98:24; 100:4
**visibly** [1] - 51:4
**visit** [8] - 37:6; 64:22; 66:9; 67:10; 71:1; 132:20; 141:15; 147:9
**Visit** [1] - 50:1
**visited** [3] - 67:7, 9; 184:14
**vitae** [9] - 32:2; 33:18, 20, 22; 34:7; 44:3, 8; 85:17; 102:16
**VOIR** [2] - 106:7; 204:10
**volume** [1] - 22:18
**Volume** [1] - 119:4
**volumes** [1] - 22:19
**voluminous** [1] - 55:11
**voluntarily** [8] - 25:23; 26:9, 12; 63:6; 167:2, 5; 193:14
**voluntariness** [1] - 178:11
**voluntary** [3] - 11:24; 75:2, 5
**vote** [1] - 141:16
**vulgar** [1] - 25:11
**vulnerable** [1] - 78:25

# W

**Wa'el** [4] - 4:6; 8:11; 18:2
**WA'EL** [1] - 1:3
**wait** [10] - 30:21; 49:6; 155:5; 170:21; 171:6; 188:16; 191:22; 202:10
**waiting** [1] - 34:4
**waive** [1] - 104:7
**walk** [10] - 14:24; 27:7, 9-10; 41:3; 48:8; 49:12; 66:17; 111:19
**walked** [1] - 26:14
**walker** [3] - 15:21; 57:21; 58:11
**walker/crutches** [1] - 57:8
**walking** [3] - 27:11; 45:6; 160:23
**walks** [1] - 27:12
**Wallace** [3] - 3:12; 203:10, 13
**Walthall** [4] - 2:16; 4:21; 32:21; 72:20
**WALTHALL** [32] - 32:21; 33:13, 17; 37:14, 17; 44:6; 46:13; 72:10, 13, 16, 20, 24; 76:15; 80:5, 11, 15; 85:2; 86:5, 11, 14, 19, 21, 23; 89:2; 92:17; 93:3, 11; 96:23; 97:2, 5, 14; 204:7
**wants** [12] - 9:6; 16:1; 50:9; 138:13; 139:2, 4; 140:25; 141:8; 143:24; 157:4
**War** [8] - 100:20, 22; 104:17; 116:2; 126:14; 173:13; 175:5
**war** [8] - 35:10; 73:7; 74:16; 104:8, 11; 108:16; 115:25; 173:19
**WARDEN** [15] - 4:19; 18:17, 19; 19:25; 20:3; 23:23; 24:24; 26:7; 27:6, 21; 28:8,

23, 25; 55:25; 56:4

**Warden** [4] - 2:11; 4:19; 18:19; 55:25
**warned** [1] - 14:21
**warrant** [1] - 69:12
**Washington** [14] - 1:7, 15, 19; 2:4, 13, 18, 22; 3:4, 9, 14; 35:2; 170:13; 174:6
**water** [19] - 22:8-10, 12, 25; 133:6; 135:25; 136:3, 11, 13, 22; 192:10, 18; 193:3, 21
**waterboarded** [1] - 158:20
**ways** [5] - 10:4; 19:1; 127:4; 182:20
**WC** [1] - 50:9
**weak** [2] - 51:16; 66:12
**weaker** [1] - 51:20
**weakness** [12] - 40:23; 41:2, 6; 45:8; 77:14; 123:9, 25; 139:22; 152:11; 184:3; 197:6
**weapon** [1] - 61:17
**Weaponized** [1] - 173:16
**Wednesday** [1] - 11:17
**week** [1] - 109:19
**weeks** [9] - 11:9; 12:5; 15:13, 16; 61:9; 147:17; 155:4, 11; 184:11
**weighed** [1] - 61:12
**weighs** [1] - 159:5
**weight** [8] - 19:18, 24; 145:7; 177:17, 20, 22; 178:25; 179:10
**welcome** [1] - 20:21
**well-settled** [1] - 11:23
**well-tolerated** [5] - 85:3; 87:18; 88:4, 20
**Wesley** [1] - 112:13
**western** [2] - 122:5; 143:23
**wheelchair** [51] - 10:25; 11:4, 14, 20; 12:10; 14:25; 15:4, 7, 9, 11, 18-19, 24; 16:1, 3; 25:19, 21, 24; 26:5, 14, 24-25; 27:3, 5; 28:7, 10, 12, 18, 22; 48:7, 10; 49:11; 50:9, 12, 20; 66:14, 17; 129:25; 139:21; 140:10, 25; 141:3, 8-9; 149:19, 21; 151:13, 25; 159:12
**wheelchairs** [1] - 151:22
**whichever** [1] - 55:6
**White** [1] - 23:15
**whole** [4] - 41:24; 127:11; 165:3; 202:21
**William** [1] - 86:16
**willing** [13] - 14:9; 47:11; 63:15, 17; 65:6, 9; 84:5; 131:7; 137:14; 149:18; 159:12
**WILTSIE** [84] - 7:13, 15; 8:2, 22; 29:24; 30:3, 7, 17; 34:2, 4; 106:5, 8; 109:5; 113:23; 114:15, 22, 25; 128:1, 4; 145:6, 10; 147:3; 150:5; 151:4; 155:24; 160:2, 7, 9, 12, 17; 164:21, 23; 165:1, 5, 8, 10; 166:13; 167:15; 169:7; 170:24; 171:4, 7, 10, 21, 23; 173:3, 8; 174:8; 175:7, 10, 12, 15; 178:17, 19, 23; 179:3, 6, 8; 180:22; 181:1; 187:3; 190:11; 193:19; 194:21, 23; 198:10, 13, 16, 18, 20; 199:7, 19, 22; 201:7, 10, 12, 16, 23;

