UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ABU WA'EL (JIHAD) DHIAB (ISN 722),<br><br>*Petitioner,*<br><br>v.<br><br>BARACK H. OBAMA, *et al.*,<br><br>*Respondents.* | Civil Action No. 05-CV-1457 (GK) |

## RESPONDENTS' MOTION FOR RECONSIDERATION OF THE COURT'S OCTOBER 3, 2014 MEMORANDUM OPINION AND ORDER

Respondents respectfully request that the Court reconsider its Memorandum Opinion and Order of October 3, 2014. *See* ECF Nos. 348 & 349 (hereinafter "Order"). The Court's Order, for the first time in any Guantanamo Bay habeas proceeding, required the public disclosure of classified national security information; specifically, 32 videos classified at the SECRET level that depict Petitioner Jihad Dhiab, a former Guantanamo Bay detainee, being removed from his cell via Forced Cell Extraction ("FCE") and/or enterally fed. At the time the Court issued its Order regarding the videos ("FCE videos"), the Court did not have the opportunity to consider the collection of supplemental declarations from high-ranking military officers, later submitted to the Court in the context of a motion to stay the Court's Order pending appeal, explaining in more detail the serious damage to national security that could result from public release of the FCE videos. The Court should now reconsider its Order on the basis of these supplemental declarations, consistent with the recent invitation from the Court of Appeals. *See Dhiab v. Obama*, No. 14-5299, 2015 WL 3429124 at *3 (D.C. Cir. May 29, 2015) (per curiam) ("Finally,

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET//NOFORN

leaving the case in the district court will also give that court an opportunity to consider the

supplemental declarations that the government submitted in support of its stay motion.").

As explained by the Court of Appeals, Respondents' supplemental declarations "set out

the harm associated with release of the videotapes in considerably more detail than the

declarations the government submitted in opposition to the initial motion." *Id.* Indeed, these

declarations, which are based upon the considered judgment of high-ranking military officers

with extensive knowledge of the potential danger to national security, explain the serious harms

that could result from public disclosure of the FCE videos, and which justify their SECRET

classification.

First, the declarations elaborate how public release of the FCE videos could harm the

United States' defense against transnational terrorism, endanger the lives of U.S. personnel,

adversely impact the security conditions in Afghanistan and Iraq, and aid in recruitment and

financing of terrorist groups.  Prior public releases of certain types of photographs and

information have caused harm to the national security, including the deaths of U.S. military

personnel, and the declarations explain with particularity that groups such as Al Qaeda and the

Islamic State of Iraq and the Levant ("ISIL") could use the FCE videos to promote similar hostile

actions against the United States.  Second, the declarations provide additional specificity that

detainees have a limited ability to view the FCE process; thus, public release of the FCE videos,

which depict the entire cell extraction process and include security details that have never been previously

disclosed publicly, could aid in the development of specific cell extraction countermeasures and

compromise the safety of military personnel.  Third, the declarations address in more detail the

concern that release of the FCE videos may encourage detainees, in the hope that videos of their

own cell extractions eventually would also be released, to act out so as to trigger more cell

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

extractions, which would increase the risk of injury to both detainees and military personnel. Consistent with well-established precedent, these judgments from senior military officers concerning harm to the national security must be accorded substantial deference by the Court.

As explained further below, the Court erred in concluding that a qualified First Amendment right of access to judicial records applies to properly classified information. But even if the Court continues to conclude that such a qualified right attaches to the classified FCE videos at issue here, Respondents' supplemental declarations are sufficient to overcome that right. Indeed, the supplemental declarations explain in significant detail the harm to an overriding, compelling interest – national security – that could result from public disclosure of the FCE videos. When the supplemental declarations are given proper deference, they establish that the FCE videos are properly classified to protect important national security interests and should remain protected from public release. Accordingly, the Court should reconsider its Order and deny the motion to unseal the FCE videos.

## BACKGROUND

### 1. Prior District Court and Court of Appeals Proceedings

The Court's Memorandum Opinion of October 3, 2014, explains the relevant procedural history and factual background of this case in considerable detail. *See Dhiab v. Obama*, 2014 WL 4954458 at *1-2 (D.D.C. Oct. 3, 2014). In short, a group of media organizations intervened in this case in June 2014 for the purpose of moving to unseal 32 classified FCE videos, which had been filed with the Court under seal in connection with litigation to enjoin Petitioner Dhiab's enteral feeding. *See id.*; *see also Dhiab v. Obama*, 2014 WL 5795483 (D.D.C. Nov. 7, 2014) (denying Petitioner's motion for preliminary injunction). The Court granted the motion to unseal the FCE videos. *See Dhiab*, 2014 WL 4954458 at *1. In so doing, the Court acknowledged that

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

no court ever before had ordered public disclosure of classified information over the

Government's objection in the Guantanamo Bay habeas litigation. *Id.* at *5.

　　In granting the motion, the Court applied the two-step "experience and logic" test of

*Press Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 (1986) ("*Press–Enterprise II*"), a case

governing access to unclassified criminal trial records, to conclude that the classified FCE videos

are subject to the public's First Amendment right of access to judicial records. With respect to

the first prong of that test, which focuses on the history of public access to the particular

information sought, the Court explained that there has been a history of public access to habeas

proceedings generally, but did not cite any authority to support a tradition of public access to

classified information filed in connection with those proceedings. *See id.* at *5. The Court also

concluded that the second prong of the test was satisfied, stating "that the public plays a

significant positive role in the functioning of these habeas proceedings." *Id.* (quoting *In re*

*Guantánamo Bay Detainee Lit.*, 624 F. Supp. 2d 27, 31 (D.D.C. 2009)). The Court, however,

made no findings addressing how public release of national security information classified by the

Executive Branch would enhance the public's ability to monitor or evaluate the habeas

proceedings in which the information was introduced. Nor did the Court address the previous

ruling by a other member of this Court that public release of classified information would not

play a significant positive role in the habeas proceedings.

　　After concluding that a First Amendment right of access attached to the FCE videos, the

Court held that the videos must be disclosed unless Respondents carried a "heavy burden" of

demonstrating a "'substantial probability' of harm to an 'overriding interest.'" *Id.* at *6 (quoting

*Press-Enterprise II*, 478 U.S. at 14). The Court therefore did not address whether the FCE

videos had been properly classified under governing classification criteria, which authorizes

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

classification of information that "could reasonably be expected to cause identifiable or describable damage to the national security." *See* Exec. Order No. 13,526, Classified National Security Information, § 1.4(c), 75 Fed. Reg. 707 (Dec. 29, 2009).

Applying the heightened *Press-Enterprise II* standard, the Court concluded that Respondents had not made the required showing on the basis of information set forth in the declaration of Rear Admiral Richard W. Butler ("RDML Butler Decl."), attached hereto as Exhibit 1. *See Dhiab*, 2014 WL 4954458 at *7. First, the Court rejected as legally insufficient Respondents' asserted harm that the videos could be used by terrorists as propaganda. The Court did not dispute the factual assessment in RDML Butler's declaration that that the FCE videos "would prove useful as propaganda for Al Qaeda and its affiliates and could increase anti-American sentiment, thereby placing the lives of United States service members at risk." *Id.* at *10. But the Court nonetheless rejected that basis for withholding the videos from public disclosure, analogizing Respondents' argument to a heckler's veto, despite citing no authority for applying the heckler's veto concept to either the qualified First Amendment right of public access to judicial records or to assessments of the dangers of publicly disclosing classified national security information. *Id.*

The Court also rejected the conclusions in RDML Butler's declaration that release of the videos could enable detainees and other enemies to develop countermeasures to forced cell extractions and enteral feedings. *Id.* at *7-9. The Court reasoned that Respondents had failed to show a "substantial probability" of harm given, in the Court's view, the detainees' familiarity with, and available public information regarding, the FCE procedures. *Id.* The Court did so notwithstanding RDML Butler's considered judgment that release of the videos would allow for a more thorough assessment of the military's security procedures, many of which are outside the

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET//NOFORN

view of the detainees and have not been released publicly. *Id.; see also* RDML Butler Decl. ¶¶ 12-14.