202:4; 204:11, 13
**Wiltsie** [3] - 2:21; 4:21; 106:9
**window** [1] - 160:22
**Winfield** [2] - 112:6, 24
**wish** [4] - 6:4; 18:15; 167:9; 176:2
**wishes** [4] - 5:17; 6:3; 95:17; 175:23
**withdraw** [1] - 150:8
**withdrawal** [1] - 49:10
**withdrawing** [1] - 59:15
**withdrew** [1] - 51:24
**withheld** [2] - 48:8; 50:17
**withhold** [2] - 50:20; 66:17
**withholding** [2] - 58:2, 5
**witness** [42] - 5:20, 25; 6:24; 29:25; 30:2, 4-5; 31:6, 11, 16; 35:24; 36:3, 5, 8, 12; 37:16, 18; 38:14; 49:21; 54:21; 80:8; 85:9; 93:4; 95:16; 96:8, 11, 21, 25; 97:18; 113:1; 114:24; 115:1; 153:10; 160:13; 164:10; 169:5; 175:7; 178:17, 19; 179:12; 200:9; 202:22
**WITNESS** [48] - 31:9; 46:19; 58:22; 59:9, 14, 18; 61:23; 62:12, 21; 68:7, 10, 13; 80:14; 84:15; 86:10, 22; 88:25; 93:21; 95:10; 98:16; 99:11; 114:12; 119:15; 120:17, 21; 133:4, 7; 145:7; 147:7, 15; 148:7, 16; 150:11; 157:20; 159:18; 164:12, 16, 19, 25; 165:3; 166:6, 8, 11; 169:6; 173:4; 180:24; 193:11, 17
**witness's** [2] - 178:22; 200:18
**witnessed** [1] - 48:1
**witnesses** [4] - 7:17; 42:16, 18; 55:7
**wonder** [1] - 59:5
**wonderful** [1] - 4:24
**wonders** [1] - 187:4
**word** [11] - 26:21; 41:4; 74:24; 80:20; 81:4, 23; 140:1; 174:3; 183:11; 193:24
**words** [1] - 9:14
**works** [2] - 19:10; 64:5
**workup** [1] - 70:10
**World** [3] - 74:23; 89:7, 13
**world** [5] - 46:6; 118:6; 122:5; 128:13
**worried** [2] - 138:4, 14
**worse** [6] - 40:12, 14; 68:9, 11; 69:2; 135:18
**worst** [1] - 160:3
**wrist** [2] - 57:11
**write** [12] - 57:19; 58:24; 73:25; 145:11; 147:10, 23; 148:1; 160:20; 173:5; 179:23; 196:20
**writing** [3] - 41:15; 59:25; 130:14
**written** [11] - 30:16; 73:13; 90:5; 136:15; 157:12; 160:22; 171:5; 176:7; 177:7; 184:7
**wrongdoing** [1] - 167:19
**wrote** [5] - 67:8; 90:1, 4; 134:1; 172:25

**X**

**x-ray** [2] - 79:1; 125:11
**x-rays** [1] - 67:5
**XENAKIS** [9] - 98:16; 106:7; 115:4; 160:16; 204:9
**Xenakis** [79] - 6:1; 8:3; 14:9; 29:25; 30:4, 10, 13, 18, 20; 39:12; 47:25; 63:8; 65:22; 96:9; 97:20, 25; 98:9, 13, 21, 25; 99:8, 16; 100:6; 101:4, 20; 102:6, 22; 104:18; 105:25; 106:9; 115:6, 13, 16; 117:13; 118:13; 119:1, 18, 25; 120:25; 122:2; 124:24; 125:22; 127:19; 128:9; 129:21; 130:17; 131:12; 132:25; 133:10; 134:2, 17-18, 23-24; 135:4; 138:23; 140:1; 141:5; 146:17; 147:23; 149:12, 23; 150:14; 151:6, 11, 23; 152:5, 19; 153:14, 23; 155:19; 156:7; 157:10; 158:4, 10; 159:8; 179:10; 199:23; 200:12
**Xenakis'** [4] - 33:18, 22; 102:16; 179:10
**Xenakis's** [1] - 178:25

**Y**

**year** [18] - 9:5; 15:18; 36:19; 37:6; 68:4; 70:3; 79:21; 109:17; 125:17; 140:15, 17; 151:14; 164:16; 168:5; 169:14; 174:10, 18
**years** [28] - 8:12; 17:24; 18:1, 4-5; 52:21; 61:4; 84:2; 93:23; 99:25; 100:1; 111:5; 115:7, 10-11; 125:4, 8; 126:18; 143:3; 146:14; 164:19; 169:14; 171:2; 184:17; 195:6
**yesterday** [1] - 60:18
**York** [3] - 168:2; 178:3
**you-all** [1] - 6:21
**young** [2] - 126:14, 18
**yourself** [2] - 90:12; 131:19

**Z**

**Zimbardo** [1] - 143:12