Similarly, the Court dismissed Respondents' concerns about public disclosure of the physical layout of the Guantanamo detention facilities, concluding that Respondents had released "the very same information to the public." *See Dhiab*, 2014 WL 4954458 at *10. To support this conclusion, the Court cited a variety of public source materials about Guantanamo Bay, but the Court did not conduct any comparison between the more detailed FCE videos and the less detailed public information. *Id.* The Court also did not acknowledge RDML Butler's conclusions about how the public availability of other related, less detailed information does not eliminate the likelihood of harm resulting from release of far more specific information in the FCE videos. *Id.; see* RDML Butler Decl. ¶¶ 10-11, 15.

The Court further rejected as "entirely too speculative" Respondents' assertion that release of the videotapes might result in more FCEs, stating that the Court was requiring only Petitioner Dhiab's FCE videos to be released. *See Dhiab*, 2014 WL 4954458 at *10. The Court, therefore, did not address RDML Butler's considered judgment that even the release of only Petitioner's cell extraction videos will incentivize other detainees to act disruptively, in the hope that video recordings of their own cell extractions would also be released, thereby increasing the risk of harm to both detainees and U.S. military personnel. *Id.; see* RDML Butler Decl. ¶ 18.

The only asserted harms that the Court credited were those from releasing unclassified identifying information about United States personnel and covert communications by detainees. *See Dhiab*, 2014 WL 4954458 at *11. The Court, thus, concluded that Respondents could make only limited redactions to the FCE videos to protect these interests. *Id.*

SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

On October 9, 2015, six days after the Court granted the motion to unseal, the Court issued an additional order specifying that Respondents must complete the permitted redactions in 8 days, by October 17, 2014. *See* Order (ECF No. 355). The Court also ordered the press intervenors and Respondents to submit a joint proposal "regarding how the videotapes can be made available to the public most efficiently." *Id.*

Respondents promptly moved to stay the Court's October 3 and October 9 Orders pending a decision on whether to appeal. *See* ECF No. 357. In support of that motion, Respondents submitted a declaration from the Department of Defense explaining that the redactions to the FCE videos could not be completed in the limited 8-day period provided by the Court, explaining the heavy burden and estimated time required to complete the complex task of redacting the videos. *See id.* The Court subsequently stayed its orders until December 2, 2014. *See* Orders (ECF Nos. 360, 367). Respondents filed a notice of appeal on that date and also moved to extend the stay pending final resolution of the appeal. *See* ECF Nos. 375, 377. Respondents' stay motions included the submission of three additional declarations from high-ranking military officers, described in more detail below, explaining the harm to national security that could result from public release of the FCE videos. *See* ECF Nos. 357, 375. On December 3, 2014, the Court granted Respondents' motion to stay pending appeal. *See* Order (ECF No. 378).

On appeal, the Court of Appeals declined to reach the merits of the First Amendment issue, concluding that Respondents' appeal was "premature." *See Dhiab*, 2015 WL 3429124 at *1. Specifically, the Court of Appeals held that it lacked jurisdiction over the appeal because the Court's Orders of October 3 and 9 were neither final appealable orders under 28 U.S.C. § 1291, nor did the orders fall within the collateral order doctrine. *See id.* at *1-3. The Court of Appeals

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

also denied Respondents' alternative request to exercise mandamus jurisdiction. *See id.* at *3. In reaching this conclusion, the Court of Appeals explained that the Court's Orders did not require the public release of any classified information and noted that there will likely be further litigation regarding the scope of the redactions before the Court would be in a position to issue a final release order. *See id.* at *1-2 ("This is simply not a case in which the district court has already ordered disclosure of allegedly protected documents."). Consequently, the Court of Appeals stated that "the government has another adequate means to prevent the release of the videotapes because it can appeal anew if the district court finally orders the videotapes unsealed and released." *Id.* at *3.[1]

The Court of Appeals also explained "that leaving this matter with the district court for the time being may have three salutary effects." *Id.* First, the court explained that this Court would have the opportunity to reconsider the schedule for production of the redacted FCE videos. *Id.* Second, the Court of Appeals noted the possibility that the redacted FCE videos may limit the scope Government's concerns over release over public release of the videos. *Id.* Third, as most relevant here, the Court of Appeals stated:

> Finally, leaving the case in the district court will also give that court an opportunity to consider the supplemental declarations that the government submitted in support of its motion for a stay. When it ruled on the intervenors' motion to unseal, the district court did not have an opportunity to consider those declarations, which set out the harm associated with release of the videotapes in considerably more detail than the declarations the government submitted in opposition to the initial motion.

*Id.*

_____

[1] The Court of Appeals also noted that "in light of the district court's willingness to stay its interlocutory orders pending this appeal, we are confident that it would do so again with respect to an order directing the unsealing and release of the video tapes, or that it would at least grant a stay providing sufficient time for this court to act before the effective date of that order." *See Dhiab*, 2015 WL 3429124 at *2.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

### 2. Respondents' Supplemental Declarations

In accordance with the recent invitation from the Court of Appeals, the Court should now reconsider whether release of the FCE videos is appropriate, considering the three supplemental declarations submitted by Respondents in connection with the stay motions. The first declaration, by Rear Admiral Sinclair M. Harris, Vice Director of Operations for the Joint Chiefs of Staff, is classified at the SECRET level and expands on the rationales set forth in RDML Butler's declaration about how public release of the FCE videos could harm national security, including the defense against transnational terrorism, by: (a) endangering the lives and physical safety of U.S. personnel, to include military, civilian and contractor personnel; (b) adversely affecting security conditions in Iraq and Afghanistan; and (c) aiding in the recruitment and financing of extremists and insurgent groups. *See* Declaration of Rear Admiral Sinclair M. Harris ¶¶ 3-4 (attached as Exhibit 2) ("RDML Harris Decl.").

Rear Admiral Harris explains that public release of the FCE videos could lead to violence against U.S. personnel. That concern is based on prior experience, in which the release of certain provocative photographs and information has caused harm to national security, including the deaths of U.S. military personnel. *Id.* ¶ 5 (citing examples of harms from the 2012 release of video of Marines urinating on corpses of alleged Taliban members, the 2012 media reports about the burning of Korans, and the 2012 release of film "Innocence of Muslims"). Although RDML Harris concludes that that the FCE videos do not depict any improper treatment of detainees, but rather the lawful, humane, and appropriate interaction between guards and detainees, it is his military judgment that persons and entities hostile to the United States are likely to think otherwise. *Id.* And, as

9
~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

with the hostile and violent reactions to the prior releases of information, the release of
the FCE videos could prompt a similar hostile reaction that would seriously harm the
national security and endanger United States personnel. *Id.*

 RDML Harris also explains that the risk of harm from release of the FCE videos
is heightened now, at a time when numerous groups continue in their efforts to attack
U.S. personnel and interests, both abroad and within the continental United States. *Id.* ¶
6. In particular, ISIL has recently attacked various allies of the United States and called
on its members to attack the United States. *Id.* ¶¶ 6-7. In RDML Harris's judgment,
because ISIL's calls to violence are being answered by its supporters, public release of
the FCE videos is the type of event that could motivate and encourage attacks against the
United States and its personnel. *Id.* Indeed, ISIL has previously used imagery from
Guantanamo Bay during its horrific executions of United States persons. *Id.* ¶ 8. In
September 2014, when ISIL released a video showing the beheading of journalist Steven
Sotloff, he was wearing an orange jumpsuit commonly associated with detainees at
Guantanamo Bay and was forced to make a statement specifically referencing President
Obama's "promise . . . to close down Guantanamo." *Id.* ¶ 8 (discussing Guantanamo
imagery in other ISIL execution videos). ISIL effectively spreads this type of
propaganda to a global audience ████████████ and the Guantanamo imagery
contained in the FCE videos would be particularly useful to its efforts because it would
allow ISIL to pick and choose what is shared in small bites, without having to address the
video honestly and in its entirety. *Id.* ¶ 9. Given ISIL's demonstrated history of
exploiting the Guantanamo detention facility for its own aims, RDML Harris concludes

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

there is little doubt that ISIL would use imagery from Guantanamo to further encourage

its supporters to attack U.S. military and government personnel. *Id.*

   Additionally, RDML Harris explains that Al Qaeda remains active in its efforts to

take hostile action against the United States and its citizens, and Guantanamo continues

to be a topic used by Al Qaeda to facilitate anti-U.S. sentiment. *Id.* ¶ 10. For example,

one of Al Qaeda's primary propaganda tools, the English language magazine Inspire,

contains multiple references to the detainees and the detention facilities at Guantanamo

Bay. *Id.* In RDML Harris's judgment, the FCE videos would likely be seized upon by

Al Qaeda for use in its continued propaganda war against the United States. *Id.*

   In light of threats posed by these groups, RDML Harris concludes that release of

the FCE videos is likely to further endanger U.S. military and civilian personnel who

continue to operate in various locations in the Central Command ("CENTCOM") region,

such as Afghanistan and Iraq. *Id.* ¶ 11. Public release of the FCE videos would facilitate

the enemy's ability to conduct information operations and could be used to increase anti-

American sentiment, thereby placing the lives of U.S. personnel serving in Afghanistan

and Iraq at risk. *Id.* In RDML Harris's view, these concerns are not hypothetical, as

evidenced by the prior violence that resulted from public release of other information,

videos, and photographs. *Id.* Further, public release could also strain relationships

between the United States and foreign governments within the CENTCOM region,

jeopardizing the United States' efforts in assisting Afghanistan and in stabilizing Iraq in

the face of ISIL's threats. *Id.*

   In sum, RDML Harris concludes, based on his military experience and judgment,

that public release of the FCE videos could be used by hostile elements such as ISIL and

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

Al Qaeda as a means to incite violence and harm the national security of the United
States. *Id.* ¶ 12.

The second declaration, by Rear Admiral Kyle J. Cozad, the former Commander
of JTF-GTMO,[2] is classified at the SECRET level and expands on how public release of
the FCE videos could aid in development of cell extraction countermeasures and
potentially lead to increased numbers of FCEs, which will significantly jeopardize the
ability of JTF-GTMO to maintain a safe and secure detention facility. *See* Declaration of
Rear Admiral Kyle J. Cozad ¶ 3 (attached as Exhibit 3) ("Second RDML Cozad Decl.").
Rear Admiral Cozad explains that public disclosure of the FCE videos poses a safety and
security risk to JTF-GTMO personnel because information in the videos can be used by
detainees to develop countermeasures to thwart FCE tactics, techniques, and procedures.
*Id.* ¶ 4. Once released to the public, information about the FCE videos could then be
provided to the detainees though multiple avenues of communication, such as from
communications with individuals outside the facility or media sources. *See id.* ¶¶ 6, 8,
18.[3]

As background, FCEs are recorded for use as a training tool for the guard force,
and are intended to show as much of what occurs during the FCE process as possible in
order to train, educate, and standardize the guard force. *Id.* The videos are reviewed in

---

[2] RDML Cozad ended his one-year duty assignment as Commander, JTF-GTMO at the
end of June 2015.

[3] These avenues of communication include television and print media as well as
communications from relatives or other persons who may obtain the information and use various
means of licit or illicit, direct or indirect communication or delivery to provide this information
to the detainees. *See* RDML Butler Decl. ¶ 17; Second RDML Cozad Decl. ¶¶ 6, 18.
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *See*
▆▆▆▆▆▆▆▆▆▆▆▆
Second RDML Cozad Decl. ¶¶ 6, 8.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

appropriate cases by guard staff to identify what they did correctly and to identify areas

of improvement. *Id.* Because neither the guards nor detainees can see everything that

happens in the moments of the FCE procedure, the ability to view the videos from a

different, more encompassing vantage point helps the development of best practices for

the guard force. *Id.* But just as the guard force uses the FCE videos to identify potential

vulnerabilities and to improve performance, detainees or other individuals outside

Guantanamo who are hostile to the United States could also use the videos to develop

countermeasures to undermine or thwart the process. *Id.* Once released to the public,

this information could then be provided to the detainees through multiple avenues of

communication. *See id.* ¶¶ 6, 8, 18. Therefore, in RDML Cozad's judgment, allowing

detainees and hostile individuals to have access to the FCE videos, which contain detailed

information about FCE tactics, techniques, and procedures, presents a significant risk that

detainees will utilize that information in ways that would negatively impact the safety

and security of JTF-GTMO personnel and operations. *Id.* ¶ 4.

Although the detainee is present during the actual FCE, his ability to view and

understand the FCE procedure as a whole in any detail is limited. *Id.* ¶ 5.



~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~



RDML Cozad also explains with specificity how disclosure of the FCE videos

would reveal FCE tactics, techniques, and procedures normally shielded from the

detainees, and how detainees could use that information to harm JTF-GTMO personnel

and operations. *See id.* ¶¶ 9-18. For example, the FCE videos show in detail how cell

extractions are conducted, including the number of personnel involved; the duties of each

person



In RDML Cozad's judgment, there is a real risk of detainees exploiting this

information to develop countermeasures that would compromise FCE tactics, techniques,

and procedures. *See id.* ¶ 8.



14

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
SECRET//NOFORN



15
SECRET//NOFORN

UNCLASSIFIED//FOR PUBLIC RELEASE

In addition, RDML Cozad explains that release of FCE videos would permit detainees to develop measures to compromise security during the enteral feeding process. *See id.* ¶¶ 15-16.



Detainees could use this type of information to assess techniques for thwarting the enteral feeding process. *Id.*

The countermeasures and tactics that detainees could develop from public release of the FCE videos place the safety and security of the JTF-GTMO guard staff at risk. *Id.* ¶ 17. These concerns are particularly evident as detainees continue to exhibit an interest, as they have in the past, to thwart security measures and attack Guantanamo staff. *Id.* ¶ 7. RDML Cozad reports that there were ████ major assaults by detainees against guard force members during detainee movements, including incidents where detainees bit and hit guards in the face with fists. *Id.*

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~



RDML Cozad also explains that public release of the cell extraction videos will likely lead to an increase in the number of FCEs, thereby straining JTF-GTMO guard staff resources and placing guards at greater risk of harm. *Id.* ¶ 19.

Consequently, in RDML Cozad's judgment, there is concern that the detainees will resist guard requests in order to force a cell extraction, so that their actions and words will be recorded and potentially communicated to a larger audience. *Id.* ¶¶ 19, 22. This potential increase in FCEs would place a significant burden on the guard force and unnecessarily expose them to greater threats to their safety. *Id.* ¶ 22.

17

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE



The third declaration, also by RDML Cozad, is unclassified and expands on the reasons why the FCE videos are different in both substance and kind from prior public releases of information by JTF-GTMO about detention operations. *See* Declaration of Rear Admiral Kyle J. Cozad (Oct. 15, 2014) ("First RDML Cozad Decl.") (attached as Exhibit 4). According to RDML Cozad, the Department of Defense has never released the level of detail regarding FCEs and enteral feedings as is contained in the FCE videos. *Id.* ¶ 7. Indeed, the FCE videos contain significantly more and different information about the layout of the Guantanamo Bay detention facilities, as well as FCE and enteral feeding procedures than prior public releases of static photographs or procedural manuals that are outdated or from other jurisdictions. *See id.* ¶¶ 4-6. Further, prior official releases of videos by JTF-GTMO, which were pre-screened to remove any classified or sensitive information, do not contain the same level of detail as the FCE videos at issue here. *See id.* ¶ 4; *see also* Second RDML Cozad Decl. ¶ 9

18

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

████████████████████████████████

████████

## ARGUMENT

**A. The First Amendment Right of Public Access to Judicial Records Does Not Apply to Properly Classified Information.**

The Court should reconsider its Order because the First Amendment right of public

access to judicial records does not attach to the FCE videos, as they are properly classified

Executive Branch information.[4]

As an initial matter, the Court failed to defer to Respondents' reasoned determination that

the FCE videos were properly classified at the SECRET level under "the operative classification

order" that sets forth the "substantive and procedural criteria for classification," and failed to

appropriately consider the request for public release in that unique context. *See Judicial Watch,*

---

[4] As noted above, reconsideration is appropriate given the recent invitation from the Court of Appeals to consider Respondents' more detailed declarations. *See Dhiab*, 2015 WL 3429124 at *3. Further, because the Court's Order is interlocutory in nature, the Court has discretion to reconsider it "as justice requires." *See, e.g., Gilmore v. Palestinian Interim Self-Government Authority*, 8 F. Supp. 3d 1, 6 (D.D.C. 2014) (Kessler, J.) (quoting Fed. R. Civ. P. 54(b)). Reconsideration of interlocutory orders is appropriate when the moving party demonstrates "(1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order." *Id.* (quoting *In re Guantanamo Bay Detainee Litig.*, 706 F. Supp. 2d 120, 122-23 (D.D.C. 2010)). Here, Respondents respectfully contend the Court made a clear error of law in concluding that a qualified First Amendment right of access applies to the classified FCE videos, and that Respondents' national security harms were insufficient to overcome that qualified right. Additionally, Respondents' supplemental declarations are new evidence not previously available to this Court at the time of its prior ruling and should be a basis for reconsideration, consistent with the established practice of considering supplemental declarations when public disclosure of national security information is at issue. *See Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 31 (D.C. Cir. 1998) (requiring the government to submit a new declaration as the "favored" course of action when a court deems a declaration inadequate regarding harm to national security arising from disclosure); *International Counsel Bureau v. U.S. Dept. of Defense*, 723 F. Supp. 2d 54, 65 (D.D.C. 2010) ("permit[ting] the Department an additional opportunity to supplement its declarations ... primarily because of the national security concerns" relating to disclosure of FCE videos).

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

*Inc. v. U.S. Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting Exec. Order No.

13,526, Classified National Security Information, 75 Fed. Reg. 707 (Dec. 29, 2009)).  Instead,

the Court incorrectly applied the heightened *Press Enterprise II* standard to conclude that the

press intervenors have a qualified First Amendment right of access to the FCE videos.  *Press-

Enterprise II*, however, governs whether the First Amendment requires a public right of access to

certain *unclassified* records and proceedings in a criminal trial.  *Press-Enterprise II*, 478 U.S. at

10.  Similarly, the Court erred in relying on a trio of Guantanamo Bay habeas cases focusing on

release of unclassified information to support its conclusion.  Those cases – *Bismullah v. Gates*,

501 F.3d 178, 187 (D.C. Cir. 2007) *cert. granted, judgment vacated*, 554 U.S. 913 (2008), and

*on reconsideration*, 551 F.3d 1068 (D.C. Cir. 2009); *Parhat v. Gates*, 532 F.3d 834 (D.C. Cir.

2008); and *Ameziane v. Obama*, 699 F.3d 488 (D.C. Cir. 2012) – addressed whether unclassified

information could be sealed, and did not concern the public release of classified information.[5]

These cases said nothing about the appropriate standard for public access to classified

information and have no relevance to the issue presented here:  whether a court may disregard

the Executive Branch's determination that public disclosure of classified information will harm

national security.  The Court, therefore, erred by not applying the well-established precedent in

this Circuit regarding the Executive Branch's authority to classify national security information

---

[5] For example, the Court's Order focused only on the portions of *Bismullah* addressing the standard for sealing unclassified information and ignored the Court of Appeals' separate holding that authorized the Government to withhold classified "highly sensitive information" even from security-cleared detainee counsel because "'[i]t is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role.'" 501 F.3d at 187-88 (quoting *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 932 (D.C. Cir. 2003)).  The Court of Appeals, therefore, even in the context of disclosure to individuals with a security clearance, drew a sharp distinction between the Government's determination regarding classified information, which the Court refused to "second-guess," and the Government's determination regarding unclassified, but sensitive, information, the disposition of which the Court of Appeals reserved for itself.

20
~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

and the significant deference owed to such determinations. *See, e.g.*, *Stillman v. C.I.A.*, 319 F.3d 546, 548 (D.C. Cir. 2003) ("If the Government classified the information properly, then Stillman simply has no first amendment right to publish it."); *McGehee v. Casey*, 718 F.2d 1137 1150 (D.C. Cir. 1983) (stating that in a case involving "a strong first amendment interest" the court's role was limited to "merely . . . determining that the CIA properly classified the deleted items"); *Wolf v. C.I.A.*, 473 F.3d 370, 374 (D.C. Cir. 2007) ("in the context of national security concerns, courts must accord *substantial* weight to an agency's affidavit concerning the details of the classified status of the disputed record") (emphasis in original)

In any event, even assuming the framework of *Press Enterprise II* governs a claim for public release of classified information filed in a judicial proceeding, the Court erred in concluding that a qualified First Amendment right attaches to the classified FCE videos at issue here. Under the "experience and logic" test of *Press Enterprise II*, a First Amendment right of access will attach only if the press intervenors make two showings: first, that "the place and process" to which access is sought "have historically been open to the press and general public," and, second, that "public access plays a significant positive role in the functioning of the particular process in question." *Press Enterprise II*, 478 U.S. at 8-9.

Applying this two prong test, the Court erred by framing the question as one of access to habeas proceedings generally, and rejecting the position that the analysis should focus on specific "information that may arise during those proceedings." *See Dhiab*, 2014 WL 4954458 at *6. *Press Enterprise II*, to the contrary, requires that the experience and logic test be applied to the "particular proceeding in question." *Press Enterprise II*, 478 U.S. at 9; *id.* at 3 (stating that analysis focuses on "access to the transcript of a preliminary hearing growing out of a criminal prosecution"). Thus, the test has not been applied to broad categories of cases, such as all

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

aspects of criminal or habeas corpus cases, but rather to narrower classes of proceedings and documents that permit focused inquiry on the historical tradition of public access and the positive role the public plays with respect to such access. *See Center for Nat. Sec. Studies*, 331 F.3d. at 934 (describing "the "First Amendment right of access to information" as "narrow"). When access to particular documents is sought, therefore, as is the case here, the Court of Appeals has focused its inquiry on the precise type of document at issue, as opposed to the broader type of proceeding in which those documents were filed. *See Washington Post v. Robinson*, 935 F.2d 282, 288 (D.C. Cir. 1991) (finding First Amendment right of access to completed plea agreements in criminal cases); *United States v. El-Sayegh*, 131 F.3d 158, 160-61 (D.C. Cir. 1997) (finding no First Amendment right of access to "unconsummated plea agreements" in criminal cases). As the Court of Appeals explained in *El-Sayegh*, the question is whether there is a "First Amendment right of access to *this document*." *El-Sayegh*, 131 F.3d at 161 (emphasis added).

Indeed, this Court adopted the same approach in *SEC v. AIG*, 854 F. Supp. 2d 75, 79 (D.D.C. 2012) (Kessler, J.), *aff'd in part and rev'd in part* 712 F.3d 1 (D.C. Cir. 2013),[6] when it rejected a First Amendment right of access to an independent consultant's report filed in a civil case. *Id.* "Because 'it is impossible to say that access to such a document has historically been available . . . intervenor's claim fails to satisfy the first of the two necessary criteria for a First Amendment right of access.'" *Id.* (quoting *El-Sayegh*, 131 F.3d at 161).[7] The Court also notably

---

[6] The Court of Appeals affirmed the Court's decision that a First Amendment right of access did not attach to the consultant's report, but reversed the Court's decision that the public was entitled to access the document under a common law right of access. *See SEC v. AIG*, 712 F.3d 1 (D.C. Cir 2013).

[7] Other Circuits also follow this approach. *See, e.g., In re Boston Herald, Inc.*, 321 F.3d 174, 184 (1st Cir. 2003) ("[t]he First Amendment does not grant the press or the public an

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

declined to extend the *Press Enterprise II* standard to civil cases, concluding that the "limits of this First Amendment right of access are clear in this Circuit" as "neither [the Court of Appeals] nor the Supreme Court has ever indicated that it would apply" the experience and logic "test to anything other than criminal judicial proceedings." *Id.*

Given this precedent, the Court should have framed the *Press Enterprise II* test around the particular documents at issue here: FCE videos classified by the Executive Branch as SECRET for reasons of national security. Applying the experience and logic test in this manner leads to the conclusion that a First Amendment right of access does not attach to the FCE videos. Indeed, there is a long tradition of courts protecting classified information from public disclosure, and the Court's Order does not conclude otherwise. *See, e.g., Bismullah*, 501 F.3d at 194-204 (providing for non-public filing of classified information); *Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 401 (D.C. Cir. 1984) (protective order sealing classified information). Further, other courts have rejected First Amendment claims for access to classified information under *Press Enterprise II*. *See United States v. Abu Marzook*, 412 F. Supp. 2d 913, 925 (N.D. Ill. 2013) (denying motion for access by press and public interest group because "anticipated testimony is classified"); *Al-Haramain Islamic Foundation, Inc. v. Bush*, 451 F. Supp. 2d 1215, 1232 (D. Or. 2006) (denying motion by Oregon newspaper for public access to classified Executive Branch document filed in civil proceeding); *United States v.*

automatic constitutional right of access to every document connected to judicial activity. Rather, courts must apply the *Press–Enterprise II* standards to a particular class of documents or proceedings and determine whether the right attaches to that class."); *United States v. McVeigh*, 119 F.3d 806, 812 (10th Cir. 1997) ("Assuming that the *Press–Enterprise II* right of access extends to at least some types of judicial documents, the question remains whether that right applies to the *particular* types of documents at issue in this case.") (emphasis in original); *In re Grand Jury Subpoena*, 103 F.3d 234, 242 (2d Cir. 1996) (holding that the *Press Enterprise II* test must focus on the specific motion that the moving party seeks to disclose publicly, not the broader grand jury investigation or hearings in which the motion arose).

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

*Poindexter*, 732 F. Supp. 165, 167 (D.D.C. 1990) (holding that there was no historical access to pretrial depositions of a former president involving classified information); *In re Motion For Release of Court Records*, 526 F. Supp. 2d 484, 491-97 (F.I.S.C. 2007) (Bates, J.) (denying motion for public access to classified judicial orders and government pleadings filed in the Foreign Intelligence Surveillance Court). Neither the Court's Order nor press intervenors cite any contrary authority to support a history of access to classified documents, much less those such as ones involved in the instant matter.

With respect to the logic prong of the *Press Enterprise II* test, the Court of Appeals has emphasized that the moving party must establish that access to the documents "serves an important function of monitoring prosecutorial or judicial misconduct." *Robinson*, 935 F.2d at 288; *El-Sayegh*, 131 F.3d at 160 (same); *see also SEC*, 712 F.3d at 5 (documents sought under First Amendment theory must have "bearing on monitoring judicial conduct"). Here, however, the Court made no findings that disclosure of the FCE videos will help the public understand the judicial process or serve as a check against judicial misconduct.[8] Nor could it, as there is no rational connection between public release of the FCE videos and judicial oversight.

Moreover, the press intervenors' primary basis for seeking disclosure of the FCE videos is not to shed light on the operation of the judiciary, but to monitor the actions of the Executive Branch. *See* Memorandum of Law In Support of Motion to Intervene at 9-10 (ECF No. 263).

---

[8] Instead, the Court cited only Petitioner Dhiab's reasons for wanting the videos public, noting his desire for the public to learn "what is going on at the prison today" and "why the prison should be closed." *See Dhiab*, 2014 WL 4954458 at *2. Those reasons have nothing to do with oversight of the judicial process. Nor would it be sufficient for the Court to rely on the generalized benefits of public access to government operations, as that type of broad finding "proves too much" because it provides a rationale under which every governmental document or process, even grand jury proceedings or jury deliberations, would be open to the public. *See In re Boston Herald, Inc.*, 321 F.3d at 187; *United States v. Gonzales*, 119 F.3d 1246, 1260 (10th Cir. 1998).

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

The Court of Appeals has made clear, however, that scrutiny of the Executive Branch does not fall within the ambit of the First Amendment right of access to judicial records. *See El-Sayegh*, 131 F.3d at 163 ("when a party seeks judicial records to "evaluat[e] the performance of" the Government "in [its] dealings with" an individual, the party is not evaluating "the judicial function" and the "appropriate device" for obtaining the information is not a request for "access to the records of the judiciary" but "a [FOIA] request addressed to the relevant agency"); *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978) (plurality opinion) ("The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act.").

Instead of making the requisite findings required under the experience and logic test of *Press Enterprise II*, the Court mistakenly concluded that the test was satisfied by relying on Judge Hogan's decision in *In re Guantanamo Bay Litigation (Detainee Litigation I)*, 624 F. Supp. 2d 27 (D.D.C. 2009). *See Dhiab*, 2014 WL 4954458 at *5-6. But *Detainee Litigation I* found only "a limited right to access the *unclassified* factual returns in these habeas proceedings." 624 F. Supp. 2d at 38 (emphasis added). That point is made clear during *Detainee Litigation I*'s discussion of the logic prong of the *Press Enterprise II* test, where Judge Hogan concludes that "any positive role would be severely diminished if the public gains access to classified information." 624 F. Supp. 2d at 37. The Court's Order mistakenly characterized this statement as "dicta." *See Dhiab*, 2014 WL 4954458 at *5. But *Detainee Litigation I* expressly notes in the same paragraph that its "conclusion" with respect to the public access to the unclassified factual returns is "conditional" – that is, limited to unclassified information – because of the harms that would flow from public access to classified information. *Id.* For that reason, *Detainee Litigation I* declined to "question, generally, government determinations that providing classified information to the public would cause serious damage to national security."

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

*Id. Detainee Litigation I*, therefore, provides no support for the Court's conclusion that there has been a history of public access to classified information or that such access would serve as a check against judicial misconduct.

In sum, it cannot be correct that the First Amendment right of access automatically attaches to every classified document once it is filed in court. Such a standard would require the Government to establish a substantial probability of harm to a compelling interest to prevent public disclosure, a more stringent requirement than existing precedent for classification of national security information. Litigants are routinely denied access to properly classified information filed in judicial proceedings, but under the Court's rationale, every time the Government submits classified information to a court – such as for *in camera* inspection in a Freedom of Information ("FOIA") case or terrorism designation proceeding common in this district[9] – the public arguably would have a greater right to access the information than the litigants in the case. Such a regime is contrary to a long line of existing precedent regarding the protection of classified information and would lead to absurd results.[10]

B. **Even If a First Amendment Right Attaches to the FCE Videos, the Supplemental Declarations Demonstrate that National Security Interests Warrant Maintaining the FCE Videos Under Seal.**

Even if the Court concludes that a First Amendment right of access attaches to the classified FCE videos, *Press Enterprise II* provides that the presumption of access may be

---

[9] *See, e.g., Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003); *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003); *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *Int'l Counsel Bureau v. U.S. Dep't of Defense*, 864 F. Supp. 2d 101, 106-07 (D.D.C. 2012) (Bates, J.).

[10] For example, FOIA cases involving *in camera* review of classified information would likely have to be litigated twice, first under the statutory FOIA standard and then under a First Amendment right of access standard. Such a result would completely undermine the FOIA statutory scheme.

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

overcome if "(1) closure serves a compelling interest; (2) there is a substantial probability that, in the absence of closure, this compelling interest would be harmed; and (3) there are no alternatives to closure that would adequately protect the compelling interest." *Robinson*, 935 F.3d at 290 (internal quotations omitted). Respondents' supplemental declarations from high-ranking military officers identify and explain in detail the concrete harms to national security that could flow from disclosure of the FCEs videos. These harms are more than sufficient to demonstrate a compelling interest for maintaining the videos under seal. *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is obvious and unarguable that no governmental interest is more compelling than the security of the Nation.") (internal quotations omitted).

When considering the supplemental declarations, the Court must give "substantial weight" to the experienced judgment of the senior military officers and accord deference to their "logical" or "plausible" predictions of national security harm. *See, e.g., Wolf*, 473 F.3d 374; *American Civil Liberties Union v. U.S. Dept. of Defense*, 628 F.3d 612, 624 (D.C. Cir. 2011). The deference that courts routinely give to the Executive regarding classification decisions is rooted in the separation of powers, namely the constitutional role of the President, as the head of the Executive Branch and as Commander-in-Chief, *see Department of the Navy v. Egan*, 484 U.S. 518, 527 (1988), as well as practical concerns: "the Executive and the intelligence agencies under his control occupy a position superior to that of the courts in evaluating the consequences of a release of sensitive information." *El-Masri v. United States*, 479 F.3d 296, 305 (4th Cir. 2007). As *Egan* instructed, "[p]redictive judgment[s] [as to national security risks] must be made by those with the necessary expertise in protecting classified information." 484 U.S. at 529. Accordingly, "the failure to give deference when it is due is error." *Ameziane*, 699 F.3d at 497.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

In its decision inviting the Court to consider Respondents' supplemental declarations, the Court of Appeals explained that the declarations "set out the harm associated with release of the videotapes in considerably more detail than the declarations the government submitted in opposition to the initial motion." *Dhiab*, 2015 WL 3429124 at *3. The supplemental declarations focus on three ways in which public release of the FCE videos could result in serious harms to national security: (1) increase anti-American sentiment, incite violence, and motivate extremists to engage in hostile actions that would endanger U.S. personnel; (2) develop countermeasures to FCE tactics, techniques, and procedures; and (3) increase detainee resistance, requiring more frequent FCEs.

### 1. Increase Anti-American Sentiment, Incite Violence, and Motivate Extremists to Engage in Hostile Actions that Would Endanger U.S. Personnel.

As explained above, the declaration of RDML Harris explains the significant concern that public release of the FCE videos could motivate extremist and insurgent groups to engage in violence against U.S. personnel. *See supra* at 9-12. In the recent past, the release of certain inflammatory photographs or information has resulted in anti-American violence, including the deaths of four U.S. soldiers. *See* RDML Harris Decl. ¶ 5. Although the videos at issue here do not depict improper treatment of the detainees, persons and entities hostile to the U.S. and its operation of the Guantanamo detention facility are likely to think otherwise. *Id.* Indeed, terrorist groups such as ISIL and Al Qaeda have in the past used the topic of Guantanamo in propaganda to recruit members and encourage attacks on the United States or its allies. *Id.* ¶¶ 6-10. Accordingly, in RDML Harris's experienced judgment, there is good reason to believe that release of the FCE videos could increase anti-American sentiment, incite violence, and motivate extremists to engage in hostile actions that would endanger U.S. personnel and threaten national security. *Id.* ¶¶ 5-12. This risk of harm is particularly acute at the present time given the large

28

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

presence of U.S. personnel in Afghanistan and Iraq, where the subject of detainee operations

remains extremely sensitive. *Id.* ¶ 6, 11. Further, this concern has grown more acute in recent

months, as explained in a June 2015 report from the United Nations emphasizing the harms that

come from ISLS's propaganda network. *See* United Stations Security Council, Seventeenth

report of the Analytical Support and Sanctions Team concerning Al-Qaida and associated

individuals and entities (June 16, 2015) (attached as Exhibit 5). Noting that ISL "continues to

pollute the digital world with its extensive and offensive propaganda," the U.N Report states that

"[a] worrying trend over the past year has been the growth of high-definition digital terror" and

ISIL's use of propaganda to attract new recruits and "to spread fear and promote their distorted

ideology." *See id.* at ¶¶ 4, 5, 9.

The Court's Order notably did not dispute the assessment in RDML Butler's declaration

that public release of the FCE videos "would prove useful as propaganda for Al Qaeda and its

affiliates and could increase anti-American sentiment, thereby placing the lives of United States

service members at risk." *Dhiab*, 2014 WL 4954458 at *10. Indeed, the declaration from

RDML Harris provides even more detailed support for this conclusion. The Court, however,

concluded that the Government's interest in seeking to prevent the harm that would flow from

terrorists using the FCE videos as "recruiting material" and "propaganda" was not legally

sufficient to defeat a First Amendment right of access claim, analogizing the Government's

argument to an unconstitutional heckler's veto. *Id.* That conclusion was error and inconsistent

with prior decisions, including a recent decision from the Court of Appeals for the Second

Circuit decided after the conclusion of briefing in this case. *See Center for Constitutional Rights

v. CIA*, 765 F.3d 161, 168 (2d Cir. 2014) (concluding that the release of photos and videos of a

Guantanamo detainee "could be exploited by extremist groups as tools to recruit or to incite

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

violence" and may prove "more effective as propaganda" than previously released, written records); *Int'l Counsel Bureau v. U.S. Dep't of Defense*, 906 F. Supp. 2d 1, 5-7 (D.D.C. 2012) (Bates, J.) (refusing to release forced cell extraction videos in FOIA case when release would "allow al-Qaeda and its affiliates to create propaganda out of such images" because the Government has provided "plausible, non-conclusory reasons" for withholding the videos such that "[t]he Court finds no reason to second-guess such assertions").

As an initial matter, when evaluating the harm that would flow from using the FCE videos as terrorist propaganda, the Court made no specific findings that Respondents' assertion of harm was neither a compelling interest nor substantially likely to occur under *Press Enterprise II*. To the contrary, the Court accepted that "terrorists of all stripes and ideologies have long been attempting to create anti-American sentiment abroad by using publications as recruiting material for new members." *Dhiab*, 2014 WL 4954458 at *10. The Court nonetheless invoked the heckler's veto concept to reject the asserted compelling interest altogether. *Id.* But the Court cited no authority for applying the heckler's veto to either the qualified First Amendment right of public access to judicial records or to assessments of the dangers of publicly disclosing classified information. Nor could it, as the situation here is far afield from a heckler's veto, that is, the government improperly silencing a private citizen's speech in a public forum to quell a potentially hostile mob. *Compare Cox v. Louisiana*, 379 U.S. 536, 549-551 (1951). The heckler's veto principle was developed as a shield to protect citizens from government censorship, not as a sword that can compel public release of classified national security information.

The Court of Appeals' decision in *Judicial Watch, Inc. v. U.S. Dep't of Defense*, 715 F.3d 937, 942 (D.C. Cir. 2013), made that distinction clear. In that FOIA case seeking public release

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

of photographs of the corpse of Osama bin Laden, the Court of Appeals concluded that "the CIA's predictions of the violence that could accompany disclosure of the images provided an adequate basis for classification." *Id.* at 943. In reach this conclusion, the Court of Appeals rejected an argument that "the government's declarations show nothing more than that release of information may cause some individuals who do not like the United States to commit violence overseas, and that courts should not succumb to this kind of blackmail." *Id.* at 942 (internal quotations omitted). The Court of Appeals cited and distinguished the heckler's veto line of cases by stating that those cases do not involve "an effort by the government to suppress images in the hands of private parties, a challenge that would come out quite differently." *Id.* at 942-43.

Moreover, applying the heckler's veto concept to the release of national security information proves too much, as the central purpose for classification and non-disclosure of national security information is to prevent hostile entities from using the information or reacting to it in a way that would harm the interests of the United States. *Cf. Afshar v. Dep't of State*, 702 F.2d 1125, 1131 (D.C. Cir. 1983) (affirming the withholding of classified documents under FOIA when release "may force a [foreign] government to retaliate"). Under the Court's heckler's veto rationale, no set of hostile actions by terrorist organizations such as ISIL and Al Qaeda (here, the hecklers in the Court's analogy) can justify the sealing of national security information without offending the First Amendment. That conclusion is plain error.

To be clear, Respondents do not oppose release of the FCE videos merely because release may spur terrorist propaganda, but rather because, as the declaration of RDML Harris explains, any such propaganda is likely to be used by terrorist groups to expand their ranks and to encourage attacks on U.S. personnel, thereby increasing the risk to U.S. personnel overseas, who are often the target of attacks. These concerns are not hypothetical, as evidenced by the prior

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

violence that resulted from release of other information. *See* RDML Harris Decl. ¶ 11.

Therefore, the harm to U.S. personnel is surely a cognizable and real threat to national security

that the Court should credit as a basis for maintaining the FCE videos under seal.

### 2. Develop Countermeasures to FCE Tactics, Techniques, and Procedures

The supplemental declaration of RDML Cozad ("Second RDML Cozad Decl.") also

explains in more significant detail how public release of the FCE videos poses a risk to military

personnel, as detainees armed with detailed information about the FCE process can develop

countermeasures to thwart FCE tactics, techniques, and procedures. *See supra* at 11-18. The

declaration specifically responds to the criticism in the Court's Order that "[n]owhere does the

Government specify what these 'countermeasures' may be or what form they may take." *Dhiab*,

2014 WL 4954458 at *7. These harms are

grounded in the experience of running the detention facility, as detainees in the past have made

use of operational information gathered during their time in detention to assault guards and

disrupt camp procedures. *See id.* ¶ 7. In RDML Cozad's judgment, release of the FCE videos

could enable detainees to devise specific cell extraction countermeasures, thereby increasing the

risk of injury to Guantanamo personnel and threatening the security of the Guantanamo detention

facility. *See id.* ¶ 17.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

RDML Cozad's declaration also responds to the criticism in the Court's Order that "given what is already available to the public and known to the detainees, it is simply not plausible to argue that release of the videos will give rise to an *additional* probability of harm by encouraging the development of FCE countermeasures." *See Dhiab*, 2014 WL 4954458 at *7 (emphasis in original).  Specifically, RDML Cozad explains how the FCE videos show specific procedures and security precautions in far more detail than the detainees are able to observe when undergoing the procedures. *See* Second RDML Cozad Decl. ¶ 4-5, 9.  Detainees subject to FCEs are able to observe some of those procedures, but they are unable to observe them all, ████████████████████████████████████████ and the fact that the detainee's view of what is taking place around him is limited, ███████████████████ ████████████████████████ For example, the FCE videos disclose detailed aspects of the FCE process that are not readily apparent to the detainees, ██████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Releasing the FCE videos, therefore, would provide detainees (or others) with a wealth of specific information about FCE procedures not available even to those detainees who have been the subject of forced cell extractions, and this information could be used to thwart those procedures. *See Zander v. DOJ*, 885 F. Supp. 2d 1, 6-8 (D.D.C. 2012) (withholding FCE video by Bureau of Prisons under FOIA because public release would

---

[11] As explained above, there are multiple avenues of communication that would enable detainees to learn about this information. *See supra* at 12 & n.3.

33

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

enable prisoners to learn agency's techniques, which could be used to thwart FCEs in the future and risk harm to agency officials).

RDML Cozad also explains that the FCE videos include imagery of detention operations not viewed by the press or released to the public by JTF-GTMO. *See* First RDML Cozad Decl. ¶¶ 4-7, Second RDML Cozad Decl. ¶ 9. The fact that some information about the FCE and enteral feeding process has been disclosed publicly does not mean that all information must be disclosed, particularly when the information that is sought to be protected here is much more detailed and impacts the security and safety of the guard staff at Guantanamo Bay. *Cf. N.Y. Times v. NASA*, 920 F.2d 1002, 1006 (D.C. Cir. 1990) (en banc) (distinguishing transcript of communications aboard the space shuttle *Challenger* before it exploded with actual voice recordings because "information is not conveyed by words alone" and "information recorded through the capture of a person's voice is distinct and in addition to the information contained in the words themselves").

In giving "substantial weight and deference" to RDML Cozad's declarations, the Court, contrary to its approach in the Order, should not "perform[] its own calculus as to whether or not harm to the national security . . . would result from disclosure." *See Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990). In considering RDML Butler's declaration addressing countermeasures, the Court conducted its own assessment of the national security harms and substituted its own judgment for that of RDML Butler. For example, in rejecting RDML Butler's explanation that release of the FCE videos poses a risk to military personnel because detainees and other enemies armed with such information could develop countermeasures to FCE procedures, the Court ignored RDML Butler's explanation that the fact that detainees have experienced FCEs themselves does not change the value that the videos would have in permitting

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

~~SECRET//NOFORN~~

detainees, alone or with the help of others outside Guantanamo, to more thoroughly assess FCE procedures and develop countermeasures. *See* RDML Butler Decl. ¶ 12. Instead, the Court's Order simply asserted that "detainees are already familiar with the tactics used to extract them" and cited various written materials and photographs about the FCE process without conducting any comparative analysis between those materials and the far more detailed FCE videos.[12] That conclusion was error, because in order to prevail on an argument that information should be released because it has already been disclosed, "the information must be as specific as the information previously released . . . [and] must match the information previously disclosed." *See Wolf,* 473 F.3d at 378; *see also Int'l Counsel Bureau,* 906 F. Supp. 2d at 7-8 (rejecting argument that prior public disclosures about the FCE process undermines argument for protection of FCE videos under FOIA because "there is no indication in the record that any portion of the FCE videos – which have been classified 'SECRET' – were ever publicly released."). The Court, therefore, improperly substituted its judgment for RDML Butler's regarding the tactical value of the FCE video footage, and furthered that error by not fully considering the substantial differences between the FCE videos at issue and the prior public releases. *See Dhiab,* 2014 WL 4954458 at *8-9.

### 3. Increase Detainee Resistance, Requiring More Frequent FCEs.

RDML Cozad's also explains in further detail the significant risk that, in response to public release of the FCE videos, detainees will engage in disruptive actions so as to require more frequent cell extractions that would be recorded and potentially released to the public, thus increasing the risk of injury to both detainees and military personnel at Guantanamo. *See* Second

---

[12] Many of the materials cited by the Court were procedural regulations governing other federal agencies or states that have no application to operations at Guantanamo Bay. *See Dhiab,* 2014 WL 4954458 at *9 nn.9-10. Further, the Guantanamo-specific procedures that the Court cited were over 10 years old. *See* Second Cozad Decl. ¶ 5.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

RDML Cozad Decl. ¶¶ 19-25. The declaration specifically responds to the concern in the

Court's Order that the justification for this positon in RDML Butler's declaration "fails to show a

substantial probability of harm and is entirely too speculative." *See Dhiab*, 2014 WL 4954458 at

*10. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ Indeed, "[i]t is common knowledge that television can work profound changes of

behavior of the people it focuses on." *Estes v. Texas*, 381 U.S. 532, 569 (1965) (Warren, C.J.,

concurring) (internal quotation marks and ellipsis omitted).[13] There is a significant risk that such

behavior will result in more FCEs, thereby increasing the risk of injury to Guantanamo personnel

and threatening the safety of the detention facility. Second Cozad Decl. ¶ 19. These harms –

based on "common knowledge" and the accumulated expertise and knowledge that the military

has acquired while running the Guantanamo Bay detention facility – are neither speculative nor

improbable.

The Court also appeared to misunderstand Respondents' argument regarding the

increased likelihood of FCEs by concluding that the argument was too speculative because the

Order requires only the public disclosure of Petitioner Dhiab's videos, not videos of other

detainees. *See Dhiab*, 2014 WL 4954458 at *10. But as Rear Admiral Cozad explains in more

detail, the important point is that, if Petitioner Dhiab's FCE videos are publicly released, other

detainees may believe that their own FCE videos will be subject to release in the future. *See*

Second Cozad Decl. ¶¶ 22-24. Thus, the fact that the Court did not specifically order the release

---

[13] In this case, for example, that type of disruptive behavior is illustrated in the National Geographic television profile of Guantanamo Bay cited in the Court's Order, as the detainees begin shouting and banging on their cells in order to gain the attention of the camera. *See id.* ¶ 19; *see also Dhiab*, 2014 WL 4954458 at *9 n.12.

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

of FCE videos of other detainee is irrelevant.

Regardless of whether additional videos would be released publicly as a matter of law based on the Court's Order, if detainees think they might be, it is not speculative for RDML Cozad to conclude, based on his experience running the detention facility, that there is significant risk of more FCEs and potential harm to the guard force.

In rejecting as "too speculative" RDML Butler's expectation that public release of the FCE videos would lead to more FCEs, the Court also erred by making its own judgments as to how likely it was that the release of the videos would cause harm. *See Fitzgibbon*, 911 F.2d at 766. But as the Court of Appeals has explained, "a court must take into account . . . that any affidavit or other agency statement of threatened harm to national security will always be speculative to some extent, in the sense that it describes a potential future harm rather than an actual past harm." *Halperin v. CIA*, 629 F.2d 144, 149 (D.C. Cir. 1980); *see McGehee*, 718 F.2d at 1150 ("These risks identified in the CIA affidavits do not, of course, rise to the level of certainty, but we believe they are real and serious enough to justify the classification decision in this case."). Further, courts lack the expertise to evaluate the degree of harm posed by a risk. *See North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198, 219 (3d Cir. 2002) ("We are quite hesitant to conduct a judicial inquiry into the credibility of these security concerns, as national security is an area where courts have traditionally extended great deference to Executive

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

expertise."). Instead, the law "allocates to the Government the responsibility for evaluating the harms associated with public disclosure, and neither the proponent of the disclosure or the district court is free to substitute its own policy judgment for those of the Executive. *See Alsawam v. Obama*, 764 F. Supp. 2d 11, 19 (D.D.C. 2011) (Kollar-Kotelly, J.) (internal quotations omitted). Here, RDML Cozad's declaration, which is based on facts and experience gained while operating the Guantanamo Bay detention facility, provides sound reasons why a significant risk of additional FCEs exists, and his judgment is entitled to "substantial weight and deference." *Id.*

***

In sum, the Court erred by not following the precedent in this Circuit that there is no First Amendment right of access to information properly classified by the Executive Branch. Instead, the Court mistakenly applied the *Press Enterprise II* standard and reached the incorrect conclusion that the press intervenors carried their burden of establishing a right of access under the experience and logic test, even though there is no history of access to classified information and public access to the classified FCE videos sought here would not further oversight of the judiciary. But even assuming the standard set forth in *Press Enterprise II* applies here, Respondents' supplemental declarations provide compelling, logical reasons why the FCE videos should remain under seal. The declarations reflect considered national security judgments from senior military officers and they are entitled to deference by this Court.

**CONCLUSION**

For the reasons stated above, Respondents respectfully request that the Court grant the motion for reconsideration and deny the press intervenors' motion for public release of the FCE videos. A proposed order is attached.

38

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE
~~SECRET//NOFORN~~

Dated:  July 15, 2015

Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General

JOSEPH H. HUNT
Branch Director

TERRY M. HENRY
Assistant Branch Director

ANDREW I. WARDEN (Indiana Bar #23840-49)
RONALD J. WILTSIE
TIMOTHY B. WALTHALL
ROBERT J. PRINCE
Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, DC 20530

Tel: 202.616.5084

E-mail: Andrew.Warden@usdoj.gov

*Counsel for Respondents*

~~SECRET//NOFORN~~

UNCLASSIFIED//FOR PUBLIC RELEASE

UNCLASSIFIED//FOR PUBLIC RELEASE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABU WA'EL (JIHAD) DHIAB (ISN 722),

*Petitioner,*

v.

BARACK H. OBAMA, *et al.,*

*Respondents.*

Civil Action No. 05-CV-1457 (GK)

[Proposed] **ORDER**

Upon consideration of Respondents' motion for reconsideration of the Court's

October 3, 2014 Memorandum Opinion and Order, it is hereby ORDERED:

1. Respondents' motion for reconsideration is GRANTED;

2. The Memorandum Opinion and Order dated October 3, 2014 (ECF Nos. 348

   & 249) are VACATED;

3. The Press Intervenors' motion to unseal (ECF No. 263) is DENIED.

DATED:_____

_____
Gladys Kessler
United States District Judge